Volume 1

Pages 1 - 209

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ORRICK, JUDGE

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,           )
    VS.                          )  No. 20-cr-00337-WHO
                                )
JOSEPH SULLIVAN,                 )
                                )
            Defendant.           )  San Francisco, California
_____)

                                 Tuesday, September 6, 2022


**TRANSCRIPT OF TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:          STEPHANIE M. HINDS
                        UNITED STATES ATTORNEY
                        450 Golden Gate Avenue, 11th Floor
                        San Francisco, California  94102
                BY:  **ANDREW F. DAWSON**
                     **BENJAMIN KINGSLEY**
                     **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:          ANGELI LAW GROUP
                        121 Southwest Morrison Street
                        Suite 400
                        Portland, Oregon  97204
                BY:  **DAVID H. ANGELI, ESQ.**
                     **MICHELLE H. KERIN, ESQ.**
                     **TYLER FRANCIS, ESQ.**

Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
              Official Reporter, U.S. District Court
              **JOAN M. COLUMBINI, CSR 5435, RPR**
              Official Reporter Pro Tem, U.S. District Court

        (Appearances continued, next page)

**APPEARANCES, CONTINUED**:

                LAW OFFICE OF JOHN D. CLINE
                600 Stewart Street
                Suite 400
                Seattle, Washington  98101
        **BY:  JOHN D. CLINE, ESQ.**


For Uber Technologies, Inc.:
                COVINGTON & BURLING LLP
                415 Mission Street
                Suite 5400
                San Francisco, California  94105
        **BY:  WILLIAM DOUGLAS SPRAGUE, ESQ.**

| | |
|---|---|
| 1 | **Tuesday, September 6, 2022**                                    **8:18 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | (The following proceedings were held outside of the |
| 4 | presence of the Jury Venire) |
| 5 | **THE COURTROOM DEPUTY:**  20-337, United States versus |
| 6 | Sullivan. |
| 7 | Counsel, if you would please come forward and state your |
| 8 | appearances.  Forward is relatively -- just -- |
| 9 | **MR. DAWSON:**  Good morning, Your Honor.  Andrew Dawson |
| 10 | and Ben Kingsley for the United States. |
| 11 | **THE COURT:**  Good morning. |
| 12 | **MR. ANGELI:**  Good morning, Your Honor.  David Angeli, |
| 13 | John Cline, Tyler Francis and Michelle Kerin for Mr. Sullivan. |
| 14 | **THE COURT:**  Great.  Good morning. |
| 15 | **MR. ANGELI:**  And Your Honor, we have a couple of other |
| 16 | folks from our team at the table, too, but those are our |
| 17 | lawyers. |
| 18 | **THE COURT:**  Okay.  Good morning. |
| 19 | **MR. SPRAGUE:**  Good morning, Your Honor.  Doug Sprague |
| 20 | on behalf of Uber Technologies. |
| 21 | **THE COURT:**  Good morning. |
| 22 | Well, this is quite a courtroom to be in.  First of all, a |
| 23 | few things.  Did you discuss the Rosh Hashanah dates, and what |
| 24 | conclusion did you draw? |
| 25 | **MR. KINGSLEY:**  I don't think we discussed with the |

**PROCEEDINGS**

1   defense, Your Honor.  My suggestion would be if -- I don't want

2   to ask the Court to come back early from the Court's wedding.

3   But I do think that in terms of some witnesses and potentially

4   some jurors, it's probably better to be dark on the day of the

5   -- the first day of Rosh Hashanah.

6           **THE COURT:**  Okay.  So, the 26th.

7           **MR. KINGSLEY:**  Yeah.  And if the Court -- I mean, we

8   can see how the trial's going.  If the Court is inclined to

9   come back and not be dark on that first Monday, the government

10  is supportive of that, but also, obviously, defers to the

11  Court's own schedule.

12          **THE COURT:**  Okay.

13          **MR. ANGELI:**  That's fine with us, Judge.

14          **THE COURT:**  Okay.  So I will tell the jury that we are

15  going to be dark on the 26th, and perhaps on the 19th.  And

16  then I'll figure that out later, after consultation with

17  important people.

18      All right.  Did you develop a joint statement?

19          **MR. DAWSON:**  We did, Your Honor.  And I believe we

20  emailed it to Ms. Davis last night.  And we would be happy to

21  email it to a different address, as you wish.

22          **THE COURT:**  That will be fine.  And Ms. Davis will

23  email it to me, and that will be good.

24      And I did see the privilege instruction so thank you for

25  that.

**PROCEEDINGS**

1        As far as the issues that are pending with respect to

2   evidence, the -- the government -- I'm inclined -- I'll listen

3   to you if you want to make further argument, but the government

4   may present evidence regarding the contemporaneous hacks of

5   which the defendant was aware, but not more than he allegedly

6   knew.  And I think the defendant can cross-examine to make

7   clear Mr. Sullivan's knowledge, or lack thereof.

8        But I think there is sufficient evidence for the

9   government to assert some knowledge, based on the offer of

10  proof.  The government may elicit information regarding

11  Individual 1's role at the outset but not make arguments that

12  infer much more than the facts that the government says that it

13  needs to show at the outset.

14       And I'm not going to order Uber to disclose the witness

15  interview notes to the government.  I think Uber's got

16  attorney/client work product privilege.  Given that Uber and

17  the government are pointing to Mr. Sullivan as the person who

18  concealed the information, he was entitled to review it, which

19  might either inculpate or exonerate him.

20       The government has had Uber's full cooperation, and the

21  ability to bring witnesses to the grand jury to build its case.

22  And if Uber's cooperation didn't extend to being briefed on its

23  internal investigation, I'm not going to require it to disclose

24  anything further, absent some authority, which I didn't -- you

25  know, I don't think there's -- this is an unusual circumstance,

 1 │ and I didn't see any in anybody's papers.

 2 │     So, that's where I am.  Mr. Angeli or Mr. Cline, or

 3 │ Mr. Francis?

 4 │         MR. FRANCIS:  Good morning, Your Honor.  Just, point

 5 │ of clarification on the contemporaneous hacks.

 6 │     Are we -- is your -- is the order limited to the

 7 │ information and the evidence that was raised by the

 8 │ government's filing?  Or is the -- is it broad enough to say,

 9 │ for example, the hackers themselves can testify about the other

10 │ conduct they did that is not actually the particular exhibits

11 │ or the particular -- the particular evidence that's listed in

12 │ the government's offer of proof?

13 │         THE COURT:  So, I'm just going off of what I know,

14 │ which is the offer of proof.

15 │     (Reporter clarification)

16 │         MR. FRANCIS:  Yes, thank you.

17 │     All right.  And as we indicated last night, we don't have

18 │ a -- we don't have an objection to the particular exhibits that

19 │ the government is raising in its offer of proof.  It's if we go

20 │ beyond that, to, for example, ask the hackers what other -- to

21 │ ask the hackers, for example, to talk about that conduct, and

22 │ talk about information that's not captured by that offer of

23 │ proof.

24 │         THE COURT:  Well, so, I assume that the testimony will

25 │ include -- would be something like:  We did the same thing with

**PROCEEDINGS**

1  other people.  And that -- that's okay, as far as I'm

2  concerned.  That would be consistent with what I'm thinking.

3         **MR. FRANCIS:**  And the reason I'm pressing on the

4  details here, Your Honor, is because, for example, there may be

5  other conduct that the hackers were engaged in that was not

6  known to anybody at Uber, that was not encompassed by any of

7  the items of evidence mentioned in the offer of proof.  So I

8  take it we're not -- the government is not permitted to go

9  beyond what is in the offer of proof.

10        **THE COURT:**  That's right.

11        **MR. FRANCIS:**  Okay.  With that clarification, thank

12 you, Your Honor.

13        **THE COURT:**  Okay.

14        **MR. DAWSON:**  I think it makes sense to dig a little

15 deeper.  Since what was in the government's offer of proof,

16 particularly with the emails coming from the hackers, they

17 referenced:  We're working with other companies.

18        **THE COURT:**  Right.

19        **MR. DAWSON:**  So we would anticipate the testimony will

20 talk about:  What companies?  What does that mean?  And then we

21 will anticipate, in particular, when Uber employees interviewed

22 at least one of the hackers -- we anticipate calling at least

23 one of the hackers -- the question is asked the discussion of

24 other targets.  Those words are on the page, but they are also

25 questions that were asked of the hacker by Uber staff.  And I

**PROCEEDINGS**

1  take it from Your Honor's comments, that is within bounds, but

2  I wanted to --

3          **THE COURT:**  Yes.

4          **MR. DAWSON:**  Thank you, Your Honor.

5          **THE COURT:**  All right.  Anything -- this is a nice

6  little echo here.  Does the government have any argument that

7  it wants to make with respect to --

8          **MR. DAWSON:**  No, Your Honor; we'll submit.

9          **THE COURT:**  Okay.  Mr. Sprague, it's a pleasure to see

10  you here.  Do you have anything that you would like to add?

11          **MR. SPRAGUE:**  Pleasure to be here, Your Honor, thank

12  you.  Just one thing I've discussed with both parties.  The

13  Court will recall at the pretrial -- may I?

14          **THE COURT:**  Yeah.

15          **MR. SPRAGUE:**  Thank you.  The Court will recall at the

16  pretrial --

17      (Reporter clarification)

18          **MR. SPRAGUE:**  No problem.  Thank you.

19      Your Honor, at the pretrial conference, we had a

20  discussion about Uber's privilege with respect to the standing

21  order, the examination topics, that I would or another lawyer

22  on behalf of Uber would stand and state an objection.

23  Mr. Cline made clear we should stand up and object.  That's

24  fine; we discussed that with the parties.  We drafted a

25  proposed order to that effect.  The government has no objection

1    to it.

2        We ran into one issue that we want to talk about today on

3    the defense side.  And that is that we've got a line that said

4    that Uber's failure to stand up and object, however, do so

5    timely, shall not be deemed a waiver of the subject matter or a

6    waiver in this or any other proceeding.

7        The defense points out:  Well, what if we don't object to

8    an issue or a conversation or a communication when one party is

9    examining that witness, and then the other party wants to

10   examine the witness on that issue?  So they had initially

11   proposed that if we did not object -- I should say that

12   differently.

13       We've discussed it.  And I think where we are with the

14   defense -- which, they will correct me if I'm wrong, as long as

15   we have discussed this issue today and all the parties are

16   aware of the issue, the Court is aware of the issue -- that the

17   Court can handle this at trial.

18       Unfortunately, it's not quite as simple, from Uber's

19   perspective, of whether one party may ask a witness about part

20   of a communication, and whether that would open up the door to

21   the other party examining a witness about that subject matter,

22   or about even that communication.

23       For example, as the Court knows from all the crime fraud

24   litigation in the matter, there are instances where a

25   witness -- perhaps a lawyer -- received a communication that is

PROCEEDINGS

1    not privileged.  That lawyer may have responded.  And that

2    lawyer, being an innocent attorney, that's that lawyer's work

3    product; it may still be privileged.

4         So just because part of that communication may come in as

5    a capital T, capital D trial document, or be discussed on, say,

6    direct, in our respect that would not open that up to the

7    subject-matter waiver, or being fully explored on cross.  So

8    there may be an objection that the Court would have to deal

9    with on the cross-examination in a hypothetical scenario.

10        So if I fairly explained that issue, I think we reached a

11   point where, now that we've discussed it on the record, the

12   Court is aware, the Court could just handle it as it may or may

13   not come up during trial.

14             THE COURT:  All right.  Mr. Angeli?

15             MR. DAWSON:  Yes, Your Honor.  I think we've sort of

16   agreed to apply the rule of common sense.  When this comes up,

17   if there is an issue that a witness goes into on direct and we

18   think, you know, there are parts of that communication we need

19   to, in all fairness, be able to explore, we will.

20        We have no intention of arguing subject-matter waiver or

21   anything like that, because a witness answers a question on

22   direct.  But I'm confident, when this comes up during trial,

23   we'll be able to deal with it.

24             THE COURT:  Okay.  That sounds good with me.

25             MR. SPRAGUE:  Thank you, Your Honor.  And with that,

PROCEEDINGS

 1  we will submit the proposed order today.

 2           THE COURT:  All right.  Excellent.

 3           MR. SPRAGUE:  Thank you, Your Honor.

 4           THE COURT:  All right.  Are there other issues from

 5  the -- either side that we ought to address before the jury

 6  comes in?

 7           MR. DAWSON:  Nothing from the government, Your Honor.

 8           MS. KERIN:  Your Honor, may I take my mask off?

 9           THE COURT:  Yes.  The standing rule is whenever you

10  you're speaking, you can take your mask off.  But otherwise,

11  people who are in the courtroom should maintain their mask.

12           MS. KERIN:  Would you like me to come up?

13           THE REPORTER:  Yes, please.

14           MS. KERIN:  Okay.  Your Honor, going over the

15  questionnaires that the jurors submitted, there were two

16  categories of very strong opinions, some of which are -- we

17  think are for-cause strikes.  And we raised those with the

18  government, and they disagreed.  But I wanted to alert you of

19  these categories.

20      With respect to one of them, there were many jurors who

21  expressed very strong opinions about a defendant's right not to

22  testify.  And I'm sure you have seen those in there.  They're

23  very strong.  It's -- I can --

24           THE COURT:  They come in every case.

25           MS. KERIN:  Okay.  The other one is a little bit more

1    case-specific, and I'm sure doesn't come in every case.  And

2    that is that there were questions about people's opinions

3    regarding Uber and Travis Kalanick, the former CEO of Uber.

4    And those -- Mr. Kalanick in particular, his actions and

5    conduct will play a pivotal role in the presentation of

6    evidence by both parties.

7        And there were at least two jurors who made comments that

8    we think meet the level of cause.  And that's Juror 2.  Her

9    response to Question 29 and 30 were particularly --

10    particularly harsh.  And I'm not sure that she could be

11    rehabilitated.

12        Juror No. 56, with respect to Question 30, he had a very

13    definite opinion of Mr. Kalanick and it does not appear that he

14    could be rehabilitated, with respect to those jurors.

15        Another thing about this category of jurors -- and there's

16    several others, as I'm sure you have noted, who expressed

17    strong opinions about Mr. Kalanick or about Uber, but we don't

18    believe rise to the level of cause.  We would ask that you

19    query those opinions outside the presence of the other jurors

20    so that if they do express very strong opinions like Juror 2

21    and like Juror 56, that they wouldn't taint the rest of the

22    jury pool.

23        And I'm happy to provide those juror numbers to you.

24        **THE COURT:**  So you would like each of the people who

25    expressed a view about Uber to be questioned individually?

PROCEEDINGS

```
 1            MS. KERIN:  No, Your Honor.  Not each person who
 2    expressed a view about Uber or Mr. Kalanick.  There are a
 3    handful of jurors in addition to Juror 2 and 56 who expressed
 4    stronger views than other people.
 5            THE COURT:  Give me the numbers, please.
 6            MS. KERIN:  Of course.  It's Juror No. 1, Juror
 7    No. 14, Juror No. 19, Juror No. 70.  And then, of course,
 8    Jurors 2 and 56.
 9            THE COURT:  Okay.  All right.  Does the government
10    have any concern about that?
11            MR. KINGSLEY:  No concerns about the Court voir diring
12    them outside of the presence of the other jurors.
13        And I think that this is -- I think for all the jurors
14    with strong opinions, I don't know if the Court is planning on
15    asking or generally giving them the instructions that you are
16    supposed to only consider the evidence in the case.  I find
17    that usually is very helpful with people who express opinions
18    on questionnaires.
19        I don't know whether the jurors that the defense has cited
20    can be rehabilitated, right now.
21            THE COURT:  So, yeah, I'm planning to talk
22    specifically about that issue when we get going.  But, I'll do
23    that.  And the way that I'll do it, because of the courtroom
24    that we have, is at some -- I'll take some long break.
25            MS. KERIN:  Okay.
```

1      **THE COURT:**  Probably after I've asked everybody else

2   questions, and then asked them to line up outside, and then

3   they'll come in one at a time and we'll deal with it that way.

4      **MS. KERIN:**  Thank you so much, Your Honor.  Just as a

5   matter of procedure, will we have time after voir dire is done

6   before we exercise our strikes?

7      **THE COURT:**  Yeah.  So my -- typically what I do is

8   give -- I try to arrange -- we may not make it today because of

9   the number of people, but I try to arrange so it that that

10  comes at the lunch break and there is a long break.  But

11  whatever -- whenever it comes, you will have at least 15

12  minutes to talk amongst yourselves about how you want to

13  proceed with respect to cause and hardship, which we will then

14  have a discussion about, and then we will go right into the

15  peremptory challenges.  So you get 15 minutes for all of that.

16     **MS. KERIN:**  Okay.  Thank you, Your Honor.

17     **THE COURT:**  Okay.  All right.  So I have been told by

18  the jury office that they expect that it is going to take a

19  little while longer than usual because of the number of jurors

20  that we have, until we get going.  So, probably in the 9:30

21  range, people will be coming in.

22     And Ms. Davis, I haven't asked you this question, but the

23  numbers, how do you -- who's over -- okay.  It's -- how do the

24  numbers work?

25     **THE COURTROOM DEPUTY:**  We start here (Indicating).

**PROCEEDINGS**

 1          THE COURT:  Okay.  And then?

 2          THE COURTROOM DEPUTY:  Go around the room

 3   (Indicating), into the second box, and then the back rows.

 4          THE COURT:  Okay.  So the backs seats there, are they

 5   the end of the line?  Or --

 6          THE COURTROOM DEPUTY:  No.  The gallery back rows are

 7   the end of the line.

 8          THE COURT:  Okay.  All right.  Well, it will be a

 9   revelation, each time I ask somebody to come to the microphone.

10      And I think I told you that that's what I'm asking jurors

11   to do is to come to the mic, and so you will see them there.

12   And I'm sorry that the microphone setup for you doesn't work

13   very well.

14          THE COURTROOM DEPUTY:  I can switch it --

15          THE COURT:  Ms. Ball, what's the best way for the

16   lawyers to -- when they're going to ask questions?

17      (Off-the-Record discussion between Court and Court

18   Reporter)

19          THE COURT:  Well, if I was one of the lawyers I would

20   want to be standing up.  And, I wonder whether you would be

21   able to pick up if they were standing up but in front of you,

22   whether that would also work?

23      (Off-the-Record discussion between Court and Court

24   Reporter)

25          THE COURT:  Ms. Ball is very good at letting you know

**PROCEEDINGS**

 1   when things aren't going perfectly, which is a good thing.

 2       So I think the idea would be if you were standing either

 3   close to that podium or close to Ms. Ball.

 4       And if that doesn't work, Ms. Davis, do we have the

 5   handheld also?

 6           **THE COURTROOM DEPUTY:**  We have -- I think -- I have a

 7   second microphone, but I don't think I have a separate control

 8   for it.  We have the one set up for --

 9           **THE COURT:**  Right.  But if they --

10           **THE COURTROOM DEPUTY:**  But I don't think I have a

11   separate control for this extra microphone.

12           **THE COURT:**  What does that mean?  That it won't work?

13           **THE COURTROOM DEPUTY:**  Yeah, I don't think it comes

14   on.  Into the system.

15           **THE COURT:**  All right.  Well, let's see how that works

16   and we'll just wing it otherwise.

17       All right.  So we'll take a break every hour and a half or

18   so after the jury comes in, and we're ready to go.

19       (Recess taken from 8:37 a.m. to 10:13 a.m.)

20       (The following proceedings were held in the presence of

21   the Jury Venire)

22           **THE COURTROOM DEPUTY:**  All rise, this Court is now in

23   session, the Honorable William H. Orrick presiding.

24           **THE COURT:**  Good morning, everybody.  Please be

25   seated.

## JURY VOIR DIRE

**BY THE COURT**

Ladies and gentlemen, welcome.  My name is William Orrick.
I'm going to be the judge who's presiding over this case.
Thank you for being here to participate in one of the
foundations of your democracy, which is the jury system.

I want to start by telling you that your health is utmost
in my mind.  That's why I'm holding the jury selection process
here, in this very large ceremonial courtroom.  I'll tell you
the important aspects of this room in just a second.  But this
is a lot bigger than my courtroom down on the 17th Floor.
That's where the trial is going to be.  But I wanted to do this
here so it wouldn't be so crowded.

Still, there are a lot of people in this courtroom.  And
while the vaccination rate in our area is high, and air
circulation in this courtroom has been vetted by a public
health expert, I am going to require that we wear masks
throughout the day to protect each other.  The exceptions are
when we're talking, as lawyers do, as witnesses will do, and as
I am doing now.  So I get to take off my mask.  And when you
are asked questions today, which you will be, you may take off
your mask as well.  I've asked also that Mr. Sullivan remain
masked during this case.  He is the defendant in the trial.

So now I'm just going to do a little side presentation of
this room.  You may wonder who all of these people are who are

1  staring down at you.  They are all former judges, retired --

2  some are still sitting senior judges in this court.

3       The painting behind you is Odgen Hoffman.  He was the

4  first judge in this district.  He was here from 1851 to 1891.

5       This courtroom is named after Thelton Henderson, who was

6  here from 1980 to 2017.  And he is in the corner to the right,

7  to my right, your left.  He was a fabulous judge.

8       And because it is -- I'm giving you this little

9  presentation, I will point out my father, who is in the far

10  left, there, staring down at me to make sure that everything

11  goes well today.  So, I want you to help me make sure that that

12  happens.

13       Let me tell you what you have been called to do.  Trial by

14  jury began in England in 1215.  Before that, the King and his

15  cronies made any decisions they wanted to do, without regard to

16  the rule of law.  Noblemen then forced the King in 1215 to

17  provide trial by jury.  At that time, it was just noblemen.

18  And then it was just people -- men who owned property.  But

19  today, that right belongs to all of us.  And it is the right

20  and the responsibility of every citizen.

21       And at a time when the fairness of our system of justice

22  is questioned, the right to a jury trial ensures that cases get

23  decided by people who are not appointed by a politician, that

24  are selected randomly from the area where the case is

25  proceeding, and they're picked not by the judge but by the

 1   parties to the lawsuit.  Our Constitution recognizes that there
 2   are just some cases that are too important for a person to
 3   decide, particularly a judge.  Each of you has the experience
 4   to judge the facts and consider the perspectives of the other
 5   jurors.  And it is those diverse experiences that you bring to
 6   the courtroom that is the best protection to the right to a
 7   fair trial.
 8        As a juror, you will apply the law that I give you to what
 9   you learn in the courtroom about the case.  And you will render
10   the verdict.  What you think and how you work with other people
11   is going to be critical in deciding a matter that has a real
12   impact on our society.
13        So I just want to underscore for you how important what
14   you have been called to do is.  I know that many people don't
15   like to be called for jury service.  I know that all of you
16   have things that are important in your lives that this is
17   interfering with, and is certainly inconvenient for.  But it is
18   your duty as a citizen.  And it's essential, if we are to
19   develop -- to deliver the promise of just for all.
20        So with that, I would like you all to stand, and I'm going
21   to ask Ms. Davis to administer the oath.
22        **THE COURTROOM DEPUTY:**  Please raise your right hand.
23        (Jury Venire sworn in)
24        **THE COURTROOM DEPUTY:**  Thank you.  Be seated.
25        **THE COURT:**  So let me tell you just a little bit about

 1  what this case is about, how long it is going to take, what our

 2  trial days are going to look like, and then what we are going

 3  to be doing today while we pick -- while the jury is picked.

 4      So this is a criminal case, brought by the United States

 5  government.  The case concerns a data security incident at Uber

 6  Technologies, Inc., in October and November of 2016 when

 7  individuals outside of the company gained access to and

 8  acquired copies of confidential Uber user data in Uber's

 9  possession.

10      The government charges that defendant Sullivan, who was

11  Uber's chief security officer at the time, unlawfully concealed

12  and covered up the nature of the data security incident.  More

13  specifically, the government charges Mr. Sullivan with two

14  counts.  First, the government charges Mr. Sullivan with

15  obstruction of proceedings before the Federal Trade Commission.

16      At the time of the 2016 data security incident, the

17  Federal Trade Commission was conducting an investigation into

18  Uber's data security program and practices as a result of a

19  separate data security incident that happened at Uber in 2014.

20  The government alleges that Mr. Sullivan concealed and withheld

21  information regarding the 2016 data security incident from the

22  Federal Trade Commission.

23      Second, the government charges that Mr. Sullivan knew that

24  the individuals who had acquired copies of Uber's confidential

25  data had committed a federal felony, and that Mr. Sullivan,

1    nonetheless, failed to report the felony, and took affirmative

2    action to conceal it.  This crime is known as misprision of a

3    felony.

4         The charges against Mr. Sullivan are contained in a

5    superseding indictment.  The superseding indictment simply

6    describes the charges that the government brings against

7    Mr. Sullivan.  The superseding indictment is not evidence, and

8    doesn't prove anything.

9         Mr. Sullivan maintains that he did not conceal or cover up

10   the 2016 incident, and he's pleaded not guilty to the charges.

11   He is presumed innocent unless and until the government proves

12   him guilty beyond a reasonable doubt.

13        In addition, Mr. Sullivan has the right to remain silent,

14   and never has to prove innocence or present any evidence.

15        I suspect that it's going to take less than four weeks, it

16   may be more closer to three weeks, to try this case.  And then

17   the jury will make its decision.

18        Today I'm going to ask you some questions which will take

19   a while, and the lawyers may also ask questions for about 15

20   minutes or so apiece.  We'll pick the jury today.  I'm pretty

21   confident of that.  And then we'll start the trial tomorrow.

22        We'll begin every day until the end of trial in my

23   courtroom on the 17th Floor at 8:30 a.m.  Our trial day goes

24   until 1:30 p.m.

25        There will be two 15-minute breaks, at 10:00 and 11:45, or

1    thereabouts.  The reason that the trial day stops at 1:45 is I

2    have a whole lot of other cases that I have to attend to in the

3    afternoons.  I found that when I was a trial lawyer, it helped

4    my presentation immeasurably to finish trial at 1:30 instead of

5    4:00 or 4:30.  And I think it's also -- I have been told by

6    jurors it is much better for you, because you can still attend

7    to some of the things in your life during that time.

8        We will not have trial on September 22nd, 23rd, and 26th,

9    and also we would not have trial on October 7th, if the case

10   went that long, which I really do not expect that it will.

11       There may be another day that also has to be dark.  But

12   otherwise, we'll be going Monday through Friday.

13       I know that jury service asks a lot of you, so I want to

14   promise to be as efficient with your time as I can be.  If I

15   need to meet with the lawyers or they need to bring me an issue

16   that shouldn't be heard by the jury, we'll do that before 8:30

17   or after 1:30, unless there's something unusual.

18       You can tell how many people there are to make a trial go.

19   So I'm going to be prompt.  The lawyers will be prompt; the

20   witnesses will be prompt.  You need to be prompt.  It's just --

21   it's not only discourteous not to be prompt, but you want this

22   trial to move as efficiently as it can be.

23       If anybody is sick or learns of COVID contact, has a

24   personal emergency that you think needs you to be excused from

25   further service, be sure to notify my courtroom deputy,

 1   Ms. Davis.  She'll get in touch with me.  And everybody who's

 2   selected to the jury will have a contact sheet from her that

 3   gives her contact information.

 4       So, that takes care of many things.  Now, we're actually

 5   going to go on to jury selection.  So thank you all for filling

 6   out the questionnaire.  In a moment, I'm going to ask the

 7   lawyers to introduce themselves.  And I'll read a list of the

 8   potential witnesses in the case to you.

 9       Then I'll talk a little bit with you about the law that

10   applies in the case.  And then I'll have some questions for

11   each of you, based on the questionnaire responses.  The lawyers

12   will have some questions as well.

13       Once we're done with that, I'm going to determine whether

14   any juror should be excused for hardship or cause reasons.

15   Then the parties will make their selections, and we'll have the

16   jury.

17       So let's start with the introductions.  We will start with

18   the prosecution.

19       Mr. Dawson?

20       **MR. DAWSON:**  Thank you, Your Honor.

21       Good morning, everyone.  My name is Andrew Dawson.  I'm an

22   Assistant United States Attorney here in San Francisco.  And

23   I'm joined by my colleague, Ben Kingsley, another Assistant

24   United States Attorney (Indicating).  And we also have at the

25   table with us two FBI Special Agents, Mario Scussel here

1  (Indicating), and Welton Pollard.

2       THE COURT:  Does anybody in the room know any of the

3  people that Mr. Dawson just introduced?

4     (No response)

5       THE COURT:  All right.  Mr. Angeli.

6       MR. ANGELI:  Good morning, everyone.  My name is David

7  Angeli.  And I represent Joe Sullivan (Indicating).  And my

8  co-counsel who you will be hearing from during this trial are

9  John Cline, Tyler Francis, and Michelle Kerin (Indicating).  We

10  have a couple of other folks at our table helping us this

11  morning, Cheryl Oakley and Laura Dominic.

12       THE COURT:  Does anybody in the room know Mr. Angeli

13  or any of the people that he just introduced?

14     (No response)

15       THE COURT:  All right.  Now I'm going to read a list

16  of the people who are potentially witnesses in this case.  And

17  I want to underscore "potentially" because it is a long list,

18  and not all of these people will testify, I suspect.  Whenever

19  I read one of these lists and I read somebody named John Smith,

20  there may be a number of people who know somebody named John

21  Smith.  I will tell you that most of the people who are listed

22  here were either current or former Uber employees or in law

23  enforcement, or are lawyers.  So that may help you as I go

24  through this list.

25     And what I'm going to do is I'm going to read the whole

1    list and then I'm going to ask you, does anybody know any of

2    these people.  So you have to remember who you think you know.

3         Um, Edward Baker, Daniel Borges, Christopher Calley,

4    Derek Care, craig Clark, john Dwyer, Rebecca Engrav, Melanie

5    Ensign.

6         Robert Fletcher, john Flynn, Alex Garbutt, Daniel Garrie,

7    Brandon Glover, Ryan Graves, Collin Greene, Gautam Gupta, Luis

8    Guzman.  Matthew Henley.  Christopher Hickey, Chris Johnstone.

9    Candace Kelly.  Dara Khosrowshahi, Erin Ladd, Randall Lee,

10   Andrew Matthews.

11        Chris McCann.  Vasile Mereacre, Emil Michael, Heather

12   Nyong'o, Thuan Pham, David Plouffe, Welton Pollard, Alex Rice,

13   Sabrina Ross, Benjamin Rossen, Hudson Thrift, Rachel Whetstone,

14   Ross Worden, Salle Yoo.

15        I'm going to stop there for a second.  Does anybody here

16   know any of the witnesses who I have named?

17        (No response)

18        **THE COURT:**  All right.  Moving on.  And as I say, I

19   don't think all these people will be testifying.

20        Brooke Anderson.  Jon Chinn.  Shari Doherty, Gerardo

21   "Ollie" Gallardo, Chris Gates, Lindsey Glovin, Justin Griggs,

22   Todd Hamblet, Jill Hazelbaker, Travis Kalanick, Matt Kallman,

23   Chris Long, Angela Padilla, Jim Routh.  Ed Russo.  Mario

24   Scussel, Brian Stumphauzer, Katherine Tassi.  Ervin Tu, Ashley

25   Vivlamore, Miriam Wugmeister.

```
 1         Does anybody know personally any of those people?  And
 2    that -- I'm seeing a hand up.
 3         (A hand is raised)
 4         THE COURT:  And it's Juror No. -- do you have your --
 5    I'm sorry, if you would hold up your card.
 6         THE COURT:  32.  And if you wouldn't mind walking over
 7    to the microphone.  This will be practice, because you are all
 8    going to have to do this sooner or later.
 9         Good morning.
10         PROSPECTIVE JUROR LIOU:  Good morning.
11         THE COURT:  Who did you know on that list?
12         PROSPECTIVE JUROR LIOU:  Ervin Tu.
13         THE COURT:  How do you know Mr. Tu?
14         PROSPECTIVE JUROR LIOU:  He is my cousin.
15         THE COURT:  Just so we know it is the same Ervin Tu,
16    what does he do?
17         PROSPECTIVE JUROR LIOU:  He is an investor, he
18    invested in Uber.  So --
19         THE COURT:  Okay.  Is there -- I'll save that.  Thank
20    you very much for letting me know.
21         PROSPECTIVE JUROR LIOU:  I'm also a shareholder, by
22    the way, so just --
23         THE COURT:  That's a useful question to ask.
24         PROSPECTIVE JUROR LIOU:  Yes.
25         THE COURT:  And so how long have you been a
```

 1  shareholder?

 2          **PROSPECTIVE JUROR LIOU:**  Um, for a couple of years,

 3  almost, around the IPO.

 4          **THE COURT:**  Okay.  Thank you.

 5      Is there anybody else in the jury who is a shareholder or

 6  has any sort of financial relationship with Uber?

 7      (No response)

 8          **THE COURT:**  Thank you.  I appreciate that.

 9      So this is a criminal case.  The jury needs to include a

10  minimum of 12 people.  I'm going to require a number of

11  alternates to ensure that the trial can proceed in case

12  somebody gets sick or has an emergency.  We don't want you to

13  be here if you are sick.  Only 12 jurors will participate in

14  the deliberations.

15      Let me tell you about the basics of the law that apply to

16  this jury trial.  The defendant has entered a plea of not

17  guilty.  And you are going to be asked whether his guilt has

18  been proved beyond a reasonable doubt, if you are selected as a

19  trial juror in this case.  A plea of not guilty is complete

20  denial, making it necessary for the government, acting through

21  the prosecutor, to prove beyond a reasonable doubt the case

22  against the defendant.

23      In a criminal case, the defendant is presumed to be

24  innocent.  This presumption requires the government to prove

25  each element of a crime, beyond a reasonable doubt.  Until and

 1   unless that's done, the presumption of innocence prevails.

 2        This is different than in a civil case, where facts may be

 3   established by a preponderance of the evidence.  Well,

 4   actually, that's slightly different.  The criminal standard is

 5   proof beyond a reasonable doubt.  In a civil case, it is by

 6   preponderance of the evidence, which is a lower standard, that

 7   it's more likely true than not.

 8        But the criminal standard is beyond a reasonable doubt.

 9   And I'll give you further instructions if you're on the jury.

10        A number of you, in answer to the questionnaire, said that

11   you thought the defendant should have to prove his innocence.

12   In a criminal case, the defendant has the right to remain

13   silent, and never has to prove innocence or present any

14   evidence.  This is a constitutional right.

15        Does anybody here believe that the presumption of

16   innocence should not apply?

17        (No response)

18        **THE COURT:**  The fact that the defendant is -- has been

19   charged or is here in court is not evidence of his guilt.  The

20   jury must base its determination in this case only on the

21   evidence that's properly received during the course of the

22   trial.  The jury must not base its decision on speculation or

23   conjecture.  If the evidence does not convince you of the truth

24   of the charge beyond a reasonable doubt, the defendant's

25   entitled to a verdict of not guilty.

1    I'm going to be giving you more instructions on the law as

2    the case progresses, but these concepts are cornerstones of our

3    system of law.

4    It will be your duty to treat all witnesses equally, and

5    not to assume that someone is truthful or not truthful, on the

6    basis of his or her profession or looks.  You can't make

7    assumptions about credibility until you hear what somebody has

8    to say.  And you can evaluate that and a whole list of factors

9    that I'll discuss with you when the trial starts.

10    Several of you indicated on the basis of your experience

11    that you would give more weight to a law enforcement officer's

12    testimony, while others said that you would give less weight.

13    Just because somebody is, as an example, a law enforcement

14    officer, doesn't mean that they're different than anybody else

15    or that they're entitled to any greater or lesser deference.

16    Anybody who comes into this courtroom is a human being who is

17    entitled to the same respect as anybody else.  And then, you

18    evaluate what they have to say, what the evidence has shown to

19    you, and make your determinations based on that, and not based

20    on some preconceived notions that you have.  You have to hear

21    what a person has to say and how she says it before judging

22    credibility.

23    A number of you also indicated that you have opinions

24    about Uber and some -- and about its -- and some of you knew

25    about his -- its former CEO, Travis Kalanick.  It didn't appear

1  to me from the answers on the questions that any of you had any

2  firsthand knowledge about Uber's response to the 2016 data

3  breach or have had any dealings with Mr. Kalanick, but I want

4  to make sure that that's true.

5      Has anybody -- did anybody have any firsthand dealings

6  with the 2016 data breach, or know Mr. Kalanick?

7          **PROSPECTIVE JUROR RODGERS:**  I was a Uber driver --

8          **THE COURT:**  Okay.  Hang on.  Would you put up your --

9  Juror No. 39.  And if you wouldn't mind coming up to the

10  microphone, please.

11     Thank you.  Good morning.

12         **PROSPECTIVE JUROR RODGERS:**  Good morning.

13         **THE COURT:**  What was your connection?

14         **PROSPECTIVE JUROR RODGERS:**  I was an Uber driver

15  during that period, and then I stopped driving.  But I had been

16  a driver.

17         **THE COURT:**  Okay.  So when I come to you in the jury

18  questions, I'm going to ask you some questions about whether

19  you think that would impact your ability to be a fair and

20  impartial juror.

21     Did you have -- were you notified about that data breach?

22         **PROSPECTIVE JUROR RODGERS:**  It seems like I remember

23  it because the -- close to it we also had a data breach at

24  work, OPM, like during that same period of time.  So we would

25  get -- I was getting bombarded with information, and I just

1  stepped away from.

2         **THE COURT:**  Okay.

3         **PROSPECTIVE JUROR RODGERS:**  Yeah.

4         **THE COURT:**  So I will come back to you.  Thank you

5  very much for raising that.

6         Anybody else?

7         (No response)

8         **THE COURT:**  Okay.  So, so, I want to emphasize for you

9  that this case involves Mr. Sullivan's conduct and intent after

10  that data breach occurred.  And it would be your job as jurors

11  to evaluate that, and not anything related to Uber's alleged

12  work culture, treatment of women or drivers or anything else

13  that you may have seen or read in the newspapers.

14         Because it is possible that there will be news reports

15  about this case, I'm going to advise you now and regularly

16  throughout the trial, don't read anything about this case.

17  Don't do any research about this case.  It's very important

18  that what you learn, you learn together with all of the jurors

19  at the same time, so that you can -- with evidence that has

20  been tested that -- that I'm allowing because it's appropriate

21  for you to consider, and that you are all considering the same

22  things, and won't be bringing things in from the outside which

23  won't have been tested in the same way.

24         The law requires that the government prove guilt beyond a

25  reasonable doubt, but that doesn't require the government to

 1   prove guilt beyond all possible doubt.

 2        In this case, as jurors, you will sit as the judge of the

 3   facts.  The law will be given to you by me, but the facts are

 4   yours to decide.  The jurors selected will be the sole judges

 5   of the facts, but you will be duty-bound to follow the law, as

 6   stated by me, and eventually to apply the law to the facts as

 7   you find them from all the evidence that's presented to you.

 8        The responsibility of judging facts must be performed

 9   without bias or prejudice to any party.  The law doesn't permit

10   jurors to be governed by sympathy, prejudice, or public

11   opinion.  The parties will expect that you'll carefully and

12   impartially consider all the evidence, follow the law as stated

13   by me, and reach a just verdict, regardless of the

14   consequences.

15        So now I'm going to ask each of you to come to the

16   microphone one at a time to answer some questions.  The purpose

17   of these questions is to enable me to determine whether any

18   prospective juror should be excused for cause, and to enable

19   counsel for the parties to exercise their individual judgment

20   with respect to peremptory challenges.  Those are challenges

21   for which no reason needs to be given.

22        In the trial of this case, as I've said before, each side

23   is entitled to have a fair, unbiased and unprejudiced jury.  So

24   it's important that you disclose any reason or fact why any of

25   you might be biased or prejudiced in any way in answer to the

 1   questions that you are asked.

 2        If at any time you are asked a question that you believe

 3   calls for a personal or embarrassing response, let me know that

 4   you would prefer to answer that individually.  And we can do

 5   that without any of the other jurors -- any of the other

 6   prospective jurors present.  And we'll do that at one of the

 7   breaks that we have today.

 8        No one wants to pry into your personal affairs.  But the

 9   reason that the question is being asked is that it may have an

10   impact on your ability to sit as a juror.  So if you want to

11   speak to me and the lawyers privately, we can do it during a

12   break.

13        I should tell you, as you have already seen, I refer to

14   jurors by numbers, rather than by name.  One of the reasons I

15   do that is because I mangle names all the time, and I just

16   think it is more respectful.  It is also easier for the court

17   reporter to take that down.

18        And I'm going to ask some of you, Jurors 1 and 70 and 3,

19   and a couple of others, I'm going to ask to speak to you

20   separately at one of the breaks, because of my own reasons.

21        So, so let's start, I would like to start the questioning

22   with Juror No. 4.  If you wouldn't mind coming up to the --

23   Good morning.

24            **PROSPECTIVE JUROR HOANG:**  Good morning.

25            **THE COURT:**  You will want to speak up a little bit.

1          **PROSPECTIVE JUROR HOANG:**  Okay.

2          **THE COURT:**  So tell me, tell me what you do as a

3  finance director.

4          **PROSPECTIVE JUROR HOANG:**  So I'm a finance director at

5  Charles Schwab and Company.

6          **THE COURT:**  And what does that mean?

7          **PROSPECTIVE JUROR HOANG:**  So I manage budgets and

8  forecasts for specific organizations, currently supporting our

9  trader and education organization and our marketing

10  organization.

11          **THE COURT:**  And how long have you been there?

12          **PROSPECTIVE JUROR HOANG:**  I have been at Schwab for 13

13  years.

14          **THE COURT:**  Do you like it?

15          **PROSPECTIVE JUROR HOANG:**  Yes.

16          **THE COURT:**  If I ask you one of those questions and

17  you don't like your job, you don't have to tell me that you

18  like it, but I'm always interested.

19      So one of your answers was on the -- the law enforcement

20  officers, you indicated that given law enforcement officers'

21  training, that you would have confidence in their ability to

22  tell the truth.  Would you be able to treat their testimony the

23  same way as any other witness when they come into the

24  courtroom?

25          **PROSPECTIVE JUROR HOANG:**  I think I would have a

1  little bit of bias just because I believe that you're trained

2  to do your job.  So if you have years of experience, through

3  your experience and training, I would think that you have that

4  judgment.

5          THE COURT:  But what about credibility?  What about --

6  assuming they definitely have more training in law enforcement

7  than the rest of us.  But does that make, in your mind, do you

8  think they are more honest and credible than anybody else?

9          PROSPECTIVE JUROR HOANG:  I would think so, just

10  because I do think that some folks tend to choose their career

11  based on their beliefs.  And as a law enforcer you will be

12  expected to tell the truth and uphold your position.

13          THE COURT:  If I instruct you, as I will, that you

14  need to treat all witnesses the same when they come to the

15  witness stand, that you consider what they say, including their

16  background and experience, but all the things that they have to

17  tell you, do you think you could treat them and everybody else

18  fairly and serve as a fair and impartial juror?

19          PROSPECTIVE JUROR HOANG:  Yes.

20          THE COURT:  Okay.  Thank you.

21          THE COURT:  Thank you.  You can sit.

22      Juror No. 5, please.

23      Good morning.

24          PROSPECTIVE JUROR COWDEN:  Good morning.

25          THE COURT:  So what did you do with the theatrical

 1  wardrobe union?

 2       **PROSPECTIVE JUROR COWDEN:**  I dressed ballerinas and

 3  opera singers.

 4       **THE COURT:**  How long did you do that?

 5       **PROSPECTIVE JUROR COWDEN:**  Well, let's see.  It was --

 6  I guess it was about 20 years, maybe.

 7       **THE COURT:**  And, and are you enjoying your retirement?

 8       **PROSPECTIVE JUROR COWDEN:**  Yes.  I'm enjoying it.

 9       **THE COURT:**  So I ask this question, because I'm also

10  getting older as time goes on.  What do you do every day?

11       **PROSPECTIVE JUROR COWDEN:**  What do I do every day?

12       **THE COURT:**  Yeah, how are you spending your

13  retirement?

14       **PROSPECTIVE JUROR COWDEN:**  Well, I was a ballerina

15  before I was wardrobe person.  So I'm kind of beat up.  So I

16  try to do a lot of exercise -- not a lot of exercise, but I try

17  to exercise every day, which I don't always do.  It's kind of

18  strange after you have been a dancer, it's all day, all night,

19  all the time.

20       **THE COURT:**  Yeah.

21       **PROSPECTIVE JUROR COWDEN:**  So.  And, well, I'm trying

22  to enjoy life.

23       **THE COURT:**  Good.  Well, those are two good things to

24  do.

25       **PROSPECTIVE JUROR COWDEN:**  Having some time.

1          **THE COURT:**  You've heard almost nothing about this

2   case except for what I've just said.  Is there any reason at

3   the moment that you can think of that you could not serve as a

4   fair and impartial juror?

5          **PROSPECTIVE JUROR COWDEN:**  No.

6          **THE COURT:**  Okay.  Thank you.

7      Juror No. 7, please.

8          **PROSPECTIVE JUROR COWDEN:**  (Inaudible) number?

9          **THE COURT:**  Yes, your numbers are all important today.

10  Thank you.

11         **PROSPECTIVE JUROR RAYGOZA:**  Good morning.

12         **THE COURT:**  Good morning.  How are you?  So what job

13  do you hold as a school administrator?

14         **PROSPECTIVE JUROR RAYGOZA:**  I'm a high school

15  principal at Berkeley High.

16         **THE COURT:**  How long have you been doing that?

17         **PROSPECTIVE JUROR RAYGOZA:**  Third year as principal,

18  sixth year at Berkeley High School.

19         **THE COURT:**  And how are you enjoying that?

20         **PROSPECTIVE JUROR RAYGOZA:**  I love it.

21         **THE COURT:**  What's your favorite part of your job?

22         **PROSPECTIVE JUROR RAYGOZA:**  I just get to work with a

23  large staff, over 250.

24         **THE COURT:**  So I'll just ask you the same followup

25  question.

1      Anything that you know of so far about this case that

2  makes you think you couldn't serve as a fair and impartial

3  juror?

4          **PROSPECTIVE JUROR RAYGOZA:**  No.

5          **THE COURT:**  Thank you.

6      Juror No. 8, please.

7      Good morning.

8          **PROSPECTIVE JUROR CHRISTIAN:**  Good morning.

9          **THE COURT:**  And, so, you work at a school district.

10  Tell me, tell me what you are doing and how long you have been

11  doing it.

12          **PROSPECTIVE JUROR CHRISTIAN:**  Yeah, I have been doing

13  IT for the school districts for about ten years.  I work for

14  San Ramon Valley right now.

15          **THE COURT:**  So how technologically proficient are the

16  teachers?

17          **PROSPECTIVE JUROR CHRISTIAN:**  Oh, I haven't got time

18  for that one.

19          **THE COURT:**  I only ask that question because I am

20  incredibly unproficient in things, so I like to find other

21  professions where people might have similar inabilities.

22          **PROSPECTIVE JUROR CHRISTIAN:**  Sure.

23          **THE COURT:**  So one of the responses that you had was

24  on a defendant, and their decision not to testify.  And as I

25  explained earlier, we all have that right.  That is our

 1  constitutional right, not to testify, not to put on any

 2  evidence.  And the burden is always on the government to prove

 3  its case.

 4      Would you have any qualms about a defendant who decided

 5  not to testify?  We don't know whether Mr. Sullivan will

 6  testify in this case or not.

 7          **PROSPECTIVE JUROR CHRISTIAN:**  If that's his right,

 8  that's his right.  So, yeah, I can abide by that.

 9          **THE COURT:**  Okay.  That is -- yeah.  And it's all of

10  our -- it is sort of a keystone of our Constitution that we

11  don't have to do that and if the government wants to make a

12  case against us, they can go ahead.  They just have to prove

13  it.

14          **PROSPECTIVE JUROR CHRISTIAN:**  Sure.

15          **THE COURT:**  Also, you strongly agreed that it is very

16  common for executives to cover up information that could harm

17  them or their company.  And I'm wondering whether you have had

18  personal experience with that, or where that opinion comes

19  from.

20          **PROSPECTIVE JUROR CHRISTIAN:**  It stems from finding

21  someone actually deleting school records at a previous district

22  I worked at.  So, and then part of the fall I was hearing

23  actual records that should have been represented to the State

24  not being represented correctly.  So...

25          **THE COURT:**  So the -- would you be able, despite that

1  experience, would you be able to set that aside and just judge

2  this case based on the evidence that is produced in this

3  courtroom, and make a determination based on that and the law

4  that I give you?

5         **PROSPECTIVE JUROR CHRISTIAN:**  Sure.  I would be able

6  -- I would have to hear the evidence, of course, yeah.

7         **THE COURT:**  And then, you also indicated that your

8  wife is pregnant, so, congratulations.

9         **PROSPECTIVE JUROR CHRISTIAN:**  Yes, sir.  Thank you.

10        **THE COURT:**  And do you have a concern that over the

11 next couple of weeks something might come up?  Or were you just

12 letting me know in general that this is a thing?

13        **PROSPECTIVE JUROR CHRISTIAN:**  She's 17 weeks, and she

14 is 41, so we're a little concerned about it, with her age.  So

15 -- yeah.

16        **THE COURT:**  Okay.  All right.  Great.  Thank you very

17 much.

18        **PROSPECTIVE JUROR CHRISTIAN:**  Thank you.

19        **THE COURT:**  Juror No. 9.

20    Good morning.

21        **PROSPECTIVE JUROR MANAYAN:**  Good morning.

22        **THE COURT:**  So, what, you work at Signal 88.  What is

23 Signal 88?

24        **PROSPECTIVE JUROR MANAYAN:**  It's a security guard.

25        **THE COURT:**  That's the company that you work for.

1   **PROSPECTIVE JUROR MANAYAN:**  Yes.

2   **THE COURT:**  And then, are you assigned out to

3   different locations?

4   **PROSPECTIVE JUROR MANAYAN:**  Yes.

5   **THE COURT:**  How do you like being a security guard?

6   **PROSPECTIVE JUROR MANAYAN:**  Well, it's not why -- what

7   I went to school for.  I went to school for a caseworker.  So,

8   this is like something that I can find for the meantime,

9   because I was out of work for two years.  So I'm a little bit

10  in a cramp.

11  **THE COURT:**  Uh-huh.  Uh-huh.  So, so, as -- since you

12  are doing -- as a security guard, what exactly are you doing?

13  **PROSPECTIVE JUROR MANAYAN:**  We observe for -- um, it's

14  basically suspicious behaviors or -- that may cause the

15  property to lose.

16  **THE COURT:**  So it's not cybersecurity, it's sort of

17  persons, you're looking around for people who might cause a

18  problem.

19  **PROSPECTIVE JUROR MANAYAN:**  More or less.

20  **THE COURT:**  Given what you are doing now, would you

21  give more credit to the testimony of a law enforcement official

22  as opposed to -- to anybody else?

23  **PROSPECTIVE JUROR MANAYAN:**  Well, what I can say is

24  that I don't know if I can be impartial.

25  **THE COURT:**  Okay.  Well, that's really what I'm

 1   getting to.  And why do you say that?

 2            **PROSPECTIVE JUROR MANAYAN:**  Why do I say that?

 3   Because I have experience in -- firsthand experience in being

 4   violated.  And my -- my personal identity was stolen and

 5   nothing was done about it.  And I had almost a year or so to

 6   try and fix it.

 7        And I kept complaining, and how it happened, so, you know,

 8   like I said, I don't believe I could be impartial in this

 9   regard.

10            **THE COURT:**  Okay.  Well, you know, you don't know any,

11   anything really about what the facts here are.  And, but it

12   doesn't involve a data breach.  Are you just saying because --

13   and there have been many people who have suffered data breaches

14   in many different settings.  So are you saying that yours was

15   so difficult that it would be hard to listen to the evidence

16   and fairly evaluate it?

17            **PROSPECTIVE JUROR MANAYAN:**  Yes.

18            **THE COURT:**  Okay.  You also indicated that you would

19   have difficulty with a defendant who didn't testify.  Now that

20   we have gone over what the Constitution requires, would you

21   still have difficulty with that?

22            **PROSPECTIVE JUROR MANAYAN:**  (Inaudible)

23            **THE COURT:**  You need to answer audibly.

24            **PROSPECTIVE JUROR MANAYAN:**  Yes.

25            **THE COURT:**  So you think, you think -- you wouldn't be

 1  able to give the defendant his constitutional right to be

 2  presumed innocent?

 3      PROSPECTIVE JUROR MANAYAN:  Well, right now I have a

 4  lot of things going on in my mind.  I'm trying to catch up with

 5  my life after what I have gone through financially, and I'm

 6  trying to recover.  And I don't think I could possibly do any

 7  -- any good to the Court or to the defendant.

 8      THE COURT:  I'm -- I'm hearing that.  And -- okay.

 9  Thank you.  You may sit down.

10      Juror No. 10, please.

11      Good morning.

12      PROSPECTIVE JUROR LAM:  Good morning.

13      THE COURT:  So, tell me what a finance manager does at

14  PG&E.

15      PROSPECTIVE JUROR LAM:  Basic, pretty much budgeting,

16  forecasting and planning for next year, short-term, long-term

17  for the company.  For the business partners that I support.

18      THE COURT:  And how long have you been doing that?

19      PROSPECTIVE JUROR LAM:  Sixteen years.

20      THE COURT:  You had indicated that you had had your

21  personal data compromised at one time.

22      PROSPECTIVE JUROR LAM:  (Nods head)

23      THE COURT:  Do you think that experience would have

24  any impact on your ability to sit as a fair and impartial

25  juror, just based on the information that you have so far?

1    **PROSPECTIVE JUROR LAM:**  No, I don't think so.

2    **THE COURT:**  All right.  Thank you.

3        Juror No. 11, please.

4        Good morning.

5    **PROSPECTIVE JUROR LAI:**  Good morning.

6    **THE COURT:**  So, how do you like being a hotel manager?

7    **PROSPECTIVE JUROR LAI:**  I love it.

8    **THE COURT:**  How long have you been doing it?

9    **PROSPECTIVE JUROR LAI:**  Oh, a long time.  Probably 30,

10   35 years.

11   **THE COURT:**  What's the best part of being a hotel

12   manager?

13   **PROSPECTIVE JUROR LAI:**  When your guests tell you

14   "Thank you.  I really have a wonderful stay in your hotel."

15   **THE COURT:**  That's great.  Is there anything that you

16   have heard so far that makes you think you couldn't be a fair

17   and impartial juror in this case?

18   **PROSPECTIVE JUROR LAI:**  No.

19   **THE COURT:**  Thank you.

20       Juror No. 13, please.

21   **THE COURT:**  Good morning.

22   **PROSPECTIVE JUROR CHILDRESS:**  Good morning.

23   **THE COURT:**  What does a marketing manager do for a

24   construction company?

25   **PROSPECTIVE JUROR CHILDRESS:**  I designed a new website

```
 1   for them, do business to business marketing, like proposals for
 2   new opportunities for projects.
 3           THE COURT:  Do you like it?
 4           PROSPECTIVE JUROR CHILDRESS:  Yes, uh-huh, it is a
 5   good company.
 6           THE COURT:  And is there anything that you have heard
 7   so far that makes you think you couldn't be a fair and
 8   impartial juror?
 9           PROSPECTIVE JUROR CHILDRESS:  No.
10           THE COURT:  Thank you.
11           PROSPECTIVE JUROR CHILDRESS:  Thank you.
12           THE COURT:  Juror No. 16.
13      Good morning.
14           PROSPECTIVE JUROR LI:  Good morning.
15           THE COURT:  And tell me what Market Access Strategy
16   and Analytics is.
17           PROSPECTIVE JUROR LI:  So I work for a (inaudible)
18   company and what we do is we develop strategies to make sure
19   that our products are covered on the formularies of insurance
20   companies so patients who need a drug will have access to the
21   drug.?
22           THE COURT:  And how long have you been doing that?
23           PROSPECTIVE JUROR LI:  Five years.
24           THE COURT:  Do you like it.
25           PROSPECTIVE JUROR LI:  Yeah, very much.
```

1        **THE COURT:**  I want to ask you the law enforcement

2   question.  The witness testimony.  Would you be able to treat

3   law enforcement officials in the same way that you would treat

4   everybody else when they come on to the stand, with respect to

5   how credible they are?

6        **PROSPECTIVE JUROR LI:**  Yes, I can.

7        **THE COURT:**  All right.  Do you know of any reason so

8   far that you wouldn't be able to be a fair and impartial juror

9   in this case?

10       **PROSPECTIVE JUROR LI:**  No.

11       **THE COURT:**  Thank you.

12       **PROSPECTIVE JUROR LI:**  Thank you.

13       **THE COURT:**  Juror No. 17, please.

14       **PROSPECTIVE JUROR DRUZHININA:**  Hi.

15       **THE COURT:**  Good morning.  How are you?

16       **PROSPECTIVE JUROR DRUZHININA:**  Fine, thank you.

17       **THE COURT:**  And what is Move Center?

18       **PROSPECTIVE JUROR DRUZHININA:**  Move Center, it is a

19   very small (inaudible) --

20       **THE COURT:**  Say it again.

21       **PROSPECTIVE JUROR DRUZHININA:**  Relocation company.

22       **THE COURT:**  Relocation company.  And, as an

23   accountant, describe what you do on a daily basis.

24       **PROSPECTIVE JUROR DRUZHININA:**  Pay bills, all kinds of

25   stuff.

1      **THE COURT:**  I'll ask you the same law enforcement

2   question that I've asked a couple of people.  You indicated

3   that you would tend to believe law enforcement just based on

4   their profession, but you would still use your critical

5   thinking.

6      So would you use that same critical thinking with respect

7   to all the witnesses who come forward?

8      **PROSPECTIVE JUROR DRUZHININA:**  In court I think I

9   will.  In real life if I see a person, officer, I think I will

10  trust him more than others.

11     **THE COURT:**  Sure, because you know what he's supposed

12  to do outside of here.

13     **PROSPECTIVE JUROR DRUZHININA:**  Yeah.

14     **THE COURT:**  And you don't know what I'm supposed to

15  do, or anybody else, when we're walking down the street.  But

16  in the courtroom --

17     **PROSPECTIVE JUROR DRUZHININA:**  Yeah, in the

18  courtroom --

19     **THE COURT:**  When people come in to testify, you treat

20  them the same?

21     **PROSPECTIVE JUROR DRUZHININA:**  Uh-huh.

22     **THE COURT:**  Is there anything you have heard so far

23  that makes you think you cannot seven as a fair and impartial

24  juror?

25     **PROSPECTIVE JUROR DRUZHININA:**  You know what's

 1  happened, I'm in contract now for buying my first condo, and,

 2  it's happened with, you know, recent, and the closing date will

 3  be September 26th and I will move in maybe the month.  So --

 4          THE COURT:  So the good news then is that the 26th is

 5  going to be a day that we are not going to have to have trial.

 6          PROSPECTIVE JUROR DRUZHININA:  Uh-huh.

 7          THE COURT:  And the trial will be over.  I am not

 8  going to say "guarantee," but I can't quite guarantee it.  I'm

 9  quite confident that the trial will be over probably by the end

10  of the month.  Certainly soon thereafter.  So I don't think

11  that it should interfere with those plans.

12          PROSPECTIVE JUROR DRUZHININA:  Also, you know, I have

13  not very high level of English, so kind of nervous.

14          THE COURT:  Tell me, have you been able to understand

15  everything that I've said today?

16          PROSPECTIVE JUROR DRUZHININA:  Not all part, not

17  everything.

18          THE COURT:  Can you, can you think of where you might

19  have gotten lost in what I was talking about?

20          PROSPECTIVE JUROR DRUZHININA:  Hm?

21          THE COURT:  Can you think of what I -- the topic that

22  I was on when it got confusing for you?

23          PROSPECTIVE JUROR DRUZHININA:  I don't know some

24  words.

25          THE COURT:  In your job, do you interact with people

1   in the office, and sometimes customers?

2          **PROSPECTIVE JUROR DRUZHININA:**  No.  It's -- you know,

3   I work in very quiet environment.  And most of the day I don't

4   speak with other people.  It's just numbers and me.

5          **THE COURT:**  And how long have you been in this

6   country?

7          **PROSPECTIVE JUROR DRUZHININA:**  I work from 2005.

8          **THE COURT:**  So you have been here for 17 years?

9          **PROSPECTIVE JUROR DRUZHININA:**  Yeah.

10         **THE COURT:**  Great.  Thank you.  Besides all of that,

11  is there anything that you can think of that makes you think

12  you couldn't seven as a fair and impartial juror?

13         **PROSPECTIVE JUROR DRUZHININA:**  Uh (inaudible).

14     (Reporter clarification)

15         **PROSPECTIVE JUROR DRUZHININA:**  Excuse me.

16         **THE COURT:**  So the Court reporter did not hear the

17  answer to the question, was there any other reason that you

18  could -- couldn't seven as a fair and impartial juror.  I heard

19  no.  Is that right?

20         **PROSPECTIVE JUROR DRUZHININA:**  Could you repeat it,

21  please?  I'm sorry.

22         **THE COURT:**  Yes.  So here is the question.  Besides

23  what you have already said, --

24         **PROSPECTIVE JUROR DRUZHININA:**  Uh-huh.

25         **THE COURT:**  -- is there any other reason that you

1   could not serve as a fair and impartial juror?

2        **PROSPECTIVE JUROR DRUZHININA:**  No.

3        **THE COURT:**  Thank you.

4   Juror No. 18, please.

5   Good morning.

6        **PROSPECTIVE JUROR JACKSON-MI:**  Good morning.

7        **THE COURT:**  So what do you do with Harvey Leaseville

8   Insurance Company (Phonetic)?

9        **PROSPECTIVE JUROR JACKSON-MI:**  Okay, so I haven't

10  worked there in a very long time.  That was my first job out of

11  college.  I worked there for six years, and then I became a

12  stay-at-home mom.  And I have been a stay-at-home mom ever

13  since.

14       **THE COURT:**  So I should have looked at that.  And your

15  kids are now --

16       **PROSPECTIVE JUROR JACKSON-MI:**  They are all in their

17  thirties.

18       **THE COURT:**  All out of the house.

19       **PROSPECTIVE JUROR JACKSON-MI:**  Yeah.

20       **THE COURT:**  Isn't it nice?

21       **PROSPECTIVE JUROR JACKSON-MI:**  It is, yeah.  And I'm a

22  grammie now.

23       **THE COURT:**  That's great.  I'll ask you that law

24  enforcement question.

25       **PROSPECTIVE JUROR JACKSON-MI:**  Okay.

1      **THE COURT:**  Would you be able to treat the testimony

2  of law enforcement just the same way as the testimony of

3  anybody else who comes into this courtroom?

4      **PROSPECTIVE JUROR JACKSON-MI:**  I think so, yes.

5      **THE COURT:**  Okay.  Is there any doubt in your mind

6  that you couldn't treat anybody the same -- fairly -- when they

7  come in, you know, once they start testifying then you get to

8  evaluate their credibility?

9      **PROSPECTIVE JUROR JACKSON-MI:**  I would probably give

10  them the benefit of the doubt because of their position.

11      **THE COURT:**  Would you give them -- you give them --

12  when you say you would give them the benefit of the doubt,

13  would you be able to evaluate what they're saying against the

14  evidence that has come into the courtroom, and judge their

15  credibility as you would anybody else?

16      **PROSPECTIVE JUROR JACKSON-MI:**  Yes.

17      **THE COURT:**  Okay.

18      **PROSPECTIVE JUROR JACKSON-MI:**  Absolutely.

19      **THE COURT:**  Great.  Okay.  Thank you.

20      **PROSPECTIVE JUROR JACKSON-MI:**  Okay.

21      **THE COURT:**  Juror No. 22.

22  Good morning.

23      **PROSPECTIVE JUROR CHERRY:**  Good morning.

24      **THE COURT:**  Have you heard anything that makes you

25  think you couldn't serve as a fair and impartial juror?

1    **PROSPECTIVE JUROR CHERRY:**  No.  I do want to say,

2    though, I put on the jury questionnaire, I know someone who

3    works at Uber.  He has a ten-year-old son who is friends with

4    my son and he does work somewhere where the defendant worked

5    but I don't know -- he never talks about anything, he is very

6    closed-mouthed.  But I want to be very open and transparent

7    about that.  He is a director there in the global enforcement,

8    something or other.

9        **THE COURT:**  All right.  You have never talked with him

10   about the data breach or --

11       **PROSPECTIVE JUROR CHERRY:**  No.

12       **THE COURT:**  Has he ever -- have you ever talked to him

13   about Mr. Sullivan?

14       **PROSPECTIVE JUROR CHERRY:**  I think he did mention that

15   someone he used to work with was going to be on trial.  And

16   once I saw the pre-questions, it was pretty clear to me that he

17   probably did work with the defendant.  But he has not spoken

18   about the breach or, really, his relationship with him.

19       **THE COURT:**  Okay.  Is there anything about that, that

20   makes you think you couldn't be fair and impartial and just

21   evaluate this case the way that it is, without regard to your

22   friend?

23       **PROSPECTIVE JUROR CHERRY:**  I don't think so, no.

24       **THE COURT:**  Okay.  All right.  Thank you.

25       Juror No. 23, please.

1     (Reporter clarification)

2          **THE COURT:**  Oh, okay, so we are at 24.  Thank you.

3  Come on up.

4     And for those of you who are wondering, we will end up

5  taking a break at about quarter of 12:00, and it will be a

6  break for about half an hour so you can go down to the second

7  floor for lunch.  But, just so that you know.

8     So, good day.

9          **PROSPECTIVE JUROR KENNEDY BREINER:**  Good morning.

10          **THE COURT:**  How are you?

11          **PROSPECTIVE JUROR KENNEDY BREINER:**  Good.

12          **THE COURT:**  So, are you -- you have been a registered

13  nurse.

14          **PROSPECTIVE JUROR KENNEDY BREINER:**  Yes.

15          **THE COURT:**  And how long did you do that for?

16          **PROSPECTIVE JUROR KENNEDY BREINER:**  I worked for

17  almost 32 years at UCSF.

18          **THE COURT:**  And did you enjoy that?

19          **PROSPECTIVE JUROR KENNEDY BREINER:**  Very much.

20          **THE COURT:**  And what are you doing now?

21          **PROSPECTIVE JUROR KENNEDY BREINER:**  I'm retired and

22  I'm enjoying that as well.

23          **THE COURT:**  Good.  The -- you had a perspective about

24  Uber and how it's freed up all the traffic in the Bay area.

25  Right?

1          **PROSPECTIVE JUROR KENNEDY BREINER:**  Well, I remember

2    reading an article about a study which I believe was conducted

3    by Uber, and which concurred with my own ideas, that even

4    though conceptually the idea, this kind of model would actually

5    create less traffic, but in fact it has most likely contributed

6    to more congestion.  That was the -- the gist of the study.

7          **THE COURT:**  As you have undoubtedly figured out, that

8    will have nothing to do with the case that we have here.  Is

9    there anything about that that makes you think that you

10   couldn't treat Uber in a fair and impartial way?

11         **PROSPECTIVE JUROR KENNEDY BREINER:**  No.

12         **THE COURT:**  You heard the trial calendar that I have.

13   So it doesn't include being off on the 27th.  Is that an issue

14   for you?

15         **PROSPECTIVE JUROR KENNEDY BREINER:**  I thought the

16   dates for Rosh Hashanah are the 25th and the 26th, unless I'm

17   mistaken.  That is my understanding.

18         **THE COURT:**  Okay.  You had written down the 26th and

19   the 27th.  And so I just wanted to make clear, you might think

20   about that, and if it's an issue for you, then bring it back up

21   later.  Okay?

22         **PROSPECTIVE JUROR KENNEDY BREINER:**  Okay.  Sure.

23         **THE COURT:**  All right.  Is there any reason that you

24   know of that you couldn't sit as a fair and impartial juror?

25         **PROSPECTIVE JUROR KENNEDY BREINER:**  No.

1      THE COURT:  Thank you.

2   Juror No. 25, please.

3   Good morning.

4      PROSPECTIVE JUROR MAR:  Good morning.

5      THE COURT:  How are you?

6      PROSPECTIVE JUROR MAR:  I'm good.

7      THE COURT:  Good.  And so how long have you been

8   working with Safeway?

9      PROSPECTIVE JUROR MAR:  About five years now.

10      THE COURT:  Do you enjoy it?

11      PROSPECTIVE JUROR MAR:  Yeah, we've been good.

12      THE COURT:  Good.  You had indicated that you have

13   cousins who are police officers.

14      PROSPECTIVE JUROR MAR:  Yes.

15      THE COURT:  And, would that, would that fact impact

16   your ability to treat them -- treat the people who testify in

17   this court who are law enforcement just the same way that you

18   would anybody else?

19      PROSPECTIVE JUROR MAR:  Maybe somewhat a little bit,

20   because I tend -- I agree with them from time to time, but I do

21   disagree, so I would be biased.

22      THE COURT:  So you wouldn't be biased, it sounds like.

23   Because sometimes you agree, sometimes you don't?

24      PROSPECTIVE JUROR MAR:  Yeah.

25      THE COURT:  Do you think when -- when a law

```
 1   enforcement officer comes up to testify, do you think

 2   automatically that they're just -- they're likely to be a

 3   little bit more credible than anybody else who comes in to

 4   testify?

 5            PROSPECTIVE JUROR MAR:  Not really.

 6            THE COURT:  Okay.  All right.  Have you heard anything

 7   so far that makes you think you couldn't be fair and impartial

 8   in this case?

 9            PROSPECTIVE JUROR MAR:  No.

10            THE COURT:  Okay.  Thank you very much.

11        Juror No. 26, please.

12        Good morning.  How are you?

13            PROSPECTIVE JUROR TORIBIO:  I'm good.

14            THE COURT:  Good.  So am I interfering with any

15   classes today?

16            PROSPECTIVE JUROR TORIBIO:  No.  No, luckily you

17   caught me on my day off.

18            THE COURT:  Awesome.  So how do you like San Francisco

19   State?

20            PROSPECTIVE JUROR TORIBIO:  It's beautiful.  I love

21   it.

22            THE COURT:  So is this your fourth year?

23            PROSPECTIVE JUROR TORIBIO:  It is actually my fifth

24   year, it is my last semester.

25            THE COURT:  Great.  And the semesters have just
```

 1    started?

 2         PROSPECTIVE JUROR TORIBIO:  Yeah, it started about a

 3    month ago.

 4         THE COURT:  You indicated that you strongly agreed

 5    that most large companies engage in serious unethical conduct.

 6    And I'm wondering where that opinion comes from.

 7         PROSPECTIVE JUROR TORIBIO:  San Francisco State.  All

 8    the classes we take -- not all of them, but a lot of them have

 9    to do with business ethics and we have done a lot of case

10    studies on businesses who make decisions focused on the

11    business rather than the people.  And so I come across a lot of

12    cases where businesses do stuff where they hide stuff under the

13    rug in order to save their profits and their stakeholders.

14         THE COURT:  So in this case, Uber is not, itself, on

15    trial.  There are facts and circumstances about Uber that are

16    going to come up during the course of the trial.  Would you be

17    able to evaluate the evidence that comes in here, without the

18    -- your preconceived notions about big companies in general?

19         PROSPECTIVE JUROR TORIBIO:  I don't think so.

20         THE COURT:  You don't think so.

21         PROSPECTIVE JUROR TORIBIO:  But I cannot guarantee

22    that we -- during this trial, we don't study a case that has to

23    do with Uber or data breach and stuff like that.

24         THE COURT:  Well, that's -- that's certainly true.

25    Although I would tell you how to deal with that.  But you also

1  indicated that you strongly agreed that it's very common for

2  executives at a company to cover up information that could harm

3  them or their company.

4      And does that -- does your opinion there come from the

5  same place, from things you have read and studied?

6          **PROSPECTIVE JUROR TORIBIO:**  Yeah, they come from

7  there, as well as videos and articles that I've read on my own

8  time.

9          **THE COURT:**  Okay.  And again, I'll ask you, can you

10  set the things that you've read and learned about in school

11  aside, and just evaluate the case that's here in a way that

12  would be fair and impartial to both sides?

13          **PROSPECTIVE JUROR TORIBIO:**  I think so, yes.

14          **THE COURT:**  Okay.  Are you concerned about the -- your

15  school schedule?

16          **PROSPECTIVE JUROR TORIBIO:**  A little bit, yes.

17          **THE COURT:**  Okay.  And so do you have classes between

18  8:30 and 1:30?

19          **PROSPECTIVE JUROR TORIBIO:**  Yes, I have -- Monday I

20  have 9:30 to 9:00 p.m.  Every week.  Straight up.

21          **THE COURT:**  Okay.

22          **PROSPECTIVE JUROR TORIBIO:**  Uh-huh.

23          **THE COURT:**  And you are set on graduating in December?

24          **PROSPECTIVE JUROR TORIBIO:**  Yes.  Yeah, yeah.  Just to

25  clarify, Monday is not my only day; it's my longest day.  And

1    that is the one that conflicts the most.

2            THE COURT:  That is a long day.

3        PROSPECTIVE JUROR TORIBIO:  Yes.

4            THE COURT:  Besides what you have told me, is there

5    any reason that you think you couldn't serve as a fair and

6    impartial juror?

7        PROSPECTIVE JUROR TORIBIO:  No.

8        THE COURT:  All right.  Thank you.

9        PROSPECTIVE JUROR TORIBIO:  Thank you.

10           THE COURT:  Juror No. 28, please.  27.  Why do I -- I

11   think I'm so well-organized, and sometimes I'm not.

12      So, welcome.

13       PROSPECTIVE JUROR OLSON:  Thank you.

14       THE COURT:  Tell me, tell me what you do.

15       PROSPECTIVE JUROR OLSON:  I teach preschool.

16       THE COURT:  And how long have you been doing that?

17       PROSPECTIVE JUROR OLSON:  Twenty-seven years.

18       THE COURT:  Do you enjoy it?

19       PROSPECTIVE JUROR OLSON:  Most days, yes.  But I

20   wouldn't be doing it for 27 years if I didn't find a lot of

21   satisfaction and quality of life through it.

22           THE COURT:  So I confess that I don't have your jury

23   questionnaire up here.  So, tell me, first, whether you have

24   heard anything that we have been talking about thus far that

25   makes you think you couldn't serve as a fair and impartial

1    juror.

2         **PROSPECTIVE JUROR OLSON:**  Well, I appreciate your back

3    story kind of filling in, you know, how we are supposed to

4    judge it.  So no, I don't feel like I could not be a fair and

5    impartial juror.

6         **THE COURT:**  You do think you could do that.

7         **PROSPECTIVE JUROR OLSON:**  Sure.

8         **THE COURT:**  Did you have any reactions on the

9    questionnaire about the -- for example, the questions that I

10   was just asking the last juror about all -- strongly agreeing

11   that all companies engage in serious unethical second conduct?

12   Did --

13        **PROSPECTIVE JUROR OLSON:**  I tend to side on the fact

14   that people cover their own rears and I think that C level

15   executives are guilty of that just like everyone else.  I think

16   that I can still be a fair and impartial juror.  I tend to side

17   with law enforcement just in my day-to-day life but I get it

18   coming in here we are supposed to be willing to hear everybody,

19   based on the evidence that they bring to us.

20      So, yeah.

21        **THE COURT:**  So you are satisfied that you could sit as

22   a fair and impartial juror.

23        **PROSPECTIVE JUROR OLSON:**  Yep.

24        **THE COURT:**  Great.  Thank you.

25        **PROSPECTIVE JUROR OLSON:**  You are welcome.

1    **THE COURT:**  Juror No. 28, please.

2    Good morning.

3    **PROSPECTIVE JUROR RAMSEY:**  Good morning.

4    **THE COURT:**  So, so, how do you enjoy being an RN?

5    **PROSPECTIVE JUROR RAMSEY:**  Oh, I like it a lot.  I

6    have been an RN for 42 years, coming up 43.  I love my job.  I

7    was in labor and delivery for a number of years, and then now

8    I'm in a women's health clinic.  And that's enjoyable.

9    **THE COURT:**  Okay.  And have you been working with

10   Kaiser most of that time?

11   **PROSPECTIVE JUROR RAMSEY:**  Most of my career, yeah.

12   **THE COURT:**  So one question I had for you was the law

13   enforcement question.

14   **PROSPECTIVE JUROR RAMSEY:**  Uh-huh.

15   **THE COURT:**  You had indicated that you would tend to

16   believe law enforcement because they're sworn to tell the

17   truth.

18   **PROSPECTIVE JUROR RAMSEY:**  Uh-huh.

19   **THE COURT:**  Everybody here who comes in to testify

20   will be sworn to tell the truth.  Would you be able to treat

21   the testimony of law enforcement with the same amount of

22   credibility that you would anybody else?

23   **PROSPECTIVE JUROR RAMSEY:**  That's kind of a tough one.

24   I -- I think I would give them just the slightest bit more

25   credence.

1          **THE COURT:**  Just, just based on their profession?

2          **PROSPECTIVE JUROR RAMSEY:**  Yeah, based on -- based on

3     their profession and my experiences with them.  I mean...

4          **THE COURT:**  You have had good experience with law

5     enforcement.

6          **PROSPECTIVE JUROR RAMSEY:**  Yeah.  Even when I was

7     pulled over for a ticket, yeah.

8          **THE COURT:**  So, you know, I assume, that the people

9     who come in to testify will not be people that you've ever had

10    any dealing with before.

11         **PROSPECTIVE JUROR RAMSEY:**  Yeah.

12         **THE COURT:**  I read through the list.  And, and I would

13    instruct you that people are -- all people are entitled to the

14    same amount of respect when they come to the courtroom.  They

15    are entitled to the same amount of credibility.  And then you

16    judge what they have to say, and make your determination on

17    whether what they're saying is -- makes sense and is truthful

18    or is -- is less credible.

19        Do you think you would be able to do that, with law

20    enforcement and non-law enforcement?

21         **PROSPECTIVE JUROR RAMSEY:**  Yeah, I think so.  It's --

22    and -- yeah.

23         **THE COURT:**  Let's see, I had another -- you've had --

24    read some stories about Uber.  Would you be able to set what

25    you have read about Uber aside and just evaluate this case

1    based on the evidence that comes in in this court?

2         **PROSPECTIVE JUROR RAMSEY:**  Yeah.

3         **THE COURT:**  Okay.  And the -- the other thing, you had

4    an unfortunate experience after being a juror in a trial, of

5    having an investigator come to your house.  I don't think

6    that's any sort of likely possibility in this case.

7         But, is there anything about that experience that makes

8    you think that you would not be able to serve as a fair and

9    impartial juror?

10        **PROSPECTIVE JUROR RAMSEY:**  It was extremely unnerving,

11   and I still have anxiety about that, even though it's been a

12   few years.

13        All the reassurances aside, you know, this -- this

14   gangster's investigator showed up on my doorstep.  So, yeah.

15   Not that the defendant here is a gangster, but -- you know --

16        **THE COURT:**  You don't have the -- you should not have

17   any of those same concerns here.  I'm just -- I'm wondering

18   whether it is something that is going to impact you, if you

19   were chosen as a juror here.

20        **PROSPECTIVE JUROR RAMSEY:**  Just the anxiety of it,

21   yeah.

22        **THE COURT:**  All right.  Thank you.

23        Juror No. 29.

24        Good morning.

25        **PROSPECTIVE JUROR BROXTON:**  Good morning.

1        **THE COURT:**  And, so, you are a teacher.  Tell me what

2    you teach.

3        **PROSPECTIVE JUROR BROXTON:**  Correct.  Currently I

4    teach physical education.  In the past I've taught elementary,

5    fourth and fifth grade.

6        **THE COURT:**  And do you like teaching phys ed better

7    than fourth or fifth graders?

8        **PROSPECTIVE JUROR BROXTON:**  I mean, each one has their

9    benefits.  The physical education part, I also coached in the

10   past, so it's kind of my wheelhouse.  Something I enjoy.  But

11   working with young kids, it's good too.

12       **THE COURT:**  Good.  I'm glad you stayed on the positive

13   side of both of those scores.

14   You've had experience with data breaches, I guess.  And is

15   there anything about that that would impact your ability to be

16   a fair and impartial juror?

17       **PROSPECTIVE JUROR BROXTON:**  Not really.  It was like

18   Home Depot, you know, because I swiped my card.  And then my

19   bank and at my school district, so it's happened three times.

20   And then you get a letter that provides you a credit check for

21   like two years.

22       **THE COURT:**  Right.  So not fabulous, but the -- would

23   you be able to evaluate the evidence in this case, and make

24   determinations based on that evidence and the instructions of

25   the law that I give you?

1    **PROSPECTIVE JUROR BROXTON:**  Yes.

2        **THE COURT:**  Okay.  And you have a little bit of

3    information about Uber, also, that you have read about or heard

4    about.  Is there anything about that that would impact your

5    ability to serve?

6        **PROSPECTIVE JUROR BROXTON:**  No.

7        **THE COURT:**  And is there anything else that makes you

8    think you couldn't sit as a fair and impartial juror?

9        **PROSPECTIVE JUROR BROXTON:**  I don't think so.

10        **THE COURT:**  Great.  Thank you.

11    Juror No. 30, please.

12    Good morning.

13        **PROSPECTIVE JUROR RIFE:**  Good morning.

14        **THE COURT:**  And, what is BMO Capital Markets?

15        **PROSPECTIVE JUROR RIFE:**  That is the Bank of Montreal,

16    so they are a Canadian bank.  And I'm in investment banking.

17        **THE COURT:**  How long have you been doing that?

18        **PROSPECTIVE JUROR RIFE:**  It will be my one-year

19    anniversary tomorrow.

20        **THE COURT:**  Congratulations.

21        **PROSPECTIVE JUROR RIFE:**  Thank you.

22        **THE COURT:**  So is it something that I should

23    congratulate you on?  Are you happy with what you are doing?

24        **PROSPECTIVE JUROR RIFE:**  Yes, I'm happy with this one.

25    I have been at a lot of different investment banking firms.

 1    This one's really nice, but they're Canadian, so --

 2         (Laughter)

 3              THE COURT:  Fair enough.  You have had some

 4    information about Uber.

 5              PROSPECTIVE JUROR RIFE:  Uh-huh.

 6              THE COURT:  That you are aware of.  Is there anything

 7    about that that would impact your ability to be a fair and

 8    impartial juror?

 9              PROSPECTIVE JUROR RIFE:  No.

10              THE COURT:  And can you think of any reason why you

11    couldn't be a fair and impartial juror?

12              PROSPECTIVE JUROR RIFE:  No.

13              THE COURT:  Excellent.  Thank you very much.

14              PROSPECTIVE JUROR RIFE:  Uh-huh.

15              THE COURT:  Juror No. 31, please.

16         Good morning.

17              PROSPECTIVE JUROR BLABY:  Hi.

18              THE COURT:  How are you?

19              PROSPECTIVE JUROR BLABY:  I am fine, thank you.

20              THE COURT:  Good.  So tell me what a product architect

21    does.

22              PROSPECTIVE JUROR BLABY:  I design, code, deliver

23    application programs.

24              THE COURT:  How long have you been doing that work?

25              PROSPECTIVE JUROR BLABY:  Forty years.

1          **THE COURT:**  And so, are you enjoying it?

2          **PROSPECTIVE JUROR BLABY:**  Well, I've got less hair

3     than you, so I have more bad days than you do.

4          **THE COURT:**  I'm not so sure, but...

5       So you have read and -- about Uber a fair amount.  And

6     indicated that it's not the kind of place that you would like

7     to join.

8          **PROSPECTIVE JUROR BLABY:**  No.

9          **THE COURT:**  But is there anything about that that

10    would impact your ability to evaluate evidence fairly as it

11    comes in to the courtroom, and to apply the law that I give

12    you?

13         **PROSPECTIVE JUROR BLABY:**  Probably not, because I did

14    not read up much about the data breach, itself.  It was more

15    the working conditions and the employment agreement, et cetera.

16         **THE COURT:**  The sort of work culture issues?

17         **PROSPECTIVE JUROR BLABY:**  Yeah.

18         **THE COURT:**  So those issues are not at issue here.

19         **PROSPECTIVE JUROR BLABY:**  If it's data breach, that is

20    a technical issue, that is a different thing completely.

21         **THE COURT:**  Okay.  Have you heard anything so far that

22    makes you think you couldn't sit as a fair and impartial juror?

23         **PROSPECTIVE JUROR BLABY:**  I don't believe so, no.

24         **THE COURT:**  Thank you.

25       Juror No. 32 please.  You know what, 32, I'm going to save

1    you.  I'm going to ask to speak to you at the break.

2         **PROSPECTIVE JUROR LIOU:**  Okay, sure.

3         **THE COURT:**  Juror No. 35, is that the next number?

4    Yeah, please.

5         **PROSPECTIVE JUROR ELLIS:**  Hi.

6         **THE COURT:**  Good morning.  How are you?

7         **PROSPECTIVE JUROR ELLIS:**  Good.

8         **THE COURT:**  So tell me, what is Lower Case

9    Productions?

10        **PROSPECTIVE JUROR ELLIS:**  So they make signs.  So,

11   like, the sign outside the door here (Indicating), I noticed

12   was a little off-center.  I could fix that for you.

13        **THE COURT:**  Ooh, excellent.

14        **PROSPECTIVE JUROR ELLIS:**  And then we also do, like,

15   way findings, so we are also working on the Salesforce Transit

16   Center building to help people find their way around the

17   building.

18        **THE COURT:**  And how long have you been doing that kind

19   of work?

20        **PROSPECTIVE JUROR ELLIS:**  This job I started in March.

21        **THE COURT:**  So you have some knowledge about Uber that

22   you've read about.  Is there anything about Uber or what you

23   have read that would impact your ability to fairly evaluate the

24   evidence here and be a fair and impartial juror?

25        **PROSPECTIVE JUROR ELLIS:**  No.

 1          **THE COURT:**  You did strongly agree that it's common

 2   for executives at a company to cover up information that could

 3   harm them or their company.  And I'm wondering what the basis

 4   of that opinion was.

 5          **PROSPECTIVE JUROR ELLIS:**  Like, probably like all TV

 6   and media, you know, I think paints a picture of this persona,

 7   I guess.

 8          **THE COURT:**  Would you be able to set all of your

 9   preconceived notions about that and other things aside and just

10   evaluate the evidence as it comes in here, and apply the

11   instructions that I give you to the law?

12          **PROSPECTIVE JUROR ELLIS:**  Yes, I would be able to

13   evaluate the evidence and, um, just in the court here, yeah.

14          **THE COURT:**  Okay.  All right.  Thank you very much.

15          **PROSPECTIVE JUROR ELLIS:**  Thanks.

16          **THE COURT:**  Juror No. 36, please.

17          **PROSPECTIVE JUROR QUINN:**  Hello.

18          **THE COURT:**  Good morning.

19          **PROSPECTIVE JUROR QUINN:**  Good morning.

20          **THE COURT:**  And so how long have you been a lawyer?

21          **PROSPECTIVE JUROR QUINN:**  Since 2003.

22          **THE COURT:**  And have you been working, doing

23   immigration work the entire time?

24          **PROSPECTIVE JUROR QUINN:**  Yes.  I have been in

25   immigration-rights-based work the entire time.

1    **THE COURT:**  And are you doing -- is it -- are you

2    litigating the cases through -- through the Immigration Court

3    and BIA?  Or how --

4    **PROSPECTIVE JUROR QUINN:**  So I did, for the first

5    decade.  I'm now at the Immigrant Legal Resource Center where

6    my role is building the capacity of the field.  I do more

7    training, and I also support others doing casework, but I do

8    not carry my own caseload anymore.

9    **THE COURT:**  All right.  So would you be able to apply

10   the instructions that I give in this case as the law, rather

11   than import some knowledge which you may think you have from

12   law school or at some other time in your experience?

13   **PROSPECTIVE JUROR QUINN:**  Yes, Your Honor.

14   **THE COURT:**  Is there anything that you've heard thus

15   far that makes you think you could not serve as a fair and

16   impartial juror?

17   **PROSPECTIVE JUROR QUINN:**  No.

18   **THE COURT:**  Thank you.

19   **PROSPECTIVE JUROR QUINN:**  Uh-huh.

20   **THE COURT:**  Juror No. 37, please.

21   **PROSPECTIVE JUROR WELCH:**  Good morning.

22   **THE COURT:**  Good morning.  How are you?

23   **PROSPECTIVE JUROR WELCH:**  I'm fine.  How are you?

24   **THE COURT:**  I'm excellent, thank you.  And so, what is

25   Welch ADR?

1          **PROSPECTIVE JUROR WELCH:**  I'm an arbitrator, so I have

2     my own practice.

3          **THE COURT:**  And how long have you been doing that?

4          **PROSPECTIVE JUROR WELCH:**  I have been an arbitrator

5     over 20 years.

6          **THE COURT:**  Prior to that, what were you doing?

7          **PROSPECTIVE JUROR WELCH:**  I was the general counsel at

8     an investment bank.  And before that, I was a commercial

9     litigator.

10         **THE COURT:**  When you were general counsel, did you

11    have any experience with data breaches?

12         **PROSPECTIVE JUROR WELCH:**  Not in that job.  I served

13    as the outside general counsel for a technology company for a

14    few years, and there was a data breach there.

15         **THE COURT:**  Okay.  And in your arbitration practice,

16    have you had any cases involving data breaches?

17         **PROSPECTIVE JUROR WELCH:**  I have.

18         **THE COURT:**  How many?

19         **PROSPECTIVE JUROR WELCH:**  Probably about five.

20         **THE COURT:**  And in those cases, were you asked to --

21    were the remedies that people were looking for from consumers

22    whose data had been breached?  Or --

23         **PROSPECTIVE JUROR WELCH:**  Correct.

24         **THE COURT:**  Okay.  Okay.  Is there anything about

25    those experiences that you think would impact your ability here

1   to be a fair and impartial juror?

2          **PROSPECTIVE JUROR WELCH:**  No.

3          **THE COURT:**  Would you be able to set aside -- you are

4   making decisions all the time as an arbitrator.

5          **PROSPECTIVE JUROR WELCH:**  I am.

6          **THE COURT:**  That's what I do, too.  Would you be able

7   to set aside your desires to make decisions in cases and just

8   evaluate the evidence as it comes in fairly and impartially and

9   interpret the law as I provide it to you, in order to help

10   reach a verdict?

11          **PROSPECTIVE JUROR WELCH:**  Yeah.  That's what I do

12   every day, so, yes.

13          **THE COURT:**  Okay, but you get to do it by yourself.

14          **PROSPECTIVE JUROR WELCH:**  Right, I understand.

15          **THE COURT:**  And that is different than working with 11

16   other people in order to come to a conclusion.  Would you be

17   able to do that?

18          **PROSPECTIVE JUROR WELCH:**  Yes.

19          **THE COURT:**  All right.

20          **PROSPECTIVE JUROR WELCH:**  But I do have something to

21   say.  I have a hearing that has been scheduled for a year that

22   is commencing on September 27th.  So there are a lot of parties

23   and witnesses that are scheduled to appear before me starting

24   on September 27th.

25          **THE COURT:**  All right.  And if -- if you were chosen

1    as a juror and I said "Juror No. 37, is it possible to delay

2    that arbitration for a week," what would you tell me?

3            PROSPECTIVE JUROR WELCH:  I would tell you I would

4    try.  Do my best to try and inform the parties that we had a

5    delay.

6            THE COURT:  Okay.  All right.  Thank you.

7        All right.  So I think what I'm going to do now, I'm going

8    to save No. 38 until after lunch.  I'm going to ask a few of

9    you to stay here because I want to speak to you personally.

10   And then I'm going to ask everybody else to come back at 12:15.

11       But before I let anybody go, I want to say something which

12   I'll say over and over again, if you are so lucky as to be

13   selected as a juror.

14       First of all, I want you to come back, be here at 12:15,

15   so that we can keep going.  We are making good progress.  But

16   there are a lot of people, as you can see.  And it takes a

17   while to get through all the questionnaires.  And I want to get

18   through this today.  So please be back at 12:15.

19       While we are on the break, please don't discuss the

20   subject matter of this case, the questionnaire or the

21   proceedings, with anybody.  Don't do any research about the

22   case.  Don't communicate with anybody concerning it, by phone

23   or text or social media.  Don't post anything anywhere.

24       If you see any of the lawyers or anybody connected with

25   the case, don't talk with them.  That can seem kind of rude.

1   But it's really important that the appearance of propriety as

2   well as the actual fact of propriety is followed in this case.

3   So, no communication with anybody in any way about the case

4   while you are on the break.

5       If you see others communicating about the case, walk away.

6   Please inform Ms. Davis.  I would hate to have to start this

7   process all over again.  These are rules that protect

8   everybody, and ensure that the verdict that's rendered is based

9   solely on what the parties bring out here in court.  It assures

10  the appearance and the reality of absolute impartiality, which

11  is what the parties and I expect.

12      So with that I would like Juror No. 32, and Juror No. 1,

13  and Juror No. 70, to stay here.  Please.  But everybody else,

14  you are excused.  Please follow my admonitions and please be

15  back in half an hour.

16      The second floor has the cafeteria.  I go there almost

17  every day.  It's great, or good enough.  I'll see you in half

18  an hour.

19      (Jury Venire excused from the courtroom)

20      (The following proceedings were held outside the presence

21  of the Jury Venire )

22          **THE COURT:**  So the jurors that I have asked to remain,

23  if you would -- I'm going to start with Juror No. 32.

24      And if the others of you would please step outside, and

25  then I will ask you to come back in.

 1          (Prospective Jurors leave the courtroom, Prospective Juror

 2     No. 32 remains)

 3          **THE COURT:**  So, yes, please come up to the mic.

 4          Would you mind closing that door, please.  And actually

 5     because we are doing this privately, I think I'll ask the --

 6     everybody in the courtroom who -- to step outside as well.  Why

 7     don't you enjoy a great break.

 8          Just the lawyers and their teams will remain.

 9          (Unnamed persons leave the courtroom)

10          **THE COURT:**  All right, Juror No. 32.  You have a

11     financial interest in Uber.  I'm going to talk with the lawyers

12     about that in a moment.  But I wanted to make sure that I had

13     understood everything about your knowledge of this data breach.

14          **PROSPECTIVE JUROR LIOU:**  Sure.

15          **THE COURT:**  Did I miss -- okay.  So, the -- so tell me

16     what you know about the data breach.

17          **PROSPECTIVE JUROR LIOU:**  I just read some general news

18     that basically a lot of the information was leaked, like

19     private -- people who used Uber.  So emails; phone numbers,

20     perhaps; maybe even credit cards.  So, similar to data breaches

21     from Marriott, and the most recent one I've had was Tiger

22     Airlines.

23          **THE COURT:**  Have you heard anything about Mr. Sullivan

24     in the course of your involvement or relationship with Uber?

25          **PROSPECTIVE JUROR LIOU:**  Not really.  Just only Travis

1   Kalanick.

2          THE COURT:  Okay.  And, and, with respect to

3   Mr. Kalanick, what have you heard?

4          PROSPECTIVE JUROR LIOU:  Oh, just he's somewhat

5   eccentric.  And there were some issues at Uber specifically

6   with culture and how employees were treated and whatnot.  But

7   it's changed, so...

8          THE COURT:  Is there anything about what you know

9   about Mr. Kalanick that -- or Uber more generally, that you

10  think would make it difficult for you to serve as a fair and

11  impartial juror?

12         PROSPECTIVE JUROR LIOU:  I think between my investment

13  and the fact that my cousin was the managing director at

14  SoftBank who invested in Uber right before they went public, it

15  -- unfortunately, it would be pretty hard for me to --

16         THE COURT:  That sounds like a -- that sounds like

17  you're right.

18     So I'm inclined to excuse Juror No. 32 right now, unless

19  the lawyers would want to raise any issue.

20         MR. KINGSLEY:  No objection.

21         MS. KERIN:  No objection, Your Honor.

22         THE COURT:  Okay.  So you may leave.  Don't brag about

23  this; don't talk to anybody as you are leaving.

24         PROSPECTIVE JUROR LIOU:  Thank you, Your Honor.  I

25  will not.

 1            THE COURT:  Okay.  Thank you very much.

 2            PROSPECTIVE JUROR LIOU:  Thank you.  Have a good day.

 3            THE COURT:  And could you ask the next juror outside

 4    to come in, please.

 5            PROSPECTIVE JUROR LIOU:  Sure.  No. 1?

 6            THE COURT:  So ask No. 1, yes, please.

 7            PROSPECTIVE JUROR LIOU:  Sure.

 8        (Prospective Juror 32 leaves the courtroom and Prospective

 9    Juror 1 enters the courtroom)

10            PROSPECTIVE JUROR AU YEUNG:  Hi.

11            THE COURT:  Good morning, how are you?

12            PROSPECTIVE JUROR AU YEUNG:  I'm good.  How are you?

13            THE COURT:  Excellent, thank you.

14        So you work with the Nature Conservancy.  And how's that?

15            PROSPECTIVE JUROR AU YEUNG:  It's great.  It's a

16    wonderful job.

17            THE COURT:  How long have you been working with them?

18            PROSPECTIVE JUROR AU YEUNG:  Two years.

19            THE COURT:  So with nonprofit fundraising, are you

20    going out trying to find land?  Or trying to find donors for

21    the organization?

22            PROSPECTIVE JUROR AU YEUNG:  It's donors, so I reach

23    out to our donors and sometimes ask them to buy land.  Uh-huh.

24            THE COURT:  It is a great organization.

25            PROSPECTIVE JUROR AU YEUNG:  Yeah, yeah.

1          THE COURT:  So I'm glad you are doing that.  So you

2     had some strong views about Uber.  True?

3          PROSPECTIVE JUROR AU YEUNG:  Yes, I -- I think so.

4          THE COURT:  So, tell me, tell me what -- you've read

5     things that -- that Uber was chaotic and unethical.  Explain a

6     little more about that.

7          PROSPECTIVE JUROR AU YEUNG:  It's similar to what you

8     described a lot about, workplace culture, the way they treat a

9     lot of their female employees.  And just, it being a chaotic

10    workplace where there was a lot going on, and not much

11    accountability.

12         THE COURT:  And so, having that -- that understanding,

13    or that understanding from the newspaper or news reports, will

14    you be able to separate that in your mind and just focus on the

15    evidence that comes in here, and be able to evaluate it in a

16    fair and impartial way?

17         PROSPECTIVE JUROR AU YEUNG:  Yeah, I think so.  It's a

18    lot of big-picture cultural issues, but I'll be able to look at

19    what's in front of me and make a decision, based on the

20    evidence that's presented.

21         THE COURT:  Okay.  Is there -- does -- Mr. Angeli, do

22    you have any questions or --

23         MS. KERIN:  We do not, Your Honor.

24         THE COURT:  Okay.  Great.  Thank you very much.

25       And could you ask Juror No. 3 to come in.

1        **PROSPECTIVE JUROR AU YEUNG:**  Okay.  Thank you.

2        **THE COURT:**  Thank you so much.  Enjoy the break.

3     (Prospective Juror 1 leaves the courtroom and Prospective

4  Juror 3 enters the courtroom)

5        **THE COURT:**  Good morning.

6        **PROSPECTIVE JUROR TACHMURADOV:**  Hello.

7        **THE COURT:**  Hi.  The reason that I asked to you come

8  in was I didn't have your survey up here, and so I wanted to

9  find out a little bit about you.

10     So tell me, tell me what you do.

11        **PROSPECTIVE JUROR TACHMURADOV:**  I'm a project manager.

12        **THE COURT:**  For --

13        **PROSPECTIVE JUROR TACHMURADOV:**  For an electrical

14  company.

15        **THE COURT:**  And what does that mean?  What do you do?

16        **PROSPECTIVE JUROR TACHMURADOV:**  I facilitate requests

17  for information, product data, specifications.  I help -- if

18  there are any issues, I help with finding solutions throughout

19  the lifetime of the project.

20        **THE COURT:**  And is there -- you've heard all the

21  different kinds of questions that I have been asking jurors

22  that came up in the questionnaire.

23     Do you have any reason to think that you couldn't be a

24  fair and impartial juror?

25        **PROSPECTIVE JUROR TACHMURADOV:**  Not that I'm aware of.

1          THE COURT:  Okay.  You didn't have any -- you didn't

2    express any concerns about law enforcement, or Uber, or

3    anything like that.

4          PROSPECTIVE JUROR TACHMURADOV:  No.

5          THE COURT:  Okay.  All right.  Thank you very much.

6          PROSPECTIVE JUROR TACHMURADOV:  May I add that my

7    employer only gives me eight hours of jury duty, so if I were

8    to be selected, that would result in financial hardship?

9          THE COURT:  You may add that.  I appreciate that.

10   That's not very generous of your employer.  And I appreciate

11   knowing that.

12         PROSPECTIVE JUROR TACHMURADOV:  (Nods head)

13         THE COURT:  Thank you.  So, so, I guess I should ask

14   you a couple more things.  Are you -- are you currently

15   married?

16         PROSPECTIVE JUROR TACHMURADOV:  No.

17         THE COURT:  Okay.  So, so you are supporting yourself,

18   basically.

19         PROSPECTIVE JUROR TACHMURADOV:  Yes.

20         THE COURT:  Okay.  Thank you very much.

21      Oh, would you ask Juror No. 70 to come in, please.

22      (Prospective Juror 3 leaves the courtroom and Prospective

23   Juror 70 enters the courtroom)

24         PROSPECTIVE JUROR DANDY:  Hello.

25         THE COURT:  Good morning.  How are you?

1          **PROSPECTIVE JUROR DANDY:**  Good.

2          **THE COURT:**  Good.  So tell me, how long have you been

3    working with Salesforce?

4          **PROSPECTIVE JUROR DANDY:**  About, almost ten years.

5          **THE COURT:**  And as a software engineer, are you

6    creating new code?

7          **PROSPECTIVE JUROR DANDY:**  Yes.

8          **THE COURT:**  Fixing it up?

9          **PROSPECTIVE JUROR DANDY:**  Yes.

10         **THE COURT:**  And do you enjoy that?

11         **PROSPECTIVE JUROR DANDY:**  Yeah.  I love it, yeah.

12         **THE COURT:**  One of the things that you had mentioned

13   was that you would prefer that a defendant testify in a

14   criminal case.  Do you -- I gave you the instruction about a

15   defendant not having to testify.

16       And, would you be able to accord the defendant his

17   constitutional right if he decided not to testify?

18         **PROSPECTIVE JUROR DANDY:**  Yes, I think so.  It's --

19   it's a little bit weird that, you know, you don't get to say

20   about your own case.  So I just find it weird.

21         **THE COURT:**  Well, you get to say if you want to, and

22   you don't have to say.  What our system does is it puts the

23   burden on the government.  And it's more than a 50 percent

24   burden.  It's beyond a reasonable doubt.  So they have to --

25   they have to establish it, and we, as citizens, can just be

1    silent and make them prove their case.  If they can't prove

2    their case, the defendant's entitled to a verdict.  And so

3    that's just the way -- that's how the Constitution operates.

4    And you would be able to follow that?

5              PROSPECTIVE JUROR DANDY:  Yes.

6          THE COURT:  You've had friends who worked at Uber who

7    had pretty harsh things to say about working at the company.

8    Is that right?

9              PROSPECTIVE JUROR DANDY:  Yes.

10         THE COURT:  And so, how -- do you think that would

11   impact your ability to listen to the evidence as it comes in,

12   and -- and treat Mr. Sullivan, who had a pretty high-ranking

13   job at Uber -- but he's not Uber, he is Mr. Sullivan.  Would

14   you be able to treat, evaluate all that evidence fairly?  Or

15   would you have trouble, in light of this?

16            PROSPECTIVE JUROR DANDY:  I think so, because I --

17   most of the stuff I heard from my friend is about, like, the

18   toxic work environment, you know, with, like, discrimination

19   against women and that kind of stuff.  But from what I heard,

20   it's irrelevant to this case.  So I think I should be able to,

21   like, you know, let that go.

22         THE COURT:  All right.  So, so, you have heard a lot.

23   So far this morning, from what you have heard, do you think you

24   would be able to serve as a fair and impartial juror?

25            PROSPECTIVE JUROR DANDY:  Yes.

1          **THE COURT:**  Okay.  Does the government have any

2     questions of this juror?

3          **MR. KINGSLEY:**  (Shakes head)

4          **THE COURT:**  Defense?

5          **MS. KERIN:**  Yes, Your Honor.

6     Good morning.

7          **PROSPECTIVE JUROR DANDY:**  Good morning.

8          **MS. KERIN:**  I just have a couple followup questions.

9          **PROSPECTIVE JUROR DANDY:**  Okay.

10         **MS. KERIN:**  Mr. Sullivan was a direct report to

11    Mr. Kalanick, the former CEO.  And I trust your friend told you

12    about Mr. Kalanick as well.

13         **PROSPECTIVE JUROR DANDY:**  Yes.

14         **MS. KERIN:**  Okay.  And what did he tell you about him?

15         **PROSPECTIVE JUROR DANDY:**  Well, it just kind of like,

16    I guess, there's not really action to, like, make the work

17    better, like, the work environment better, to the point that

18    you kind of get whistle-blown to, like, media about all this

19    allegation stuff.  I guess this -- the upper management doesn't

20    try to acknowledge it and fix it.

21         **MS. KERIN:**  Mr. Kalanick's conduct will be at issue in

22    this case.  And do you think that, knowing what you know about

23    Mr. Kalanick, that you would be influenced even a little bit by

24    the way you view the evidence that's presented?

25         **PROSPECTIVE JUROR DANDY:**  I don't think so, because

 1  it's a different problem, altogether, like, you know, security

 2  versus like, you know, like, like, work, work, like, harassment

 3  and that kind of stuff.

 4          MS. KERIN:  And the fact that Mr. Sullivan reported

 5  directly to Mr. Kalanick and was one of the higher executives

 6  that you spoke about, you would be able to set that aside.

 7          PROSPECTIVE JUROR DANDY:  Yes, because I'm not really

 8  sure how Uber structural organization -- like, I'm not sure if

 9  Mr. Sullivan has anything to do with, like, the HR department

10  and that kind of stuff.  Because I'm pretty sure Uber is pretty

11  big, like, not everybody is responsible for everything.

12          MS. KERIN:  Thank you.

13          THE COURT:  All right.  Thank you very much.  Go down

14  to get something to eat, but be back here at 12:15.  All right.

15      (Prospective Juror 70 leaves the courtroom)

16          THE COURT:  So we will break for 15 minutes.

17      (Recess taken from 12:00 p.m. to 12:21 p.m.)

18          THE COURT:  Welcome back from lunch.  I hope it wasn't

19  too rushed, but we're moving right along.

20      Juror number 38.  Good afternoon.

21          PROSPECTIVE JUROR NANDY:  Good afternoon.

22          THE COURT:  So tell me -- oh, you're working at

23  Amazon?

24          PROSPECTIVE JUROR NANDY:  Right.

25          THE COURT:  What do you do as an engineer?

1          **PROSPECTIVE JUROR NANDY:**  I'm assistant products

2     design, kind of products you see in the market.

3          **THE COURT:**  How long have you been there?

4          **PROSPECTIVE JUROR NANDY:**  Been there about six years.

5          **THE COURT:**  Are you enjoying it?

6          **PROSPECTIVE JUROR NANDY:**  Yes, pretty good.

7          **THE COURT:**  The law enforcement question, would you be

8     able to evaluate fairly the testimony of all the people who

9     come into the courtroom and not treat law enforcement officers

10    any differently than you do anybody else who testifies?

11         **PROSPECTIVE JUROR NANDY:**  Probably, yes.  I mean, I do

12    give more credence in general, but, yes, probably I should be

13    able to regard them fairly, I guess.

14         **THE COURT:**  So, again, the -- I think it's important

15    to separate what you might think out in the world when you run

16    into law enforcement or see law enforcement, as opposed to

17    coming in the courtroom, because once they're here, we're all

18    alike, and we're entitled to the same treatment.  And then how

19    we testify, how we behave, that's something where you can begin

20    to judge credibility.  Do you think you would be able to do

21    that?

22         **PROSPECTIVE JUROR NANDY:**  Yeah, I mean, I guess it

23    goes to human nature.  Like, so you are placed in different

24    circumstances, you'll react differently, so yeah.

25         **THE COURT:**  Okay.

1          **PROSPECTIVE JUROR NANDY:**  It doesn't really matter

2     what your profession is.

3          **THE COURT:**  That, I think, is very true.

4          So you indicated that you've got some hip and shoulder

5     issues, and I wanted you to know that if you're chosen to sit

6     on the jury, you'd be able to stand whenever you wanted to, you

7     know, during the course of the trial.  If you wanted to stand

8     instead of sit, that would be fine.  We'll take a break every

9     hour and a half for about 15 minutes.

10         **PROSPECTIVE JUROR NANDY:**  All right.

11         **THE COURT:**  Do you think those accommodations would be

12    able to deal decently with your problem?

13         **PROSPECTIVE JUROR NANDY:**  There are two issues on

14    there.  One I didn't mention.  Maybe I can talk to you directly

15    about that.

16         **THE COURT:**  Okay.

17         **PROSPECTIVE JUROR NANDY:**  This one, as long as I'm

18    able to stand periodically, it should be okay.

19         **THE COURT:**  Okay.  We can talk separately at the next

20    break.

21         **PROSPECTIVE JUROR NANDY:**  Sure.

22         **THE COURT:**  Great.  Thank you.

23         **PROSPECTIVE JUROR NANDY:**  Thank you.

24         **THE COURT:**  All right, Number 39, please.  Sorry to

25    make you walk over there again.  Is that all right?

```
 1            PROSPECTIVE JUROR RODGERS:  It just takes me a minute
 2     to stand if I sit too long.
 3         Good afternoon.
 4            THE COURT:  Good afternoon.  If I had been smarter, I
 5     would have asked all my questions when you were here before, so
 6     I apologize.
 7            PROSPECTIVE JUROR RODGERS:  That's okay.
 8            THE COURT:  Now, you are a claims specialist.  So tell
 9     me what you do.
10            PROSPECTIVE JUROR RODGERS:  I get to pay people money
11     after most of them have waded through the ALJ process through
12     Social Security, and I've been a government employee for 46
13     years, but with Social Security, 35.  And this is my third job
14     in paying benefits is the best.
15         But it's -- it's rewarding to get to know people.  I'm a
16     talker.  So I'll pick up the phone and talk to people.  I've
17     actually lived the experience.  Thirty-plus years ago my
18     husband went through the same process.  He was seriously ill,
19     and we had a -- we have a survivor son who is a cancer
20     survivor.  So I've kind of lived the work I've been doing, ooh,
21     over half my life.  Sixty-seven, yeah.
22            THE COURT:  That's very impressive.
23            PROSPECTIVE JUROR RODGERS:  Yes.
24            THE COURT:  So you work for the Government?
25            PROSPECTIVE JUROR RODGERS:  Yes.
```

1    **THE COURT:**  And it is the Government that is bringing

2    this case as they do with every criminal case.  Would that make

3    you -- give you any reason to think that the Government is

4    going to be more right than wrong, give them sort of a leg up,

5    or a leg down, for that matter?  You've had a lot of

6    experience.

7    **PROSPECTIVE JUROR RODGERS:**  No, no.  I've been in

8    family with police work and understand, you know, our

9    congressmen legislating.  I work for them.  It doesn't affect

10   me in the sense, I say, personally.

11   My husband gets mad because I disconnect.  I go to work, I

12   don't watch the news.  I don't Google.  It's, like, I watch

13   Hallmark and play with a seven-year-old after work.

14   I stepped away from social media, Facebook and all that,

15   during the political hate.  That was just too much for me

16   because I'm still a little kid.  I believe everybody has to be

17   treated like we want to be treated, and you treat everybody

18   equal, so yeah.

19   **THE COURT:**  Amen to that.

20   You indicated that it's hard for you to sit for long

21   periods of time.

22   **PROSPECTIVE JUROR RODGERS:**  But your chairs are pretty

23   comfortable.  I have some lymph fluid issues, swelling, and I'm

24   a little overweight.  But if I can stand and be out of the way,

25   you know, it will be -- I shouldn't have any problem, because

1  since COVID I stand all day at work.  I still work from home,

2  and I put a riser on.  So I stand and I exercise at work.

3      But, yeah, this, it shouldn't be that bad.  And you said

4  through 1:00 o'clock?

5          THE COURT:  1:30, yeah.

6          PROSPECTIVE JUROR RODGERS:  Yes.  I should probably be

7  okay.  I just have two funerals that I'll probably have to

8  miss, you know, because they're not in the days that you're

9  going to be out.  They're the 15th and the 16th, so...

10         THE COURT:  So is there any reason that you think you

11 could not serve as a fair and impartial juror?

12         PROSPECTIVE JUROR RODGERS:  No.

13         THE COURT:  All right.  Thank you very much.

14     Juror Number 40, please.  And if we don't have Juror

15 Number 40, how about Juror Number 42?

16         PROSPECTIVE JUROR KIM:  Hello.

17         THE COURT:  Good afternoon.  How are you?

18         PROSPECTIVE JUROR KIM:  Good.  How are you?

19         THE COURT:  I'm very well.  Thank you.

20     So tell me where you work.

21         PROSPECTIVE JUROR KIM:  I work at KBM-Hogue.  We're a

22 furniture dealer, predominantly furnishing commercial office

23 spaces, around the -- well, nationally, and predominantly in

24 San Francisco.

25         THE COURT:  So have you been enjoying that job?

 1          **PROSPECTIVE JUROR KIM:**  Yes, I have.

 2          **THE COURT:**  Okay.  The law enforcement question, would

 3     you be able to evaluate the law enforcement and give them the

 4     same degree of credibility coming into the courtroom as you do

 5     everybody else?

 6          **PROSPECTIVE JUROR KIM:**  Yes, I believe so.

 7          **THE COURT:**  And for criminal defendants, you indicated

 8     that they should be able to speak to their points.  Will you

 9     accord them -- Mr. Sullivan his constitutional right not to

10     testify if he doesn't want to, and presume him innocent, and

11     make the Government prove its case beyond a reasonable doubt?

12     Would you be able to do all that?

13          **PROSPECTIVE JUROR KIM:**  Yes.

14          **THE COURT:**  All right.  You have some information

15     about Uber.  Would you be able to set that information aside

16     and just evaluate this case based on the evidence that you

17     learn in this case and then apply the instructions of the law

18     that I provide to you to reach a just verdict?

19          **PROSPECTIVE JUROR KIM:**  Yes, if the evidence is

20     objective and they're presented, then, yes, I can do that.

21          **THE COURT:**  Okay.  You qualified that a little bit.

22          I'm the one who gets to decide what evidence comes into

23     the courtroom.  I think I'm a very objective person.  But the

24     evidence that you get and that's -- that is the benefit of a

25     jury trial, as opposed to reading things in the newspaper.

1     The evidence comes in.  Each side gets to ask questions of

2  the witnesses to make sure that all the issues are aired.  And

3  so that's how the adversarial process works.  And that's a --

4  so you will get -- you will get what you're looking for.

5          PROSPECTIVE JUROR KIM:  Exciting.

6          THE COURT:  And I didn't note even a tinge of sarcasm

7  in your answer, so...

8     And the other thing that you indicated was that it's --

9  you had the opinion that it's very common for executives to --

10 companies to cover up and -- information.  And I'm wondering

11 where that belief came from.

12         PROSPECTIVE JUROR KIM:  Similar to what other

13 prospective jurors have stated, it's just mainly wide mass

14 media of exploitation of these bigger firms using users'

15 information and selling it for their own personal gain,

16 whatever that may be.

17         THE COURT:  So whatever you have heard or believe

18 about large companies, will you be able to set that aside and

19 judge Mr. Sullivan, and Uber, and everybody that comes in, is

20 involved in some way in this case, through the evidence that

21 you get in this case, and then apply the instructions that I

22 give on the law to the facts that you learn while you're here?

23 Will you be able to do that?

24         PROSPECTIVE JUROR KIM:  Yes.

25         THE COURT:  All right.  Thank you very much.

1     Juror Number 44, please.

2          **PROSPECTIVE JUROR KENNEDY:**  Hello.

3          **THE COURT:**  Good morning.  How are you?  Good

4     afternoon, I should say.

5          **PROSPECTIVE JUROR KENNEDY:**  A little nervous, but I'm

6     okay.

7          **THE COURT:**  Do not be -- this is less intimidating

8     than a bunch of preschoolers, I think.

9          **PROSPECTIVE JUROR KENNEDY:**  I don't know.  Sometimes

10    those kids...

11         **THE COURT:**  Have you enjoyed being a preschool

12    teacher?

13         **PROSPECTIVE JUROR KENNEDY:**  So far.  I only worked the

14    summer as a preschool teacher.  Today is actually my first day,

15    but I'm here, so, so far...

16         **THE COURT:**  Okay.  You'll have to tell me later about

17    the intimidation factor then.

18      Is there anything you heard thus far that makes you think

19    you couldn't serve as a fair and impartial juror?

20         **PROSPECTIVE JUROR KENNEDY:**  I don't think so.  A lot

21    of my job is evaluating when kids tell me something happened

22    and figuring out which kid is telling the truth and what

23    happens, so I don't believe so.

24         **THE COURT:**  Great.  Thank you.

25     Juror Number 45.

 1              **PROSPECTIVE JUROR KENNEDY:**  Thanks.

 2              **THE COURT:**  Juror Number 45.

 3        Good afternoon.

 4              **PROSPECTIVE JUROR CHONG:**  Hello.

 5              **THE COURT:**  So you are an attorney?

 6              **PROSPECTIVE JUROR CHONG:**  Yes.

 7              **THE COURT:**  And you work for Apple.  What do you do?

 8              **PROSPECTIVE JUROR CHONG:**  I'm a deals lawyer.

 9              **THE COURT:**  A deals lawyer?

10              **PROSPECTIVE JUROR CHONG:**  Yes.  Transactional lawyer,

11    MMA, yes.

12              **THE COURT:**  How long have you been doing that?

13              **PROSPECTIVE JUROR CHONG:**  Seven years, but not all at

14    Apple.

15              **THE COURT:**  Are you now working remotely, or are you

16    going in?

17              **PROSPECTIVE JUROR CHONG:**  Hybrid, yes.

18              **THE COURT:**  So have you -- is there anything that's

19    come up for you today that makes you think you couldn't serve

20    as a fair and impartial juror?

21              **PROSPECTIVE JUROR CHONG:**  No.

22              **THE COURT:**  Thank you.

23        Juror Number 47, please.  And Juror Number 47 isn't here.

24        Juror Number 48.  Good afternoon.

25              **PROSPECTIVE JUROR FIELDS:**  Good afternoon.

1          **THE COURT:**  And what is Blume Global?

2          **PROSPECTIVE JUROR CHONG:**  It's a supply chain and

3    logistics software as a service company.

4          **THE COURT:**  So are you hiring?  You are a recruiting

5    coordinator?  What are you recruiting?  Who are you recruiting

6    at this point?

7          **PROSPECTIVE JUROR FIELDS:**  Right now we are not

8    hiring, so I'm helping the marketing team.

9          **THE COURT:**  Are you enjoying that?

10         **PROSPECTIVE JUROR FIELDS:**  Yeah.

11         **THE COURT:**  So both the questions, the law enforcement

12   question, do you think you would be able to evaluate the law

13   enforcement personnel when they come in here and their

14   credibility the same way that you would anybody else?

15         **PROSPECTIVE JUROR FIELDS:**  Yes, I would.

16         **THE COURT:**  And then the presumption of innocence

17   question, you've heard me talk about the rights of a defendant

18   to say nothing and to make the government prove its case.

19   Would you be able to follow those instructions?

20         **PROSPECTIVE JUROR FIELDS:**  Yes, if it's his rights

21   then to remain silent, then sure.

22         **THE COURT:**  Okay.  You also had the strong view about

23   that it's very common for executives to cover up information

24   that could harm them or their company.  What did you base that

25   on?

 1          PROSPECTIVE JUROR FIELDS:  Mostly movies.

 2          THE COURT:  Okay.  Would you be able to set those --

 3   the way that things have been presented in the movies aside and

 4   evaluate what will be a very interesting story coming in

 5   through the witnesses and the documents here?

 6          PROSPECTIVE JUROR FIELDS:  Yes, I would.

 7          THE COURT:  Okay.  Is there any reason you couldn't

 8   serve as a fair and impartial juror?

 9          PROSPECTIVE JUROR FIELDS:  No.

10          THE COURT:  Thank you.

11       Juror Number 49.

12          PROSPECTIVE JUROR DE VERA:  Good afternoon.

13          THE COURT:  Good afternoon.  How are you?

14          PROSPECTIVE JUROR DE VERA:  I'm fine.

15          THE COURT:  So what is California Golden Bear -- three

16   words I like a lot -- Shipping Cart?

17          PROSPECTIVE JUROR DE VERA:  We ship packages and

18   documents, specifically just to the Philippines.

19          THE COURT:  And are you enjoying being an

20   administrative manager there?

21          PROSPECTIVE JUROR DE VERA:  Sometimes.

22          THE COURT:  Say no more.

23       You indicated that you would be interested in hearing what

24   the defendant has to say about his case.  Would you be able to

25   respect his right not to testify and apply the presumption of

 1   innocence as I've been talking about it today?

 2              PROSPECTIVE JUROR DE VERA:  Yes.

 3         THE COURT:  And you have -- you have a brother-in-law

 4   who is a police officer?

 5              PROSPECTIVE JUROR DE VERA:  SFPD.

 6         THE COURT:  SFPD, excellent.

 7       Is there anything about that that would make you respect

 8   the testimony of a law enforcement official more than you would

 9   the testimony of any other individual who comes into court?

10              PROSPECTIVE JUROR DE VERA:  No.

11         THE COURT:  Okay.  Is there any reason you can think

12   of that you couldn't serve as a fair and impartial juror?

13              PROSPECTIVE JUROR DE VERA:  No.

14         THE COURT:  Thank you very much.

15              PROSPECTIVE JUROR DE VERA:  You're welcome.

16         THE COURT:  Juror Number 51, please.

17              PROSPECTIVE JUROR TANG:  Your Honor.

18         THE COURT:  Good morning.  You sound like somebody who

19   works for a law firm.

20              PROSPECTIVE JUROR TANG:  I do, yep.

21         THE COURT:  And so what do you do for marketing for

22   your firm?

23              PROSPECTIVE JUROR TANG:  I am the associate business

24   development director for the IP department at my law firm.  I

25   work with patent litigators.

1          **THE COURT:**  Not my favorite.  I'm very glad to say

2   there are no patents involved in this trial.

3          **PROSPECTIVE JUROR TANG:**  Pretty needy.

4          **THE COURT:**  Do you enjoy that?

5          **PROSPECTIVE JUROR TANG:**  Yeah, I've been working with

6   them for seven years now.  I've been working at law firms for

7   close to 20.

8          **THE COURT:**  So is there anything that you've heard

9   thus far about this case that makes you think you couldn't

10  serve as a fair and impartial juror?

11         **PROSPECTIVE JUROR TANG:**  No.

12         **THE COURT:**  Thank you.

13      Juror Number 54, please.

14         **PROSPECTIVE JUROR RILEY:**  Hello.

15         **THE COURT:**  What is AstroSpace?

16         **PROSPECTIVE JUROR RILEY:**  We build rockets.

17         **THE COURT:**  Seriously?

18         **PROSPECTIVE JUROR RILEY:**  Yeah.

19         **THE COURT:**  And where do those rockets go?

20         **PROSPECTIVE JUROR RILEY:**  To low earth orbit

21  currently.

22         **THE COURT:**  That's pretty exciting.  Have you had some

23  successes in that?

24         **PROSPECTIVE JUROR RILEY:**  Yes, we went into space

25  earlier this year, into orbit, and delivered our first payload,

1   so...

2          THE COURT:  That's very exciting.  And as a program

3   manager, what do you do?

4          PROSPECTIVE JUROR RILEY:  I manage the team of

5   engineers that designs and builds and tests the rocket.

6          THE COURT:  How long have you been doing that?

7          PROSPECTIVE JUROR RILEY:  About two years.

8          THE COURT:  What kind of background do you have to

9   have in order to do what you're doing?

10         PROSPECTIVE JUROR RILEY:  You know, I was a classics

11  major in college, but somehow they trust me.  No.  I worked at

12  Apple for a long time working on iPhone product development.

13         THE COURT:  So the -- you indicated on your

14  questionnaire that your best friend works with Cloud Kitchens,

15  and that that's now owned by Travis Kalanick?

16         PROSPECTIVE JUROR RILEY:  Right, yes.

17         THE COURT:  Do you know -- have you met Mr. Kalanick?

18  Do you know him?

19         PROSPECTIVE JUROR RILEY:  I have not, no.  Sorry.

20  There's another secondary connection I should mention.  One of

21  my other great close friends is -- or at least was a legal

22  counsel for Travis, or at least Uber.  Not sure if he currently

23  is, but for Fenwick & West.

24         THE COURT:  I'm sorry?

25         PROSPECTIVE JUROR RILEY:  For Fenwick & West.

 1          THE COURT:  Is there anything about that that would

 2   make you consider Mr. Kalanick any differently than you

 3   consider any other witness in the case?

 4          PROSPECTIVE JUROR RILEY:  No, I've not heard anything

 5   about the company or Travis.

 6          THE COURT:  Okay.  Is there any reason that you

 7   couldn't sit as a fair and impartial juror?

 8          PROSPECTIVE JUROR RILEY:  No.  The only thing is I do

 9   have travel from the 20th through the 25th out of state.

10          THE COURT:  Is this business travel?

11          PROSPECTIVE JUROR RILEY:  It is a vacation.

12          THE COURT:  And do you have a prepaid ticket?

13          PROSPECTIVE JUROR RILEY:  I do.

14          THE COURT:  Where are you going?

15          PROSPECTIVE JUROR RILEY:  Washington State, where I'm

16   from, to visit family.

17          THE COURT:  Thank you for telling me that.  All right.

18   Thank you.

19      Juror Number 55 -- 57.  Good afternoon.

20          PROSPECTIVE JUROR ADAMS:  Good afternoon.

21          THE COURT:  So you used to teach.  What did you teach?

22          PROSPECTIVE JUROR ADAMS:  I did.  First and second

23   grade for 30 years.

24          THE COURT:  Do you miss it?

25          PROSPECTIVE JUROR ADAMS:  I miss it a lot, yeah, but I

 1   still see the students sometimes.

 2          THE COURT:  Are you usually happy when you see the

 3   students?

 4          PROSPECTIVE JUROR ADAMS:  Yeah, yeah.

 5          THE COURT:  Every once in a while you can go out into

 6   the world after you've seen people, and one could be

 7   standoffish, but I'm glad you're happy to see them.

 8          PROSPECTIVE JUROR ADAMS:  Children at that age really

 9   love their teacher, and as I aged, I became, like, grandma in

10   the classroom.  And my husband joined me for three years, so we

11   were, like, the grandparents in the classroom and they loved

12   it.

13          THE COURT:  That's great.

14          PROSPECTIVE JUROR ADAMS:  Yeah, lots of hugs.

15          THE COURT:  So is there anything that you've heard so

16   far that makes you think you could not serve as a fair and

17   impartial juror?

18          PROSPECTIVE JUROR ADAMS:  Well, that comes to an

19   interesting point.  My hearing has become -- it's deteriorated

20   a lot, and in the last couple of months I've worked with Kaiser

21   to get hearing aids.  So they have some coming, but they're not

22   arriving until next week.

23      And today, when people stand here, I'm right there, but I

24   can't hear anything they're saying.  So it's just -- it's

25   noise, and it's -- it's the ambiance, and the environment.  And

 1   if people have a mask on -- I didn't realize it was so bad

 2   until recently.  And then in here it's, like, impossible.

 3          THE COURT:  So have you been able to hear me?

 4          PROSPECTIVE JUROR ADAMS:  I can hear you, yes, and I

 5   can read your lips pretty well.

 6          THE COURT:  So if you were sitting -- if you were

 7   chosen on the jury, you would be sitting in that box.  The

 8   witnesses would be testifying right over here, basically.  The

 9   lawyers would be looking at you because you're the primary

10   audience over there, and they would -- everybody would be

11   mic'd.

12      So in that situation, do you think you would be able to

13   hear, or do you think would it still be a struggle?

14          PROSPECTIVE JUROR ADAMS:  I don't know.  I don't know.

15   It just -- sometimes it's fine, and then there's times when

16   you're speaking that it's just gone.  So I can't control it.

17   So, yeah.  And I'm so sorry.  I wish it was different.

18          THE COURT:  I'm positive that that's true, and, I know

19   people in your situation who are close to me, so I hope those

20   hearing aids work.

21          PROSPECTIVE JUROR ADAMS:  Thank you.

22          THE COURT:  Okay.  Thank you very much.

23      Juror Number 60, please.

24          PROSPECTIVE JUROR AUGUST:  Hello.

25          THE COURT:  Good afternoon.

1      **PROSPECTIVE JUROR AUGUST:**  Hi.

2      **THE COURT:**  So many teachers today.

3      **PROSPECTIVE JUROR AUGUST:**  Second grade.

4      **THE COURT:**  How long have you been teaching second

5  grade?

6      **PROSPECTIVE JUROR AUGUST:**  Twenty years.

7      **THE COURT:**  You've barely started according to some of

8  the people who've been --

9      **PROSPECTIVE JUROR AUGUST:**  I'm on my second career, so

10  second career.

11      **THE COURT:**  Are you liking it?

12      **PROSPECTIVE JUROR AUGUST:**  Oh, yeah.  I love teaching.

13      **THE COURT:**  You indicated law enforcement is a noble

14  profession and went on from there, and so I wonder whether,

15  with that belief, you would still be able to evaluate the

16  testimony that law enforcement gives -- law enforcement

17  officers who come in to testify here give in the same way as

18  everybody else?

19      **PROSPECTIVE JUROR AUGUST:**  Yes.  I think that

20  question, I answered it in a general way.  I have a general

21  feeling about that.  I feel in this setting I could be very --

22  listen to the facts, listen to the evidence, and be skeptical

23  when need be, and really think critically about what they were

24  saying and how it fit with what was being presented to me.  So

25  I feel like I would be impartial.

1          THE COURT:  That is the job.

2      But you did express some concern about your students.

3          PROSPECTIVE JUROR AUGUST:  Yeah, I think after

4  COVID -- although getting out at 1:30, like, alleviated some of

5  my fears, because I can go back to school and plan for the next

6  day --

7          THE COURT:  Okay.

8          PROSPECTIVE JUROR AUGUST:  -- for the substitute.  So

9  that, to me, was a positive.

10          THE COURT:  All right.

11          PROSPECTIVE JUROR AUGUST:  And knowing the trial

12  wasn't going to last an exorbitant amount of time, I think it's

13  doable.

14          THE COURT:  So is there any reason you think you could

15  not serve as a fair and impartial juror?

16          PROSPECTIVE JUROR AUGUST:  No, I think I could.

17          THE COURT:  Great.  Thank you.

18          PROSPECTIVE JUROR AUGUST:  Thank you.

19          THE COURT:  Juror Number 62.  Good afternoon.

20          PROSPECTIVE JUROR OSBORN:  Good afternoon.

21          THE COURT:  And Friendly Robots.  Tell me -- tell me

22  what kind of Friendly Robots you create.

23          PROSPECTIVE JUROR OSBORN:  It is a startup company

24  that does autonomous robot vacuums, kind of think of like a big

25  Roomba but for office buildings.

 1        THE COURT:  What do you do for them?

 2        PROSPECTIVE JUROR OSBORN:  I am a robotics engineer,

 3   so I do hardware and software design both.

 4        THE COURT:  So you've heard all the information that's

 5   been provided thus far.  Is there any reason you think you

 6   couldn't serve as a fair and impartial juror?

 7        PROSPECTIVE JUROR OSBORN:  No, there isn't.

 8        THE COURT:  Great.  Thank you.

 9        PROSPECTIVE JUROR OSBORN:  Thank you.

10        THE COURT:  Juror Number 63, please.  Good afternoon.

11        PROSPECTIVE JUROR LIN:  Hi.

12        THE COURT:  You are an RN.  What do you specialize in?

13   Where do you work?

14        PROSPECTIVE JUROR LIN:  I work in a cardiothoracic

15   unit at UCSF.

16        THE COURT:  And how long have you been doing that?

17        PROSPECTIVE JUROR LIN:  I've been a nurse for six

18   years.  I've been working there for about a year.

19        THE COURT:  And you -- in answer to the law

20   enforcement question, you wrote that you don't think that

21   police officers are actually more ethical or law abiding than

22   any other citizen.  Does that also mean they're not less

23   ethical?

24        PROSPECTIVE JUROR LIN:  No.  I just -- I think people

25   are people no matter what our jobs are.

1      **THE COURT:**  That's exactly the way that you need to

2  evaluate them when they come in to testify, everybody when they

3  come to testify.

4      Is there any reason you could think of that you couldn't

5  serve as a fair and impartial juror?

6      **PROSPECTIVE JUROR LIN:**  No.

7      **THE COURT:**  Thank you.

8      **PROSPECTIVE JUROR LIN:**  Thanks.

9      **THE COURT:**  Number 64.

10     **PROSPECTIVE JUROR LEE:**  Hello.

11     **THE COURT:**  Good afternoon.

12     **PROSPECTIVE JUROR LEE:**  Good afternoon.

13     **THE COURT:**  So what is Eucalyptus House?

14     **PROSPECTIVE JUROR LEE:**  Eucalyptus House Caminar is a

15  residential facility that holds -- or temporarily houses people

16  with mental health -- sorry, excuse me -- conditions while

17  they're trying to find stable income and stable housing.  Yeah.

18     **THE COURT:**  So are these -- are these people referred

19  through law enforcement, or just they're just individuals who

20  got mental health issues that you help stabilize?

21     **PROSPECTIVE JUROR LEE:**  Yeah.  In the facility we

22  would, like, help them with, like, daily tasks that maybe they

23  have difficulties with.  So, you know, cooking, cleaning.

24     But, typically, when they're referred to the facility,

25  they're not referred by law enforcement.  It's typically from

1    another facility.

2            THE COURT:  Okay.

3            PROSPECTIVE JUROR LEE:  It could be, like, a homeless

4    shelter or something like that, for example.

5            THE COURT:  Do you like that work?

6            PROSPECTIVE JUROR LEE:  I actually just recently quit

7    the job.  It was just really difficult, especially during the

8    pandemic.  I am also in, like, school.  So the demands for

9    school are just outrageous.  I needed to either find a

10   different job or, yeah, just not work at all.

11           THE COURT:  You're going to school right now?

12           PROSPECTIVE JUROR LEE:  Yeah, I'm currently in a Ph.D.

13   program at Palo Alto University.

14           THE COURT:  I missed the name.

15           PROSPECTIVE JUROR LEE:  At Palo Alto University.  I'm

16   doing clinical psychology.

17           THE COURT:  Where is that located?

18           PROSPECTIVE JUROR LEE:  Palo Alto University is in

19   Palo Alto, but it's -- yeah, it's, like, in Palo Alto.

20           THE COURT:  Are you -- are these classes in person, or

21   remote, or --

22           PROSPECTIVE JUROR LEE:  These classes are remote.  I

23   was thinking about the scheduling.  These classes are remote.

24      I have a class on Monday and Friday interfering in between

25   the times you had mentioned, I believe on 8:00 to 1:30.

1    And then I'm also -- in the Ph.D. program I'm in right

2    now, they give us an opportunity to do internships to get

3    experience.  Currently, right now, off the top of my head, I

4    have meetings from 10:00 to 3:30, and I do therapy with a

5    client I think I am assigned to on Thursday.

6         **THE COURT:**  Are you telling me this would be difficult

7    for you to serve as a juror on?

8         **PROSPECTIVE JUROR LEE:**  Considering this is a three to

9    four-week span, duration, I feel like it would be.  I think it

10   would be pretty detrimental to my schooling if I were to miss a

11   lot of those meetings, yeah.

12        **THE COURT:**  You indicated that -- on the law

13   enforcement question, that you would slightly disbelieve the

14   testimony of law enforcement based on a variety of things.  If

15   you were chosen to sit on the jury, would you be able to set

16   those beliefs aside and treat them just the same as you

17   would -- treat the people who come into the courtroom just the

18   same, no matter whether they're law enforcement or not?

19        **PROSPECTIVE JUROR LEE:**  Yes, I would, yes.

20        **THE COURT:**  Okay.  All right.  Thank you.

21        **PROSPECTIVE JUROR LEE:**  Thank you.

22        **THE COURT:**  Number 65, please.

23        **PROSPECTIVE JUROR KARAKASEVIC:**  Hello.

24        **THE COURT:**  Good afternoon.  So tell me what you do.

25        **PROSPECTIVE JUROR KARAKASEVIC:**  Well, I'm supposed to

1  be retired, but I'm still running a family business, and then I

2  have a rental business also.

3       THE COURT:  And so have you been running -- are you

4  the family --

5       PROSPECTIVE JUROR KARAKASEVIC:  Matriarch.

6       THE COURT:  -- wise person who always has to run the

7  business?

8       PROSPECTIVE JUROR KARAKASEVIC:  I've been sorting

9  facts for a long time, yes.

10       THE COURT:  Is there -- have you heard anything -- is

11  there any reason you think that you could not serve as a fair

12  and impartial juror?

13       PROSPECTIVE JUROR KARAKASEVIC:  My only concern is

14  it's at least two hours to San Francisco and then two hours in

15  traffic home, daily.

16       THE COURT:  I don't have the right sheet.  Where do

17  you live?

18       PROSPECTIVE JUROR KARAKASEVIC:  St. Helena.  So

19  it's -- I mean, once a week, twice a week is a lot.  More is

20  tough, but I -- I would love to help, but...

21       THE COURT:  Okay.  I hear what your problem is.  Thank

22  you.

23       PROSPECTIVE JUROR KARAKASEVIC:  Thank you.

24       THE COURT:  And that would be the only reason?

25       PROSPECTIVE JUROR KARAKASEVIC:  Yes.

1          **THE COURT:**  Okay.  Thank you very much.

2      Juror Number 66, please.  Good afternoon.

3          **PROSPECTIVE JUROR MASUKAWA:**  Good afternoon.

4          **THE COURT:**  What is Trimble?

5          **PROSPECTIVE JUROR MASUKAWA:**  It's a GPS company.

6  Global positioning systems; construction, agriculture.  We have

7  a military group and an autonomous group.

8          **THE COURT:**  And what is -- what do you do as an

9  engineering systems administrator?

10          **PROSPECTIVE JUROR MASUKAWA:**  So I work with the

11  engineering group.  I've been there almost 30 years.  I started

12  in the stockroom and worked my way up.

13      And so now -- we have a data management system that I got

14  pretty proficient in.  So in the engineering group, we make new

15  kits for tractors so they can drive themselves, and, so, the

16  engineers have to make new parts.  So my job is to get those

17  parts, get them a part number, and get them released in our

18  system.

19          **THE COURT:**  You've heard a lot of questions today.  Is

20  there any reason you couldn't serve as a fair and impartial

21  juror?

22          **PROSPECTIVE JUROR MASUKAWA:**  No, I don't think so.

23      But I do have a problem with my tooth.  Two weeks ago I

24  broke a crown, and so my schedule to get the new crown put on

25  is tomorrow, but since then there's been complications.

1  There's pain and sensitivity.  So I was talking to my dentist

2  and he says I probably need a root canal.  So in the last

3  couple of days the pain has gotten more worse.

4          THE COURT:  Just thinking about a root canal hurts

5  worse.

6          PROSPECTIVE JUROR MASUKAWA:  Exactly, yeah.

7          THE COURT:  When --

8          PROSPECTIVE JUROR MASUKAWA:  So the original procedure

9  was tomorrow to put the crown on, the new crown on, the

10 replacement crown.  But in the two weeks prior -- well, since I

11 had the old crown, the temporary, put on two weeks ago, and

12 since then I've gotten this problem with pain and stuff.

13         THE COURT:  So when are you going to go in?  Do you --

14         PROSPECTIVE JUROR MASUKAWA:  It's scheduled tomorrow

15 for 11:00.

16         THE COURT:  It is?

17         PROSPECTIVE JUROR MASUKAWA:  It is.

18         THE COURT:  Thank you.

19         PROSPECTIVE JUROR MASUKAWA:  Thank you.

20         THE COURT:  Juror Number 67, please.

21         PROSPECTIVE JUROR EVANS:  Hello.

22         THE COURT:  Good afternoon.  How are you?

23         PROSPECTIVE JUROR EVANS:  I'm good.  Thank you.

24         THE COURT:  You work for the National Park Service.

25 Where are you located?

1          **PROSPECTIVE JUROR EVANS:**  I'm over in Marin Headlands,

2    Rodeo Beach, Fort Cronkhite.

3          **THE COURT:**  How long have you worked for the Park

4    Service?

5          **PROSPECTIVE JUROR EVANS:**  Since 2018.  I was on active

6    duty before that, Navy.

7          **THE COURT:**  That's great.  Are you enjoying it?

8          **PROSPECTIVE JUROR EVANS:**  Yes.

9          **THE COURT:**  Your current work?

10          **PROSPECTIVE JUROR EVANS:**  Yes, I am.

11          **THE COURT:**  That's great.

12    One of your responses was about the defendant testifying.

13    And so having heard what you've heard today, would you be able

14    to follow my instructions, provide the defendant with the

15    presumption of innocence, and, if he decided not to testify,

16    not hold that against him?

17          **PROSPECTIVE JUROR EVANS:**  Oh, yes.  I thought the

18    question was, like, unfair for him.  I thought it was saying he

19    wouldn't be able to testify.

20          **THE COURT:**  All right.

21          **PROSPECTIVE JUROR EVANS:**  Yeah.

22          **THE COURT:**  Okay.  And then you've seen and heard some

23    information about Uber.  Would you be able to put that out of

24    your mind, and, when it comes to this trial, evaluate the guilt

25    or innocence of the defendant based on what you learned in this

1  courtroom?  Would you be able to do that?

2      **PROSPECTIVE JUROR EVANS:**  Yes.

3      **THE COURT:**  Is there any reason you know of that you

4  couldn't serve as a fair and impartial juror?

5      **PROSPECTIVE JUROR EVANS:**  No, Your Honor.

6      **THE COURT:**  Great.  Thank you.

7      **PROSPECTIVE JUROR EVANS:**  Thank you.

8      **THE COURT:**  Number 68, please.  Good afternoon.

9      **PROSPECTIVE JUROR DELANEY:**  Good afternoon.

10      **THE COURT:**  And so you are a managing director for

11  private banking offices.

12      **PROSPECTIVE JUROR DELANEY:**  Yes.

13      **THE COURT:**  What does that entail?

14      **PROSPECTIVE JUROR DELANEY:**  I manage all the branches

15  of a private banking sales team in California.

16      **THE COURT:**  How long have you been -- have you been

17  with Silicon Valley Bank for a while?

18      **PROSPECTIVE JUROR DELANEY:**  They acquired my previous

19  bank, Boston Private, a little over a year ago.

20      **THE COURT:**  How long had you been working for the

21  prior bank?

22      **PROSPECTIVE JUROR DELANEY:**  For 12 years.  I've been

23  in banking 39 years.

24      **THE COURT:**  So you've heard a lot so far today.  Is

25  there any reason that you're aware of that you couldn't serve

 1   as a fair and impartial juror?

 2           **PROSPECTIVE JUROR DELANEY:**  No.

 3           **THE COURT:**  Okay.  Thank you.

 4       Juror Number 69.

 5           **PROSPECTIVE JUROR HEARTT:**  Good afternoon, Your Honor.

 6           **THE COURT:**  Good afternoon.  So -- good afternoon.

 7   What do you in healthcare?

 8           **PROSPECTIVE JUROR HEARTT:**  I'm a risk specialist.

 9           **THE COURT:**  A wrist [sic] specialist?

10           **PROSPECTIVE JUROR HEARTT:**  Mm-hmm.

11           **THE COURT:**  Tell me what that means.

12           **PROSPECTIVE JUROR HEARTT:**  I investigate and review

13   all patient safety events and negative outcomes to patients.

14           **THE COURT:**  How long have you been doing that?

15           **PROSPECTIVE JUROR HEARTT:**  Four years.

16           **THE COURT:**  Do you enjoy that?

17           **PROSPECTIVE JUROR HEARTT:**  I do.

18           **THE COURT:**  I'm going to ask you that same question.

19   You've been here a lot today.  You've heard lot.  Is there any

20   reason you couldn't serve as a fair and impartial juror?

21           **PROSPECTIVE JUROR HEARTT:**  No, Your Honor.

22           **THE COURT:**  Thank you.

23           **PROSPECTIVE JUROR HEARTT:**  Thank you.

24       Juror Number 71, please.  Good afternoon.

25           **PROSPECTIVE JUROR ESQUEDA-MARTINEZ:**  Good afternoon.

1           THE COURT:  And tell me what you do.

2           PROSPECTIVE JUROR ESQUEDA-MARTINEZ:  I work at a

3    warehouse organizing packages for drivers.

4           THE COURT:  And how long have you been doing that?

5           PROSPECTIVE JUROR ESQUEDA-MARTINEZ:  Oh, like, two

6    years.

7           THE COURT:  Are you enjoying it?

8           PROSPECTIVE JUROR ESQUEDA-MARTINEZ:  It's all right.

9           THE COURT:  You indicated that you strongly agree that

10   most large companies engage in serious unethical conduct.  I'm

11   wondering where that belief comes from.

12          PROSPECTIVE JUROR ESQUEDA-MARTINEZ:  Just stuff I see

13   online and in the media.

14          THE COURT:  So, in this case, you will get some

15   exposure to how one company dealt with one particular

16   situation, and you will learn everything that you need to know

17   to make a decision based on what comes in in evidence here.

18   Would you be able to set aside the beliefs that you have about

19   large companies and just assess the information you learn about

20   Uber based on what you learn about Uber in the courtroom?

21          PROSPECTIVE JUROR ESQUEDA-MARTINEZ:  Yeah, yeah.

22          THE COURT:  You also indicated that it was -- that

23   your belief is it's very common for executives at a company to

24   cover up information that could harm them or the company.  And

25   is that -- do you come to that belief based on the same

1   information that you described before?

2           PROSPECTIVE JUROR ESQUEDA-MARTINEZ:  Mm-hmm.

3           THE COURT:  That's a yes?

4           PROSPECTIVE JUROR ESQUEDA-MARTINEZ:  Yeah.

5           THE COURT:  And would you be able to, just as I asked

6   you about Uber, would you be able to set those preconceived

7   beliefs aside and just treat Uber, and Mr. Sullivan, and the

8   witnesses who come in here as human beings and deal with them

9   based on the information that you learn in here?

10          PROSPECTIVE JUROR ESQUEDA-MARTINEZ:  Yeah, I think so.

11          THE COURT:  Great.  Is there any reason that you think

12  you couldn't serve as a fair and impartial juror?

13          PROSPECTIVE JUROR ESQUEDA-MARTINEZ:  No.

14          THE COURT:  Thank you.

15      Juror number 73.

16          PROSPECTIVE JUROR RAMOS:  Hi.

17          THE COURT:  Hi.  Good afternoon.  How are you?

18          PROSPECTIVE JUROR RAMOS:  I'm good.

19          THE COURT:  Good.  You know, the names of all the

20  different jobs that people have today are different than the

21  ones that when I came out of college.  So tell me what a

22  content review specialist does.

23          PROSPECTIVE JUROR RAMOS:  I review content.  Right now

24  my scope is political ads.

25          THE COURT:  So -- and how do you -- what are you

1   looking for?

2         **PROSPECTIVE JUROR RAMOS:**  I'm not fact checking right

3   now.  What I'm doing is editorial and landing pages.  So I have

4   to make sure that, you know, what the ad says is -- you can

5   understand it, and then if the page that it links to is a

6   correct page that is the same as the ad.

7         **THE COURT:**  Is it for -- is it for, I guess, your

8   company and their clients, is that the --

9         **PROSPECTIVE JUROR RAMOS:**  Yeah.  They're doing, like,

10  an agency-type job for them, for the different clients.  So

11  that's basically what I do.

12        **THE COURT:**  So do you enjoy that?

13        **PROSPECTIVE JUROR RAMOS:**  Yeah.  I'm not customer

14  facing any more, and that's a big plus.

15        **THE COURT:**  The law enforcement question.  There have

16  been a number of people who have come up who had -- their

17  experiences have been positive with law enforcement.  You're --

18  you were indicating an inclination, maybe, to disbelieve

19  because of things that you've learned.  Would you be able to

20  treat every individual who comes in here the same when they

21  start off testifying and not hold it against somebody that

22  they're in law enforcement?

23        **PROSPECTIVE JUROR RAMOS:**  Yeah, I could put my

24  personal beliefs aside.

25        **THE COURT:**  And just evaluate the -- it is the job of

1  a juror to identify the biases that they have coming in,

2  because we all have them, and do exactly what you said;

3  identify them, put it aside, treat the people who come in here

4  fairly; and then do the right -- do what's right based on all

5  of the information that comes in.  You would be able to do

6  that?

7           PROSPECTIVE JUROR RAMOS:  Yes.

8       THE COURT:  You've also been, as a number people, a

9  victim of data breach.  Is there -- that, of course, is going

10  to be a very different situation.  Every situation is

11  different, and it's going to be different than the ones that I

12  described here.  Is there anything about your experience there

13  that would make it difficult for you to sit as a juror in this

14  case?

15           PROSPECTIVE JUROR RAMOS:  Yeah.  I had an incident

16  with a local community college, and the hackers actually

17  reached out to some of the students and said, hey, you know,

18  the school doesn't want to pay the fee, or whatever they're

19  doing, can you -- basically, asking us to escalate it, which I

20  don't know if any other students did, but I did, and there was

21  nothing really done about it, which kind of discouraged my

22  continuation in that school.  So I stopped attending because of

23  that.

24           THE COURT:  Is that right?

25           PROSPECTIVE JUROR RAMOS:  Yeah.

1      **THE COURT:**  Do you think that would carry over in some

2  way to your evaluation of the evidence in this case, that

3  you -- at the moment you don't know what's -- how the breach

4  occurred, and you don't know what happened afterwards.  Do you

5  think that your -- you would be able to set your experience

6  aside and just evaluate the evidence fairly as it comes in, or

7  would your experience just interfere with that?

8      **PROSPECTIVE JUROR RAMOS:**  I want to say I'll be

9  impartial.  So, yes.

10     **THE COURT:**  So wanting to say and then actually saying

11 are two different things.

12     **PROSPECTIVE JUROR RAMOS:**  Yeah.  I mean, I put myself

13 in other people's shoes a lot and just think, if that happened

14 to me, what would I feel.  But as far as, like, what evidence

15 is going to be brought, I can just definitely base my decision

16 on the evidence.

17     **THE COURT:**  Okay.  All right.

18    And then you had some -- you've seen some reports

19 regarding Uber.  Could you set the information that you have

20 about Uber aside and just evaluate the evidence as it comes in

21 here?

22     **PROSPECTIVE JUROR RAMOS:**  Yes.

23     **THE COURT:**  Is there any reason you think you couldn't

24 serve as a fair and impartial juror?

25     **PROSPECTIVE JUROR RAMOS:**  No.

 1          **THE COURT:**  Okay.  Thank you.

 2      Juror number 74, please.

 3          **PROSPECTIVE JUROR TERADA:**  Hello.

 4          **THE COURT:**  Hi.  Good afternoon.

 5      So, what kind of research editing do you do?

 6          **PROSPECTIVE JUROR TERADA:**  So educational research.  I

 7  work for Edutopia, which is part of the George Lucas

 8  Educational Foundation.  We're a media company, basically.

 9      I write articles.  I do videos.  I do all the research

10  stuff for the organization.  Everything that comes in, I vet to

11  make sure it's aligned with the current research of the day,

12  because a lot of what's in education is traditional and

13  outdated.  So part of my job -- I was a researcher before I was

14  a research editor.  So part of my job is to make sure all the

15  current research informs what we do.

16          **THE COURT:**  And is it based on -- or focused on any

17  particular areas or subject matters.

18          **PROSPECTIVE JUROR TERADA:**  Not any particular area.

19  We tend to focus on kind of what's working currently.  So we

20  tend to focus more on things like project-based learning,

21  problem-based learning.  We tend to think about assessment of

22  learning.  We think about the neuroscience of learning, kind

23  of, like, how does the current science inform, like, the

24  importance of taking breaks, for example, or the importance of

25  things like recess, or the importance of relationships, how

1    they build, kind of dispositions in children to be able to

2    learn better.

3        These aren't just kind of ethereal things that exist.

4    They have an actual core function in learning.  So that's what

5    I do.  I try to take the research and translate it into

6    practice.

7            THE COURT:  Very interesting.

8        On that law enforcement question, you indicated that you

9    don't have any personal reason to be biased against law

10   enforcement officers, and I just want to make sure that you

11   don't -- that you would be able to treat everybody's testimony

12   the same --

13           PROSPECTIVE JUROR TERADA:  Yeah --

14           THE COURT:  -- that you judge credibility --

15           PROSPECTIVE JUROR TERADA:  I have no reason to believe

16   one way or the other.

17           THE COURT:  Okay.  Is there any reason you think you

18   couldn't serve as a fair and impartial juror?

19           PROSPECTIVE JUROR TERADA:  I would like to note my

20   wife is going on a trip next week.  I have two kids that are

21   four and seven, so that would make it fairly challenging, but

22   not impossible.

23           THE COURT:  Do you have family or friends around?

24           PROSPECTIVE JUROR TERADA:  Not really.  My mom's in

25   L.A.  My wife's parents are a few hours away.  It would be

 1  challenging but not impossible.

 2          THE COURT:  Thank you very much.

 3      Juror Number 75, please.

 4          PROSPECTIVE JUROR HAGOPIAN:  Good afternoon, Your

 5  Honor.

 6          THE COURT:  How are you?

 7          PROSPECTIVE JUROR HAGOPIAN:  Fabulous.

 8          THE COURT:  Excellent.  And so you are an executive

 9  chef?

10          PROSPECTIVE JUROR HAGOPIAN:  Yes, in Sonoma.  Stop

11  down for lunch, all right?  It's on me.

12          THE COURT:  I should know about Nugget Markets.  What

13  kind of a restaurant is it?

14          PROSPECTIVE JUROR HAGOPIAN:  Nugget Markets is a

15  family-owned grocery chain out of Woodland/Davis area, owned by

16  an awesome family, the Stille Family.  And we have 17

17  locations, working on number 18, now being built from the

18  ground up just outside of Lake Tahoe.

19          THE COURT:  Oh, wow.

20          PROSPECTIVE JUROR HAGOPIAN:  You don't really know a

21  lot about Nugget down here quite a bit.  We have locations in

22  Corte Madera, Novato, Tiburon, and then they sort of stray up.

23  Sonoma, Glen Ellen, pass over Santa Rosa area, and start

24  Heading out to Sacramento.

25          THE COURT:  Sounds like I should know about it.

 1      And you've been working there for three years.  What were
 2   you doing before?
 3          **PROSPECTIVE JUROR HAGOPIAN:**  So I am a transplant from
 4   the East Coast.  So you'll probably hear it in my voice.  Me
 5   and my wife had a barbecue business back in Delaware.  I'm a
 6   Philadelphia guy, but I was married for 15 years.  Met my wife
 7   down in Delaware, moved back down to Delaware.  My wife is
 8   deceased, so I'm a widowed husband.
 9      After she passed away, I made my way to California.  I
10   just was tired of the snow, sleet, and rain, and all that other
11   stuff.
12          **THE COURT:**  This is a much better place to be --
13          **PROSPECTIVE JUROR HAGOPIAN:**  I love it.  I love it.
14   I'm so happy to be here.  My life has changed.  Not that I was
15   on a -- nothing bad or anything.  I gave myself a great raise.
16   I have awesome people, and now I'm building a community.  And
17   the community knows me now in that little town of Sonoma.  I'm
18   real proud of where I'm at.
19          **THE COURT:**  That's real great.
20      Is there any reason you could not serve as a fair and
21   impartial juror?
22          **PROSPECTIVE JUROR HAGOPIAN:**  Being fair and impartial,
23   that's fine with me because I'm a very fair guy, and I listen
24   to everything and how things are brought about and all, and I
25   listen to other people and how these express themselves as

1  well.

2      The only thing is, is my stepfather back in Delaware is

3  not doing very well.  He's pretty much on his last days.  He

4  wants to do it at home.  He doesn't want any doctors coming in.

5  We've got him on oxygen.  And that would be one thing could

6  happen any day now, that I would just have to break off and fly

7  out back to Philadelphia.

8      I'd rather not see -- my brothers are in close contact

9  with me if things are getting real bad.  I can be there in six

10  hours.  I have a standby ticket through American.  That's just

11  something I want to feel good about.

12      Like I said, this -- I don't know when that could happen,

13  but it's in the future, so...

14          THE COURT:  All right.  Thank you for telling me that.

15          PROSPECTIVE JUROR HAGOPIAN:  Thank you so much for

16  your work.  I appreciate you.

17          THE COURT:  I thank you.  Bring your number.  I

18  appreciate your number, also.

19      Juror Number 76, good afternoon.

20          PROSPECTIVE JUROR GROTHEN:  Good afternoon.

21          THE COURT:  So you're an online content strategy

22  manager.  What is -- tell me what that is.

23          PROSPECTIVE JUROR GROTHEN:  So I am responsible,

24  primarily, for doing projects associated with content for our

25  corporate website.  So marketing, sales, anything that has to

1  do with online content.

2          THE COURT:  How long have you been doing that?

3          PROSPECTIVE JUROR GROTHEN:  I've been doing that for

4  five years, but I've been with the corporation for 33.

5          THE COURT:  And what other kinds of jobs were you

6  doing?

7          PROSPECTIVE JUROR GROTHEN:  Sales, support.  I was on

8  the website before we went into service, now back to the

9  website.

10         THE COURT:  You have been here all day.  Is there any

11 reason that you are aware of that you couldn't be a fair and

12 impartial juror in this case?

13         PROSPECTIVE JUROR GROTHEN:  No.

14         THE COURT:  Thank you.

15         PROSPECTIVE JUROR GROTHEN:  Thank you.

16         THE COURT:  Juror Number 77, please.

17    Good afternoon.

18         PROSPECTIVE JUROR McMANAMON:  Good afternoon.

19         THE COURT:  And so you have -- you're spending a fair

20 amount of time these days babysitting; is that right?

21         PROSPECTIVE JUROR McMANAMON:  I don't babysit any

22 more.  I'm finished.

23         THE COURT:  Okay.  Congratulations.

24    And how long were you doing the babysitting?

25         PROSPECTIVE JUROR McMANAMON:  Like five years ago.

1           THE COURT:  How are you spending your days now?

2           PROSPECTIVE JUROR McMANAMON:  Staying at home with my

3   dogs and cats and taking care of the garden.

4           THE COURT:  Those all seem like very good things.

5           PROSPECTIVE JUROR McMANAMON:  Yep.

6           THE COURT:  You've been here all day.  Is there any

7   reason you think you couldn't be a fair and impartial juror in

8   this case?

9           PROSPECTIVE JUROR McMANAMON:  No.

10          THE COURT:  Thank you very much.

11          PROSPECTIVE JUROR McMANAMON:  Okay.

12          THE COURT:  Take your number, please.

13          PROSPECTIVE JUROR McMANAMON:  Thank you.

14          THE COURT:  Juror Number 79, I think.

15          PROSPECTIVE JUROR WU:  Good afternoon.

16          THE COURT:  Good afternoon.

17      So you work as Chase?

18          PROSPECTIVE JUROR WU:  Yes.

19          THE COURT:  Tell me what you do.

20          PROSPECTIVE JUROR WU:  As a banker.  So, basically,

21  day to day basis to help client with their banking need and

22  then -- yeah.

23          THE COURT:  So you've been there for three years?

24          PROSPECTIVE JUROR WU:  Three years.

25          THE COURT:  Do you like it?

1    **PROSPECTIVE JUROR McMANAMON:**  Yes.  I just got

2    promoted.  So, yeah.  Right now, basically, it's, like, on the

3    pay, it's, like, commission.  So it's very good.

4    **THE COURT:**  So are you employed, or are you a

5    contractor?

6    **PROSPECTIVE JUROR WU:**  Hmm?

7    **THE COURT:**  Are you an employee or contractor?

8    **PROSPECTIVE JUROR WU:**  Employee.

9    **THE COURT:**  And have you heard anything today that

10   makes you think you could not serve as a fair and impartial

11   juror?

12   **PROSPECTIVE JUROR WU:**  No.

13   **THE COURT:**  Thank you.

14      Juror Number 80, please.

15   **PROSPECTIVE JUROR TAM:**  Good afternoon, Your Honor.

16   **THE COURT:**  Good afternoon.  How are you?

17   **PROSPECTIVE JUROR TAM:**  Good.

18   **THE COURT:**  Good.  And so you're a physician.  What

19   kind?

20   **PROSPECTIVE JUROR TAM:**  General.  I was trained

21   internist, but I'm doing mainly outpatient clinic.  I work in a

22   community clinic, which is my client, patients, low-income

23   Medi-Cal patients.

24   **THE COURT:**  And how long have you been working with

25   that client group?

 1          **PROSPECTIVE JUROR TAM:**  Thirteen years.

 2          **THE COURT:**  And do you find it rewarding?

 3          **PROSPECTIVE JUROR TAM:**  Kind of.

 4          **THE COURT:**  One of the responses that you made was

 5   that the defendant should be able to tell his story or be

 6   cross-examined.  And I wonder whether you, now having heard

 7   about the defendant's constitutional rights not to testify, not

 8   to put on any evidence and require -- and have the presumption

 9   of innocence, whether you would be able you to follow those

10   instructions and provide the defendant with his constitutional

11   rights?

12          **PROSPECTIVE JUROR TAM:**  Yes.

13          **THE COURT:**  You stated that you strongly agree that

14   most large companies engage in serious unethical conduct, and

15   I'm wondering where that opinions comes from?

16          **PROSPECTIVE JUROR TAM:**  From the news, and

17   documentary, and some personal experience.

18          **THE COURT:**  Not personal experience or, yes, personal

19   experience?

20          **PROSPECTIVE JUROR TAM:**  Some.

21          **THE COURT:**  Some.

22          **PROSPECTIVE JUROR TAM:**  Some.

23          **THE COURT:**  I assume that none of that comes from a

24   contact with Uber or Mr. Sullivan?

25          **PROSPECTIVE JUROR TAM:**  No.

1      **THE COURT:**  And would you be able to put those

2  beliefs -- identify those beliefs, but put them aside, evaluate

3  the evidence as it comes in this case in a fair and impartial

4  manner?

5      **PROSPECTIVE JUROR TAM:**  Yes.

6      **THE COURT:**  And is there any reason you think you

7  could not serve as a fair and impartial juror?

8      **PROSPECTIVE JUROR TAM:**  Personally, I have vacation

9  leave scheduled September 19th to October 4th.

10     **THE COURT:**  Ah, well, that might be a reason.  Do you

11 have prepaid tickets?

12     **PROSPECTIVE JUROR TAM:**  My son bought the ticket, but

13 I'm waiting because non-refundable.

14     **THE COURT:**  Where are you going to go?

15     **PROSPECTIVE JUROR TAM:**  Finally, we decide to go to

16 Lisbon and London.

17     **THE COURT:**  It would be hard to commute from Lisbon.

18 Thank you.  Thank you for letting me know.

19     Number 81, I think.

20     **PROSPECTIVE JUROR HONNAVALLI:**  Hi.

21     **THE COURT:**  Good afternoon.

22     **PROSPECTIVE JUROR HONNAVALLI:**  Good afternoon.

23     **THE COURT:**  What does ServiceNow do?

24     **PROSPECTIVE JUROR HONNAVALLI:**  So, it is a cloud --

25 it's a cloud platform, providing automized, digitized workplace

1    for enterprises.  So pretty much anything in the workplace that

2    requires interoffice signature, like today, is automated

3    throughout cloud platform.

4         **THE COURT:**  And what do you do with them?

5         **PROSPECTIVE JUROR HONNAVALLI:**  So I manage -- I am

6    part of the global technical support team, and I manage one of

7    the teams that cater -- provide services for our enterprise

8    customers.

9         **THE COURT:**  Is there any reason that you've become

10   aware of that you wouldn't be able to serve as a fair and

11   impartial juror in this case?

12        **PROSPECTIVE JUROR HONNAVALLI:**  I don't think so.  I

13   mean, I have read about Uber, again, through online and, you

14   know, news in the past about its work culture.  But this is

15   about a data breach, so impartiality is not an issue for me.

16       But, I think, coming from Fremont, I have aged parents at

17   home, and I have high school senior.  So my only concern would

18   be it takes me two hours -- it took me two hours to come in in

19   the morning.  So two hours a day for three weeks, it is not

20   impossible.  And, plus, COVID exposure is one of my concerns.

21        **THE COURT:**  Okay.  All right.  I appreciate your

22   concerns.  Thank you.

23       Number 82, please.

24        **PROSPECTIVE JUROR TANG:**  Good afternoon.

25        **THE COURT:**  Good afternoon.  So what does a site

1  reliability engineer do?

2      **PROSPECTIVE JUROR TANG:**  It is kind of a position that

3  pioneer by Google.  Essentially, it's just trying to make sure

4  that our environment is up and running so that we can serve our

5  client, so...

6      **THE COURT:**  How long have you been working at B of A

7  doing that?

8      **PROSPECTIVE JUROR TANG:**  Well, for this position, I

9  just kind of move into this position, but I've been with B of A

10  for 20 years.

11      **THE COURT:**  Okay.  The law enforcement officer

12  question, you indicated that they have -- that officers have a

13  moral responsibility to be truthful and testify based on the

14  facts.  I will tell you that everybody has that responsibility.

15      **PROSPECTIVE JUROR TANG:**  Yes, maybe.

16      **THE COURT:**  So would you treat law enforcement the

17  same as anybody else when they come in here to testify?

18      **PROSPECTIVE JUROR TANG:**  I would like to say yes, but

19  I think subconsciously I'll give them more credit than...

20      **THE COURT:**  Tell me why.

21      **PROSPECTIVE JUROR TANG:**  Again, if I explain, I think

22  what their job is, they have more responsibility to do that,

23  and if they don't, then we should not even hire them in the

24  first place.

25      **THE COURT:**  So, do you not think that when somebody

1   who's not in law enforcement, like you, if you were sworn in to

2   tell the truth, do you think you would have a moral

3   responsibility to tell truth?

4        PROSPECTIVE JUROR TANG:  Yeah, I mean, if I get sworn

5   in, yeah.

6        THE COURT:  So I'm just wondering why you think law

7   enforcement -- you should credit law enforcement just because

8   of their job?

9        PROSPECTIVE JUROR TANG:  Yeah.  I can't give you a

10  good reason.  It's just personal opinion, so...

11       THE COURT:  Let me ask you another question.  The

12  defendant, you've heard me say a few times, has the

13  constitutional right, the presumption of innocence, doesn't

14  need to testify, government has to prove its case beyond a

15  reasonable doubt.  Would you be able to apply those

16  constitutional principles when deciding this case?

17       PROSPECTIVE JUROR TANG:  You mean for presuming

18  innocent?

19       THE COURT:  Yes.

20       PROSPECTIVE JUROR TANG:  Yeah, I think everyone should

21  be presumed innocent when they come to the court.

22       THE COURT:  Okay.  And that means among other things

23  that the defendant doesn't have to testify, and the government

24  has to prove its case beyond a reasonable doubt.  Would you be

25  able to follow that instruction?

1      **PROSPECTIVE JUROR TANG:**  I can tell you personally if

2  I am being accused of doing something wrong, I will do

3  everything I can to try defense myself and not, you know, give

4  my fate to other people.  So that would be my opinion.

5      **THE COURT:**  That might be for you, and that would be

6  fine.  You could being make that decision.

7      But I'm now talking about the Constitution of the United

8  States and the rights that we all have as citizens not to

9  testify, and so when we're -- when somebody is on trial, that's

10  a right that has to be honored, like every other right that we

11  have.  Would you be able to do that as a juror?

12      **PROSPECTIVE JUROR TANG:**  It will be challenging, I

13  think.  I think I'm pretty opinionated.  So I would like to say

14  I will just treat everyone the same, but, you know, it's just

15  personality-wise, and what my belief is sometimes at this time

16  get in the way subconsciously, so...

17      **THE COURT:**  And then you'd also heard a few things

18  about Uber.  Would you be able to put those things aside and

19  just judge -- evaluate the evidence that comes in with respect

20  to all of the witnesses, and Uber, and the defendant?

21      **PROSPECTIVE JUROR TANG:**  Yeah, in that regard, yes.

22  The other stuff I list in the questionnaire, whatever, is

23  really just what I heard, so...

24      **THE COURT:**  All right.  And then final thing, you

25  mentioned a concern with respect to COVID.  And you heard my

1  description at the beginning of the case.  Does that satisfy

2  those concerns?

3        **PROSPECTIVE JUROR TANG:**  Yeah, I think the layout in

4  court today and the process you have, I don't have concern.

5        **THE COURT:**  All right.  Thank you very much.

6        **PROSPECTIVE JUROR TANG:**  Oops.  Sorry.

7        **THE COURT:**  Juror Number 83, please.

8        **PROSPECTIVE JUROR BENNINGFIELD:**  Good afternoon, Your

9  Honor.

10        **THE COURT:**  Good afternoon.  How are you?

11        **PROSPECTIVE JUROR BENNINGFIELD:**  Well.  Thank you.

12        **THE COURT:**  So tell me what you do as a clinical

13  research assistant.

14        **PROSPECTIVE JUROR BENNINGFIELD:**  I worked as a

15  clinical research coordinator at UCSF from '93 to 2017, doing

16  women's health cancer screening research, so cervical cancer

17  and breast cancer.  I then became an emeritus, which meant I

18  retired and came back on a volunteer status.  So I continue to

19  work on other projects about ten hours a week.

20        **THE COURT:**  Are you enjoying that?

21        **PROSPECTIVE JUROR BENNINGFIELD:**  I love it, because

22  when you are emeritus, you do only the parts you like because

23  you are doing it for free, and you dump everything else.

24        **THE COURT:**  That is pretty great.

25        So the law enforcement question.  To you, you had

1   indicated reading a number of articles about officers who lied

2   on the stand to cover up their misdeeds, and I'm wondering what

3   your -- you've now heard all these questions and answers.

4           PROSPECTIVE JUROR BENNINGFIELD:  I think, sitting

5   here, marinating these ideas for these hours, is I can think of

6   a lot of examples of law enforcement officers doing the right

7   thing.  If -- I don't even remember what I said, if I said, you

8   know, if big medicine is bad, you know, you can think about

9   Obala (phonetic) or Tylenol who did the right thing when they

10  had a problem, and they came forward and they did the right

11  thing by their customers and their people.

12      I think people are people first.  Law enforcement officers

13  can be good or bad guys, likewise businesses.  So I will just

14  defer to your instructions.

15          THE COURT:  Okay.  Great.

16      And, same, you had read things about Uber.  So -- and you

17  knew some things, I think, about Mr. Kalanick.  Would you be

18  able to put those issues out of your mind and just evaluate the

19  evidence as it comes in?

20          PROSPECTIVE JUROR BENNINGFIELD:  At the beginning of

21  this trial you said the Uber stuff and whatever else, you know,

22  immoral or unsavory, that's not what's on trial here.  And I

23  would follow your instructions.  If it's just about the data

24  breach I have no information about this particular aspect of

25  Uber's business.  I haven't read up about the data breach,

 1  so...

 2          **THE COURT:**  So is there anything you could think of

 3  that would make you not be able to be a fair and impartial

 4  juror?

 5          **PROSPECTIVE JUROR BENNINGFIELD:**  I don't think

 6  anything about fair and impartial.

 7      I do have something about the dates.  I can tell you Rosh

 8  Hashanah is the 26th and 27th.  No court on the 26th.  The

 9  27th, I personally won't be observing the second day.  But

10  October 4th is Yom Kippur and you said we're probably done in

11  three weeks, but maybe four.

12          **THE COURT:**  Okay.

13          **PROSPECTIVE JUROR BENNINGFIELD:**  The 4th is the

14  holiest day on the calendar.  If we're still on, I couldn't

15  come.

16          **THE COURT:**  I meant to have Yom Kippur as the date,

17  and I probably just misstated it.  But if the trial is going

18  that long, we will be off that day.

19          **PROSPECTIVE JUROR BENNINGFIELD:**  Then I have no

20  schedule conflicts.

21          **THE COURT:**  Thank you for raising that.  All right.

22  Thank you.

23      Number 84, please.  Good afternoon.

24          **PROSPECTIVE JUROR MARQUIS:**  Good afternoon.

25          **THE COURT:**  So what is California Benefits Group?

1          **PROSPECTIVE JUROR MARQUIS:**  It was a pension

2    administration company.  And I was the managing partner, and I

3    did -- I designed pension plans and administered them for small

4    businesses like doctors, dentists, lawyers, that sort of thing.

5          **THE COURT:**  And so what are you doing?  How are you

6    spending your time?

7          **PROSPECTIVE JUROR MARQUIS:**  I'm retired.

8          **THE COURT:**  And how are you spending your time?

9          **PROSPECTIVE JUROR MARQUIS:**  Well, lately, I've been

10   doing Pilates.  I'm a grandma Uber.  I run my grandkids all

11   over town, school, jobs.  That's what I'm doing.

12         **THE COURT:**  Okay.  So is there any reason you think

13   you could not serve as a fair and impartial juror?

14         **PROSPECTIVE JUROR MARQUIS:**  No, not at all.

15         **THE COURT:**  Great.  Thank you.

16       Juror Number 87, please.

17         **PROSPECTIVE JUROR YANG:**  Good afternoon.

18         **THE COURT:**  Good afternoon.  How are you?

19         **PROSPECTIVE JUROR YANG:**  Good.

20         **THE COURT:**  Good.  So you have just started working, I

21   guess, at Oakland Health Center; is that right?

22         **PROSPECTIVE JUROR YANG:**  That's right.

23         **THE COURT:**  So tell me, who you were working with

24   before and what kind of group you were working with as a

25   psychiatric social worker.

1         **PROSPECTIVE JUROR YANG:**  So I was working with MSSP.

2  That's in Pleasant Hill.  I was a social worker working with

3  dementia population and Alzheimer's.  So I helped them with

4  coordinating with case managements there for two years.

5         **THE COURT:**  And so how are you -- how have your first

6  two weeks been?

7         **PROSPECTIVE JUROR YANG:**  I have been in training.  I

8  haven't had any clients yet.

9         **THE COURT:**  Good, good.  So is there any reason that

10  you think you could not be a fair and impartial juror?

11         **PROSPECTIVE JUROR YANG:**  I am so new to the job, so

12  I'm kind of worried.  I have to be there in training, so I

13  don't think I can focus because I'm thinking about my training.

14         **THE COURT:**  Did they start with a bunch of people at

15  the same time?  Are you in training with a number other people?

16         **PROSPECTIVE JUROR YANG:**  I was the only one.

17         **THE COURT:**  Okay.  So they would be able to postpone

18  the next little bit of your training if you were selected as a

19  juror in this case; is that true?

20         **PROSPECTIVE JUROR YANG:**  I think -- I think so.

21         **THE COURT:**  Probably.  Okay.  All right.  Thank you.

22  I appreciate it.  Thank you.

23     Number 88, please.  Good afternoon.

24         **PROSPECTIVE JUROR CAPOBIANCO:**  Good afternoon.

25         **THE COURT:**  And what is a GL manager?

 1          PROSPECTIVE JUROR CAPOBIANCO:  It's kind of like

 2   accounting manager.

 3          THE COURT:  Like?

 4          PROSPECTIVE JUROR CAPOBIANCO:  Accounting manager.

 5          THE COURT:  Okay.  So what do you do?

 6          PROSPECTIVE JUROR CAPOBIANCO:  APR, fixed asset,

 7   intercompany cash.

 8      (Reporter asks for clarification.)

 9          THE COURT:  Could you repeat what it is that you do?

10   APR manager, did you say?

11          PROSPECTIVE JUROR CAPOBIANCO:  Yeah, it's like

12   accounting manager, accounts payable, accounts receivable,

13   fixed asset, intercompany.

14          THE COURT:  And have you heard anything today that

15   makes you think you could not serve as a fair and impartial

16   juror?

17          PROSPECTIVE JUROR CAPOBIANCO:  No.  It's just my

18   schedule.  So, tomorrow I have a dental appointment for wisdom

19   teeth removal, and maybe there's another one next week.

20          THE COURT:  Okay.  Is that something that can be -- it

21   sounds like it's something that was scheduled in advance by a

22   month or so?

23          PROSPECTIVE JUROR CAPOBIANCO:  Well, I have to

24   schedule ahead of time, so it's very hard to get a dental

25   appointment.

1          THE COURT:  Yeah.  I'm wondering how long it takes to

2    get wisdom tooth appointment?

3          PROSPECTIVE JUROR CAPOBIANCO:  Like a month, yeah.

4          THE COURT:  Is it bothering you at the moment, or you

5    just know you got to get it done?

6          PROSPECTIVE JUROR CAPOBIANCO:  It bothers me.

7          THE COURT:  Are you in pain right now?

8          PROSPECTIVE JUROR CAPOBIANCO:  Yeah.

9          THE COURT:  All right.  Thank you.

10        Juror Number 89, please.

11         PROSPECTIVE JUROR JUAREZ:  Good afternoon.

12         THE COURT:  Good afternoon.  How are you?

13         PROSPECTIVE JUROR JUAREZ:  I'm doing great.  Yourself?

14         THE COURT:  I'm going great.  Thank you.

15         PROSPECTIVE JUROR JUAREZ:  Wonderful.

16         THE COURT:  So what does a program manager like you do

17    for Adobe?

18         PROSPECTIVE JUROR JUAREZ:  So I manage web projects.

19    So anything on their corporate website I'm responsible for.

20         THE COURT:  And how long have you been working with

21    them?

22         PROSPECTIVE JUROR JUAREZ:  I've been in marketing for

23    25 years, but I've been at Adobe for a year and a half.

24         THE COURT:  You had you indicated that you would

25    like -- you'd prefer to hear directly from the defendant.

1            **PROSPECTIVE JUROR JUAREZ:**  Correct.

2            **THE COURT:**  And you've now heard the statements about

3     the law in that regard.  Would you be able to follow the law

4     and accord Mr. Sullivan his constitutional right not to testify

5     if that's what he chooses to do?

6            **PROSPECTIVE JUROR JUAREZ:**  Yes, I would.

7            **THE COURT:**  Okay.  You indicated some knowledge of

8     Uber.  Would you be able be to set that knowledge aside and

9     just evaluate the evidence as it comes into this courtroom in

10    order to make a decision in this case?

11           **PROSPECTIVE JUROR JUAREZ:**  It would be very difficult.

12           **THE COURT:**  It would be difficult for you to do that?

13           **PROSPECTIVE JUROR JUAREZ:**  Yes, sir.

14           **THE COURT:**  Tell me why.

15           **PROSPECTIVE JUROR JUAREZ:**  I know someone that used to

16    work at Uber, so I'm very familiar with the culture, and I

17    understand it's quite toxic, and profit's very important for

18    Uber.

19           **THE COURT:**  So the information that comes in in this

20    case involving these facts is going to be actual information

21    that has been vetted through the adversarial process.  Do you

22    think it would -- the things that your friend has told you

23    would still leak over to you so that you could not evaluate it

24    alone in order to reach a just verdict?

25           **PROSPECTIVE JUROR JUAREZ:**  It would be challenging,

1  yeah.  I do have sort of a very conscious bias, so I just

2  wanted to make you aware of that.

3        THE COURT:  One of the great things about conscious

4  biases is you can identify them and then set them side.  It's

5  the unconscious ones that are the harder ones to deal with.

6        PROSPECTIVE JUROR JUAREZ:  Correct.

7        THE COURT:  I appreciate what you said.  Thank you

8  very much.

9        PROSPECTIVE JUROR JUAREZ:  Thank you.

10       THE COURT:  Number 90, please.  Good afternoon.

11       PROSPECTIVE JUROR PEDDIREDDY:  Good afternoon.

12       THE COURT:  What does Avanade do?

13       PROSPECTIVE JUROR PEDDIREDDY:  Avanade is a consulting

14 firm, so we work for other companies, incorporating IT

15 services.  Currently, I'm working for Microsoft.

16       THE COURT:  For?

17       PROSPECTIVE JUROR PEDDIREDDY:  Microsoft as a software

18 engineer.

19       THE COURT:  I'm sorry?

20       PROSPECTIVE JUROR PEDDIREDDY:  As a software engineer.

21       THE COURT:  And how long have you been working with

22 Avanade?

23       PROSPECTIVE JUROR PEDDIREDDY:  One year.

24       THE COURT:  Before that what were you doing?

25       PROSPECTIVE JUROR PEDDIREDDY:  I was a software

1    engineer for Wells Fargo.

2          (Reporter asks for clarification.)

3              **THE COURT:**  Wells Fargo?

4              **PROSPECTIVE JUROR PEDDIREDDY:**  That's right.

5              **THE COURT:**  Is there anything that you've heard today

6    that makes you think that you could not be a fair and impartial

7    juror?

8              **PROSPECTIVE JUROR PEDDIREDDY:**  Not from the trial

9    perspective.  But from a personal end, I have two kids, seventh

10   grader and first grader who I take them every day from school.

11   So if I have to serve duty, I have to make other arrangements

12   for after-school services.

13           **THE COURT:**  And do you have family or friends in the

14   area that can do that?

15           **PROSPECTIVE JUROR PEDDIREDDY:**  No.  I have to talk to

16   any after school people.  I have to make calls.

17           **THE COURT:**  Or other parents that are at the school?

18           **PROSPECTIVE JUROR PEDDIREDDY:**  Yeah, but leaving a

19   12-year-old girl in someone else's house, I'm not comfortable.

20           **THE COURT:**  All right.  Thank you.

21      Juror Number 91, please.

22           **PROSPECTIVE JUROR WILLIAMS:**  Hello.

23           **THE COURT:**  Good afternoon.  How are you?

24           **PROSPECTIVE JUROR WILLIAMS:**  I'm good.  I'm not

25   disrespect you, but I'm going to keep my mask on.  A lot of

1    people expressed themselves into this mic today.

2         **THE COURT:**  You are more than welcome to keep your

3    mask on.  That is fine.

4         So you are now a mobile Notary Public?

5         **PROSPECTIVE JUROR WILLIAMS:**  Yes.

6         **THE COURT:**  And before being a mobile Notary Public,

7    what were you doing?

8         **PROSPECTIVE JUROR WILLIAMS:**  I was a director at a

9    non-profit, and I worked in the legal profession prior to that.

10        **THE COURT:**  So tell me about the non-profit.  What was

11   it?

12        **PROSPECTIVE JUROR WILLIAMS:**  It served homeless

13   population, so people who were at risk of being homeless or

14   people who were actually homeless.  I ran the department that

15   provided housing resources to the people we serve.

16        **THE COURT:**  How long did you do that?

17        **PROSPECTIVE JUROR WILLIAMS:**  Maybe about five years.

18        **THE COURT:**  Was that in Richmond?

19        **PROSPECTIVE JUROR WILLIAMS:**  No, it was in Contra

20   Costa County.  Martinez, Concord.

21        **THE COURT:**  You said you worked for a law firm.  What

22   did --

23        **PROSPECTIVE JUROR WILLIAMS:**  Yes, several law firms.

24        **THE COURT:**  What kind --

25        **PROSPECTIVE JUROR WILLIAMS:**  And the Federal Public

 1  Defender's office.

 2       **THE COURT:**  Defenders.  Were the law firms criminal

 3  defense firms?

 4       **PROSPECTIVE JUROR WILLIAMS:**  General.  So big law

 5  firms in San Francisco.

 6       **THE COURT:**  Oh, okay.  And is there anything about

 7  having worked in the public defender's office that gives you --

 8  makes you give more credence to the defense, or the prosecution

 9  for that matter?

10       **PROSPECTIVE JUROR WILLIAMS:**  Actually, opposite.  It

11  would give me more credence to the prosecution, because I've

12  seen a lot of things in the background.  And I would say that I

13  knew, when I worked there, what their conviction rate was, and

14  I saw their investigations, and the evidence that was produced,

15  and I was always highly impressed.

16       **THE COURT:**  So, in this case -- this is a federal.  I

17  assume that you were working at Contra Costa Public Defender?

18       **PROSPECTIVE JUROR WILLIAMS:**  No, I was working for the

19  Federal Public Defender's office in Oakland.

20       **THE COURT:**  Ah, okay.  So this case is not the same

21  case as any other case that you ever saw, and the -- I guess

22  the question is, could you be a fair and impartial juror and

23  just evaluate what is coming in in this case?  The words of

24  lawyers are not evidence.  They're just there to help you

25  understand what the case is, but you would have to make sure

1    you didn't bring any assumptions one way or another into the

2    courtroom.  Would you be able to do that?

3          PROSPECTIVE JUROR WILLIAMS:  To be very transparent,

4    no.  I'm extremely biased, because I always tell friends all

5    the time -- I always say, it's always the same players, the

6    defendants and, you know, plaintiffs change, but all the

7    attorneys are always the same, the judges are always the same.

8    So I have a bias.

9          THE COURT:  Okay.  Thank you for expressing that.

10   Okay.  Thank you.

11         PROSPECTIVE JUROR WILLIAMS:  Okay.

12         THE COURT:  Number 92, please.

13         PROSPECTIVE JUROR ADAMS:  Hi.

14         THE COURT:  Good afternoon.

15      What is Publicus Sapient?

16         PROSPECTIVE JUROR ADAMS:  So close.  "Publicus

17   Sapient."  It's a holding company for a number of advertising

18   and marketing companies and technical companies as well.

19         THE COURT:  Tell me what your job is.

20         PROSPECTIVE JUROR ADAMS:  I'm a content strategist and

21   a copywriter, and, essentially, that has to do with the words

22   that you would see whenever you're using a website or an app.

23   Can be lengthy language, short language.  "Click here" is one

24   of my greatest hits.  So, yeah, there's a lot to it.  There's

25   the copy aspect and the content aspect, which is not just

1  words, but can also be images and other sorts of things.

2       THE COURT:  How about you, is there anything that

3  you've heard today that makes you think you could not serve as

4  a fair and impartial juror?

5       PROSPECTIVE JUROR ADAMS:  No.

6       THE COURT:  Great.  Thank you.

7       PROSPECTIVE JUROR ADAMS:  Thank you.

8       THE COURT:  Number 93, please.

9       PROSPECTIVE JUROR KORENGOLD:  Hello.

10      THE COURT:  Good afternoon.  How are you?

11      PROSPECTIVE JUROR KORENGOLD:  I'm fine.

12      THE COURT:  You work with the Golden Gate National

13  Parks Conservancy.  Where do you work?

14      PROSPECTIVE JUROR KORENGOLD:  I do.  I work on

15  Alcatraz Island and in Fort Mason.

16      THE COURT:  Tell me what kinds of things you do.

17      PROSPECTIVE JUROR KORENGOLD:  I am leading a historic

18  garden restoration project, and I also lead community programs

19  and events and volunteer events in the gardens.

20      THE COURT:  So is the historic garden on Alcatraz or

21  is it at Fort Mason?

22      PROSPECTIVE JUROR KORENGOLD:  There's one on Alcatraz

23  and Fort Mason.

24      THE COURT:  What do they grow on Alcatraz?

25      PROSPECTIVE JUROR KORENGOLD:  Lots of cut flowers.

1  Right now we're trying to match the historic gardens, but also

2  be climate conscious, so not using the same stuff that they

3  grew.

4       THE COURT:  So you are somebody who doesn't have a lot

5  of trust in law enforcement.  Would you be able to set your

6  feelings about law enforcement officers outside the courtroom

7  aside and just treat them as human beings inside the courtroom

8  and evaluate their testimony based on their testimony and the

9  evidence that's in the case?

10       PROSPECTIVE JUROR KORENGOLD:  I would try my best.

11       THE COURT:  Do you think that your best is -- won't be

12  good enough?

13       PROSPECTIVE JUROR KORENGOLD:  I think that I would be

14  able to evaluate people's testimony based on what they said.

15  But I can't lie, like, I obviously have a bias against people

16  who voluntarily work for an organization that regularly harms

17  community members.

18       THE COURT:  Do you come to that belief from things

19  that have happened in your own experience or just the things

20  that you have heard about from others, or read about, or seen

21  on the news?

22       PROSPECTIVE JUROR KORENGOLD:  The countless examples

23  of that happening, and also personal and family and friends'

24  experiences.

25       THE COURT:  Another question was the defendant

1    testifying.  Would you -- if you were chosen to the jury, would

2    you be able to accord him his constitutional rights and not

3    require in your own mind that he testify?

4              **PROSPECTIVE JUROR KORENGOLD:**  Yes.

5              **THE COURT:**  And then you know some things about Uber.

6    Would you be able to set those things aside?

7              **PROSPECTIVE JUROR KORENGOLD:**  I would try my best,

8    but, to be completely honest, corporations like Uber disgust

9    me, so I think it would be a challenge to fully put that bias

10   aside.

11             **THE COURT:**  And that feeds into your belief that large

12   companies engage in -- most large companies engage in serious

13   unethical conduct.  Is that, again, something that you've had

14   personal experience with or something that comes from the stuff

15   that you've read?

16             **PROSPECTIVE JUROR KORENGOLD:**  Something that I've

17   learned from following the news for several years, and also

18   being an avid reader, documentary watcher, article reader, that

19   type of thing.

20             **THE COURT:**  Okay.  Is there anything else that you

21   think the parties and I should be aware of --

22             **PROSPECTIVE JUROR KORENGOLD:**  No.

23             **THE COURT:**  -- related to your ability to serve as a

24   juror?

25             **PROSPECTIVE JUROR KORENGOLD:**  No, that's all.

1          **THE COURT:**  Okay.  Thank you very much.

2      Number 95, please.

3          **PROSPECTIVE JUROR CHONG:**  Good afternoon.

4          **THE COURT:**  Good afternoon.  How are you?

5          **PROSPECTIVE JUROR CHONG:**  I'm good.  Thank you.

6          **THE COURT:**  Good.  So describe your job to me, please.

7          **PROSPECTIVE JUROR CHONG:**  Yeah.  So, I'm a time-entry

8      lead analyst.  So our department is in charge with processing

9      time sheets.  So as a lead, we are overseeing the whole

10     department, making sure works are getting done and the time

11     sheets are getting processed in time.

12         **THE COURT:**  And you've been working with your employer

13     for a long time?

14         **PROSPECTIVE JUROR CHONG:**  Yes, eighteen years.

15         **THE COURT:**  Is there -- having sat through as much as

16     you've sat through today, is there -- are you aware of anything

17     that makes you think you could not serve as a fair and

18     impartial juror?

19         **PROSPECTIVE JUROR CHONG:**  I would be fair, but then I

20     would like to be excused, because I have three daughters who

21     are in school.  The youngest one is kindergarten.  The second

22     one is in middle school, and the oldest one is in high school.

23     So I am the one who is dropping them off and picking them up

24     from school.

25         **THE COURT:**  Do you have other family members in the

1  area that would be able to assist you in, particularly, the

2  dropoff?

3          **PROSPECTIVE JUROR CHONG:**  No.  They're also working.

4          **THE COURT:**  And how about friends?  Is there some way

5  that you could --

6          **PROSPECTIVE JUROR CHONG:**  Friends, it's hard because

7  they are in three different schools, yeah.

8          **THE COURT:**  Okay.  All right.  Thank you very much.

9          **PROSPECTIVE JUROR CHONG:**  Thank you.

10         **THE COURT:**  So, Ladies and Gentlemen, I think I'm

11 going to call a break here for 15 minutes just to take a break.

12 I'm almost done with the people that I'm going to ask questions

13 of, but then the lawyers will have some questions.

14     After that we will take another break, and then we will

15 get to the actual selection process.  We're going to be done

16 today.  Don't worry about that.

17     Please remember my admonitions.  Don't talk about this,

18 don't communicate, don't research, don't do any of those

19 things, and we will be -- we're moving in a good direction.  So

20 I will see you here at five past 2:00.  Thank you.

21     (Recess taken from 1:53 p.m. to 2:08 p.m.)

22     (The following proceedings were held in the presence of

23 the Jury Venire)

24         **THE COURTROOM DEPUTY:**  Please come to order.

25         **THE COURT:**  Please be seated, everybody.

1          I'm on to Juror No. 96, please.

2              **PROSPECTIVE JUROR LIAO:**  Hello.

3              **THE COURT:**  Good afternoon.  How are you?

4              **PROSPECTIVE JUROR LIAO:**  Good.  How's your day going?

5              **THE COURT:**  Well, you have seen my day.  It's been a

6    great day.

7          So tell me what a grievance appeals clerk is.

8              **PROSPECTIVE JUROR LIAO:**  So I work for a non-profit

9    that manages Medicare and Medi-Cal members' accounts so my role

10   is to intake any complaints that the members have as well as

11   any appeals that providers may need to have filed for whatever

12   medical reason.

13             **THE COURT:**  How long have you been doing that?

14             **PROSPECTIVE JUROR LIAO:**  About three months.

15             **THE COURT:**  Do you like it?

16             **PROSPECTIVE JUROR LIAO:**  It's a lot easier and less

17   demanding than my previous roles.

18             **THE COURT:**  So is there -- you have been sitting here

19   all day.  Is there any reason that you are aware of that you

20   could not serve as a fair and impartial juror?

21             **PROSPECTIVE JUROR LIAO:**  No.

22             **THE COURT:**  Thank you.

23         Juror No. 97, please.

24         Good afternoon.

25             **PROSPECTIVE JUROR DIMAILIG:**  Good afternoon.

1          THE COURT:  And, so, Electronic Arts.  What do you do?

2          PROSPECTIVE JUROR DIMAILIG:  Me?  I'm a game play

3    software engineer so we work with designers and artists who

4    just work on implementing game features within our games.

5          THE COURT:  How long have you been with them?

6          PROSPECTIVE JUROR DIMAILIG:  With EA I have been

7    working for roughly about 15 years now.

8          THE COURT:  And where did you work before that?

9          PROSPECTIVE JUROR DIMAILIG:  I was in college before

10   that so I was very lucky to get into the industry when I did.

11         THE COURT:  Your recollection that's great.  Same

12   question, is there anything that you are aware of that makes

13   you think could you not seven as a fair and impartial juror?

14         PROSPECTIVE JUROR DIMAILIG:  I think I would be fair

15   and impartial.  My concern is more of the schedule because for

16   me this is a bit earlier than I'm used to waking up.  It is a

17   bit of a commute for me because I woke up today at like 5:30

18   just to get here.

19         THE COURT:  So did I.

20         PROSPECTIVE JUROR DIMAILIG:  And in about two weeks

21   also my wife is actually going to be out of the country so it's

22   going to be a little bit harder managing things at home at that

23   time.

24         THE COURT:  Thank you for sharing that.  Thank you.

25         PROSPECTIVE JUROR DIMAILIG:  Thank you.

1           **THE COURT:**  And I'll just say to everybody, I know, I

2      appreciate you telling me the concerns that you have about how

3      this impacts your personal life, because it does.  There is

4      just no doubt about it.  And in some ways, some of the -- some

5      things are extremely material.  They matter, a lot.  And so

6      does serving on a jury.  So does the responsibility that we all

7      have as citizens.  I'm being called to jury duty in

8      San Francisco Superior Court in a month and a half.  And I've

9      got other things that I have to do.  And they're not going to

10     give me a pass for showing up.  So it is -- I, I recognize, I

11     recognize how hard it is.  And we're going to be going over

12     hardships and cause in a little bit.  But I just wanted to let

13     you know that I appreciate the concerns that you have, I'm

14     hearing them, and I'm also thinking about how important this

15     thing that you have been called to do is.  Thank you.

16          Juror No. 98.

17          **PROSPECTIVE JUROR STANLEY:**  Good afternoon, Your

18     Honor.

19          **THE COURT:**  Good afternoon.  How are you?

20          **PROSPECTIVE JUROR STANLEY:**  I'm great, how are you?

21          **THE COURT:**  I'm excellent, thank you.  So, you are a

22     pet groomer.

23          **PROSPECTIVE JUROR STANLEY:**  I am.

24          **THE COURT:**  And you have been doing that there for 15

25     years, is that right?

1    **PROSPECTIVE JUROR STANLEY:**  This is my 16th year with

2    my company and 20 years consecutively in the industry.

3    **THE COURT:**  And how has your job changed over that

4    period of time?

5    **PROSPECTIVE JUROR STANLEY:**  Mostly by wage, and with

6    inflation.

7    **THE COURT:**  Uh-huh, well, I'm sorry about that.

8    **PROSPECTIVE JUROR STANLEY:**  Oh, that's a good thing.

9    **THE COURT:**  And I'm pretty sure you haven't had any of

10   my children's dogs.  So, that's also a good thing.

11   **PROSPECTIVE JUROR STANLEY:**  It is possible.

12   **THE COURT:**  You have been here all day.  Is there any

13   reason that you think you would not be a fair and impartial

14   juror in this case?

15   **PROSPECTIVE JUROR STANLEY:**  No reason to not be fair

16   or impartial.  Just the financial hardships that you were going

17   to discuss shortly.

18   **THE COURT:**  Okay.

19   **PROSPECTIVE JUROR STANLEY:**  That I would prefer to

20   discuss in private.

21   **THE COURT:**  Okay.  All right.  I will -- thank you.

22   **PROSPECTIVE JUROR STANLEY:**  Thank you.

23   **THE COURT:**  I will ask you to come back.  Great.

24   **PROSPECTIVE JUROR STANLEY:**  Okay.

25   **THE COURT:**  And No. 99, please.  Good afternoon.

1        **PROSPECTIVE JUROR LEHMAN:**  Greetings.

2        **THE COURT:**  Tell me what JustAnswer LLC is.

3        **PROSPECTIVE JUROR LEHMAN:**  We connect customers with a

4   couple of our professional service experts in a meaningful,

5   affordable and fast way.

6        **THE COURT:**  So tell me what that means.

7        **PROSPECTIVE JUROR LEHMAN:**  Yes.  People that need to

8   speak to doctors, lawyers, veterinarians, mechanics and don't

9   have the access to do so, we break down barriers and provide

10  that for them in an online format.

11       **THE COURT:**  I see.  So give me an example of a typical

12  customer and a typical connection.

13       **PROSPECTIVE JUROR LEHMAN:**  One you can connect with is

14  animals have a tendency to get into trouble.  And so we have a

15  lot of customers that call us when dogs eat things they

16  shouldn't be eating, including chocolate and fruit and things

17  like that, as one example.

18       **THE COURT:**  And then you put them in touch with --

19       **PROSPECTIVE JUROR LEHMAN:**  The veterinarian, in that

20  case.

21       **THE COURT:**  Put them in touch with a vet?

22       **PROSPECTIVE JUROR LEHMAN:**  That's correct, yes.

23       **THE COURT:**  That's great.  So, have you -- is there

24  any reason that you would not be a fair and impartial juror in

25  this case?

1          **PROSPECTIVE JUROR LEHMAN:**  The only thing that I

2     wanted to point out to the Court is I have very, very deep

3     expertise in the area of corporate fraud, waste and abuse.  As

4     a matter of fact I created software, probably the

5     industry-leading software for this in the commercial software

6     sector.  And I've also applied it to the majority of the

7     Fortune 100.

8          And, quite frankly, it has had an impact on me personally

9     and professionally, seeing some of the things that I found

10    during that analysis, to the point I actually stepped away from

11    a 20-year job and stepped away for a year and took a lesser

12    job.

13         That's the one concern I would want the Court to know.

14         **THE COURT:**  So, so, do you think that that experience

15    would sort of bleed over into your evaluation of the

16    credibility of witnesses or --

17         **PROSPECTIVE JUROR LEHMAN:**  I would hope not.  And I

18    would try to not let it.  As I said, you know, I saw a lot of

19    things that were disturbing when I did that work.  And, to the

20    point that I actually stepped away from it.  But I did step

21    away from it in 2017, so it's been a few years.

22         **THE COURT:**  And you probably saw many good stalwart

23    corporate citizens during your time as well, correct?

24         **PROSPECTIVE JUROR LEHMAN:**  Yeah.  I never -- I never

25    saw this case, though, I don't believe.

1        **THE COURT:**  Okay.  So that is your one concern.  Thank

2    you for bringing that to my attention.

3        **PROSPECTIVE JUROR LEHMAN:**  Sure.

4        **THE COURT:**  And, Juror No. 100.

5        **PROSPECTIVE JUROR KWONGSIATUU:**  Good afternoon.

6        **THE COURT:**  Good afternoon.  How are you?

7        **PROSPECTIVE JUROR KWONGSIATUU:**  Good.

8        **THE COURT:**  So, you are a social worker.  Who -- who's

9    your clientele, mostly?

10        **PROSPECTIVE JUROR KWONGSIATUU:**  I'm a hospice social

11   worker.  So my clientele is clients with terminal illnesses.

12        **THE COURT:**  Thank you.  I am such a big fan of

13   hospice.  And that's got to be rewarding, but also very hard

14   work.  So I appreciate what you do.

15        **PROSPECTIVE JUROR KWONGSIATUU:**  Thank you.

16        **THE COURT:**  The -- I wanted to ask you about the law

17   enforcement question and then the defendant question.  You

18   indicated that law enforcement, if they were testifying, would

19   need to state facts.

20        In your mind, does that mean that you would treat them

21   just the way that would you treat any -- any witness who comes

22   here would need to state facts, and you would be able to judge

23   their testimony that way?

24        **PROSPECTIVE JUROR KWONGSIATUU:**  Yes.

25        **THE COURT:**  Okay.  And, and then, as far as the

1  defendant's right not to testify, you said, needs to have a

2  good reason for not testifying, basically.  Would you be able

3  to follow the instructions that I give you, that -- his

4  constitutional right not to testify, and put the appropriate

5  burden of proof on the government in order to convict?

6        **PROSPECTIVE JUROR KWONGSIATUU:**  Yes.  Yeah.  That's

7  their choice.

8        **THE COURT:**  It is their choice.  Exactly.

9     You also had -- you strongly agreed that most large

10  companies engage in serious unethical conduct.  And what were

11  you basing that belief on?

12        **PROSPECTIVE JUROR KWONGSIATUU:**  Like, what everybody

13  said, the media, news, social medias.

14        **THE COURT:**  And the same, very common for executives

15  at a company to cover up information that could harm them or

16  their company.  Same thing?

17        **PROSPECTIVE JUROR KWONGSIATUU:**  Yes.

18        **THE COURT:**  Would you be able to set those beliefs

19  aside when you are a juror in this case and simply evaluate the

20  conduct of everybody, from the information that you get here

21  from the witnesses and from the documents?

22        **PROSPECTIVE JUROR KWONGSIATUU:**  I think with your

23  guidance, yes.

24        **THE COURT:**  Great.  Is there any other -- is there any

25  reason that you think you could not serve as a fair and

1   impartial juror?

2           **PROSPECTIVE JUROR KWONGSIATUU:**  No.

3           **THE COURT:**  Thank you.

4           **PROSPECTIVE JUROR KWONGSIATUU:**  Thank you.

5           **THE COURT:**  Is there anybody that I have forgotten?

6      (No response)

7           **THE COURT:**  Okay.  So now I will turn it over to the

8   prosecution and for their questions.  Please proceed,

9   Mr. Kingsley.

10                      **<u>JURY VOIR DIRE</u>**

11  **BY MR. KINGSLEY**

12      Thank you, Your Honor.

13      Can everybody hear me?

14      So, good afternoon.  The Court introduced us this morning,

15  but that was a long time ago, a lot of questions ago.  So I'm

16  going to introduce myself again.  I'm Ben Kingsley.  I'm an

17  Assistant United States Attorney in the U.S. Attorney's Office

18  here in San Francisco.  Andrew Dawson is my colleague, also an

19  Assistant United States Attorney, or AUSA.  You will hear that

20  as well.

21      Mario Scussel is a Special Agent for the FBI.  Welton

22  Pollard, also a Special Agent for the FBI.  We are going to be

23  trying this case for the United States over the next few weeks.

24      We've read your questionnaires; they're really helpful.

25  All of your answers to the questions today will be helpful.  I

 1   only have a few questions.  I'll start just a little bit with

 2   who we are.

 3       There was a lot of answers on the questionnaires, a lot of

 4   discussion today about views on law enforcement.  And we heard

 5   all of that, and I wrote it down, so I'm not asking anybody to

 6   repeat themselves on that subject.  But I just want to focus

 7   specifically on the Justice Department and the Federal Bureau

 8   of Investigation.

 9       So we are the government for all intents and purposes in

10   this case and there's been a lot of news about, however long,

11   about the FBI and the Justice Department.  So I want to make

12   sure nobody has views specific to the FBI or the Justice

13   Department, negative views or a bias that would affect your

14   ability to consider the evidence that we're going to put on in

15   this case and your ability to act as an impartial juror as the

16   Court has instructed you to do.

17       If anybody has views like that, could you please raise

18   your hand?

19       (No response)

20       **MR. KINGSLEY:**  Great.  Thank you.

21       Another thing that I think is clear from the Court's

22   instructions, the Court early on told you about the role of a

23   juror, to consider the defendant innocent until proven guilty,

24   the importance of the presumption of innocence, the importance

25   of the defendant's right not to testify.  And also told you

1  that your job is to find the defendant not guilty if we don't

2  prove our case beyond a reasonable doubt and guilty if we do

3  prove it beyond a reasonable doubt.

4      And I don't think the Court gave this particular

5  definition of reasonable doubt but I think you will get an

6  instruction that says reasonable doubt means that you are

7  firmly convinced that the defendant is guilty.  And one thing

8  people sometimes struggle with is:  What does that mean?  I

9  feel like I need to be 100 percent certain that somebody is

10  guilty before I find them guilty.

11      And so I want to ask if anybody would have difficulty

12  applying that reasonable-doubt standard that I just described

13  and feel like they would need something like absolute certainty

14  or 100 percent certainty before they found the defendant

15  guilty, if the evidence supported a finding that he was guilty

16  beyond a reasonable doubt.

17      Does anybody have that view or that sort of concern?

18      (A hand is raised)

19          **MR. KINGSLEY:**  What Juror Number are you?

20          **PROSPECTIVE JUROR KARAKASEVIC:**  No. 65.

21          **MR. KINGSLEY:**  65, you said?

22          **PROSPECTIVE JUROR KARAKASEVIC:**  (Nods head)

23          **THE COURT:**  Give me a moment.

24          **MR. KINGSLEY:**  Can you give me a second?  I hate to

25  ask you to come up again, but I want to ask you for a moment to

1   explain that.

2       Yeah.  So what, what, why did you raise your hand?

3           **PROSPECTIVE JUROR KARAKASEVIC:**  Well, we spoke of

4   sorting out the facts.  It's the facts or it's not the fact.

5   So if you don't have all the facts, then how can you say

6   someone's guilty?

7           **MR. KINGSLEY:**  Well, so, I guess -- this is sort of a

8   theoretical question, but as the Court said, the parties are

9   going to present evidence.  You are going to get a bunch of

10  evidence in the different forms of facts that are going to come

11  from us and from the defense, from witnesses and documents.

12  And from your perspective that is going to be the universe of

13  facts for you to consider.

14      If that's the universe of facts, are you saying that you

15  wouldn't be able to vote that the defendant is guilty because

16  you might think there would be other facts out there?  Or just

17  saying that to consider those you would need to be 100 percent

18  sure that the defendant was guilty?

19          **PROSPECTIVE JUROR KARAKASEVIC:**  Hundred percent sure.

20          **MR. KINGSLEY:**  Thank you.

21          **PROSPECTIVE JUROR KARAKASEVIC:**  Yeah.  Shall I leave?

22          **MR. KINGSLEY:**  Yeah, that's it, thank you.

23      One other question I would ask, and I know it's a little

24  hard for people to answer this in the abstract until you see

25  the evidence in this case and you know what stuff is going to

1   look like.  But one thing that happens a lot in cases like this

2   one is you're going to be asked to make judgments on what was

3   in a person's mind, based on things that the person did, maybe

4   things that they said, maybe things that other people saw them

5   do.  But, not necessarily be in their mind.  One of the reasons

6   for that is that the defendant has a right not to testify.  You

7   may or may not hear directly from the defendant on something.

8   And the Court asked a lot of questions on that.

9        My question is, would anybody have a problem or difficulty

10  with being asked to determine what's in a person's mind, based

11  on looking at evidence of what they did, of things they said in

12  the time, of things other people saw them do?  Would they feel

13  like they need something more than that, something like, you

14  know, the defendant's own statement now, or something like that

15  to understand what was in their mind?

16       (A hand is raised)

17            **MR. KINGSLEY:**  Yes.  What number are you?  64?

18       **PROSPECTIVE JUROR LEE:**  Yes.

19            **MR. KINGSLEY:**  Could you just come up for a second,

20  please?

21       **PROSPECTIVE JUROR LEE:**  Sure.

22       **MR. KINGSLEY:**  Thank you.

23       **PROSPECTIVE JUROR LEE:**  Hello.

24       **MR. KINGSLEY:**  Hi.  Sorry to bring you back up again.

25       **PROSPECTIVE JUROR LEE:**  That's okay.

1          **MR. KINGSLEY:**  Why did you raise your hand?

2          **PROSPECTIVE JUROR LEE:**  I was just thinking about

3   that.  And to me it sounds like when I'm trying to understand

4   someone's thought process just by their actions, I'm innately

5   just making assumptions.  To me that's almost -- not demanding,

6   per se, but requesting somebody to make a bias from what

7   somebody is thinking about, based on purely behavioral

8   observations.

9      But I think you mentioned there were -- like, the evidence

10   is very unclear right now, and there could be other ways, I

11   suppose, that I could make those types of judgment calls.

12      But, just off the top of my head, that was something that

13   came into mind.

14          **MR. KINGSLEY:**  So, but my guess is you probably, in

15   your day-to-day, make assumptions about what people are

16   thinking based on what you see them do all the time.  Right?

17          **PROSPECTIVE JUROR LEE:**  Correct.

18          **MR. KINGSLEY:**  I'm not asking whether you would want

19   to critically evaluate the evidence and make sure that you saw

20   enough to feel firmly convinced of what's in their mind.

21          **PROSPECTIVE JUROR LEE:**  Understood.

22          **MR. KINGSLEY:**  And it may be seeing somebody doing one

23   thing isn't enough.  You may need to see several pieces of

24   evidence or several forms of action that are consistent with a

25   state of mind for you to get to that point.

1          Do you think that you -- do you think that you are saying

2     you can never get to that point?  Or do you think that you just

3     might need more; you don't want to jump to conclusions based on

4     seeing somebody about one thing?

5          **PROSPECTIVE JUROR LEE:**  If in this situation it was

6     only one behavioral action, I would definitely need to see more

7     evidence.  But I feel like I could get to a point, I suppose,

8     to make a decision like that.  Yeah.  If there was enough

9     evidence to -- to make that kind of call.

10         **MR. KINGSLEY:**  Okay.

11         **PROSPECTIVE JUROR LEE:**  If that makes sense.

12         **MR. KINGSLEY:**  No, that makes sense, and it's a bit of

13    an unfair question because you don't know what the evidence is,

14    and I'm not going to tell you.

15         **PROSPECTIVE JUROR LEE:**  I understand.  Yeah, no, no

16    worries.

17         **MR. KINGSLEY:**  Okay, thank you.

18         All right, I have a specific question for Juror No. 36.

19    If you could come up again, please.  And I'm so sorry.

20         **PROSPECTIVE JUROR QUINN:**  Sure.

21         **MR. KINGSLEY:**  Hi.  So you do immigration work, right?

22         **PROSPECTIVE JUROR QUINN:**  I do.

23         **MR. KINGSLEY:**  So do you litigate against the United

24    States sometimes?

25         **PROSPECTIVE JUROR QUINN:**  Yes.

1       **MR. KINGSLEY:** And that includes the Justice

2   Department?

3       **PROSPECTIVE JUROR QUINN:** Um, well, yes. So, in

4   general, now, I'm at a support center so I don't take -- we

5   don't do direct representation. So for the last ten years I

6   don't take direct cases. But we have been plaintiff in a

7   couple lawsuits in the last five years under the last

8   administration. And then when I was in court, I would take

9   cases through to the Ninth Circuit on behalf of a direct

10  immigrant.

11      **MR. KINGSLEY:** So I assume the cases in the last

12  administration were against -- the Justice Department was

13  either the defendant or representing the defendant in those

14  cases?

15      **PROSPECTIVE JUROR QUINN:** Correct.

16      **MR. KINGSLEY:** Is there anything in your time

17  litigating against the federal government -- so, we work for

18  the Justice Department.

19      **PROSPECTIVE JUROR QUINN:** Yes, I'm aware.

20      **MR. KINGSLEY:** We are litigators for the Justice

21  Department, Mr. Dawson and I are.

22      Is there anything about that experience that would affect

23  your ability to judge this case fairly?

24      **PROSPECTIVE JUROR QUINN:** No, I feel like I'm looking

25  at a different landscape, and I'm absolutely able to discern

 1  facts and take what's in front of me.

 2          **MR. KINGSLEY:**  Okay.  Thank you.

 3          **PROSPECTIVE JUROR QUINN:**  Sure.

 4          **MR. KINGSLEY:**  That's all I have.  Thank Your Honor.

 5  Thank you, everyone.

 6                          **<u>JURY VOIR DIRE</u>**

 7  **BY MS. KERIN**

 8      Good afternoon, members of the jury.  I'm Michelle Kerin,

 9  and I represent the defendant, Joe Sullivan.

10      Judge Orrick was very thorough today so I have just a

11  handful of questions for you.  And these questions, I'm going

12  to ask you to raise your hand if you agree with the statement.

13  And it's kind of like if you're at an auction, if you can raise

14  your number if you agree with the statement.  Okay?

15      So a number of you identified in your questionnaire that

16  you were a person -- because of your job or because of where

17  you worked, that you had a duty to report specific conduct to

18  law enforcement or authorities.  And what you will hear if you

19  are a member of this jury is that generally the law does not

20  require a person to report a crime if they witness one.

21      So raise your hand if, regardless of this, you believe

22  everyone has a moral obligation to report criminal activity to

23  law enforcement or other authority, even if they're not

24  required to.  Raise your --

25      (Hands raised)

 1          **MS. KERIN:**  Yes, okay.  I'm not going to call all of

 2     you out because there are a lot of you.  So keep them up, keep

 3     them up.

 4          I just want to dig a little bit more into that.  So for

 5     those of you who are raising your hand, do you think someone

 6     should be accountable or that they're in the wrong if they

 7     didn't do the morally right thing, even if the law doesn't

 8     require it?

 9          Keep your number up if you believe that.

10          (Hands raised)

11          **PROSPECTIVE JUROR:**  Can you repeat that?

12          **MS. KERIN:**  Yes.  So for those of you who have raised

13     your hand, do you think somebody should be held accountable or

14     that they're in the wrong if they didn't do the morally right

15     thing?

16          (Hands raised)

17          **MS. KERIN:**  Okay, if you could just -- okay.  Thank

18     you.

19          I wanted to follow up on another area that Judge Orrick

20     asked you about and that's about data breaches.  And a lot of

21     you wrote in your questionnaire that you were a victim of data

22     breach or identity theft.  I would have had to answer yes as

23     well.  And specifically, Jurors No. 9, 29 and 73 provided

24     insight on how that had affected them.

25          Now that you all know more about the case, is there

 1   anything about that experience of being a victim of data breach

 2   or identity theft that would be on your mind as you listen to

 3   the evidence in this case?  Is there anybody else who has those

 4   feelings?

 5        (No response)

 6            MS. KERIN:  Okay.  I'm going to move on.

 7        AUSA Kingsley just informed you or told you about the

 8   definition of reasonable doubt.  And you have heard multiple

 9   times today, right, that the burden of proof in a criminal

10   matter, it also rests on the government.  And Judge Orrick told

11   you that the government burden in a criminal case is to prove

12   that evidence beyond a reasonable doubt.

13        Raise your hand if you think that is an unfair burden.

14        (A hand is raised)

15            MS. KERIN:  Juror 91.  Thank you.  Anybody else?

16            PROSPECTIVE JUROR:  (Inaudible)

17            THE COURT:  Repeat the question.

18            MS. KERIN:  Oh.  Of course.

19        You have heard today that the burden of proof in a

20   criminal matter is on the government.  And that the burden the

21   government must prove its case by is beyond a reasonable doubt.

22   AUSA Kingsley helpfully described what that was.

23        Now that you have heard all of this, raise your hand if

24   you think that is an unfair burden.

25        (A hand is raised)

 1          MS. KERIN:  Yes, you think that is an unfair burden?

 2          PROSPECTIVE JUROR LEE:  Unfair burden for the Court to

 3   make that choice, to make that call.  Is that -- is that what

 4   that is?

 5          MS. KERIN:  If you think it is an unfair burden to the

 6   government.

 7          PROSPECTIVE JUROR LEE:  (Inaudible)

 8          MS. KERIN:  You think it is an unfair burden to the

 9   government.

10          PROSPECTIVE JUROR LEE:  I do not think it is unfair.

11          MS. KERIN:  Do you think it is an unfair burden to the

12   defendant?

13          PROSPECTIVE JUROR LEE:  No.

14          MS. KERIN:  Thank you.  So I want to circle back.

15   Yes, No. 9.

16          PROSPECTIVE JUROR MANAYAN:  Yeah, I do believe --

17          THE COURT:  Would you step up to the microphone,

18   please.  Thank you.

19          PROSPECTIVE JUROR MANAYAN:  Yeah, I believe that it

20   can be an unfair burden to the defendant.  The -- only because

21   he can -- he can be telling the truth all this time, but found

22   something -- that the prosecutor finds something, and still

23   found him guilty.

24          MS. KERIN:  Thank you for that.  Yep.  Thank you.

25       So, last question on this general topic.  Raise your hand

 1   if you believe that the criminal justice system is too soft on

 2   what we call "white-collar crimes."  And those are primarily

 3   non-violent crimes that are typically financially motivated.

 4        (Hands raised)

 5        MS. KERIN:  Who thinks the justice system is -- okay.

 6   Juror 1, 13, 9, 70, 89, 73 -- there's a lot.  I'm not going --

 7   I only have 15 minutes, so -- if you could just keep it up for

 8   just a little bit longer.

 9        Okay.  Thank you.

10        I just want to go back on some ground that has been tread

11   on quite a bit today, but I want to put a different spin on it.

12   And that is people's opinions of Uber, and more specifically,

13   the former CEO, Travis Kalanick.  And several of you have

14   indicated that you have strong feelings about Uber, and about

15   Travis Kalanick, the former CEO.  And you know neither

16   Mr. Kalanick or Uber are on trial.  But the conduct of Uber and

17   Mr. Kalanick will play a role in the evidence that you hear

18   throughout this case.  And we all have opinions, for sure.  I

19   need to know whether your opinions are strong enough that they

20   would get in the way of deciding this case with an open mind.

21        So let me follow up on a couple questions to the whole

22   group.

23        You are going to hear that Mr. Sullivan was the chief

24   security officer.  You've heard that today.  But you will also

25   hear that he reported directly to Mr. Kalanick.  Raise your

 1   hand if you think that your opinion of Uber or Mr. Kalanick

 2   might influence you, even a little bit, the way that you view

 3   the evidence in this case.  Raise your hand if you think that.

 4        (Hands raised)

 5        **MS. KERIN:**  Juror 89, 93, 38, 31, and 35.

 6   Thank you.

 7        **PROSPECTIVE JUROR:**  (Inaudible) So this is

 8   (Inaudible).

 9        **THE COURT:**  Please, if you wouldn't mind coming up to

10   the mic, that would be great.

11        **PROSPECTIVE JUROR HONNAVALLI:**  All the news I've heard

12   about Uber and all the news I've heard about the CEO, hearing

13   about the culture and the company for a long time now.  Forget

14   the technological expertise, it is also about the culture, as a

15   woman that, you know, we have been reading about.  So

16   irrespective of whether it is, you know, completely true or

17   false, the facts are there.  It is going to be a baseline or a

18   setting.

19        And although, you know, we want to look at the facts on

20   hand, culture is driven from the top.  So, it will add to the

21   mix, if not completely, at least, an implicit bias.  So, we

22   are -- we will try to be fair, but it's going to be there.

23        **MS. KERIN:**  So you would be influenced by your beliefs

24   about Uber or your understanding of Uber and Mr. Kalanick,

25   based on Mr. Sullivan was a direct report, and Mr. Kalanick's

 1    conduct will be an issue in this case.

 2              **PROSPECTIVE JUROR HONNAVALLI:**  So these two issues are

 3    separate.  One is about a data breach, and one is, you know,

 4    the questions that were asked in the questionnaire were about

 5    his behavior towards women.  So, these are two separate issues.

 6              But the final thing is, you know, what's the right thing

 7    to do?  Both are moral issues.  Two separate issues, but both

 8    are moral issues.  One is a data issue.  And anyone who's got

 9    an online account, you always -- I'm sure 90 percent here have

10    gotten an email saying:  Please change your password.  You

11    know, the data leak has been there.

12              So the question is, you know, what was the impact?  Again,

13    I do not know all the full facts.  I haven't read the entire

14    facts of the 2016.  I just know the basics, being in the

15    industry.  But the fact is that there was a data breach.  The

16    question was -- you know, again, I do not know what the

17    question is, based on the trial.  But the question is going to

18    be, you know, what was the impact.  And, you know, what were

19    the facts that it wasn't -- I mean, what the problem was.

20    Right?

21              So the -- it is -- what I'm trying to say is that there is

22    going to be a slight amount of implicit bias, whether we

23    declare it or not.

24              **MS. KERIN:**  Thank you for that.  Thank you.

25              **THE COURT:**  And you will get an instruction that you

 1  will be bringing your implicit biases with you.  There is

 2  nothing you can do about that.  We all have them, all the time.

 3  The issue is what you do.  And how you evaluate the information

 4  that you get.  And I will be giving you an instruction that is

 5  specifically about that, that information.

 6      **PROSPECTIVE JUROR HONNAVALLI:**  Yeah.  If it was called

 7  an explicit bias, you would know how to handle it.  But it's an

 8  implicit bias.

 9      **MS. KERIN:**  Thank you.

10      Just a couple more, a couple more questions.  Judge Orrick

11  instructed you multiple times today that the Fifth Amendment of

12  the United States Constitution offers a defendant in a criminal

13  case the right not to testify.  And there are a lot of reasons

14  why a defendant might opt to exercise this right.

15      Raise your hand if you think that a defendant who chooses

16  not to testify, who exercises this right, is most likely making

17  the choice because they are guilty.

18      (Hands raised)

19      **MS. KERIN:**  Juror 89, Juror 80, 93, 99, 82, 38.

20      Anybody else?

21      (No response)

22      **MS. KERIN:**  Okay.  And my final question, before I sit

23  down after your very long day:  You guys have heard a lot about

24  the case by this time.  And you've answered a lot of questions.

25  But is there any other issue you feel is important to raise

1  with the Court that hasn't been responsive to a question that

2  the Court or Mr. Kingsley or I have asked?

3      Is there anybody else who thinks that there's something

4  the Court should know?

5      (No response)

6          **MS. KERIN:**  Thank you very much.

7                  **<u>JURY VOIR DIRE</u>**

8  **BY THE COURT**

9      All right.  So ladies and gentlemen, I have a couple more

10  things to tell you, and then we're going to take a break so

11  that the lawyers can do some work.  And actually we have a

12  couple of people who wanted to speak individually, and we'll do

13  that.  But I just have a few more questions for you as a group.

14      Jurors -- and you have heard this from me, but jurors may

15  not express or form any opinion on the merits of the case until

16  the end of the trial, when it's been finally submitted to them

17  for their verdict.  That is to say, until they have had the

18  benefit of the arguments of counsel, and the instructions of

19  the Court.

20      Are you all satisfied that you will be able to listen to

21  all of the evidence from both sides, and listen to and follow

22  the instructions that I give you, before you form any final

23  opinion on the merits?  Everybody able to do that?

24      (No response)

25          **THE COURT:**  If you're selected to sit on the case,

1   will you be able and willing to render a verdict based solely

2   on the evidence presented at trial and the law that I give you

3   in my instructions?

4        (No response)

5            THE COURT:  Everybody will.

6        Does anybody know of any reason other than those that you

7   have already stated today, and with the exception of the couple

8   of people who wanted to talk to me in a moment, why you could

9   not sit with absolute impartiality of both sides as a juror in

10  this case?

11       (No response)

12           THE COURT:  Does anyone suffer from any mental,

13  physical, or emotional impairment, besides what you may have

14  said to me today, that would make it difficult for you to sit

15  as a fair and impartial juror?

16       (No response)

17       (A hand is raised)

18           THE COURT:  Juror No. 5?

19           THE LAW CLERK:  Yes.

20           THE COURT:  Is this something that you have not spoken

21  about yet?

22           PROSPECTIVE JUROR COWDEN:  I have not.

23           THE COURT:  Would you like to speak about that

24  privately?

25           PROSPECTIVE JUROR COWDEN:  I'm just wondering if these

1    -- are the other chairs more comfortable than these?

2          THE COURT:  That's a -- that's -- that's a

3    personal-preference thing.  There will be two different kinds

4    of chairs.  And you won't have a day as long as this one is.

5          PROSPECTIVE JUROR COWDEN:  Yes.

6          THE COURT:  So that would be my answer to your

7    question.

8          PROSPECTIVE JUROR COWDEN:  Okay.  That's fine.

9          THE COURT:  All right.  Nobody else.

10    Recognizing that service on the jury is inconvenient for

11    everybody because it requires you to be doing something other

12    than what you would ordinarily be doing and it interferes with

13    a number of your plans, does anyone have any special disability

14    or problem that you haven't already told me, that would make

15    serving as a member of the jury difficult or impossible?

16          (Hands raised)

17          THE COURT:  All right.  I'll ask the people who have

18    raised their cards to wait, and -- and when we have a break,

19    I'll ask you to come in and you can explain that issue to me.

20          One of the instructions I'm going to be giving you is that

21    you -- is not to discuss the case with anybody until your jury

22    service is over.

23          Does anybody here have any problems with keeping things

24    confidential?

25          (No response)

1      **THE COURT:**  Having heard all of the questions that you

2   have been asked, is there any other reason why you could not

3   sit on the jury and render a fair verdict, based on the

4   evidence presented in the context of the instructions that I

5   give you on the law?

6      (No response)

7      **THE COURT:**  Okay.  So here's what's going to happen

8   now.  I'm going to ask the people who have something more to

9   say, we'll do it individually, but first I'll ask you to stay

10  seated in the courtroom.

11     Everybody else, I would like you to come back at 3:20.

12  And, and it may be that the courtroom is locked on the outside,

13  but just stand in the hall if it is, because what's going to

14  happen while we go on this recess is that the lawyers are going

15  to be working on -- and I am -- whether to excuse some of you

16  for cause, or hardship, and the lawyers are also going to be

17  trying to figure out how to make the peremptory challenges that

18  they're going to make.

19     When you come back, then things will seem to go much

20  quicker, and we'll probably -- I'm not going to tell you what

21  time we're going to be done.  But we'll be done in a -- at a

22  reasonable hour.

23     So with that, please remember my admonitions.  Don't talk

24  to anybody.  Come back when I said to come back.  And, those

25  who need to say one more thing, stay in the courtroom.

1        (Jury Venire excused)

2        (The following proceedings were held outside the presence

3   of the Jury Venire)

4        **THE COURT:**  All right.  The juror who just approached

5   me, are you still here?  I think she left the courtroom.

6        So, I am willing -- if anybody wants to speak privately,

7   then, um, I will talk with you privately after I talk to

8   anybody who wants to speak -- who doesn't mind speaking in

9   front of everybody else.

10        So, Juror No. 35.

11        **PROSPECTIVE JUROR ELLIS:**  Yeah.  You mentioned, you

12   said if it would be difficult for me.  So I mentioned before my

13   other, my job currently is part-time, and I just accepted an

14   offer to start at a new job, in addition to that job.  And so

15   my time is extremely limited, the allowable time that I have.

16   And I start -- tomorrow is my first day, my on-boarding day, at

17   my other new job.  And it's a temporary six-month position.

18        So adding -- removing more than half of my day for that

19   first six-month temporary job would be not impossible, but

20   difficult.  So I just wanted to communicate that, because you

21   mentioned if it would be difficult for me, so --

22        **THE COURT:**  Okay.  You didn't tell your new employer

23   that you were called to jury service?

24        **PROSPECTIVE JUROR ELLIS:**  I just shared my schedule

25   with them yesterday, or the day before, when I got this notice.

 1   But I haven't had an opportunity to speak with them, because of

 2   the holiday and everything like that.

 3       But, yeah.  I do believe that they would allow me

 4   flexibility.  But, again, you know, I'm obligated with these

 5   other jobs as well.  So it's not only that one position.

 6           **THE COURT:**  I understand.  Okay.  Thank you.

 7           **PROSPECTIVE JUROR ELLIS:**  I just wanted to communicate

 8   that.

 9           **THE COURT:**  Yeah, I appreciate it.  Thank you.

10           **PROSPECTIVE JUROR ELLIS:**  Yep.

11           **THE COURT:**  All right.  Who else?

12       Sure, come on up.  Juror No. 42.

13           **PROSPECTIVE JUROR KIM:**  Hello again.  Um, this is my

14   first time being on the prospective jury so I didn't know when

15   the right time was to discuss if there was any hardship or

16   anything, but I'm glad I'm getting to bend your ear again.

17       So I'm an account manager, and I'm kind of a liaison

18   between clients and vendors.  And I have -- am spearheading a

19   big project coming up on Thursday.  And in the following weeks

20   in September, 15th through the 17th, I am on call to the phone

21   to New York to oversee a 48-office reconfigure.  Still not

22   booked yet, but that's definitely out in the wind.  And that

23   will probably be solidified closer to the end of next week.

24       But, yeah, I just -- that's the only thing that I would

25   like to mention.

1              **THE COURT:**  Thank you.

2              **PROSPECTIVE JUROR KIM:**  Thank you.

3              **THE COURT:**  Yes.  Go ahead.  Come -- and you can --

4    now take your break after you --

5              **PROSPECTIVE JUROR KIM:**  Oh, great.  Don't need to

6    listen.

7              **PROSPECTIVE JUROR FIELDS:**  Hi, Your Honor.

8         So when I received the letter to participate on the jury,

9    I thought it would be from August 25th through September 8th.

10   And I let my HR department know.  But my company has been

11   really gracious in allowing me to stay with them because, as

12   you probably know, with recruiting they are letting everybody

13   go.  And I didn't anticipate that this would be three to four

14   weeks.  And I don't know what I would do.  Like, if I would

15   have to request a leave of absence, that would impact me and my

16   family.

17        So I would like to ask if I could be excused from the

18   case.  I -- last week my boss asked if I could go to the

19   Intermodal Association of North America conference in Long

20   Beach next week.  I said yes, because I wasn't -- I wasn't

21   anticipating to be, um, you know, maybe being in a jury for

22   past September 8th.

23        So, that's my situation.

24             **THE COURT:**  Okay.  Well, thank you for sharing.  And

25   if you are chosen for the jury, I would be very happy to field

1  any call from your boss to explain the importance of jury

2  service.

3              **PROSPECTIVE JUROR FIELDS:**  All right.  Thank you.

4              **THE COURT:**  Thank you.

5       Let me keep going around the room.  So Juror No. 37,

6  privately?

7              **PROSPECTIVE JUROR WELCH:**   (Inaudible)

8              **THE COURT:**  Privately, okay.  Anybody else?  Juror

9  No. 28.

10             **PROSPECTIVE JUROR RAMSEY:**  Thank you for this chance.

11  I know this doesn't amount to anything, because, you know, it's

12  important for people to get a trial and jury service is

13  important and all that.  But my 50th high school reunion is on

14  the 16th.  And, 50 years only comes by once.  It was already

15  postponed two years because of the pandemic.

16      And another thing, my root canal that I mentioned on my

17  questionnaire, the second part of it is tomorrow.  So.

18             **THE COURT:**  Okay.

19             **PROSPECTIVE JUROR RAMSEY:**  That's all I've got.

20             **THE COURT:**  All right.  And where's your reunion?

21             **PROSPECTIVE JUROR RAMSEY:**  It's in southern

22  California.

23             **THE COURT:**  Great.  Thank you.

24       Juror No. 91, come on up.

25             **PROSPECTIVE JUROR WILLIAMS:**  Hello again.  So I'm a

1  little reluctant to bring this up, but I have been stressing

2  here this whole time, looking at the clock.  I have -- I don't

3  know how many people, you know, are fur parents, but I have a

4  little doggie who has a severe neurological problem, and she's

5  on her last leg.  So she requires medication, literally every

6  eight hours.  She requires -- she can't go to the bathroom, she

7  can't stand, she can't eat on her own, she can't drink liquid.

8      I have been watching her on a camera every break,

9  stressing out.  And so I said I was going to try to push

10  through this.  I didn't know today was going to be so long.

11  She's past her medication.  If she doesn't get it, she starts

12  having what they call cluster seizures, and she could die from

13  them.  So I take her everywhere -- with me everywhere I go most

14  of the time, so I can manage that.  Can't bring her here.

15      And so if she gets into a cluster seizure today, because

16  she's late on her medication, I'm -- I'm working on three hours

17  sleep, now.  But it'll go all night long.  Either I have to go

18  emergency -- or whatever.

19      So I just want to just -- I was reluctant to say this, but

20  she means a lot to me.  And I just wanted to put it out there.

21          THE COURT:  Okay.  I appreciate that.  We will get to

22  your matter soon.

23          PROSPECTIVE JUROR WILLIAMS:  Okay.

24          THE COURT:  Okay.

25      Come on ahead.  And you're Number --

1          **PROSPECTIVE JUROR JACKSON-MI:**  I'm 18.  This is

2    normally something that I think I would have a lot of

3    discernment of, and be able to do, but I do have surgery

4    scheduled on September 13th.  It's a colon resection, for a

5    perforated -- I perforated my colon.  And so it's -- this has

6    been in the works for months.  I have been waiting to get the

7    surgery.

8        And I have a note with all my information, if you'd like

9    to see it, from my doctor (Indicating).

10          **THE COURT:**  Okay.  I believe you.  And what date is

11   it?

12          **PROSPECTIVE JUROR JACKSON-MI:**  It's September 13th.

13          **THE COURT:**  And is it a morning surgery?

14          **PROSPECTIVE JUROR JACKSON-MI:**  I have to -- yes, it

15   is.

16          **THE COURT:**  Okay.

17          **PROSPECTIVE JUROR JACKSON-MI:**  7:30.

18          **THE COURT:**  Okay.  All right.  Thank you.

19       Juror No. 24.

20          **PROSPECTIVE JUROR KENNEDY BREINER:**  Hi.  I just want

21   to get it all clarified as to when the Jewish holidays are,

22   because if the Court is closed, it would be terrible to close

23   on the wrong day.

24          **THE COURT:**  Yes.

25          **PROSPECTIVE JUROR KENNEDY BREINER:**  So the -- Rosh

1   Hashanah is definitely the 26th and the 27th.  And Yom Kippur

2   is the 5th.  And the reason -- I can tell you why there's

3   always ambiguity, is Jewish holidays actually start in the

4   evening.  So on calendars where they haven't checked with

5   rabbis -- I don't know why -- they often misstate the day

6   before.

7            THE COURT:  Okay.

8            PROSPECTIVE JUROR KENNEDY BREINER:  It just sets off a

9   terrible thing.

10           THE COURT:  So whatever the right date of Yom Kippur

11   is, I believe you.  We're not going to be -- we will be closed.

12   We will be dark.  Without a doubt.  The 26th is the first day

13   of Rosh Hashanah.

14           PROSPECTIVE JUROR KENNEDY BREINER:  Right.

15           THE COURT:  And that day, we will be dark, also.

16           PROSPECTIVE JUROR KENNEDY BREINER:  Uh-huh.

17           THE COURT:  We'll not be dark the second day, the

18   27th.  And, is -- what does that do to you?

19           PROSPECTIVE JUROR KENNEDY BREINER:  You know, Jewish,

20   like Christianity, there's a range of observances, that's how

21   I'll put it.  And Reformed only recognizes one day of Rosh

22   Hashanah.  All conservative and orthodox realms, it's a two-day

23   holiday.  In fact, it's the only holiday that's two days, even

24   in Israel.

25        So, I mean, it's -- it will be hard.  To say nothing -- to

1  be frank, kind of embarrassing, I mean, it doesn't matter in

2  the big picture but you know, I have a lot of people over at my

3  house and -- you know, I mean, if I have to do it I have to do

4  it.  But, I don't know, that's just -- it's a two-day holiday.

5            **THE COURT:**  Okay.  All right.  Thank you.

6            **PROSPECTIVE JUROR KENNEDY BREINER:**  Thank you.

7            **THE COURT:**  All right.  Juror No. -- oh, it's private.

8            **PROSPECTIVE JUROR STANLEY:**  This's private enough.

9            **THE COURT:**  Okay.  This is Juror No. 98.  Go ahead.

10           **PROSPECTIVE JUROR STANLEY:**  Okay, thank you.  So five

11 months ago I left a 19-year long sexually, physically and

12 emotionally abusive relationship.  Separated back in March,

13 filed for a divorce in April, filed for a default in May.

14 Since then, my ex-husband has completely drained all of my

15 finances out of my bank account.

16     So, I am still financially attached to that lease where he

17 refuses to leave.  So I have to pay that rent at the apartment,

18 as well as the portion of my rent at the house that I am

19 currently staying at, as well as all the bills.  So,

20 unfortunately, my company only pays three days of jury service.

21 So, in order for me to lose those wages means that I can no

22 longer support my 9-year-old son, the two households that we

23 are going in between.

24     And, he also has a broken wrist right now.  Three weeks

25 ago he jumped off the top slide at school, broke his wrist.

1  And his cast removal to find out if he needs orthopedic surgery

2  or not is on September 21st.

3      I would appreciate an excusal, just so that I can continue

4  to support these households.

5          **THE COURT:**  I hear all of those things.  Thank you for

6  telling me.

7          **PROSPECTIVE JUROR STANLEY:**  Thank you for hearing me.

8          **THE COURT:**  Juror No. 79.

9          **PROSPECTIVE JUROR WU:**  So, hello.  So at first, I

10  mentioned that I just got promoted --

11          **THE COURT:**  I'm sorry; could you speak up a little

12  bit, Juror No. 79.

13          **PROSPECTIVE JUROR WU:**  So basically I just mentioned I

14  just got promoted from my Chase job, and this promotion

15  basically, for the income, is for commission.  And also I

16  (Inaudible) activate all this year, I decide to go back to

17  school, which is, went back to City College, started last week.

18      And then, I am here to ask that can I be excused, because

19  I am not sure how long this will be.  But if it's longer than

20  one or two weeks, that means I'm going to miss my class and

21  then my work.  So, yeah.  Thank you.

22          **THE COURT:**  Thank you.

23          **PROSPECTIVE JUROR WU:**  Yep.

24      (Prospective Juror No. 79 leaves the courtroom)

25          **THE COURT:**  All right.  So there are two others.  So,

1   Juror No. 38, if you wouldn't mind stepping out for a moment,

2   that would be great.

3        (Prospective Juror No. 38 leaves the courtroom)

4        **THE COURT:**  And I'll ask everybody else who is in the

5   courtroom to also step out, except for those in the well.

6        (Unidentified people leave the courtroom)

7        **THE COURT:**  All right.  Juror No. 37, if you would go

8   to the microphone.

9        **PROSPECTIVE JUROR WELCH:**  So Mr. Sullivan might not

10  recall this, but I was chosen as the arbitrator in his wrongful

11  termination arbitration against Uber.  And so I have -- I

12  looked at all the pleadings.  I accepted the assignment.  And I

13  had to conflict myself out, after I accepted it.

14       So I have knowledge of the underlying facts that led to

15  his wrongful -- what he claimed was his wrongful termination.

16  Although he never appeared in front of me, because I eventually

17  declined the appointment.  So.

18       **THE COURT:**  All right.

19       **PROSPECTIVE JUROR WELCH:**  You know, arbitrations are a

20  confidential matter, so I couldn't really raise it in front of

21  anybody else.

22       **THE COURT:**  Yeah.  I mean, I'm glad that you did raise

23  it here.

24       Does anybody, Mr. Angeli, Mr. Kingsley --

25       **MS. KERIN:**  No follow-up.

1        **THE COURT:**  Thank you for raising that.  I appreciate

2   it.  And, could you ask Juror No. 38 to come back in.

3        (Prospective Juror No. 37 leaves the courtroom, and

4   Prospective Juror 38 enters the courtroom)

5        **PROSPECTIVE JUROR NANDY:**  Hello, Your Honor.

6        **THE COURT:**  Juror No. 38, tell me what you want to

7   tell me.

8        **PROSPECTIVE JUROR NANDY:**  So I do have Stage 2 kidney

9   disease, and I'm supposed to get my kidneys flushed.  So I

10  drink water a lot; I have to go to the restroom a lot.

11  Typically about once an hour or so, so that is a thing.

12       **THE COURT:**  That is a thing.  If the schedule was an

13  hour and a half, is that --

14       **PROSPECTIVE JUROR NANDY:**  That could be managed, yes;

15  I have been doing that today.  I have gone five times already,

16  but I have -- yes.

17       **THE COURT:**  That's what we will do.  I'm pretty darn

18  strict about taking breaks every hour and a half.  Because I

19  have got to go, too; everybody's got to go.

20       So thank you for letting me know.

21       **PROSPECTIVE JUROR NANDY:**  Sure, thank you.

22       (Prospective Juror No. 38 leaves the courtroom)

23       **THE COURT:**  All right.  So Ms. Davis, if you would

24  lock the doors.  I will give the parties -- actually, better

25  make sure that the parties don't need to get out for a moment.

1      But, so, I'll come back at about 3:20.  And by that time,

2   hopefully you will have decided on hardship and cause, and done

3   as much work as you can on the peremptories.  And then we'll

4   get going.

5           MS. KERIN:  Excuse me, Your Honor?

6           THE COURT:  Ms. Kerin.

7           MS. KERIN:  Yes.  At the pretrial conference you had

8   indicated at one point four alternates, and at another point

9   six alternates.  What are you thinking for this jury?

10          THE COURT:  I'm thinking that I'm going to see how

11  many people we end up with, and then make a firm decision based

12  on principle.

13          MS. KERIN:  That's fair.  Thank you, Your Honor.

14      (Recess taken from 3:08 p.m. to 3:21 p.m.)

15      (The following proceedings were held outside the presence

16  of the Jury Venire)

17          THE COURTROOM DEPUTY:  Please come to order.

18          THE COURT:  All right, so I saw the parties conversing

19  about hardship and cause.  Did you have recommendations for me?

20          MR. KINGSLEY:  We did.  We had some.  I don't think we

21  covered everybody.  I think we covered most of our causes.  And

22  we don't agree on everything, but I can read off the ones we

23  agreed on.

24          THE COURT:  Okay.

25          MR. KINGSLEY:  Juror 3, Juror 9, Juror 17.  We had 26

1    and 28 both for hardships.  37.  I think the next one, if -- my

2    handwriting is terrible, but I think it says 54.

3        Is that right, Michelle?

4        **MS. KERIN:**  Uh-huh.

5        **MR. KINGSLEY:**  57.  73.  80.  82.  89.  91, and 93.

6        Did I miss anyone, Michelle, that we just covered?

7        **MS. KERIN:**  That's correct.

8        **MR. KINGSLEY:**  Okay.

9        **THE COURT:**  All right.  Let me ask you about a couple

10    of those.  Or one of them.

11        73.  What was the basis?

12        **MS. KERIN:**  I'm sorry?

13        **MR. KINGSLEY:**  73.

14        **THE COURT:**  73.

15        **MR. KINGSLEY:**  The government's basis was that she was

16    a victim, I think of what sounds like a ransom attack.  And she

17    seemed very upset about it, and it wasn't clear that she could

18    put that aside.

19        **MS. KERIN:**  Yes, Your Honor.  We were concerned as

20    well about that.  And she noted she had to leave her school as

21    a result of a data breach.

22        **THE COURT:**  Let me ask you about a couple of other

23    people, because everybody else I also had on my list.

24        Juror No. 18 has surgery -- indicated that she has surgery

25    on the 13th.  So I was inclined to let her go.

1    **MR. KINGSLEY:**  No objection from the government on 18.

2    **MS. KERIN:**  No objection, Your Honor.

3    **THE COURT:**  Okay.  I'm inclined to let 64 go.  He's

4    the Ph.D. with the -- he's going to school down in Palo Alto,

5    and this would interfere with classes.

6    And 65, who is -- was coming in from St. Helena, driving

7    two hours each way.  And she also was the 100 percent person

8    with respect to innocence.

9    And 66 is having a new crown put in tomorrow.

10    So I'm inclined to let all of them go, unless I hear

11    something.

12    **MR. KINGSLEY:**  No objection from the government.

13    **MS. KERIN:**  No objection, Your Honor.

14    **THE COURT:**  Okay.  And then 75 is the -- the executive

15    chef whose father-in-law is on death's door.  And if that's the

16    case, he's not going to be thinking about this case all that

17    much.  So I would let him go.

18    **MR. KINGSLEY:**  No objection, Your Honor.

19    **MS. KERIN:**  No objection, Your Honor.

20    **THE COURT:**  88 has the wisdom teeth issue.  So I was

21    thinking of letting him go.  I think it's a him.

22    **MR. KINGSLEY:**  Yep.  No objection.

23    **MS. KERIN:**  No objection, Your Honor.

24    **THE COURT:**  Okay.  I would definitely let 98 go, who

25    is the pet person who was -- who described her hardship at the

1    end.

2         **MR. KINGSLEY:**  No objection.

3         **MS. KERIN:**  No objection, Your Honor.

4         **THE COURT:**  And then the only other two people I had

5    were -- that I was undecided on, and I'm happy to keep them in

6    the mix but they both had child-care issues, 90 and 95.  So,

7    that's -- I leave it to you.

8         **MR. KINGSLEY:**  The government didn't have strong views

9    on either.

10        **MS. KERIN:**  We didn't have strong views, either.  But

11   Your Honor, we think there are other jurors with hardships that

12   we would like to talk with you about.

13        **THE COURT:**  Okay, go ahead.

14        **MS. KERIN:**  So for example, Juror Number -- if I may?

15        **THE COURT:**  Yes.

16        **MS. KERIN:**  Juror No. 28, if you recall, she's the

17   juror who previously served on a jury, and indicated that she

18   would have significant anxiety.

19        **THE COURT:**  I have her as a hardship also.

20        **MS. KERIN:**  Okay.

21        **MR. KINGSLEY:**  28, you said?

22        **THE COURT:**  28.

23        **MS. KERIN:**  28.

24        **THE COURT:**  She was on your list.

25        **MR. KINGSLEY:**  We already -- 28 was on our list.

1          **MS. KERIN:**  We have other cause challenges as well, if

2     you are prepared.

3          **THE COURT:**  I'm all ears.

4          **MS. KERIN:**  Yes, Your Honor.  We would like to strike

5     Juror 22 for cause.  If you recall, she was the woman whose son

6     was close -- her son and another son were close, and the father

7     worked at Uber and was pretty high up.  Had heard of

8     Mr. Sullivan.  He is a director.  Undoubtedly, given the nature

9     of the witnesses -- and she had heard about him.  Given the

10    nature of the witnesses who will be testifying, multiple

11    executives from Uber around the same period, she's undoubtedly

12    heard information about them as well.

13         **THE COURT:**  What is the government's perspective on

14    her?

15         **MR. KINGSLEY:**  I don't -- was she the one who said you

16    can't believe everything you read in the news?  I thought she

17    was pretty clear on not being affected by anything she might

18    know about Uber.  And I didn't think she had any personal or

19    firsthand knowledge.  At least, according to my notes.

20         **THE COURT:**  Yeah, I agree with that.  So, who's -- who

21    else do you have?

22         **MS. KERIN:**  Juror No. 38.  He raised his hand that he

23    can't be fair regarding negating the bias against -- his own

24    personal bias against Uber.

25         And he also raised his hand that he would believe a

1  defendant who chooses not to testify probably does so if they

2  were guilty.  And this is after the Court said multiple times

3  that the defendant had a constitutional right not to testify.

4      THE COURT:  What is the government's perspective on

5  38?

6      MR. KINGSLEY:  I think he is somebody who the Court

7  spent a lot of time with when he was up here individually, and

8  I think that his views were pretty clearly on the record.  And

9  he said it doesn't really matter what your profession is.

10     THE COURT:  You know, I agree.  The questions that are

11 asked with hand -- hand answers don't get me to cause, unless

12 you actually ask them the question and go back to them, and,

13 and -- because it's not obvious that they understand the

14 question.

15     I did spend a lot of time with him, at the get-go.  We

16 went through things.  And so, so I'm not inclined to strike

17 him.

18     MS. KERIN:  Okay.  Your Honor, No. 8.  He has a wife

19 who was pregnant, and he was very nervous about sitting for the

20 jury.  He expressed a lot of hesitation in sitting for the

21 jury.

22     THE COURT:  What's the government's perspective on

23 No. 8?

24     MR. KINGSLEY:  I -- he said his wife was 17 weeks

25 pregnant.  It seemed like he was anxious, but he wasn't really

1  raising it as a hardship.  There were other people with more

2  substantial hardships.  And he said he could follow the law.

3  The Court spent a lot of time with --

4        **THE COURT:**  I also -- I felt the same way with respect

5  to him.

6        And, given where we are, I think the answer to your

7  question, Ms. Kerin, before we left is I'll have six

8  alternates.  And if something happens, he can scoot off the

9  jury and do something.  But I think he's okay.

10        **MS. KERIN:**  Your Honor, the last one is Juror No. 99,

11  who was also, um, a victim of a data breach.  And it caused a

12  lot of turmoil and problems for that juror as well.

13        **THE COURT:**  Mr. Kingsley?

14        **MR. KINGSLEY:**  I think that his answers to your

15  questions were pretty clear, that he could follow the law.

16        **THE COURT:**  So, that's -- I thought -- oh, he was the

17  JustAnswer guy.  Yeah, I don't think we're going to get to him

18  anyway.  So, I -- I will -- I'll strike him for cause, just

19  because he had a lot of experience in corporate fraud issues.

20  If I didn't have enough jurors, I would feel differently.

21        **MS. KERIN:**  That is all for the defense, Your Honor.

22  Thank you.

23        **THE COURT:**  All right.  So I will -- pay attention to

24  who I announce I'm allowing off the jury, just to make sure I

25  don't miss somebody.  And bring it to my attention, because --

1   not that I'm not infallible, but my notes are somewhat messy.

2   All right.

3       Why don't we -- and so we're going to move directly into

4   the peremptory challenges after I let people go for hardship

5   and cause.  We've -- Ms. Davis will give you a piece of paper

6   to strike, to pass back and forth to make your strikes.  And --

7   and then, that's how we will proceed.

8           MS. KERIN:  Your Honor, if you could for us read what

9   your notes reflect as the first 12 jurors, given -- I'm not

10   trying to test you, I promise.

11          THE COURT:  Yes, you are.  I believe that the first 12

12   jurors are 1, 4, 5, 7, 8; that's five.  10, 11, 13, 14 (sic);

13   that's four.  That's nine.

14          MR. KINGSLEY:  14, we --

15          THE COURT:  14's gone.

16          MR. KINGSLEY:  Yeah.

17          MS. KERIN:  Yeah.

18          THE COURT:  And did I -- I said 16, right?  That's the

19   last one on the second page.  So that's four plus five, that's

20   nine.

21       And then 22, 25, and 27.  That gets me to 12.

22          MR. KINGSLEY:  Did you -- did you say 24?

23          THE COURT:  I didn't say 24, because she had something

24   -- oh.  She was -- she has the -- Rosh Hashanah.  So I should

25   have mentioned her before.  I don't think we can keep her on if

1  she would be leaving during Rosh Hashanah.  So she should also

2  be struck.  Sorry.

3      MS. KERIN:  And then for the record, can we -- should

4  we confirm with Ms. Woods the remaining strikes that you've

5  recorded?  So we know we have the right list?

6      THE COURTROOM DEPUTY:  They will be on your sheet.

7      MS. KERIN:  Okay, thank you.

8      THE COURT:  So, you have the list, Ms. Davis?

9      THE COURTROOM DEPUTY:  Yes.

10     THE COURT:  Okay.  Do you want to give it to me?

11     THE COURTROOM DEPUTY:  Yes.

12  (Document handed up to the Court)

13     THE COURT:  It's much neater than mine.  Oh, this

14  isn't going to help me, though.

15  (Off-the-Record discussion)

16     THE COURT:  Okay, here is who I'm going to tell the

17  jury is off and excused:  3, 9, 17, 18, 24, 26, 28, 37, 54, 57,

18  64, 65, 66, 75, 80, 82, 88, 89, 91, 93, 98, and 99.

19  Did I miss somebody?

20     MR. KINGSLEY:  73, I think.

21     THE COURT:  And 73.  Has somebody added up how many

22  we'll have left?

23     MS. KERIN:  I have 45, Your Honor.

24     THE COURT:  Okay, so I get that we will have at least

25  42 or 43.

1    **MR. KINGSLEY:**  I think I counted like 46, 47.

2       **THE COURT:**  Okay.  So as long as -- as long as -- as

3    long as we are over 40, that's all I care about.

4       Okay, let's bring them back in and get going.

5       (The following proceedings were held in the presence of

6    the Jury Venire)

7       **THE COURT:**  All right.  Yes, please be seated,

8    everybody.  And could somebody just close the doors in the

9    back?

10      Thank you.

11      All right.  Ladies and gentlemen, I apologize that I took

12   a lot longer than I anticipated, but we're now ready to proceed

13   with the first part of this final selection process.  And in

14   this part, I will thank and excuse a number of people.

15      I want you -- if your number is called, just stay in your

16   seat until I finish calling all the numbers so that everybody

17   can hear.  And I want you to know that you have done your

18   service as citizens, and I appreciate the fact that you were

19   here today, doing exactly that.

20      So, I am thanking and excusing:  Juror No. 3, No. 9,

21   No. 17, No. 18, No. 24, No. 26, No. 28, No. 37, No. 54, No. 57,

22   No. 64, No. 65, No. 66, No. 73, No. 75, No. 80, No. 82, No. 88,

23   No. 89, No. 91, No. 93, No. 98, and No. 99.

24      So if I called your number, thank you.  And you are

25   excused.

1       **UNIDENTIFIED MAN:**  Thank you, Your Honor.

2       (Excused Prospective Jurors leave the courtroom)

3       **THE COURT:**  All right.  So the next part of the

4  proceedings are the exercise of what are called peremptory

5  challenges.  And those are challenges that the lawyers can make

6  or the parties can make with no -- for any reason, or no reason

7  at all.

8       If you are excused, you shouldn't take it personally.

9  It's just part of the -- part of the process.  And it's part of

10  the fairness to make sure that it's the parties that choose the

11  jurors, as opposed to the judge.

12       So, Ms. Davis, I don't know whether you have passed the

13  sheet yet, but -- so this will take a little bit of time.

14  We're going to turn on the white noise machine so that you

15  don't hear any whispered conversations by the lawyers.  You can

16  stand up if you want to.  You can admire these beautiful

17  portraits, and look over at my dad.

18       And after -- after a little bit we'll be able to come back

19  and we'll have a jury.

20       (A pause in the proceedings)

21       **THE COURT:**  All set?

22       **MR. DAWSON:**  Not for the alternates.  Depending on

23  your (Inaudible).

24       **THE COURT:**  Whisper in my ear.

25       (Off-the-Record discussion)

1    (A pause in the proceedings)

2    (Document handed up to the Court)

3    **THE COURT:**  All right.  Ladies and gentlemen -- you

4    can turn off the sound machine.

5    So the peremptory challenges have been made.  I'm going to

6    read off the list of people who are being excused.  And again,

7    thank you for -- this has been a long day.  And I appreciate

8    the service that you have given.  And you have done your duty

9    as citizens.

10    And I would like you to wait, again, until I've finished

11    reading off all of the numbers.  But, the following people are

12    thanked and excused.  Jurors No. 42, 36, 63, 5, 13, 25, 83, 79,

13    81, 38, 45, 22, 8, 48, 68, 1, 29, 4, 67, 60, 69, and 77.

14    So if I didn't read your number, please stay here.  If I

15    did, thank you very much for your service.

16    (Excused Prospective Jurors leave the courtroom)

17    **THE COURT:**  All right.  And so now I would like all of

18    the jurors up through, including Juror No. 49, to come sit in

19    the jury box.

20    **THE COURTROOM DEPUTY:**  This side (Indicating).

21    **THE COURT:**  To my left, your right.  So everybody

22    below and including the number of 49, please.

23    (Request complied with by the Jury Panel)

24    **THE COURT:**  All right.  And that means that I didn't

25    add -- keeping -- does anybody here keep score at baseball

 1  game?  Use your -- use the thing?  I do.  And, and I'm usually

 2  not bad at it.  But when it comes to juries -- and that's what

 3  I've got here.  I've got my own little scorecard.  But my

 4  scorecard, sometimes I don't add it up properly.

 5      So I think that I would like to invite Juror No. 50 to

 6  join this group.  But I want to figure out why I made a

 7  mistake.

 8      So, Juror No. 50.

 9          THE COURTROOM DEPUTY:  I think 50 is excused.

10          THE COURT:  Not here?  Juror No. 51.

11      (Request complied by Juror No. 51)

12          THE COURT:  So, I'd like the government and the

13  defense to be satisfied that the 12 people in the box are the

14  12 jurors in this case.

15          THE COURTROOM DEPUTY:  And if you have your numbers,

16  if you can hold it up, that might help.

17      (Request complied with by the Jury Panel)

18          THE COURT:  So, Juror No. 90, I'm not sure why you're

19  there.  So why don't you step into the --

20          PROSPECTIVE JUROR PEDDIREDDY:  Sure.

21          THE COURT:  Here's who I thought would be -- Juror

22  No. 7, Juror No. 10, Juror No. 11, Juror No. 16 is not there.

23  And, did the parties think that Juror No. 16 was here?  Or no?

24          MR. ANGELI:  Should be here.

25          MR. FRANCIS:  Should be here.

1        **MR. ANGELI:**  No. 16 I think should be here,

2   Your Honor.

3        **THE COURT:**  I'm sorry?

4        **MR. KINGSLEY:**  Yeah, 16 was not struck.  16 should be

5   here.

6        **THE COURT:**  All right.  Well, we're missing No. 16.

7   Okay.  That's -- that's a question.

8        Then, Juror No. 27?  Juror No. 30, 31, 35, 39, 40, there's

9   another.

10        **MR. KINGSLEY:**  40 (Inaudible).

11        **THE COURT:**  Was anybody expecting Juror No. 40?

12        **SPECIAL AGENT SCUSSEL:**  (Shakes head)

13        **THE COURT:**  Okay.  My scorecard.  Juror No. 44.  Juror

14   No. 49.  Not here.

15        **THE COURT:**  I'm sorry, do I see 49?

16        **MR. DAWSON:**  49's in the front.

17        **THE COURT:**  Sorry, I'm just not seeing -- 49.  And,

18   and now we have 51.

19        Okay.  So, that -- I think will be our jury.  I don't know

20   where Juror No. 16 went to, but that's not a good sign.  So, I

21   think this will be the jury.

22        And then, I would also, then, invite the following

23   people -- and please, lawyers, catch me up if I miss somebody.

24   Juror No. 62.  Juror No. 70.  Juror No. 71.  That's three.

25   Juror No. 76.  That's four.

1          And then it would be, I believe, Juror No. 84, and 92.

2    Okay.

3               MS. KERIN:  Your Honor?

4               THE COURT:  Did we miss somebody?

5               MS. KERIN:  I think so.  Juror No. 74 wasn't struck,

6    according to our notes.  Is that right?

7               THE COURT:  Ah, so true.  Sorry.  So, Juror No. 92,

8    I'm sorry.  But, Juror No. 74, I'm so glad.

9          You six are going to be alternate jurors.  And I would

10   invite you to come to the first row inside the well of the

11   Court.  Yeah, come right, come right in.

12         (Request complied with by Alternate Jurors)

13              THE COURT:  And I would like the lawyers to be

14   satisfied that these are the alternates.

15              MR. KINGSLEY:  (Nods head)

16              MS. KERIN:  We are, Your Honor.

17              THE COURT:  Satisfaction.  Okay.  So --

18              MR. KINGSLEY:  Your Honor, are we going to find Juror

19   No. 16?

20              THE COURT:  I'm -- I am assuming that Juror 16 has

21   left the building.  And I'm -- I'm comfortable in proceeding

22   with this jury.  If you're not, if there is a concern, let me

23   know, and we should send out the marshals.

24              MR. KINGSLEY:  I think there's only 11 in the box

25   right now, Your Honor.

1          **THE COURT:**  Because I can't count?

2      That is so true.  So, who's got the lowest number?  This

3  is ridiculous.  I apologize.

4      Okay, Juror 62, would you please join your compatriots

5  now.  I can promise you, tomorrow will go much better than

6  today.

7          (Request complied with by Juror No. 62)

8          **THE COURT:**  Okay.  And then we will need to add Juror

9  No. 92 back.

10          (Request complied with by Juror No. 92)

11          **THE COURT:**  Okay.  Now we have a jury of 12, and we

12  have six alternates.  Is everybody satisfied with the people

13  that we have?

14          **MS. KERIN:**  Your Honor, we just need to check our

15  notes.  We think that there might be a juror who has a lower

16  number than Juror 90.

17          **THE COURT:**  Does any -- is there any juror out there

18  with a number lower than 92?

19          **UNIDENTIFIED WOMAN:**  Lower than 92?

20          **THE COURT:**  No, I'm sorry; that has not been called.

21  Oh, it's Juror No. 90 who came up the first time.  It's so

22  true.

23      Would you come up and -- Juror No. 92, I apologize.

24          **MS. KERIN:**  And Your Honor, I'm sorry, there might be

25  somebody with an even lower number than 90.

1      We're just looking --

2          **THE COURT:**  Okay.  Is there anybody with a lower

3    number than 90?  A lower number than No. 90.

4      (A hand is raised)

5          **THE COURT:**  87.

6      (Off-the-Record discussion between the Court and Clerk)

7          **THE COURT:**  All right.  So Juror No. 87, if you would

8    come.  And I very much apologize for this mess.

9      (Request complied with by Juror No. 87)

10         **THE COURT:**  All right.  Usually what I do is I come to

11   the side of the courtroom and I check with the lawyers ahead of

12   time, say:  Do I have the right 12, do I have the right six

13   people?  And here there's no -- these sides don't work in the

14   same way.  So, I apologize for this delay.

15     Are the lawyers now satisfied that we have our jury?

16         **MS. KERIN:**  Yes, Your Honor.

17         **THE COURT:**  Okay.  So, then I'm going to ask the jury

18   to stand, and Ms. Davis, if you could swear the jury, please.

19     (Jury Panel sworn in)

20         **THE COURT:**  All right.  Please be seated, everybody.

21   So you are now the jury in this case.

22     And, the alternates will have the same responsibilities

23   and duties as the 12 other jurors.  And you are called

24   "alternates" because if one of the 12 gets sick or has an

25   emergency, then you will be stepping in for them.  So you have

1  to do everything exactly as the other jurors do.

2      What I'm going to ask you all to do in a moment is to go

3  with Ms. Davis to my jury room and my courtroom, which is where

4  the trial is going to be proceeding.

5      As I said at the beginning of the day, the trial starts at

6  8:30.  It will end at 1:30.  And I hope that you will get there

7  about 15 minutes early.  I expect that there will be coffee and

8  something to eat when you arrive.

9      And, and then we'll get going promptly at 8:30, and I will

10  instruct you a little bit more about what's -- what the law is

11  in this case.  And then the lawyers will be able to make

12  opening arguments.  And then the case will proceed, the

13  witnesses will proceed, and we'll move right along.

14      So the one thing that I want to leave you with that is

15  extremely important, don't do any research about this case.

16  Don't try to figure out anything with respect to this.

17  Everything you need to know will come in through the evidence.

18  And the lawyers will tell you what their perspective is on

19  that.  But the key thing is the evidence and the witnesses.

20  And that -- it's very important that you all have the same

21  information on it.  And so, that's the one thing I'll leave you

22  with.

23      And then, so I will ask the 18 of you to join Ms. Davis

24  over here, and she'll show you the ropes.  And then we will see

25  you at 8:30 tomorrow.  Thank you.

**PROCEEDINGS**

 1      (Jury excused)

 2              **JUROR:**  Your Honor, I have a question about, um --

 3              **THE COURT:**  So if you ask -- why don't you ask

 4      Ms. Davis the question.

 5              **JUROR:**  All right.

 6              **THE COURT:**  That would be great.  Thank you.

 7      (The following proceedings were held outside of the

 8      presence of the Jury)

 9              **THE COURT:**  All right.  Please be seated, everyone.

10      And all of the remaining jurors, thank you for your

11      service today.  It's been a long day.  And, and you have done

12      your duty as citizens.  And I appreciate it.  So, thank you and

13      you are excused.

14      (Remaining Jury Venire excused)

15              **THE COURT:**  All right.  Is there anything else that we

16      ought to do today?

17              **MR. DAWSON:**  Not from the government's perspective,

18      Your Honor.

19              **MR. ANGELI:**  Nor ours, Your Honor.

20              **THE COURT:**  Okay.  So, I will see you at 8:00

21      tomorrow.  Downstairs.  So, Courtroom 2 on the 17th Floor.  And

22      there will be no picture of my father.

23      Thank you all.

24              **MS. KERIN:**  Thank Your Honor.

25      (Proceedings concluded)

## **I N D E X**

Tuesday, September 6, 2022 - Volume 1

|                                    | **PAGE** | **VOL.** |
|------------------------------------|----------|----------|
| Jury Voir Dire by The Court        | 17       | 1        |
| Jury Voir Dire by Mr. Kingsley     | 159      | 1        |
| Jury Voir Dire by Ms. Kerin        | 167      | 1        |

### CERTIFICATE OF REPORTERS

We, BELLE BALL, CSR, and JOAN COLUMBINI, CSR, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*Belle Ball*

_____
/s/ Belle Ball

Belle Ball, CSR 8785, CRR, RDR

*Jncolumbini*

_____
/s/ Joan Columbini

Joan Columbini, CSR 5435, RPR

Tuesday, September 6, 2022