DAVID H. ANGELI (admitted *pro hac vice*)
TYLER P. FRANCIS (admitted *pro hac vice*)
MICHELLE H. KERIN (admitted *pro hac vice*)
URSULA LALOVIĆ (Cal. Bar No. 215551)
ANGELI LAW GROUP LLC
121 SW Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232 | Facsimile: (503) 227-0880
Email: david@angelilaw.com; tyler@angelilaw.com; michelle@angelilaw.com; ursula@angelilaw.com

JOHN D. CLINE (Cal. Bar No. 237759)
600 Stewart Street, Suite 400
Seattle, WA 98101
Telephone: (360) 320-6435
Email: cline@johndclinelaw.com

*Attorneys for Defendant Joseph Sullivan*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOSEPH SULLIVAN,<br><br>Defendant. | Case No. 3:20-cr-00337-WHO<br><br>DEFENDANT JOSEPH SULLIVAN'S SENTENCING MEMORANDUM<br><br>Date: May 4, 2023<br>Time: 1:30 p.m.<br>Crtrm: 2, 17th floor<br><br>Hon. William H. Orrick |

## TABLE OF CONTENTS


TABLE OF CONTENTS ........ ii

TABLE OF AUTHORITIES ........ iv

INTRODUCTION ........ 1

FACTUAL BACKGROUND ........ 1

- I. Mr. Sullivan's History ........ 1
  - A. Upbringing and Education ........ 2
  - B. DOJ Service ........ 4
  - C. Work in the Private Sector ........ 5
  - D. Public Service and Mentoring ........ 14
  - E. Family and Faith ........ 17
- II. The Offense Conduct ........ 19

DISCUSSION ........ 22

- I. Legal Framework ........ 22
- II. Application to Mr. Sullivan ........ 24
  - A. The nature and circumstances of the offense strongly support a sentence of probation. ........ 24
  - B. Mr. Sullivan's personal history and characteristics strongly support a non-custodial sentence. ........ 25
  - C. A probationary sentence will provide adequate specific and general deterrence. ........ 28
    - 1. Specific Deterrence ........ 28
    - 2. General Deterrence ........ 29
  - D. A period of incarceration is not necessary to achieve just punishment and ensure respect for the law. ........ 35
  - E. The Advisory Sentencing Guidelines ........ 37
    - 1. The Advisory Guidelines, particularly § 2J1.2, have limited use in this case. ........ 37
    - 2. Uncontested Guidelines Calculations ........ 38
    - 3. The Court should not apply § 2J1.2(2)'s enhancement for "substantial interference with the administration of justice." ........ 39
    - 4. The sentencing guidelines counsel a downward departure under § 5K2.20. ........ 42
    - 5. The Court should apply the recently promulgated prospective amendments to the Sentencing Guidelines. ........ 44

F. Section 3553(a)(6) supports a downward variance from the Guidelines to avoid unwarranted sentencing disparities. ........................... 47

G. Incarceration would cause substantial harm to Mr. Sullivan's family. ........................................................................................... 52

CONCLUSION ........................................................................................................... 54

## TABLE OF AUTHORITIES

**Cases** **Page(s)**


*Gall v. United States*,
552 U.S. 38 (2007)....................28, 29, 36

*Kimbrough v. United States*,
552 U.S. 85 (2007)....................37

*Koon v. United States*,
518 U.S. 81 (1996)....................2, 23

*Nelson v. United States*,
555 U.S. 350 (2009) *(per curiam)* ....................23, 37

*Pepper v. United States*,
562 U.S. 476 (2011)....................2, 23, 24, 28

*United States v. Amer*,
110 F.3d 873 (2d Cir. 1997)....................39, 42

*United States v. Calderon Espinosa*,
569 F.3d 1005 (9th Cir. 2009) ....................41

*United States v. Campbell*,
762 Fed. App'x 877 (11th Cir. 2019) ....................29

*United States v. Carty*,
520 F.3d 984 (9th Cir. 2008) (*en banc*) ....................23, 37

*United States v. Colace*,
126 F.3d 1229 (1997)....................43

*United States v. DeRusse*,
859 F.3d 1232 (10th Cir. 2017) ....................25

*United States v. Dickey*,
924 F.2d 836 (9th Cir. 1991) ....................42

*United States v. Edwards*,
595 F.3d 1004 (9th Cir. 2010) ....................29

*United States v. Fairless*,
975 F.2d 664 (9th Cir. 1992) ....................42, 43

*United States v. Goodrich*,
919 F.2d 1365 (9th Cir. 1990) ....................39

*United States v. Gupta*,
904 F. Supp. 2d 349 (S.D.N.Y. 2012)....................25

*United States v. Hadash*,
408 F.3d 1080 (9th Cir. 2005)....................25

*United States v. Howe*,
543 F.3d 128 (3d Cir. 2008)....................25

*United States v. Martinez*,
No. CR 09-3078 JB, 2011 WL 6828055 (D.N.M. Dec. 19, 2011)....................51

*United States v. McSherry*,
226 F.3d 153 (2d Cir. 2000)....................40

*United States v. Monetti*,
705 Fed. App'x 865 (11th Cir. 2017)....................29

*United States v. Norris*,
217 F.3d 262 (5th Cir. 2000)....................49

*United States v. Norton*,
218 F. Supp. 2d 1014 (E.D. Wis. 2002)....................52

*United States v. Rojas-Pedroza*,
716 F.3d 1253 (9th Cir. 2013)....................46

*United States v. Ruiz-Apolonio*,
657 F.3d 907 (9th Cir. 2011)....................46

*United States v. Sachsenmaier*,
491 F.3d 680 (7th Cir. 2007)....................23

*United States v. Smith*,
387 F.3d 826 (9th Cir. 2004)....................43

*United States v. Takai*,
941 F.2d 738 (9th Cir. 1991)....................42

*United States v. Whitehead*,
532 F.3d 991 (9th Cir. 2008)....................36

*United States v. Working*,
224 F.3d 1093 (9th Cir. 2000)....................42, 43

**Comparator Cases**

*United States v. Colombe*,
3:18-cr-30015-RAL (D.S.D.)....................50

*United States v. Gayl*,
1:16-cr-00154-NLH (D.N.J.)....................51

*United States v. Jindal*,
Case No. 4:20-CR-00358 (E.D. Tex.)....................48

*United States v. Johnston*,
1:18-cr-00127-JPW (M.D. Pa)....................49

*United States v. Johnston*,
1:18-cr-00127-JPW (M.D. Pa)....................49

*United States v. Logan*,
3:16-cr-212-VEH-JEO (N.D. Ala.)....................50

*United States v. Norris*,
2:03-cr-00632-ER (E.D. Pa.)....................51

*United States v. Owuama*,
4:14-cr-00040 (S.D. Tex.)....................51

*United States v. Sanio*,
1:16-cr-00033-RJA-JJM (W.D.N.Y.)....................50

*United States v. Sheen*,
4:18-cr-00607-AGF (E.D. Mo.)....................50

*United States v. Worrell*,
4:15-cr-00486 (E.D. Mo.)....................50

*United States v. Worrell*,
4:15-cr-00486-HEA (E.D. Mo.)....................49

**Statutes**


18 U.S.C. § 4 .......... 22

18 U.S.C. § 1503 .......... 51

18 U.S.C. § 1505 .......... 22, 38, 40, 49

18 U.S.C. § 1516 .......... 50

18 U.S.C. § 1519 .......... 50

18 U.S.C. § 3553 .......... *passim*

28 U.S.C. § 994(j) .......... 47

Sarbanes-Oxley Act of 2002, Pub. L. 107–204, 116 Stat. 745 (2002) .......... 37


**Rules and Regulations**


U.S.S.G., Ch. 1, pt. A, § 4(d) .......... 42

U.S.S.G. § 1B1.1 .......... 39

U.S.S.G. § 2J1.2 .......... *passim*

U.S.S.G. § 3D1.2 .......... 38

U.S.S.G. § 4C1.1 (proposed April 5, 2023) .......... 44, 45, 46

U.S.S.G. § 5C1.1 (proposed April 5, 2023) .......... 44, 46, 47

U.S.S.G. § 5H1.6 .......... 51

U.S.S.G. § 5K2.20 .......... 42, 43

## INTRODUCTION

Joe Sullivan has lived an exemplary life marked by hard work, integrity, and a commitment to doing the right thing. The eldest of seven children, his parents' strong work ethic, patriotism, and deep faith instilled lasting values in Mr. Sullivan and his siblings. Due to the family's financial struggles, Mr. Sullivan started working while in the eighth grade and paid a large share of his own college and law school expenses.

Guided by his parents' example, he also embarked early on what has been a lifetime journey of public service. That journey began after law school, when Mr. Sullivan joined the U.S. Department of Justice, where he ultimately became an inaugural member of the DOJ's first unit focused on prosecuting cybercrime. That work became Mr. Sullivan's professional passion. Ultimately persuaded that he could help people even more effectively as a member of the technology industry, Mr. Sullivan left the DOJ in 2002 to begin a long career of innovative and principled leadership in the private sector while volunteering to support organizations assisting children and serving underrepresented groups. Even now, after the trial, his commitment to bettering society is evident by his work volunteering as the CEO of a nonprofit providing humanitarian aid to the people of Ukraine.

The values that have guided Mr. Sullivan's life have earned him the universal respect of his professional colleagues, family, and friends. The conduct for which the jury convicted Mr. Sullivan—confined to a brief period, unlikely ever to be repeated, and resulting in no demonstrated harm to the individuals whose data was compromised—should be viewed in the larger context of that otherwise truly exemplary life. Considering the totality of the circumstances, and consistent with the recommendation of the Presentence Report (PSR), a probationary sentence with appropriate conditions would be sufficient, but not greater than necessary, to achieve the goals articulated in 18 U.S.C. § 3553.

## FACTUAL BACKGROUND

### I. Mr. Sullivan's History

A sentencing court's task is "to consider every convicted person as an individual and



**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). For that reason, "[h]ighly relevant—if not essential—to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." *Pepper v. United States*, 562 U.S. 476, 480 (2011) (brackets in original) (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)).

**A. Upbringing and Education**

Mr. Sullivan, the oldest of seven children, was born in 1968 in Rutland, Vermont to Cornelius and Winona Sullivan. Mr. Sullivan's father is a professional artist. He intended to join the Navy after high school until his parents discouraged him from doing so after the plane flown by his only and older brother John, a Navy fighter pilot, crashed in the Mediterranean Sea. (Declaration of David H. Angeli in Support of Defendant's Sentencing Memorandum ("Angeli Decl."),[1] Ex. 16 (Letter from Cornelius Sullivan).) The only cufflinks Mr. Sullivan has ever worn are those that belonged to his Uncle John. Mr. Sullivan's mother, who worked for the Central Intelligence Agency as a Russia specialist before starting a family, was an award-winning poet, a published author of mystery stories, a high school teacher, and a professor of writing at several colleges. (*Id.*) She died in 2004 from non-smoking lung cancer.

The Sullivans raised their family in a 1,500 square-foot three-bedroom house in Massachusetts. Mr. Sullivan's lifelong commitment to the Catholic Church is rooted in his

---

[1] The defense has submitted over 185 letters written by individuals in support of Mr. Sullivan (including a letter submitted on behalf of 60 cybersecurity professionals and another letter submitted by more than 40 current and former CISOs and CSOs). One hundred seventy-five of the letters were considered in the preparation of the PSR and have been forwarded to the Court by the Probation Office. These letters are cited herein as "Letters of Support," and are organized by category based on the context in which the letter writer knows Mr. Sullivan: (A) Family; (B) Friends and Faith Leaders; (C) Not-for-Profit Organizations; (D) Colleagues from the United States Attorney's Office; (E) Colleagues from eBay; (F) Colleagues from Facebook; (G) Colleagues from Uber; (H) Colleagues from Cloudflare; and (I) Cybersecurity Industry Colleagues. Letters within each category are arranged alphabetically according to the writers' last names.

Additional letters submitted after the preparation of the PSR are attached as exhibits to the Declaration of David Angeli.



**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

family's deep faith and involvement in their local parish, where his mother taught religious education classes and his father served as a eucharistic minister. As an eighth grader attending a nearby parochial school, Mr. Sullivan began working at the parish three days a week, cleaning and doing maintenance and yard work. (*Id*.) By the time he was in high school, Mr. Sullivan was working at least ten hours a week at the church, overseeing maintenance, organizing masses, coordinating weddings and funerals, and working at church-related events. (Angeli Decl., Ex. 16 (Letter from Cornelius Sullivan).)

Working at his church was just one of many jobs Mr. Sullivan held during his childhood. (Letters of Support, Ex. A at 21 (John Sullivan); Angeli Decl., Ex. 16 (Letter from Cornelius Sullivan).) His family, though rich in art, culture, and faith, faced significant financial challenges. Mr. Sullivan often found himself using the money he earned from odd jobs to purchase his own clothing and shoes.

When Mr. Sullivan was in middle school, he was mugged near a park where he often played basketball. After Mr. Sullivan identified the perpetrator, a high school student, the police arrested the student and Mr. Sullivan provided testimony at the resulting juvenile court hearing. This incident shaped Mr. Sullivan's deeply held belief that those who harm others should be held accountable for their actions, and was instrumental in Mr. Sullivan's desire to become a lawyer. (Angeli Decl., Ex. 16 (Letter from Cornelius Sullivan).)

Mr. Sullivan graduated high school in 1986 and earned a partial scholarship to attend Providence College, a Dominican institution located in Rhode Island. Mr. Sullivan's grandmother paid for his room and board. Mr. Sullivan paid his remaining expenses by holding down multiple jobs, working through the school's work-study program all four years and at a restaurant for the last three years. Following in his mother's footsteps, Mr. Sullivan studied Russian at Providence and earned a Bachelor of Arts in Political Science.

During his junior year at Providence, Mr. Sullivan again learned the importance of standing up for what is right, even in the face of difficult personal consequences. He and other students witnessed the assault of a fellow student who was beaten so severely that he had to be



**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

hospitalized. In the ensuing investigation, Mr. Sullivan and other witnesses identified the two perpetrators. Facing social pressure and even physical threats from the perpetrators, the other witnesses recanted their earlier testimony, leaving Mr. Sullivan as the sole witness who stood by his earlier statements at the college's disciplinary hearing. (Letters of Support, Ex. B at 13 (Father James Quigley).) The college expelled one of the perpetrators and placed the other on probation—a just result, but one that cost Mr. Sullivan many of his previously close friendships.

Having been raised in a patriotic family that instilled in him a commitment to public service, Mr. Sullivan next enrolled in law school at the University of Miami, with the goal of becoming a government lawyer. He worked his way through law school, paying his own tuition and expenses and taking out student loans to cover the balance. (Angeli Decl., Ex. 16 (Letter from Cornelius Sullivan).) In addition to his grueling work and school schedule, Mr. Sullivan found time to serve the Miami community, volunteering as guardian ad litem representing foster children and working with FEMA rescue efforts in the wake of Hurricane Andrew in 1992. (Letters of Support, Exhibit B at 13 (Father James Quigley); *id.* at 21 (Kirk Wagar).)

**B. DOJ Service**

Mr. Sullivan spent the summer between his second and third years of law school volunteer interning with the Department of Justice's Miami office, where he focused on immigration matters. He worked at a restaurant in the evenings to cover his living expenses. That experience led to a one-year DOJ clerkship after graduation. Following a brief stint in private practice in Miami, Mr. Sullivan moved to San Francisco, rejoining the DOJ as an associate counsel supporting the Immigration and Naturalization Service.

In 1997, Mr. Sullivan became an Assistant United States Attorney in the District of Nevada, focusing on prosecuting white-collar crime. Soon after, he became that district's Computer and Telecommunications Crime Coordinator, working with other federal agencies to investigate and prosecute some of the first cybercrime cases. At the end of 1999, Mr. Sullivan returned to the Bay Area for good, joining the U.S. Attorney's Office in the Northern District of California, where he became one of the first federal prosecutors in the country working full time



**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

on high-tech crime cases. (Letters of Support, Ex. D at 5 (Robert Rodriguez).) In 2000, he was a founding member of the DOJ's first Computer Hacking and Intellectual Property ("CHIP") unit. Even then, Mr. Sullivan was a staunch advocate for consumer privacy—balancing law enforcement's need for information about individual consumers against those consumers' legitimate privacy rights. (Letters of Support, Ex. D at 1 (Scott Frewing).) Because of the pioneering work of that group, each of the 94 United States Attorneys' Offices now has at least one CHIP coordinator and twenty-five offices have CHIP units.

### C. Work in the Private Sector

In 2002, former Assistant United States Attorney Rob Chesnut, then eBay's Senior Vice President of Global Trust and Safety, persuaded Mr. Sullivan to join eBay to work on enhancing e-commerce trust and safety. "You have two rewarding but very different paths," Mr. Chesnut told Mr. Sullivan. "You can prosecute one bad actor at a time, or you can try to build solutions that take away many bad actors' ability to do harm at all." (Letters of Support, Ex. I at 13.)

Swayed by the possibility of making a broader impact in the fight against cybercrime, Mr. Sullivan joined eBay as Senior Director of Trust and Safety. That marked the beginning of a twenty-year private-sector career focused on building robust cybersecurity programs and encouraging the technology industry to foster close partnerships with law enforcement to find and hold accountable those responsible for perpetrating child exploitation, fraud, and other abuse on the internet. In all the years that Mr. Sullivan and Dan Levy, a former colleague of Mr. Sullivan at both eBay and Facebook, worked together, "Mr. Sullivan's ONLY objective was to help protect people and businesses from harm; he had no personal agenda to inflate with his title nor size of his organization." (Letters of Support, Ex. F at 35 (Dan Levy (emphasis in original)).)

As part of eBay's Trust and Safety team—the first of its kind—Mr. Sullivan worked closely with global law enforcement and regulatory agencies and led the company's Fraud Investigations Team. In those early days of the internet, Mr. Sullivan focused "almost exclusively on how best to improve the trust and safety of eBay and PayPal customers"—a responsibility he assumed with "professionalism, dedication, and thoughtfulness." (Letters of


**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

Support, Ex. E at 6 (Larry Friedberg).) Mr. Sullivan shared Mr. Chesnut's philosophy of engaging with the government, both to investigate potential wrongdoing and to craft reasonable rules that promoted commerce and protected consumers. eBay's "flexible privacy policy," under which the company provided broad assistance to law enforcement, was controversial at a time when companies, individuals, and law enforcement were determining the boundaries of personal privacy on the internet.

Jack Christin, a former state prosecutor and one of Mr. Sullivan's eBay colleagues, recalls working "side by side" with Mr. Sullivan during those early years, building relationships and collaborating with law enforcement agencies and regulators. (Letters of Support, Ex. E at 3.) Describing one of those instances, former U.S. Secret Service Agent David Piggott recalls the assistance Mr. Sullivan provided to the Secret Service in a massive undercover investigative operation by dedicating two eBay security specialists to mentor and provide technical assistance to agents working undercover. Noting that Mr. Sullivan's personal reputation was the motivating factor for the Secret Service's willingness to partner with the private sector, Mr. Pigott credits the success of the operation to Mr. Sullivan's support. (Letters of Support, Ex. E at 14.) And that was just one of many cases in which Mr. Sullivan's eBay team worked with law enforcement to combat cybercrime. Dave Tyson, another former eBay colleague, recalls Mr. Sullivan "help[ing] to increase law enforcement's understanding and ability to be effective of defense of US business globally" in countries like Romania, Russia, and China, "where legal systems did not yet support a judicial response to these problems." (Letters of Support, Ex. E at 20.)

In 2006, Mr. Sullivan moved to PayPal to lead the company's North American legal team. That experience deepened Mr. Sullivan's appreciation and understanding of the emerging threats facing internet-based companies. At PayPal, Mr. Sullivan continued to partner with law enforcement on investigations while also working with the company's information security team to understand and strengthen PayPal's technical defenses. During this time, Mr. Sullivan also emerged as a public face for the cybersecurity industry, championing safety measures that thwarted phishing attempts and testifying before the U.S. House Committee on Energy and



**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

Commerce about criminal behavior on the internet. While at PayPal, Mr. Sullivan also began to build bridges with the external research community (private individuals who attempt to find vulnerabilities in companies' security systems). As part of that process, he co-authored and helped publish one of the first ever "responsible disclosure" policies, which promised outside security researchers that they would not be referred for criminal prosecution if they reported discovered vulnerabilities and did not harm the company's customers.

In 2008, Mr. Sullivan left eBay to join Facebook. After serving briefly in a legal role, he quickly transitioned to overseeing the company's security team. During Mr. Sullivan's tenure as Facebook's Chief Security Officer, the platform grew from just over one hundred million active users to more than 1.4 billion. The company's security team grew as well, from just ten people based in California to over 130 employees worldwide. Under Mr. Sullivan, that team worked hard to make the platform safer for users by protecting them from government surveillance in authoritarian nations, developing tools that allow users to better safeguard their privacy, integrating product features that reduced risk for teens, helping law enforcement agencies to identify and apprehend sexual and financial criminals, preventing terrorists from using Facebook as a communications platform, and guarding users against viruses and denial of service attacks.[2] As described by his former colleague, Ryan Hoyt, "the investigative work and resources utilized by Facebook [under Mr. Sullivan's leadership] was trailblazing" and included partnering "with federal, state, and municipal law enforcement agencies around the United States and even form[ing] an entire sister team of former law enforcement professionals to help build relationships and serve [Facebook's] casework to law enforcement agencies in jurisdictions all around the world." (Letter of Support, Ex. F at 9.)

Former Facebook colleague and General Counsel Colin Stretch recalls those efforts, and particularly Mr. Sullivan's work to prevent child exploitation, scamming, and bullying. Mr.

[2] Mr. Sullivan made numerous news appearances and spoke at many industry conferences to provide insight on the innovative ways in which he and his cybersecurity teams were protecting the public. Some of those, and a link to his appearances, are listed in Exhibit 8 attached to the Declaration of David Angeli.



**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

Stretch recalls how Mr. Sullivan was "singularly focused on ensuring that the company understood the human costs of these issues, and that the team working on these challenges was adequately resourced, had the support of senior leadership, and was motivated." (Letters of Support, Ex. F at 23.) As Mr. Stretch explains, although that work "did not draw headlines," Mr. Sullivan "made it a priority at the company" and "kept many people safe from wrongdoers who would have otherwise done them harm." (*Id.*)

For example, Mr. Sullivan dedicated a group of Facebook engineers and customer support analysts specifically to promoting child safety. Under Mr. Sullivan's direction, Facebook, then the internet's largest photo-sharing website, became one of the first technology companies to implement PhotoDNA—a tool that enabled the company to proactively search its platform for images associated with child exploitation—and a system to detect and report child sexual abuse material at scale. (Letters of Support, Ex. C at 1 (Julie Cordua).) As Julie Cordua, CEO of the anti-human trafficking organization Thorn, recalls, "Facebook was one of only a few companies in the world doing this work" back in 2010. (*Id.*) As a result, the company became the leading source of reports to the National Center for Missing and Exploited Children and worked relentlessly on attribution—identifying the bad actors behind improper or illegal behavior. As Alex Stamos, Facebook's CSO after Mr. Sullivan, recalls: "The Facebook child safety edifice that Joe helped build was responsible for around 75% of all reports made to the National Center for Missing and Exploited Children in 2021. That's over 22 million reports of child exploitation. . . . It is not unreasonable to say that Joe and the handful of other executives who tackled this problem in those early days are likely responsible for more global prosecutions of child sexual exploitation than pretty much any other living people." (Letters of Support, Ex. F at 41.)

In one critical proactive case that received global attention in the safety community during Mr. Sullivan's watch, Facebook's security team single-handedly identified the man who harassed and exploited Amanda Todd, a Canadian teenager whose suicide in 2012 alerted the



**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

world to the dangers facing children online.[3] Mr. Sullivan's work caused a dynamic shift in the entire tech industry. As Mr. Hoyt explains, "The safety program Mr. Sullivan created at Facebook had results—children protected around the world, their abusers arrested and sentenced to prison—and changed the tech industry. As those of us who worked for Mr. Sullivan went off to other companies such as Twitter, Microsoft, LinkedIn, Airbnb, and elsewhere, we brought with us the lessons learned and the skills developed under Mr. Sullivan's leadership." (Letters of Support, Ex. F at 9.)

Reflecting his deep commitment to this work, Mr. Sullivan delivered the "State of the Industry" address each year from 2011 to 2015 at the Dallas Children's Advocacy Center's (DCAC) annual Crimes Against Children Conference, which brings together thousands of professionals employed by government and nonprofit agencies who work directly with child victims of crime. As DCAC's former CEO recalls, during this time, DCAC "had enormous growth in law enforcement attendance and corporate support. Our attendance grew from 2,500 to over 5,000 and our corporate sponsors quadrupled. This would not have occurred without Joe leading the way." (Letters of Support, Ex. C at 3 (Lynn Davis).) During this time, Mr. Sullivan also became one of the first members of Thorn's Tech Task Force—a volunteer group of tech leaders who discussed ways to increase protections for children online and worked to mobilize more companies to proactively implement such protections. (Letters of Support, Ex. C at 1 (Julie Cordua).) In 2011, President Obama invited Mr. Sullivan to the White House to speak as an expert on combatting online bullying.[4] And during the last decade, Mr. Sullivan has remained

---

[3] Vanmala Surbramaniam and Julia Whalen, *Dutch Man Suspected of Tormenting Amanda Todd had 75 Other Victims, Facebook Report Says*, CBC News (Dec. 5, 2014), https://www.cbc.ca/news/canada/dutch-man-suspected-of-tormenting-amanda-todd-had-75-other-victims-facebook-report-says-1.2857281.

[4] A video of the special "Facebook Live" event held during the March 10, 2011 White House Conference on Bullying Prevention is available at https://www.youtube.com/watch?v=L5v9Hoe1GB0. During the event, Mr. Sullivan, White House Domestic Policy Council Director Melody Barnes, White House Deputy Senior Advisor Stephanie Cutter, MTV's Vice President of Public Affairs Jason Rzepka, and author Rosalind Wiseman took live questions from the public via the White House Facebook account on bullying prevention.



**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

steadfastly committed to protecting children online,[5] while continuing to mentor leaders, like Ms. Cordua and Ms. Magnis, who are dedicated to preventing child abuse. (Letters of Support, Ex. C at 1 (Ellen Magnis).)

Mr. Sullivan's work protected other vulnerable Facebook users, as well. For example, in December 2010, civil unrest began roiling the tiny country of Tunisia, the first of a series of events that would eventually spread across the region in a mass social revolution known as the "Arab Spring." After political activists reported that their Facebook accounts were being deleted, Mr. Sullivan's security team investigated and implemented a technical solution that allowed Tunisians to continue their fight for freedom online and in the streets.[6] As Alex Stamos remarks, "Facebook's crash rollout of encryption was critical in protecting the safety of democracy activists across Northern Africa." (Letters of Support, Ex. F at 41.)[7]

Mr. Sullivan's important contributions to the tech industry have extended well beyond innovations to cybersecurity systems and methods. For example, he has consistently used his platform as an industry leader to spearhead and support initiatives aimed at increasing diversity

[5] Mr. Sullivan spoke often to large groups within the industry about protecting children, including at the RSA conference in 2013 where he discussed cyberbullying: https://www.youtube.com/watch?v=YFZA3Q4MinU (*see*, 17:01-22:45; 29:45-37:15; 41:20-42:55). As a parent, protecting children from online predators and other harm was personal for Mr. Sullivan, as he discussed while providing advice about internet safety to parents and teens at a local high school: https://www.youtube.com/watch?v=kOh53HoLyv4.

[6] *See* Alexis C. Madrigal, *The Inside Story of How Facebook Responded to Tunisian Hacks*, The Atlantic (Jan. 23, 2011), https://www.theatlantic.com/technology/archive/2011/01/the-inside-story-of-how-facebook-responded-to-tunisian-hacks/70044/.

[7] In describing some of the groundbreaking work Mr. Sullivan performed over his career that improved the safety of users, Mr. Stamos emphasizes that Mr. Sullivan actively worked "to protect the privacy of activists during the Arab Spring," created "a threat intel team that turned away dozens of attacks by America's adversaries," and implemented "Facebook's massive bug bounty program." (Letters of Support, Ex. F at 41 (Alex Stamos).) In addition, since leaving Facebook, Mr. Sullivan "turned around Uber's terrible history of assaults both by and against drivers" and at Cloudflare "rolled out CSAM [child sexual abuse material] scanning to thousands of smaller companies." (*Id.*)



**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

not only within his own security teams, but also within the broader technology industry.[8] The powerful impact of that work is described in letters to the Court from people who worked closely with Mr. Sullivan and benefitted from his commitment to these efforts.

As an example of one of his larger contributions to corporate diversity efforts, Mr. Sullivan helped create and oversaw Facebook's first corporate "unconscious bias" workshop (one of the first in the world). He also successfully advocated for the assignment of a dedicated diversity recruiter to his security team, enabling him to produce empirical evidence that prioritizing diversity in recruiting efforts improved the pipeline of candidates seeking to work at Facebook. Jennifer Henley, Vice President, Infrastructure - Technical Program Management at Facebook, recalls how Mr. Sullivan "took the lead as an ally and an advocate to support initiatives and work related to bringing more gender parity to the Security field," including by sponsoring women's groups, lobbying within the company for dedicated funding, and building a culture that was inclusive from recruitment all the way up the corporate ladder. (Letters of Support, Ex. F at 7.) Under Mr. Sullivan's leadership, Facebook became one of the founding sponsors of the Women in CyberSecurity conference, and Mr. Sullivan personally participated in the Executive Women's Forum, a group dedicated to supporting senior female leaders in the security space. (*Id.*) As Ms. Cordua recalls, the work Mr. Sullivan did on these fronts "has led to

---

[8] The lack of diversity in the technology sector has been a well-documented problem for years. *See, e.g.*, Bonnie Marcus, *The Lack Of Diversity in Tech is a Cultural Issue*, Forbes (Aug. 12, 2015), https://www.forbes.com/sites/bonniemarcus/2015/08/12/the-lack-of-diversity-in-tech-is-a-cultural-issue/ ; *Will Silicon Valley Face Up To Its Diversity Problem*, The Economist (June 20, 2020), https://www.economist.com/business/2020/06/20/will-silicon-valley-face-up-to-its-diversity-problem; Sam Dean and Johana Bhuiyan, *Why Are Black and Latino People Still Kept out Of the Tech Industry?*, The L.A. Times (June 24, 2020), https://www.latimes.com/business/technology/story/2020-06-24/tech-started-publicly-taking-lack-of-diversity-seriously-in-2014-why-has-so-little-changed-for-black-workers; Steven Melendez, *One Reason for the Tech Industry's Great Resignation: Lack of Diversity*, Fast Company (Aug. 13, 2021), https://www.fastcompany.com/90665530/great-resignation-tech-diversity; *Ten Years on, Why Are There Still So Few Women in Tech?*, The Guardian (Jan. 2, 2020), https://www.theguardian.com/careers/2020/jan/02/ten-years-on-why-are-there-still-so-few-women-in-tech; Nick Morrison, *Tackling the Shortage of Women in Tech Means Tackling the Shortage of Girls in the Tech Classroom*, Forbes (Sep. 30, 2022), https://www.forbes.com/sites/nickmorrison/2022/09/30/tackling-the-shortage-of-women-in-tech-means-tackling-the-shortage-of-girls-in-the-tech-classroom/?sh=467663702b7b.



**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

the advancement and growth of countless women, myself included." (Letters of Support, Ex. C at 1.)

Mr. Sullivan continued that important work when he moved to Uber in 2015. Komal Mangtani, current Head of User Identity Data Infrastructure at Meta and a former security engineering director at Uber, recalls Mr. Sullivan being one of two key sponsors of Uber's LadyEng group, an employee affinity group dedicated to the advancement of women in engineering. (Letters of Support, Ex. G at 25.) During his time at Uber, Mr. Sullivan made time to guide women engineers to define their career path and encouraged the men on his teams to be better allies, including by supporting the group's technical and career mentorship program. (*Id.*)

He also used his position as Chief Security Officer to promote other types of diversity throughout the company, including by assuming the executive leadership role for Uber's Black employee resource group, UberHUE. As former Uber employee Nicole Cuellar-Lopez recalls, Mr. Sullivan "understood that diversity of background, thought, and experience would make our organization stronger. He put his own reputation on the line to help me and other ERG leaders get an audience with the CEO and other executives to present our ideas and proposals to strengthen the company by increasing diversity and inclusion." (Letters of Support, Ex. G at 9.) As Ms. Cuellar-Lopez explains, "To describe Joe as an 'ally' would be an understatement. The time he committed to helping us strategically present our ideas, and his humility in shining the spotlight on us rather than himself mean the world to me." (*Id.*) Kevin Maher similarly recalls Mr. Sullivan going "out of his way to help disadvantaged people of color get access to internships and high-paying jobs at Uber through his work with the 'Black at Uber' employee resource group." (Letters of Support, Ex. G at 18.) At trial, Kandace Cooks, Uber's former head of Diversity and Inclusion, testified about Mr. Sullivan's ready willingness to have difficult and emotional conversations about issues surrounding race and diversity and inclusion in the workplace. (Trial Tr. at 2280:25–2281:5.) She explained that as the executive sponsor of UberHue, Mr. Sullivan demonstrated that he "was the executive leader that we could all depend on to do the right thing, even if it was the hard thing." (*Id.* at 2282:10–11.) Mr. Sullivan was "a



**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

very integral part of not only [Ms. Cooks'] success, but others at Uber being able to move forward, find solutions, and really do things that were seemingly impossible." (*Id.* at 2282:16–19.)

While at Uber, Mr. Sullivan also sought opportunities to improve the lives of underserved people at large. For example, Ellen Magnis describes how she connected Mr. Sullivan with a prison entrepreneurship program that helped formerly incarcerated people find employment upon release from prison. (Letters of Support, Ex. C at 4.) Susan Chiang describes how she and Mr. Sullivan worked together on that initiative at Uber, using "aggregated data" to prove that a person's nonviolent felony conviction did not render them unsafe to drive for rideshare companies like Uber. (Letters of Support, Ex. H at 4.) Both Ms. Magnis and Ms. Chiang note how Mr. Sullivan's work on this program resulted in several states amending their laws to allow certain people with nonviolent felony convictions the opportunity to work in sectors like ridesharing, enabling them to contribute to society and support their families. (Letters of Support, Ex. C at 4; *id*. Ex. H at 4.)

When Mr. Sullivan joined Uber in 2015, the company was widely regarded as a place in need of substantial cultural change.[9] Mr. Sullivan was credited with driving many positive changes there beyond his work on diversity and professionalizing the company's security and safety programs. The largest impetus for change at the company during those years, the 2017 "Holder Report," resulted from Mr. Sullivan introducing former Attorney General Eric Holder to Uber in 2016. Mr. Sullivan invited Mr. Holder to speak at a company all-hands meeting where Mr. Sullivan interviewed Mr. Holder about the importance of integrity inside a company. (Letters of Support, Ex. G at 9 (Nicole Cuellar-Lopez).)

Mr. Sullivan continued this work in earnest after he left Uber and joined Cloudflare. As Cloudflare's CEO explains, "Joe believes fundamentally that more diverse teams are stronger

---

[9] *See*, *e.g.*, Dominic Rushe, *Is Uber the Worst Company in Silicon Valley?*, The Guardian (Nov. 18, 2014), https://www.theguardian.com/technology/2014/nov/18/uber-worst-company-silicon-valley.


**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

teams. As a result, he worked tirelessly to attract women and racial minority candidates to his team. Today, the team he built counts half of its members as coming from groups traditionally underrepresented in the technology industry." (Letters of Support, Ex. H at 27 (Matthew Prince).). Cloudflare's Nicole Ellis echoes those sentiments, describing Mr. Sullivan's participation as an executive sponsor of Cloudflare's employee resource group as "go[ing] above and beyond performative participation by showing real results in our department's diversity." (Letters of Support, Ex. H at 11.) As a result, Mr. Sullivan's department at Cloudflare was "noted as being the most diverse, along with having the highest scores in Employee Satisfaction during the 2021 Employee Experience Survey." (*Id.*) When Jacqueline Keith was contemplating joining Cloudflare, numerous industry leaders "pointed [her] to working with Joe as a leader who would further my career as a woman in cybersecurity (a highly male-dominated and sometimes brutal industry)." (Letters of Support, Ex. H at 18 (Jacqueline Keith).) Those recommendations came "well after news of Joe's firing from Uber was public knowledge because he continued to be viewed as an ethical leader who championed the careers of underrepresented groups and gives employees the ability to try new things and fail in the learning process, all while moving forward." (*Id.*) Other Cloudflare employees report similar experiences with Mr. Sullivan, including Julie Sparks, who notes that Mr. Sullivan was "a core advocate for Afroflare and an ally for Proudflare," two of Cloudflare's ERGs. (Letters of Support, Ex. H at 31.) She describes how Mr. Sullivan "sets aside time and energy to connect to minority groups, hire them, [and] put his name behind them," lending their careers "invaluable" support. (*Id.*; *see also* Letters of Support, Ex. H at 12 (James Espinosa); *id*. at 15 (Janet Huysse).)

**D. Public Service and Mentoring**

Mr. Sullivan's lifelong commitment to public service continued after he joined the private sector. In 2010, after his Palo Alto community first experienced a "suicide cluster" among local high school students,[10] Mr. Sullivan became an inaugural executive committee

[10] *See* Jamie Chung, *The Silicon Valley Suicides*, The Atlantic (Dec. 2015), https://www.theatlantic.com/magazine/archive/2015/12/the-silicon-valley-suicides/413140/.



**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

member of the National Action Alliance for Suicide Prevention, the nation's public-private partnership for suicide prevention. He later took what he learned in that work to deploy into Facebook direct connections to the suicide and crisis prevention lifeline.

In 2012, Mr. Sullivan agreed to serve on the Homeland Security Advisory Council Task Force on CyberSkills, formed by DHS Secretary Janet Napolitano. That group of volunteers identified means by which DHS could "foster the development of a national security workforce capable of meeting current and future cybersecurity challenges" and outlined how DHS could "improve its capability to recruit and retain that sophisticated cybersecurity talent." The group's work helped position DHS to make the country "safer, more secure, and more resilient."[11]

In 2016, President Obama appointed Mr. Sullivan to the President's nonpartisan Commission on Enhancing National Cybersecurity. In her letter to the Court, Kiersten Todt, the Commission's Executive Director, recalls that in "literally each call I made" after being asked by the White House to research appropriate individuals from the private sector to serve on the Commission, "every person with whom I spoke recommended Joe to serve and each person commented on his leadership in the space, but importantly, his thoughtfulness, conscientiousness, and discipline in the space." (Letters of Support, Ex. I at 77.) The twelve members of the Commission were "charged with developing actionable recommendations for securing and growing the digital economy by strengthening cybersecurity in the public and private sectors."[12] The Commission reviewed past reports, consulted technical and policy experts, held six in-person public hearings, issued an open solicitation for input, and invited the public at large to share facts and views. Ms. Todt recalls that Mr. Sullivan "was consistently one of the most responsive and thoughtful individuals and quickly became the respected voice of industry and technology for the other Commissioners." (*Id.*)

---

[11] Homeland Security Advisory Council, *CyberSkills Task Force Report*, at 2 (Fall 2012) https://www.dhs.gov/publication/homeland-security-advisory-council-cyberskills-task-force-report.

[12] Commission on Enhancing National Cybersecurity, *Report on Securing and Growing the Digital Economy* (Dec. 1, 2016), https://www.nist.gov/cybercommission.


**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

Mr. Sullivan has also served as an adviser for many industry groups and emerging technology companies. For example, in 2011, he joined the board of the National Cyber Security Alliance, a nonprofit public-private partnership focused on helping users stay safer and more secure online. He has also served on the advisory boards for Airbnb and several other Silicon Valley startup companies. (Letters of Support, Ex. I at 88 (Jim Wilson); *id*. at 46 (Ryan Noon).)

Despite his many formal duties and commitments, Mr. Sullivan has always taken the time to personally mentor individuals within the cybersecurity industry. He is a longtime member of the Bay Area CSO Council, a volunteer CISO/CSO mentoring organization. (Letters of Support, Exhibit I at 45 (Izak Mutlu).) Cloudflare's CEO recalls how he "would often get notes from people both inside and outside of Cloudflare who would thank me for how giving Joe was with his time. . .. Joe saw mentorship as critical to making [the industry] more open and inclusive and always volunteered his time toward that end." (Letters of Support, Ex. H at 27 (Matthew Prince).) In his letter to the Court, former Secret Service Agent David Pigott recounts how Mr. Sullivan inspired him and "countless others." (Letters of Support, Ex. E at 14.) "Joe has spent the better part of his adult life in service; service to his country and service to the global security community." (*Id.*)

After he lost his position as CSO of Cloudflare last October following the outcome of the trial, Mr. Sullivan threw himself into even more mentoring and volunteering. In January, he became the CEO of Ukraine Friends, a 501(c)(3) organization dedicated to providing humanitarian aid to the people of Ukraine. (Letters of Support, Ex. C at 6 (Ukraine Friends); *id*. at 5 (Teddy Raskin).) This new role was a natural extension of the work Mr. Sullivan did at Cloudflare in the first half of 2022, when the company partnered with the United States government to shore up the cyber-defenses of Ukraine's government, military, and critical infrastructure companies. As Hanna Shuvalova reports: "Joe's support has been instrumental in the country's fight against Russia in the digital space, effectively protecting critical infrastructure and national security interests." (Angeli Decl., Ex. 15 (Letter from Hanna Shuvalova).)

As CEO of Ukraine Friends, Mr. Sullivan is poised to do even more to help the people of



**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

Ukraine in a broader capacity. He now oversees all operations for this nonprofit which, among other things, refurbishes and provides ambulances to civil defense and fire departments in Ukraine, delivers tens of thousands of first aid kits to communities throughout the country, and helps resettle people displaced by the war. Mr. Sullivan has also leveraged his unique network across the technology industry to launch a new initiative to deliver laptops to Ukrainian children whose attendance at school has been disrupted by the war. (Letters of Support, Ex. C. at 6 (Ukraine Friends); *id*. at 9 (Brett Velicovich).) In just a short time, he has established himself as a compassionate and competent leader and made a significant impact on both the organization and humanitarian aid in Ukraine. The organization's Board Chair echoes this, noting that the organization would "never be able to help the people of Ukraine in these areas without Joe's unique expertise, willingness to get his hands dirty on the ground in Ukraine, and network of security-expert friends he has called upon frequently already." (Letters of Support, Ex. C. at 6 (Ukraine Friends).)

**E. Family and Faith**

The Court has heard much about Mr. Sullivan as a pioneering leader in cybersecurity, but he most cherishes his role as father to his three daughters, Bridget (20), Celia (17), and Audrey (15). At the end of 2020, Mr. Sullivan and his wife of nearly twenty-five years, Suzanne, divorced. (Letters of Support, Ex. A at 29 (Suzanne Sullivan).) Mr. Sullivan was awarded primary custody (70% parenting time) of his daughters, two of whom attend local high schools. The other is a college junior. Mr. Sullivan has been the sole source of income for his family since 2002.

Despite his professional obligations, Mr. Sullivan is an attentive father dedicated to raising and supporting these three impressive young women. Like many who know Mr. Sullivan and his family, close family friend Gabriel Brenner describes how, despite the pressures of his "crazy job," Mr. Sullivan always made sure to prioritize his family's well-being, from enthusiastically supporting his daughters' athletic endeavors to honoring their dietary choices, to offering them comfort and solace as they navigate a challenging relationship with their mother.


**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

(Letters of Support, Ex. B at 1.) Mr. Sullivan's former Facebook colleague, Colin Stretch, recalls that "Joe cared deeply about his family. . . . Joe seldom drew boundaries, but when he did, it was for one reason, and one reason only: so that he could spend time with his wife and children." (Letters of Support, Ex. F at 23.)

Mr. Sullivan's daughters confirm his devotion to parenting. His youngest daughter, Audrey, describes the impact Mr. Sullivan's presence has had on her life: "With my dad, I learn by example, through stories he or his friends tell me, through the things I watch him say and do. Half of what I learn from him, he does not even realize he is teaching or that anyone is watching at all." (Letters of Support, Ex. A at 11.) Mr. Sullivan's middle-daughter, Celia, echoes her sister's sentiments: "He has shown us how to be a good person. He emphasizes the importance of family and that taking care of those you love is the most important thing in life." She recalls Mr. Sullivan encouraging her to persevere through discomfort and exhaustion by running with her when she started running cross-country: "With him by my side, encouraging me to work my hardest, I saw a lot of improvement." (Letters of Support, Ex. A at 15.) Bridget, Mr. Sullivan's oldest daughter, recounts how "from a very young age, my dad impressed upon me the importance of integrity and hard work. My dad never sternly lectured me about these values. Rather, he demonstrates them to me every day in how he lives his life." (Letters of Support, Ex. A at 13.)

Mr. Sullivan also maintains close relationships with his father, his siblings, and their families. They speak together on a group video call once a week, and several of them traveled to San Francisco to attend portions of Mr. Sullivan's trial. (Letters of Support, Exhibit A at 24 (Mary Sullivan); *id*. at 27 (Rachel Sullivan), *id*. at 16 (Chris Sullivan), *id*. at 21 (John Sullivan), *id*. at 23 (Leslie Sullivan).) As the oldest of seven, Mr. Sullivan plays a central role in the care of his extended family. Mr. Sullivan's youngest sibling, Mary, describes how, "[n]o matter what else was going on in his life, Joe would drop everything and immediately get to work sorting through paperwork, writing letters, or whatever else needed to be done. From distant relatives' confusing last will and testaments to my brother Eddie's brush with copyright law when he was



**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

nineteen, Joe has been a steady voice of reason and support throughout the years." (Letters of Support, Ex. A at 24; *see also id*. at 18 (Edmund Sullivan).)

In the summer of 2022, just weeks before the trial in this case, Mr. Sullivan's 12-year-old nephew died suddenly from a massive brain hemorrhage. The family was devastated. Mr. Sullivan's sister relates how Mr. Sullivan "flew to Atlanta right away to be with us. He embraced us with love and support while we struggled to understand our incomprehensible loss. He took care of details with the church for the funeral and made sure that the many relatives were fed and cared for." (Letters of Support, Ex. A at 3 (Kathleen Dremann).) Mr. Sullivan's cousin, James McAuley, explains how Mr. Sullivan's care for his mother and father "has been a shining example to me as I find myself assisting my elderly mother." (Letters of Support, Ex. A at 6.)

The Catholic faith that Mr. Sullivan's parents instilled in the family has always been central to Mr. Sullivan's life. Each Sunday, his weekly call with his siblings begins with a prayer. (Letters of Support, Ex. A at 16 (Chris Sullivan).) And he continues his practice of regularly attending Mass that he first began in early childhood. (Letters of Support, Ex. A at 8 (Michelle Murray).) He married his former wife at St. Peter's Church in Vatican City, where he had the extreme good fortune of receiving Pope John Paul II's personal blessings on his family. (Angeli Decl., Ex. 16 (Letter from Cornelius Sullivan).) Mr. Sullivan and his daughters are parishioners at St. Thomas Aquinas Parish in Palo Alto and attend weekly mass there unless they join his fiancée and her son at services at the Bay Area Christian Church, also in Palo Alto.

## II. The Offense Conduct[13]

On November 14, 2016, while serving as Uber's Chief Security Officer, Mr. Sullivan learned via email of a potential data breach by someone purporting to have "found a major vulnerability in [U]ber" (the "2016 Incident"). Mr. Sullivan immediately began an investigation in accordance with written policies prepared by Uber's Security and Legal teams—policies which tasked Mr. Sullivan's Security group with investigating the technical aspects of data

[13] Given the Court's familiarity with the facts underlying the counts of conviction, only a summary of the offense conduct is included here.



**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

breaches and the Legal department's "Privacy" attorneys (a group that did not include Mr. Sullivan) with understanding and conducting Uber's breach-related legal and reporting obligations.

Among Mr. Sullivan's first actions was to notify the highest level of Uber management—Chief Executive Officer Travis Kalanick—of the incident and to seek the assistance of Uber Privacy attorney Craig Clark, a member of Uber's Legal department responsible for advising Mr. Sullivan's team and others at Uber about the company's security-related legal responsibilities. From there, roughly thirty Uber employees from Uber's Security, Legal, and Communications groups played a variety of roles responding to the 2016 Incident. Those individuals communicated with each other extensively throughout the ensuing investigation.

Mr. Sullivan's Security team meticulously documented the incident and Uber's response in real time. A key document used for this purpose was the Preacher Central Tracker (PCT). The PCT was updated regularly, sometimes multiple times per day, and documented the Security team's efforts to investigate the incident, take steps in response, and memorialize meetings and issues that arose throughout. This document was stored on Uber's systems and made widely available to every member of the response team.

Throughout Uber's response to the 2016 Incident, Legal's Craig Clark—in furtherance of his twin duties to provide legal advice to the Security team and to help Legal understand and carry out its reporting obligations—was provided the details about the investigation (indeed, he created the PCT) and was involved in key decisions. Similarly, lead Uber Privacy attorney Candace Kelly, a former longtime AUSA in this District who regularly interacted with law enforcement while at Uber, was informed of the details of the 2016 Incident within 24 hours of its occurrence, as was Rachel Whetstone, the head of Uber's Communications team.

Mr. Clark advised Mr. Sullivan and the rest of the response team that the matter would properly be treated as a "bug bounty"—and not a reportable data breach—if the response team could locate the hackers, get confidence that they had deleted the data and not disseminated it further, and enter into a non-disclosure agreement with the hackers. After an intense, six-week


**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

effort, the response team—comprised of industry-leading personnel with vast experience dealing with similar situations—reported to Mr. Sullivan that the two men responsible for the 2016 Incident had been located and confronted and that the team believed, based on its forensics work and interviews with the hackers, that the compromised data had been deleted, *i.e.*, that there was no material risk of harm to the drivers whose data was at issue.

Mr. Sullivan was aware of a $100,000 bug bounty payment to the hackers and, with Mr. Kalanick's knowledge and approval, approved a non-disclosure agreement (NDA)—drafted primarily by Mr. Clark—that was signed by the parties.

About a year and a half before the 2016 Incident, in 2015, the FTC had launched an investigation into a separate data breach that occurred at Uber in 2014, before Mr. Sullivan joined the company (the "2014 Incident"). During the investigation, Uber was required to produce documents to the FTC and answer interrogatory-style questions. On November 4, 2016 (shortly before the 2016 Incident), Mr. Sullivan sat for a deposition and provided testimony on behalf of Uber regarding, among other things, the remedial security measures Uber had implemented following the 2014 Incident.

Mr. Sullivan was not a Privacy lawyer in Uber's Legal department, had never advised businesses in data breach law or done legal research into that fast-evolving area of the law, had little direct interaction with the FTC during its investigation (apart from the deposition and an earlier presentation), and was not responsible for preparing Uber's responses to the FTC's inquiries. He was occasionally consulted about specific issues related to the FTC investigation and was copied on or asked to review certain of Uber's submissions to the FTC, typically at or near the submission deadline after the drafting process was complete. And he instructed members of his team to provide detailed information to, and meet with, Uber's in-house and outside attorneys overseeing the FTC matter. The witnesses at trial were unanimous in their testimony that Mr. Sullivan never instructed them to lie to, or withhold information from, the Uber lawyers managing the FTC investigation. Nevertheless, the FTC did not learn of the 2016 Incident until approximately one year later when, following Mr. Kalanick's departure from the



**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

company, new management determined that the incident should have been disclosed. At that same time, Uber also fired Mr. Sullivan and Mr. Clark, a decision that was widely reported in the national and international media.

Mr. Sullivan was subsequently charged with one count of obstructing the FTC's investigation, in violation of 18 U.S.C. § 1505, and one count of misprision of a felony, in violation of 18 U.S.C. § 4. Despite widespread knowledge of the 2016 Incident within Uber, the government argued that Mr. Sullivan "withheld knowledge of the breach from others within Uber who were in a position to disclose that information to the FTC." (ECF No. 1 (Compl.) ¶ 43.) The government further contended that Mr. Sullivan concealed the 2016 Incident from the FTC, which, the government argued, should have been made aware of the incident because the FTC's ongoing investigation of the 2014 Incident "focused on data security, data breaches, and protection of [personal identifying information]." (*Id.* ¶ 13.) The government contended that Mr. Sullivan "concealed" the 2016 Incident, principally by failing to affirmatively disclose it to Uber's Legal department as it worked to respond to the FTC's investigation into the 2014 Incident. (*See, e.g.*, *id.* ¶¶ 13, 43; ECF No. 71 (Superseding Indictment) ¶ 5.) On October 5, 2022, following a multi-week trial and several days of deliberation, the jury returned a verdict of guilty on both counts.

## DISCUSSION

### I. Legal Framework

"The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in [18 U.S.C. § 3553(a)(2)]." 18 U.S.C. § 3553(a).[14]

---

[14] The factors a sentencing court must consider include:

1. [T]he nature and circumstances of the offense and the history and characteristics of the defendant;
2. the need for the sentence imposed—
   - A. to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;


ANGELI LAW GROUP LLC
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

Courts may take a broad view of what to consider in arriving at an appropriate sentence. The Sentencing Guidelines are only "one factor among the § 3553(a) factors that are to be taken into account in arriving at an appropriate sentence," without being given "more or less weight than any other" of those factors. *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (*en banc*); *see also United States v. Sachsenmaier*, 491 F.3d 680, 685 (7th Cir. 2007) (noting that courts are to consider all the § 3553(a) factors "without any thumb on the scale favoring a guideline sentence"). "The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009) *(per curiam*) (emphasis in original).

In short, a sentencing court's task is "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). As the Supreme Court wrote in *Pepper v. United States*, 562 U.S. 476 (2011):

> [W]e have emphasized that "[h]ighly relevant—if not essential—to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." Permitting sentencing courts to consider the

---

B. to afford adequate deterrence to criminal conduct;

C. to protect the public from further crimes of the defendant; and

D. to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

3. the kinds of sentences available;
4. the kinds of sentences and the sentencing range established [by the Sentencing Guidelines];
5. any pertinent policy statement . . .;
6. the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and
7. the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(2).


**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

> widest possible breadth of information about a defendant "ensures that the punishment will suit not merely the offense but the individual defendant."

*Id.* at 488 (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949) and *Wasman v. United States*, 468 U.S. 559, 564 (1984)) (second and third brackets in original; internal citation omitted)). Applying those principles in this case, we respectfully urge the Court to follow the recommendation of the PSR and impose a probationary sentence with appropriate conditions.

## II. Application to Mr. Sullivan

### A. The nature and circumstances of the offense strongly support a sentence of probation.

The Court's ultimate determination will presumably rely in part on its assessment of the overall wrongfulness of the offense conduct. In that regard, obstruction cases cover a broad spectrum. On one end are cases in which defendants, often motivated by personal financial gain, actively destroy evidence, lie, and encourage others to do the same to conceal their own illegal conduct. On the other end are cases that are far more nuanced, in which the defendant's motivation is not so obviously nefarious and the conduct at issue is much more attenuated from the underlying proceeding.

This case is at the latter end of that spectrum. Numerous witnesses testified that they believed the response team, including Mr. Sullivan, were always acting in good faith. (*See, e.g.*, Trial Tr. 2489:15–2490:5 (Guzman).) Greed or personal gain did not motivate the conduct underlying the conviction. There was no allegation that Mr. Sullivan lied to law enforcement, the FTC, or any other investigating government agency, or that he instructed anyone else to lie. (*Id.* 697:5–19, 698:23, 699:20–700:6 (Flynn); *id*. 837:11–838:2, 839:3–9, 839:17–24 (Garbutt); *id*. 1068: 13–1070:9 (Fletcher); *id*. 1763:18–1764:21 (Worden); *id*. 2259:14–2260:5 (Greene).) Mr. Sullivan quickly informed the company's CEO of the incident and kept him apprised of the progress of the investigation. He ensured that the lawyer assigned to his team was fully aware of the details of the situation. He knew that the head of Uber's Communications team was briefed. No documents were destroyed. To the contrary, Mr. Sullivan ensured that the response to the 2016 Incident was carefully documented in the Preacher Central Tracker and elsewhere. And the



**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

criminal conduct that was allegedly concealed was *someone else's* conduct—the hackers'—and not Mr. Sullivan's.

In other words, notwithstanding the government's protests to the contrary, the case against Mr. Sullivan was fundamentally one of omission: that he "withheld knowledge of the [2016 Incident] from others within Uber who were in a position to disclose that information to the FTC." (Compl. ¶ 43.)[15] While the parties may disagree as to the legal sufficiency of that case, Mr. Sullivan's conduct falls, at worst, on the benign end of the spectrum of conduct encompassed by the obstruction statutes.

### B. Mr. Sullivan's personal history and characteristics strongly support a non-custodial sentence.

"Each of us is more than the worst thing we've ever done." Bryan Stevenson, J*ust Mercy: A Story of Justice and Redemption* (Spiegel & Grau 2014). A sentencing court's inquiry under § 3553(a) often turns on whether the offense for which the defendant is to be sentenced reflects the essence of that person or whether the conduct was an aberrant deviation from an otherwise exemplary life. *See*, *e.g.*, *United States v. DeRusse*, 859 F.3d 1232, 1237 (10th Cir. 2017) (approving of variance based on "the extent to which the criminal conduct was out of character"); *United States v. Howe*, 543 F.3d 128 (3d Cir. 2008) (variance appropriate based on "isolated mistake" in otherwise long and entirely upstanding life); *United States v. Hadash*, 408 F.3d 1080, 1084 (9th Cir. 2005) (downward departure to a probationary sentence reasonable where defendant was a "law abiding citizen who did an incredibly dumb thing"); *United States v. Gupta*, 904 F. Supp. 2d 349, 353 (S.D.N.Y. 2012) (granting significant downward variance when the defendant's "personal history and characteristics starkly contrast with the nature and

[15] As discussed in the Motion for Judgment of Acquittal, the few examples of affirmative conduct the government has cited were not tied to the FTC investigation at all. (ECF No. 242 at 15–20.) For example, although much ink has been spilled and court time consumed with discussion of a purportedly false statement in the NDA, there was no evidence that Mr. Sullivan and Mr. Clark discussed the FTC while drafting the NDA; that Mr. Sullivan (or anyone else) showed the NDA to anyone at the FTC, to any of Uber's lawyers involved in the FTC investigation, or to the WilmerHale lawyers investigating the matter in late 2017; or that Mr. Sullivan urged anyone else to do so.



**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

circumstances of his crimes"). There is no question that the conduct for which the jury convicted Mr. Sullivan represents a singular departure from an otherwise exemplary life. Indeed, the PSR writer, as support for the recommendation of a probationary sentence, noted that "[w]hat is apparent to this officer is that the instant offense is an isolated incident in what is otherwise a long and positive career of public service." (ECF No. 252 (PSR) at 26.)

As discussed in Section I above, the PSR and the many letters submitted to this Court attest to Mr. Sullivan's admirable life, built on a foundation of hard work, integrity, dedication to his family and faith, and a desire to help others. He is renowned professionally not only for his technical innovation, skill, and integrity, but also for his commitment to championing and promoting groups who have been historically underrepresented in the industry. He has devoted his time and expertise to protecting the most vulnerable in society through his work with the Dallas Child Advocacy Center and the National Center for Missing and Exploited Children. And throughout his career, both as an AUSA and as a private partner to law enforcement, he has worked tirelessly to protect consumers and hold accountable those who cause harm to others.

Mr. Sullivan's colleagues have written powerfully regarding his character. A fellow CISO who has known Mr. Sullivan since 2011 describes him as a "highly ethical, competent and effective leader in the security community" who cares "for the security of not just his employer but that of the broader world and all the individuals connecting through the technology we use in our daily lives." (Letters of Support, Ex. I at 40 (Steve Martino).) One of Mr. Sullivan's earliest mentors as a CISO agrees wholeheartedly that "There are some people you trust with your life and then there are some people you trust with your life and the lives of your family. Joe is in the latter category." (Letters of Support, Ex. I at 34 (Patrick Heim).) Another CISO observes that Mr. Sullivan "has been instrumental in shaping a critical industry": in addition to consistently emphasizing "integrity, honesty, and ethical behavior" when speaking to the security community, Mr. Sullivan has left "each organization far better prepared to defend itself against cybercrime than he found it [and] he has shared everything he learned along the way transparently." (Letters of Support, Ex. I at 58 (Jerry Perullo).) Yet another describes Mr. Sullivan as a person who


**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

"holds himself to the highest standards possible," whose "integrity has never come into question," and who "has been a role model for transparency in cybersecurity, for giving back to our community, and for developing his own teams to be the best leaders they can be." (Letters of Support, Ex. I at 22 (Adam Fletcher).) And yet another, discussing the passion and dedication Mr. Sullivan brought to protecting children from online predators, reflects:

> We could have done the bare minimum of reporting content to the National Center for Missing and Exploited Children and taking down profiles on the social media platforms, but that was not enough for Mr. Sullivan. There were stories to be told of victims who needed help right away. There were dots that needed to be connected by skilled investigators so that law enforcement could have a more complete picture of the complicated webs of fake accounts and anonymized VPN services that the perpetrators utilized to engage in their abuse.

(Letters of Support, Ex. F at 9 (Ryan Hoyt).) Finally, Mr. Sullivan's former boss, Travis Kalanick, observes that Mr. Sullivan was an "honest, trusted employee who always acted with integrity . . . always pushing the company to do the right thing." (Letters of Support, Ex. G at 23.)

Those who know Mr. Sullivan in other contexts also speak about "his unflinching resolve in the face of challenging problems and his dedication to helping others." (Letters of Support, Ex. A at 16 (Chris Sullivan).) Mr. Sullivan's sister-in-law describes how he is "a model to so many" in the Sullivan family, inspiring them with his "dedication, love, and support" for his daughters. (Letters of Support, Ex. A at 10 (Alice Sullivan).) One of Mr. Sullivan's brothers, who has "looked up to Joe my entire life," describes how Mr. Sullivan sent him "money each month to help cover room and board so that I could make it through" college. (Letters of Support, Ex. A at 13 (Chris Sullivan).) Mr. Sullivan's youngest sister also relates how Mr. Sullivan "closed the gap" between her financial aid and her college tuition and "paid for everything that my financial aid didn't cover," enabling her to pursue her dream of teaching art and "bringing art into the lives of underprivileged children." (Letters of Support, Ex. A at 24 (Letter form Mary Sullivan).) Another of Mr. Sullivan's sisters, Kathleen Dremann, describes how she recently learned that Mr. Sullivan "had helped pay for college for [their siblings]. He



**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

has been quietly taking care of those around him without announcing his good deeds to the world." (Letters of Support, Ex. A at 3.) She also relates how after she graduated from college with no place to live and no job, Mr. Sullivan welcomed her into the studio apartment he shared with his fiancée while she "worked it out." (*Id.*) Those are personal examples of what Ms. Dremann describes as Mr. Sullivan's everyday acts "of impacting the world on a small scale":

> My brother is a man who understands the value of small kindnesses that may go unnoticed by many. He is the type to slip a waiter some extra money and apologize if the people he is with are unkind. He will bring attention to injustices by cracking a joke and making the person feel seen and understood. He contributes greatly to the world and those around him. He does so quietly and without expectation of repayment or favors in return.

(*Id.*)

**C. A probationary sentence will provide adequate specific and general deterrence.**

Section 3553(a)(2) requires the Court to account for other purposes of sentencing, including "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct." In Mr. Sullivan's case, imprisonment is not necessary to deter him from engaging in future criminal conduct or to deter others from doing so; a sentence of probation, as recommended by the PSR, would be sufficient to serve both deterrent purposes of sentencing.

**1. Specific Deterrence**

Mr. Sullivan is extremely unlikely to engage in future criminal conduct.[16] Throughout his letter to the Court, Mr. Sullivan thoughtfully and candidly grapples with the consequences of his actions and demonstrates his awareness that his conduct "hurt others and served as a bad example." (Angeli Decl., Ex. 1 (Letter from Joe Sullivan).) Most importantly, Mr. Sullivan not

[16] It is both reasonable and appropriate for the Court to consider Mr. Sullivan's history and age (54) when determining his likelihood of recidivism. Defendants over the age of 40 at the time of sentencing exhibit substantially lower rates of recidivism in comparison to younger defendants. *See* U.S. Sentencing Comm'n, Measuring Recidivism: The Criminal History Computation of The Federal Sentencing Guidelines, at 28 (2004); *see also* U.S. Sentencing Comm'n, The Effects of Aging on Recidivism Among Federal Offenders, at 10 (2017). Based on Mr. Sullivan's history of respecting the law, his age, lack of criminal history, and the strong support of his friends and family, his likelihood of recidivism is as close to zero as an individual can be.



**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

only assures the Court that the conduct in this case "won't happen again on his watch," but has taken action to help ensure that others avoid making the same mistakes. (*Id.*)

The United States Supreme Court has recognized that a defendant's likelihood to engage in future criminal conduct is a central factor that courts must assess when imposing a sentence. See *Pepper*, 562 U.S. at 492 (citing 18 U.S.C. § 3553(a)(2)(B)–(C)); *see also Gall v. United States*, 552 U.S. 38, 59 (2007) ("imprisonment was not necessary to deter [the defendant] from engaging in future criminal conduct or to protect the public from his future criminal acts"). Courts have approved downward variances based on a defendant's low risk of recidivism. *See, e.g.*, *United States v. Campbell*, 762 Fed. App'x 877, 879 (11th Cir. 2019) (noting that the District Court's "44-month downward variance reflected the court's consideration of [the defendant's] characteristics, including his age, low risk of recidivism, and family relationship and of the seriousness of his criminal history"); *United States v. Monetti*, 705 Fed. App'x 865, 869 (11th Cir. 2017) (noting that District Court granted a downward variance based, in part, on defendant's low risk of recidivism).

**2. General Deterrence**

"Section 3553(a) . . . does not require the goal of general deterrence be met through a period of incarceration." *United States v. Edwards*, 595 F.3d 1004, 1016 (9th Cir. 2010); *see also Gall*, 552 U.S. at 59 (recognizing that in determining an appropriate sentence, "[s]ection 3553(a)(3) directs the judge to consider sentences other than imprisonment"). The pertinent legislative history of § 3553(a) reflects Congress' view that "it may very often be that release on probation under conditions designed to fit the particular situation will adequately satisfy any appropriate deterrent or punitive purpose." *Edwards*, 595 F.3d at 1016 n.9 (quoting S. Rep. No. 98-225 at 92). Probation is a weighty sanction that imposes on an offender "several standard conditions that substantially restrict their liberty." *Gall*, 552 U.S. at 48. Imposing special conditions restricts a defendant's liberty even further.

While § 3553(a) requires courts to consider general deterrence as one of the goals of sentencing, judges are often placed in the difficult position of having to wonder whether any



**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

particular case or any specific sentence will *in fact* act as a general deterrent. Mr. Sullivan's is the rare case where we have *direct evidence* of the impact his prosecution has had on the cybersecurity industry—the precise audience the government sought to influence from the very beginning of this case. Regardless of how the government may now choose to frame its general deterrence goals to support its sentencing recommendation, it has been very explicit, from the time it announced the charges against Mr. Sullivan until it publicized the jury's verdict, that it sought to send a message to technology companies and security professionals that the government expects them to "step forward and provide us evidence of an intrusion"[17] and to "alert customers and appropriate authorities when . . . data is stolen by hackers."[18] In other words, throughout this prosecution, the government's consistent message has been that the industry must report data intrusions when they happen, and that there will be consequences for its failure to do so.

That message has clearly been received. Mr. Sullivan's very public firing and his subsequent indictment and conviction garnered widespread media attention and caused the industry immediately to sit up and take notice. As Asana's Head of Security, Sean Cassidy, explains, "This is a landmark case already, and has already changed the course of cybersecurity programs at many companies for the better. CSOs across the country are clarifying our roles and responsibilities and making sure we do the right thing in every circumstance." (Letters of Support, Ex. I at 11(emphasis added).) As one information security consultant writes, "The jury has spoken, the precedent has been set, and the reverberations are now being felt throughout the security industry." (Letters of Support, Exhibit F at 2 (Paul Cochrane).) PayPal's first CISO, Michael Barrett, similarly notes that Mr. Sullivan's conviction has "generated significant

---

[17] United States Attorney's Office, Press Conference at 6:50–6:58 (Aug. 20, 2020), *available at* https://www.youtube.com/watch?v=QEPRm2E_PUw.

[18] United States Attorney's Office, *Former Chief Security Officer of Uber Convicted of Federal Charges for Covering Up Data Breach Involving Millions of Uber User Records* (Oct. 5, 2022), http://www.justice.gov/usao-ndca/pr/former-chief-security-officer-uber-convicted-federal-charges-covering-data-breach.



**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

shockwaves within the cybersecurity community." (Letters of Support, Exhibit I at 6.) As Alex Stamos, former CSO for Facebook and Yahoo, puts it in his letter, "It is not an understatement to say that Joe's conviction has shaken the small community of security executives. It is the top topic of conversation at industry events and in CISO Slack channels. It is a constant source of stress among directors and VPs who are considering making the jump into the role." (Letters of Support, Exhibit F at 42.) As over 50 current and former CISOs explain in their letter to the Court:

> Joe's case has had a huge impact on the cybersecurity community. It has been the subject of frequent executive team conversations and panel discussions at industry seminars, and a significant driver of efforts to change policies and practices to err on the side of disclosure, even when the legal requirement to do so remains unsettled. Based on what we have observed, further processes will likely be implemented throughout the industry to better articulate CISOs' responsibilities and to build a culture of shared accountability.

(Letters of Support, Ex. I at 26 (Group Letter 1).) And Rob Chesnut, a former federal prosecutor and past Senior Vice President of Global Trust and Safety for eBay, provides perhaps the best summary of the impact this case has already had on the cybersecurity community:

> [S]ome might believe that a jail sentence is important here to send a message to others in the cyber security field. I disagree. I have spoken at several cyber security events attended by well over 100 top security professionals in the last 3 months about this case, and have heard directly from many of the professionals. The fact that a criminal case was brought against Joe, and that he was convicted, has shaken many within the industry who understand that cyber events are a way of life in this field. Some security executives expressed deep concern over taking any C level security position at a top company, and questioned whether they needed to get their own independent outside counsel to advise them on breaches. . . . In a positive development, I have been told that Joe's case has spurred a focus on establishing better internal communication protocols to directly involve general counsel, executive teams and boards around breaches, and clarifying roles and decision making authority about reporting. One security officer recently told me that he would report a breach even if his company explicitly decided not to do it, all because of this case. If prosecutors were hoping to get the security industry's attention with this prosecution, they have already succeeded.

(Letters of Support, Ex. I at 14.)



**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

Indeed, as explained in the many letters submitted in support of Mr. Sullivan, not only is a custodial sentence unnecessary to deter wrongful conduct—it would create the real risk of undesirable *negative* consequences by *over-deterring* socially worthy conduct. *See generally* 18 U.S.C. § 3553(a) (court may not impose a sentence "greater than necessary" to accomplish goals of sentencing). That is particularly true with respect to the misprision charge. Absent any federal statutory or regulatory guidance for dealing with various security incidents, security professionals are left to worry that common incident response practices could be construed later by an aggressive prosecutor as "affirmative acts of concealment" giving rise to a misprision charge and potential term of imprisonment.[19] As noted in the commentary following Mr. Sullivan's conviction, these concerns are not merely theoretical:

> **Ransom Payments:** Victims of computer intrusions often choose to pay a ransom to the hackers for a variety of valid reasons, including to protect their business and their customers. Often, a company pays ransom, in part, to prevent the hackers from publishing sensitive data online, including the personal information of its customers. Outside the context of sanctioned groups, the government has thus far never seriously considered making ransom payments illegal.[20] Yet, post-Sullivan, it is not hard to imagine that a ransom payment in exchange for an explicit or implicit promise not to disclose the existence of the incident could be considered affirmative concealment of the incident. Indeed, the Justice Department's press release cited as aggravating factors that "Sullivan orchestrated [the payment] despite knowing that the hackers were hacking and extorting other companies as well as Uber" and "despite the fact that the hackers had refused to provide

---

[19] For example, "[p]ractices such as paying a 'ransom' to ensure the safety of customer data, agreeing to treat a researcher submission as a 'bug bounty' (even in the face of bad behavior or even extortionate demands), and viewing incidents resolved through a bug bounty program as different from data breaches that resulted in the public dissemination of organizational or customer data were relatively common, and often viewed as necessary to protect customers and their data." (Letters of Support, Ex. I at 26 (Group Letter 1).)

[20] While the U.S. government "does not encourage" paying ransom to criminal actors, its official guidance for CISOs explicitly recognizes that the question of "whether to pay a ransom is a serious decision, requiring the evaluation of all options to protect shareholders, employees, and customers." U.S. Dept. of Justice *et al*., "How to Protect Your Networks from Ransomware," at 5, https://www.justice.gov/criminal-ccips/file/872771/download (last accessed Jan. 6, 2023). And as Mr. Stamos points out in his letter to the Court, "The Executive Assistant Director of CISA believes that only a quarter of ransomware attacks are reported. This is not an illogical choice, as it is extremely rare for law enforcement to be helpful during a breach, and by the time one happens paying the ransom is almost always the best decision for a company's customers and other stakeholders." (Letters of Support, Ex. F at 42.)


**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

> their true names." Of course, those same factors are present with nearly every ransom payment.
>
> **Vulnerability Disclosure Programs**: Many companies have vulnerability disclosure, or bug bounty, programs that offer monetary rewards to ethical, or "white hat," hackers who discover and report vulnerabilities that could allow a company to be hacked. The Justice Department's misprision charge against Sullivan was based largely on a $100,000 payment to the hackers that he orchestrated through Uber's bug bounty program in exchange for the hackers signing an NDA promising not to reveal the incident. *But companies frequently use NDAs as part of their bug bounty programs as they understandably do not want to publicize the fact that they were or even could be hacked or the vulnerabilities that allowed such hacking to occur.* To be sure, the government also faulted Sullivan for having the hackers falsely state that they did not exfiltrate sensitive customer information. But it is not clear that a false statement was necessary for the misprision charge. After all, misprision only requires an "affirmative act of concealment," not a false or misleading statement, and NDAs, by definition, conceal.

Kellen Dwyer, *The Fallout from the First Trial of a Corporate Executive for 'Covering Up' a Data Breach*, Lawfare (Oct. 19, 2022), https://www.lawfareblog.com/fallout-first-trial-corporate-executive-covering-data-breach (emphasis added).[21]

Letter after letter from distinguished and experienced current and former Chief Security Officers ("CSOs") and Chief Information Security Officers ("CISOs") have articulated these fears. Kiersten Todt, Chief of Staff at the federal Cybersecurity and Infrastructure Security Agency, reports in her letter to the Court that "[a]fter Joe's verdict came through, I had several CISOs and CIOs of global companies—names you know well—reach out to me and say Joe's verdict will make it impossible to recruit smart people into the roles of CISOs and CSOs if imprisonment is on the table—and will set the industry back." (Letters of Support, Ex. I at 77.) As former CISO Patrick Heim explains in his letter, "[t]he news of [Mr. Sullivan's] conviction has shocked the community of security leaders and dominates every recent discussion I have

[21] Indeed, the government argued that the NDA itself (not just the "did not take or store" language) was an act of concealment that supported the misprision charge. (Trial Tr. 2749:10–13 ("[The NDA] purchased silence to make sure that Brandon Glover and Vasile Mereacre never went out and told anyone else what had happened because that would be tremendously embarrassing for the company"); *id.* 2608:20–23 (describing "Uber making a deal with the hackers to shut up and not talk about it in exchange for Uber not having them prosecuted and not referring them to the FBI" as the "concealment of a crime" justifying conviction for misprision).)



**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

participated in." (Letters of Support, Ex. I at 34.) John Watters, the retired President and CEO of Mandiant[22] observes that "CISOs around the world are already looking at retiring early, changing professions, or simply leaving their roles for fear that a poor decision could result in jail time. . . . If the result of poor judgment translates into a loss of one's job, that's the way it is. If it results in the loss of one's freedom, that's an entirely different outcome—one that will result in a mass migration out of CISO jobs, putting our country at heightened risk to the nation-state and criminal actors that attack our society every day." (Letters of Support, Ex. I at 82; *id*. at 11 (Sean Cassidy) ("To sentence an executive like Joe to prison would be to make every cybersecurity professional's job harder, because it raises the stakes drastically); *id*. at 40 (Steve Martino) ("An overly punitive sentence would only create an environment that inhibits collaboration across operational disciplines and slows the development of the role of security in organizations.") And as SINET Chairman and former U.S. Secret Service Agent Robert Rodriguez explains, even for those executives who remain in their positions, overdeterrence could lead companies to adopt a security posture focused more on "CYA" than on protecting their organizations and customers, with security leaders outsourcing or avoiding the riskiest work to avoid even the possibility of personal civil or criminal liability. (Letters of Support, Ex. D at 5.)

The job of CSO or CISO is "an often-thankless position that bears wide oversight and responsibility, carrying the burden of corporate Cyber risk with near impossible odds of defense; a few dozen security people on average pitted against literally millions of digital attacks and threats during any given month." (Letters of Support, Ex. I at 1 (Fares Alraie).) CISOs often "operate in the context of a larger organization where they provide input and advice into decision making processes they do not control," (Letters of Support, Ex. I at 24 (Jim Goddard)), and the position "often requires nuanced judgment calls in a largely unregulated environment." (Letters of Support, Ex. I at 26 (Group Letter 1).) Worse yet, when things do go wrong, companies often blame CISOs and CSOs for larger organizational failures:

[22] Mandiant was retained by Uber in 2017 to conduct a technical review of the 2016 Incident.



**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

> When a security incident does occur, [CISOs] are often instantly blamed for not preventing the exact scenario they had warned the business about and are the first to be fired after a breach. The time between security incidents can be spent begging for resources and attempting to protect the business from itself as ambitious executives take on more and more risk. It is no wonder that a public company CISO often lasts less than two years.

(Letters of Support, Exhibit F at 41 (Alex Stamos) at 42.) *See also* (Letters of Support, Ex. I at 34 (Patrick Heim)) ("CISOs are already resigned to the fact that they may be fired, abandoned, or scapegoated by their employers.") This dynamic has led to the wry observation by many that the acronym "CSO" in fact stands for "Chief Scapegoat Officer" in the event of a cybersecurity incident. (Letters of Support, Ex. I at 79 (Julie Tsai).) Take an already difficult and under-resourced position, and layer on top of it not only the risk of unemployment, civil (or even criminal) liability, but also the risk of imprisonment, and the result becomes clear: A sentence of incarceration for Mr. Sullivan is not only unnecessary to deter future *illegal* conduct by security officers, but may well also convince many talented individuals to abandon the profession or choose never to enter it and put themselves in such a risky position to begin with.

### D. A period of incarceration is not necessary to achieve just punishment and ensure respect for the law.

A period of incarceration is unnecessary to ensure just punishment for the counts of conviction; Mr. Sullivan has suffered, and will continue to suffer, significant consequences because of this case. As described during the trial and in the letters of support and other materials submitted to the Court, Mr. Sullivan was a well-compensated, respected leader in his field, working closely with government agencies and entities in the private sector at the highest levels, and serving on advisory boards of startup entities, and even on a Presidential commission. His very public firing from Uber in 2017, and the following five years of investigations and litigation, exacted a substantial toll on Mr. Sullivan and his family. Because of his conviction, Mr. Sullivan's most recent employer had no choice but to let him go from his position as Chief Security Officer and Mr. Sullivan is unlikely ever again to find work that requires a security clearance or to work closely with government agencies—work that has been his passion for the past 25 years and in which he has excelled. The stigma and consequences of being a convicted



**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

felon, particularly considering the intense media scrutiny that has followed this case, will always remain with Mr. Sullivan. Those consequences, combined with the loss of liberty that would come with the conditions of probation, are just punishment for the conduct at issue in this case.

The United States Supreme Court has recognized that, while custodial sentences are "qualitatively more severe than probationary sentences of equivalent terms," a probationary sentence "substantially restricts" a defendant's liberty. *Gall*, 552 U.S. at 48. For example, "probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from their probation officer or the court. They must report regularly to their probation officer [and] permit unannounced visits to their homes," among other standard conditions of probation. *Id*. "Most probationers are also subject to individual 'special conditions' imposed by the Court." *Id*.

A period of incarceration is also unnecessary to ensure respect for the law. Mr. Sullivan's 54 law-abiding years and his long career dedicated to working for and with law enforcement are a testament to his respect for the law. The attached letters demonstrate that Mr. Sullivan was and remains a vocal advocate of bringing law enforcement and the tech industry together to protect consumers and vulnerable individuals. Indeed, Mr. Sullivan's entire career has demonstrated his respect for the law.[23] For defendants like Mr. Sullivan, who show exemplary character outside of the conduct for which they have been convicted and who enjoy the support of friends, family, colleagues, and community leaders, a sentence outside the Guidelines is appropriate. *See United States v. Whitehead*, 532 F.3d 991 (9th Cir. 2008) (upholding sentence of probation for creating counterfeit access device despite Guidelines range of 41–51 months where defendant was remorseful, employed, supported his daughter, and did not pose a threat to the community).

---

[23] Attached to the PSR are letters of support from numerous current and past law enforcement officers, government employees, and political appointees, including from the Department of Justice, Federal Bureau of Investigation, Secret Service, Department of Homeland Security, Cybersecurity and Infrastructure Security Agency, United States Army, Delta Force, An Garda Siochana (Ireland's National Police service), Australian Federal Police, Italian police, NATO Cybersecurity Center of Excellence, the former United States Ambassador to Singapore, and the Massachusetts Attorney General's Office.



**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

A sentence of probation with appropriate conditions would be adequate, but not greater than necessary, punishment to promote respect for the law, reflect the seriousness of the offense, and afford adequate deterrence.[24]

**E. The Advisory Sentencing Guidelines**

**1. The Advisory Guidelines, particularly § 2J1.2, have limited use in this case.**

As noted above, the Guidelines are "not to be *presumed* reasonable," *Nelson*, 555 U.S. at 352 (emphasis in original), and represent only "one factor among the § 3553(a) factors that are to be taken into account in arriving at an appropriate sentence," *Carty*, 520 F.3d at 991. "[C]ourts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (alterations in original) (quoting Brief for United States). The Supreme Court has made clear that such variances are particularly appropriate when the applicable "Guidelines do not exemplify the [Sentencing] Commission's exercise of its characteristic institutional role." *Id.* at 109. Specifically, Guidelines that are not the product of "empirical data and national experience" deserve significantly less deference, and courts may vary from such Guidelines "even in a mine-run case." *Id.* at 109–10.

Of note here, the Sarbanes-Oxley Act of 2002 required that the Commission review and enact specific amendments to the Guidelines within 180 days of the law's enactment. Pub. L. 107–204, § 805, 116 Stat 745, 802 (2002). The Commission enacted these amendments on an emergency basis in January 2003, in what one commissioner called a "rushed" process. "Hearing on Amendments in Response to Sarbanes-Oxley, March 25, 2003," Federal Sentencing Reporter Vol. 15, No. 4, The Sarbanes-Oxley Act and Federal Economic Crime Sentencing (April 2003),

[24] Mr. Sullivan has no objection to the community service requirement proposed in the PSR. As the many letters of support attest, Mr. Sullivan has demonstrated a life-long commitment to helping others in his community—whether it be helping his community recover from the devastation of Hurricane Andrew or assisting formerly incarcerated people secure jobs upon their release from prison. He recognizes that others have not always enjoyed the advantages or the assistance he has received along the way and stands ready to continue to contribute to society in ways he is well positioned to provide.



**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

at 296. The amendments included two major changes to the guideline for obstruction of justice offenses, § 2J1.2. As then-Commission Vice Chair Greer explained, Sarbanes-Oxley:

> direct[ed] the Commission to amend section 2J1.2 "as appropriate" to ensure that the base offense level is adequate to deter and punish, and further, that the specific offense characteristics in that guideline adequately address ***cases where either a large quantity of, or especially valuable, evidentiary material was destroyed, altered, or fabricated***. Section 1104(b)(4) of the Act contains a similar expression that the obstruction of justice guideline should adequately punish cases involving the ***destruction or fabrication of documents or other physical evidence***.

Steer, John, "The Sentencing Commission's Implementation of Sarbanes-Oxley," Federal Sentencing Reporter Vol. 15, No. 4, The Sarbanes-Oxley Act and Federal Economic Crime Sentencing (April 2003), at 267 (emphasis added). It was "*these directives*, of apparent Enron-derivation," (not any empirical study of whether the historical sentences for obstruction of justice adequately served the purposes articulated in 18 U.S.C. § 3553) that "motivated the Commission to increase the base offense level in section 2J1.2 from 12 to 14." *Id.* (emphasis added).[25] Applying the principles outlined in *Kimbrough* and *Gall*, the obstruction of justice guidelines deserve significantly less deference from the Court than other guidelines might and are not particularly useful in determining culpability in an obstruction case such as this, where the conduct at issue is vastly different from the Enron scandal that prompted the enhancement to § 2J1.2. Whatever weight the Court chooses to afford the Guidelines calculation, Mr. Sullivan's position on that calculation is set forth below.

**2. Uncontested Guidelines Calculations**

Mr. Sullivan agrees with the base offense level as calculated by the Probation Office and the government. The guideline for a violation of 18 U.S.C. § 1505 is § 2J1.2, which specifies a base offense level of 14. U.S.S.G. § 2J1.2(a) & Appendix A (Statutory Index). Mr. Sullivan also

[25] The Department of Justice's explicit recommendation to increase the § 2J1.2 base offense level from 12 to 14 no doubt played a role in this decision as well. *See Letter of Department of Justice to U.S. Sentencing Commission Regarding Post-Sarbanes-Oxley Guidelines Amendments, October 1, 2002*, Federal Sentencing Reporter Vol. 15, No. 4, The Sarbanes-Oxley Act and Federal Economic Crime Sentencing (April 2003), at 272.


**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

agrees that the two counts of conviction involve the same harm and thus should be grouped together into a single group.[26]

**3. The Court should not apply § 2J1.2(2)'s enhancement for "substantial interference with the administration of justice."**

Guidelines section 2J1.2(b)(2) provides for a three-level enhancement for obstruction of justice where "the offense resulted in substantial interference with the administration of justice." Both the government and the PSR urge the application of that section. But Application Note 1 to § 2J1.2 makes clear that this term "includes a premature or improper *termination* of a *felony* investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources." U.S.S.G. § 2J1.2 cmt. n.1 (emphasis added). The government cites *none* of these factors in support of its argument for this enhancement, instead asserting that Mr. Sullivan's offense conduct: (1) "caused the improper and premature termination[27] of the *FTC's* [administrative] investigation and a settlement with the FTC based on false evidence"; and (2) prevented criminal proceedings from being *initiated* against the hackers. These, the government asserts, are sufficient to trigger the § 2J1.2(b)(2) enhancement. The Court should reject this enhancement.

In support of its argument that it may establish "substantial interference" with factors other than those listed in Application Note 1, the government relies heavily on *United States v.*

---

[26] The government and the PSR group the counts together pursuant to § 3D1.2(c) on grounds that Misprision of a Felony is treated as a specific offense characteristic (for "substantial interference with the administration of justice" pursuant to § 2J1.2(b)(2)) in the calculation for Obstruction of Justice. Even if, as Mr. Sullivan advocates, the Court concludes that the § 2J1.2(b) enhancement does not apply, the counts of conviction should nevertheless be grouped pursuant to § 3D1.2(b), as they represent counts that "involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan."

[27] As a factual matter, the FTC did not in fact enter a Final Order terminating the agency's investigation into Uber until *after* the disclosure of the 2016 incident in late 2017. And the testimony at trial established that Uber's new management delayed informing the FTC about the existence of the 2016 Incident for *months* after Mr. Sullivan discussed it with internal investigators in August 2017.



**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

*Amer*, 110 F.3d 873 (2d Cir. 1997). Even assuming the government is correct that the Application Note 1 factors are not exhaustive,[28] the government reads far too much into *Amer*, which explicitly notes that "other acts" trigger this enhancement only if they are "similarly or even more disruptive of the administration of justice" as the enumerated factors. *Amer*, 110 F.3d at 885; *see also United States v. McSherry*, 226 F.3d 153, 158 (2d Cir. 2000). That is not the case here.

**a. The enhancement does not apply to the premature termination of an agency's administrative investigation.**

As to the government's argument that Mr. Sullivan caused the improper and premature termination of the FTC's investigation, the explicit limitation in Application Note 1 to *felony* proceedings would appear to rule out obstructive conduct that caused the "premature or improper termination" of even a criminal *misdemeanor* investigation, and it is difficult to see how a purely administrative FTC investigation could be considered more serious than an investigation into a criminal misdemeanor.

*Amer* only bolsters this point. The offense conduct deemed by the court in *Amer* to be "similarly or even more disruptive of the administration of justice" than, for example, causing the premature or improper termination of a felony investigation was the defendant *abducting his own children and fleeing the country* in violation of the International Parental Kidnapping Act. Indeed, the overwhelming majority of cases to extend § 2J1.2(b)(2) beyond the enumerated factors (citing *Amer*) have featured similarly egregious facts.[29] While it is easy to recognize how preventing the lawful determination of child custody through international kidnapping could be just as disruptive to the administration of justice as wrongfully terminating a felony investigation or committing perjury in such a way that leads to a wrongful verdict, the same cannot be said of conduct that delayed the ultimate resolution of a purely administrative agency investigation into

[28] *See United States v. Goodrich*, 919 F.2d 1365, 1369 (9th Cir. 1990) (commenting on the absence of any of these enumerated factors). *But see* U.S.S.G. § 1B1.1, comment (n.2) ("The term 'includes' is not exhaustive.").

[29] None of them, it is worth noting, are from the Ninth Circuit.


**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

data security practices. And while the government suggests that § 2J1.2(b)(2) applies by analogy to conduct that prematurely or improperly terminates an *agency proceeding* by virtue of Mr. Sullivan's conviction under 18 U.S.C. § 1505, the defense is aware of no case in which a court has extended the reach of § 2J1.2(b)(2) so far.

**b. The enhancement does not apply to conduct that interferes with the *initiation* (as opposed to premature termination) of a criminal investigation.**

In the alternative, the government contends that § 2J1.2(b)(2) is triggered by virtue of Mr. Sullivan's conviction for misprision of a felony, pointing to the allegation that Mr. Sullivan "covered up a crime" by "paying the hackers $100,000 in exchange for their silence" and that his "goal" was to keep the FBI from learning about the hack. But even if the government had established that Mr. Sullivan's actions prevented the FBI from *learning of* the hackers' activities, that would not be enough to trigger the application of § 2J1.2(b)(2). Application Note 1 makes clear that the enhancement applies to conduct that causes the "premature or improper *termination* of a felony investigation," rather than conduct that delays or interferes with the *initiation* of an investigation in the first place.

The government again cites *Amer*—an out-of-circuit case decided 26 years ago—for the proposition that even where a defendant's conduct does not interfere with an ongoing proceeding, a defendant who "prevent[s] proper legal proceedings from occurring" in the first place triggers the enhancement as well. But the Ninth Circuit has been clear that "[i]n interpreting the Sentencing Guidelines, '[t]he plain meaning of unambiguous language in a guideline provision controls.'" *United States v. Calderon Espinosa*, 569 F.3d 1005, 1007 (9th Cir. 2009) (quoting *United States v. Valenzuela*, 495 F.3d 1127, 1133 (9th Cir. 2007).) The plain meaning of the word "termination" forecloses the government's argument; something obviously cannot be "terminated" before it even exists.

Moreover, *Amer* itself is readily distinguishable from the facts here. As noted above, the defendant in *Amer* engaged in illegal "self-help," preventing the (foreseeable and inevitable) legal proceedings that would have determined custody of his children from occurring by


**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

kidnapping them and taking them to Egypt. This was the conduct that prompted the district court to comment that Mr. Amer had "deemed himself the judge, and then he made the decision . . . and act[ed] in the form of a vigilante, if you will, [taking] matters into his own hands," and which the Second Circuit ruled was "similar or even more disruptive of the administration of justice" as the factors listed in Application Note 1. *Amer*, 110 F.3d at 885. The same cannot be said when the *victim* of an offense (or its employees) acts to conceal the fact that it has been victimized, even if that conduct also amounts to misprision of a felony. The government's position improperly conflates "the more serious forms of obstruction," U.S.S.G. § 2J1.2, cmt. (Background), with the heartland variety already captured by the base offense level for the offense.

**4. The sentencing guidelines counsel a downward departure under § 5K2.20.**

Courts have long recognized that the aberrant nature of a defendant's criminal conduct can justify a downward departure from the relevant Guidelines. *See United States v. Working*, 224 F.3d 1093, 1099 (9th Cir. 2000); *United States v. Fairless*, 975 F.2d 664, 669 (9th Cir. 1992) ("A single act of aberrant behavior is a mitigating circumstance not taken into consideration by the Guidelines which warrants departure.") When it promulgated the Guidelines, the Sentencing Commission recognized that it was unable to fashion guidelines that could apply to every offense. In particular, the Commission acknowledged that in fashioning the Guidelines, it did not deal with "single acts of aberrant behavior that still may justify probation at high offense levels through departures." U.S.S.G., Ch. 1, pt. A, § 4(d). As a result, "the Guidelines recognize that the first offense may constitute a single act of truly aberrant behavior justifying a downward departure." *United States v. Dickey*, 924 F.2d 836, 838 (9th Cir. 1991); *see also United States v. Takai*, 941 F.2d 738, 741 (9th Cir. 1991) (affirming trial court's downward departure to permit probation for two first offenders who plead guilty to charges of bribery and conspiracy to bribe a federal agent because, among other things, the defendants' conduct were "single acts of aberrant behavior").


**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

"Aberrant conduct is conduct that represents a 'short-lived departure from an otherwise law-abiding life.'" *Working*, 224 F.3d at 1099 (quoting *United States v. Colace*, 126 F.3d 1229, 1231 (1997)). "Aberrant behavior is best assessed 'in the context of the defendant's day-to-day life' rather than solely 'with reference to the particular crime committed.'" *Working*, 224 F.3d at 1101 (citations omitted). When considering whether a defendant's behavior falls within the "spectrum of aberrant behavior," the Court may consider "a convergence of factors," *Fairless*, 975 F.2d at 667, including:

> (1) the singular nature of the criminal act, (2) spontaneity and lack of planning, (3) the defendant's criminal record, (4) psychological disorders the defendant was suffering from, (5) extreme pressure under which the defendant was operating, including the pressure of losing his job, (6) letters from friends and family expressing shock at the defendant's behavior, and (7) the defendant's motivations for committing the crime.

*Colace*, 126 F.3d at 1231 n.2. None of these factors standing alone is dispositive; the court must review the totality of the circumstances when making findings of aberrancy. *Working*, 224 F.3d at 1100–01 (citing cases).

The totality of the circumstances makes clear that the offense conduct constituted a singular departure from an otherwise law-abiding—indeed, law enforcing—life. The was the conclusion of the Probation Office as well. (PSR at 26 ("What is apparent to this officer is that the instant offense is an isolated incident in what is otherwise a long and positive career of public service.").) Section 5K2.20 permits the Court to depart downward "in an exceptional case" if the defendant's conduct was a single criminal occurrence that "(1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise law-abiding life." U.S.S.G. § 5K2.20(b). A downward departure from the Sentencing Guidelines under § 5K2.20 is appropriate here. *United States v. Smith*, 387 F.3d 826, 833 (9th Cir. 2004) (District Court erred when it refused defendant's request for downward departure on the ground that the crime for which defendant was convicted was aberrant behavior; the evidence, including many letters for failing to find defendant's conduct extraordinary under U.S.S.G. § 5K2.20); *Fairless*, 975 F.2d 664 (affirming downward departure


**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

of five offense levels on the ground that the armed bank robbery for which defendant was convicted was a "single act of aberrant behavior" considering the "convergence" of the factors listed in *Colace*).

**5. The Court should apply the recently promulgated prospective amendments to the Sentencing Guidelines.**

On April 5, 2023, after a notice-and-comment period and public hearing, the Sentencing Commission formally promulgated a series of proposed amendments to the Sentencing Guidelines which are scheduled to take effect on November 1, 2023.[30] Two of these proposed amendments deserve scrutiny and further support a noncustodial sentence for Mr. Sullivan.

As the Court is aware, the Guidelines assign points to prior convictions, which are then converted into a Criminal History Category. Criminal History Category I, the lowest category, lumps together offenders with zero criminal history points and those with one criminal history point. As the Sentencing Commission explains in its synopsis of the new amendments:

> Recidivism data analyzed by the Commission suggest that **offenders with zero criminal history points ("zero-point" offenders) have considerably lower recidivism rates than other offenders**, including lower recidivism rates than the offenders in Criminal History Category I with one criminal history point. Among other findings, the report concluded that "zero-point" offenders were less likely to be rearrested than "one point" offenders (26.8% compared to 42.3%), the largest variation of any comparison of offenders within the same Criminal History Category. In addition, 28 U.S.C. § 994(j) directs that alternatives to incarceration are generally appropriate for first offenders not convicted of a violent or otherwise serious offense.

[30] These prospective amendments to the Guidelines are available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20230405_prelim-RF.pdf.



**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

Proposed Amendment: Criminal History (Preliminary) at 2–3, United States Sentencing Commission (April 5, 2023)[31] (emphasis added) (citing U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021)[32]).

As a result of these findings, the Commission promulgated: (1) a new Chapter Four Guideline departure, § 4C1.1, which provides a decrease of two offense levels for certain "zero-point" offenders; and (2) amendments to the Commentary to § 5C1.1 providing that an additional downward departure—including a departure to a non-custodial sentence—may be appropriate where a defendant receives an adjustment under (new) § 4C1.1 and the defendant's resulting Guidelines range "overstates the gravity of the offense because it is not a crime of violence or an otherwise serious offense." *Id.* at 3. These amendments are likely to take effect on November 1, 2023—less than six months from Mr. Sullivan's scheduled sentencing. Both proposed amendments apply to Mr. Sullivan and further warrant a downward variance to a noncustodial sentence. They should be considered now.

**a. The Court should decrease the offense level by 2 levels pursuant to prospective § 4C1.1.**

Prospective § 4C1.1 provides that the Court should "decrease the offense level determined under Chapters Two and Three by 2 levels" where all the following criteria are met:

> (1) the defendant did not receive any criminal history points from Chapter Four, Part A;
>
> (2) the defendant did not receive an adjustment under § 3A1.4 (Terrorism);
>
> (3) the defendant did not use violence or credible threats of violence in connection with the offense;
>
> (4) the offense did not result in death or serious bodily injury;
>
> (5) the instant offense of conviction is not a sex offense;

[31] *Available at* https://www.ussc.gov/sites/default/files/pdf/ amendment-process/reader-friendly-amendments/20230405_prelim-RF.pdf.

[32] *Available at* https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010.



**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

> (6) the defendant did not personally cause substantial financial hardship;
>
> (7) the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;
>
> (8) the instant offense of conviction is not covered by § 2H1.1 (Offenses Involving Individual Rights);
>
> (9) the defendant did not receive an adjustment under § 3A1.1 (Hate Crime Motivation or Vulnerable Victim) or § 3A1.5 (Serious Human Rights Offense); and
>
> (10) the defendant did not receive an adjustment under § 3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848.

U.S.S.G § 4C1.1(a) (proposed April 5, 2023). Mr. Sullivan meets each of the listed criteria, and this Guideline would unquestionably apply were Mr. Sullivan scheduled to be sentenced in just six months. Numerous courts—including the Ninth Circuit—have made clear that sentencing courts may apply promulgated Guidelines amendments even before formal adoption of the proposed amendment. *See, e.g.*, *United States v. Rojas-Pedroza*, 716 F.3d 1253, 1271 (9th Cir. 2013); *United States v. Ruiz-Apolonio*, 657 F.3d 907, 917 (9th Cir. 2011). And, of course, that makes eminent sense—denying Mr. Sullivan the benefit of an amendment that would clearly apply if he were sentenced six months from now would result in an arbitrary but potentially material difference in his sentence. Moreover, the Commission has indicated that it is actively considering giving *retroactive* effect to new § 4C1.1, which could *require* the Court to revisit Mr. Sullivan's sentence if it does not apply the amendment today. *See* Issue for Comment: Retroactivity, United States Sentencing Commission (April 5, 2023).[33]

**b. The Court may apply a downward departure under the proposed amendments to § 5C1.1 because the applicable guidelines overstate the gravity of the offense.**

The amendments also propose the following ground for downward departure:

> A departure, including a departure to a sentence other than a sentence of imprisonment, may be appropriate if the defendant

[33] *Available at* https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20230405_prelim-IFC.pdf.



**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

> received an adjustment under § 4C1.1 (Adjustment for Certain Zero-Point Offenders) and the defendant's applicable guideline range overstates the gravity of the offense because the offense of conviction is not a crime of violence or an otherwise serious offense. *See* 28 U.S.C. § 994(j).

U.S.S.G. § 5C1.1, cmt. 4(B) (proposed April 5, 2023). This amendment is aimed squarely at ensuring that courts consider noncustodial sentences for people in Mr. Sullivan's precise situation. As noted above, the Commission concluded that "zero-point" offenders were less likely to be rearrested than "one point" offenders (26.8% compared to 42.3%)—the largest variation of any comparison of offenders within the same Criminal History Category. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021). In addition, 28 U.S.C. § 994(j) directs the Commission to ensure that the Guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first-time offender who has not been convicted of a crime of violence or an otherwise serious offense. The Commission proposed this amendment pursuant to that statutory directive.[34]

For the reasons set forth throughout this memorandum, the Guideline range proposed in the PSR overstates the severity of the counts of conviction. These circumstances would warrant a downward departure to a noncustodial sentence under (new) § 5C1.1, and accordingly the Court should grant a downward variance to give effect to this prospective guideline.

**F. Section 3553(a)(6) supports a downward variance from the Guidelines to avoid unwarranted sentencing disparities.**

Avoidance of "unwarranted disparity" among similarly situated defendants convicted of similar conduct also favors a non-custodial sentence here. According to the Sentencing Commission's statistical report for FY 2021, nearly half (42.1%) of those convicted of obstruction of justice type offenses (categorized as "Administration of Justice" offenses) during

[34] In proposing this departure, the Commission was cognizant that it would likely primarily affect defendants like Mr. Sullivan, whose resulting Guideline range would otherwise fall in Zone D. Indeed, the Commission noted that of the 3,024 offenders in fiscal year 2021 who would have been eligible for the departure, about a quarter (23.8%) were in Zones A and B, 17.1% were in Zone C, and almost 60 percent (59.2%) were in Zone D. Clearly, the proposed amendments are aimed at encouraging courts to impose alternatives to imprisonment by imposing downward departures for the 60% of first-time Zone D offenders.



**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

FY 2021 in the Ninth Circuit received a sentence that contained no prison time.[35] In fact, courts in the Ninth Circuit provided a non-prison sentence 70.6% of the time for U.S. citizens who were eligible for a non-prison sentence.[36] More locally, probationary sentences were imposed in both Northern District of California convictions for Administration of Justice offenses in FY 2021 (one following trial and one following a guilty plea).[37]

The median sentence for all seventy-six "Administration of Justice" cases sentenced in the Ninth Circuit in FY 2021—including cases involving conduct far more serious than Mr. Sullivan's (e.g., threatening witnesses and destroying documents)—was six months' confinement, far below the advisory Guidelines range in this case.[38]

Courts have routinely sentenced defendants convicted of obstruction of justice or misprision charges to probation or other non-custodial sentences, even when such a sentence was far below the advisory Guidelines range. Three recent examples are particularly salient here:

**Neeraj Jindal**: In December 2022, Mr. Jindal, a former executive in the health care industry, was sentenced to three years' probation and a $10,000 fine after a jury found him guilty of obstructing an FTC investigation. *United States v. Jindal*, Case No. 4:20-CR-00358 (E.D. Tex.). Mr. Jindal is the same age as Mr. Sullivan, with no health maladies, no criminal history,

---

[35] *Statistical Information Packet, Fiscal Year 2021, Ninth Circuit*¸ United States Sentencing Commission at p. 8, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2021/9c21.pdf). Although this data applies to all administration of justice offenses, and not just those to which §2J1.2 of the Guidelines applies; this overbreadth addresses conduct that is both less severe and dramatically more severe than the offense conduct at issue here.

[36] *Statistical Information Packet, Fiscal Year 2021, Ninth Circuit*¸ United States Sentencing Commission at p. 10 (available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2021/9c21.pdf).

[37] *Statistical Information Packet, Fiscal Year 2021, Northern District of California*¸ United States Sentencing Commission at p. 9 (available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2021/can21.pdf).

[38] *Statistical Information Packet, Fiscal Year 2021, Ninth Circuit*¸ United States Sentencing Commission at p. 11 (available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2021/9c21.pdf).


**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

and a history of commitment to his family and community. Just as is the case here, Mr. Jindal's offense involved no loss and no identifiable victim, and the related corporate entities, like Uber, entered into a consent decree with the FTC. (Angeli Decl., Ex. 5 (Jindal Sentencing Tr.) at 14:13–24; 59:25–60:2.) Mr. Jindal's case featured several aggravating factors absent here, including the fact that Mr. Jindal directly lied to the FTC multiple times (including in direct testimony to the agency) as well as and his involvement in the underlying offensive conduct that was the subject of the FTC's investigation. (*Id.* at 7:10–22; 41:8–42:8; 50:6–12; 63:16–25.) Mr. Jindal's Guidelines range was identical to that calculated by the PSR for Mr. Sullivan: a base level of 14 points under § 2J1.2 with a three-level enhancement pursuant to § 2J1.2(2) for "substantial interference with the administration of justice."[39] Despite these aggravating factors, the court imposed a non-custodial sentence, concluding that it satisfied 18 U.S.C. § 3553 under the circumstances.

**Charles W. Johnston**: Mr. Johnston, an attorney, received a non-custodial sentence of 12 months' probation and a $50,000 fine in July 2022 following his conviction at trial on one count of obstruction of justice in violation of 18 U.S.C. § 1505. *United States v. Johnston*, 1:18-cr-00127-JPW (M.D. Pa). Mr. Johnston was counsel to a labor union pension plan that was under investigation for potential financial mismanagement and fraud. Although Mr. Johnston was not involved in the underlying wrongdoing, the government alleged that he exploited his position of trust and legal training to obstruct the government investigation—which he had been pretending to cooperate with—to protect his own reputation and avoid embarrassment. A judge found Mr. Johnston guilty of lying to the government pension fund investigators and failing to provide a complete subpoena response. He faced an advisory Guidelines range of 21 to 27 months'

[39] Unlike Mr. Sullivan, Mr. Jindal gave false testimony and deliberately concealed and withheld documentary evidence that was solely in his possession from the FTC. *See* U.S.S.G. § 2J1.2 cmt. n.1 ("Substantial interference with the administration of justice" defined to include "an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence"); *United States v. Norris*, 217 F.3d 262, 274 (5th Cir. 2000) ("where a defendant actively conceals important evidence of which [he or] she is the only source, a court may infer that the defendant's interference with the administration of justice was substantial") (quoting *United States v. Tackett*, 193 F.3d 880, 887 (6th Cir. 1999)).


**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

imprisonment, with the government recommending a term of 15 months' imprisonment. Like Mr. Sullivan, Mr. Johnston was a lawyer, was not involved in the underlying criminal conduct, and lacked any financial motivation. *United States v. Johnston*, 1:18-cr-00127-JPW (M.D. Pa), ECF Nos. 102, 106, 108.

**Bliss Worrell**: Another attorney, Ms. Worrell, similarly received a probationary sentence after pleading guilty to misprision of a felony. *United States v. Worrell*, 4:15-cr-00486-HEA (E.D. Mo.). Ms. Worrell abused her position as an assistant district attorney to help cover up a crime committed by a law enforcement officer who had assaulted a robbery suspect. Rather than reporting the officer's misconduct, Ms. Worrell filed false charges against the suspect for resisting arrest to explain the suspect's injuries and hide the officer's misconduct. Despite the deliberate abuse of her position, which threatened to deprive the falsely charged individual of his liberty, Ms. Worrell was sentenced to 18 months' probation, including 140 hours of community service. *United States v. Worrell*, 4:15-cr-00486 (E.D. Mo.), ECF Nos. 4, 32.

Other individuals—even those who participated in the underlying criminal conduct they tried to cover up—have received sentences that included alternatives to imprisonment. Notable examples include:

- Sharlie Colombe, who learned of her co-defendant's fraudulent scheme to use victim's signed, blank checks for personal instead of business purposes, pleaded guilty to misprision of a felony and was sentenced to 3 years' probation and $10,000 restitution. Ms. Colombe did not report the fraudulent scheme and instead participated in it by helping to cash checks. *United States v. Colombe*, 3:18-cr-30015-RAL (D.S.D.), ECF Nos. 84, 85, 109.
- A medical doctor, Dr. Vidal Sheen, who obstructed an FBI investigation into whether he falsely billed Medicare for face-to-face visits when he was out of town, received a sentence of 2 years' probation, a fine of $45,000, and restitution of $142,000 after pleading guilty to falsification of records in violation of 18 U.S.C. § 1519. Dr. Sheen had been facing a Guidelines range of 10–16 months. *United States v. Sheen*, 4:18-cr-00607-AGF (E.D. Mo.), ECF Nos. 27, 28, 33.
- Wilfredo Sanio, a broker, was sentenced to two years' probation and ordered to pay $147,000 restitution after pleading guilty to misprision. Mr. Sanio learned of his co-defendants' fraudulent scheme involving leased equipment and took no steps to stop or report the fraudulent conduct or even withdraw from participation. Instead, Mr. Sanio catalogued equipment for use in creating false invoices and continued to accept commissions from his co-defendants' scheme, thus personally profiting from the underlying illegal conduct. *United States v. Sanio*, 1:16-cr-00033-RJA-JJM (W.D.N.Y.), ECF Nos. 84, 87, 89.



**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

- Pharmacy-owner, Rodney Dalton Logan, was sentenced to 12 months' probation, including six months' home confinement, and a $2.5 million fine after pleading guilty to obstruction of a federal audit in violation of 18 U.S.C. § 1516. Mr. Logan had improperly billed Medicare for medications compounded using bulk powders and submitted false paperwork in response to a Medicare audit, representing that he had instead used crushed pills. Mr. Logan faced a Guidelines range of 12–18 months. *United States v. Logan*, 3:16-cr-212-VEH-JEO (N.D. Ala.), ECF Nos. 29, 35, 37.
- A registered nurse, Marla Owuama, was sentenced to one day in custody (time served) and 1 year of supervised release with special condition of 6 months' home confinement, as well as ordered to pay restitution after pleading guilty to one count of misprision. Her Guidelines range was 12–18 months. Ms. Owuama knew that her husband's medical practice was billing Medicare and Medicaid for services that were either not performed, not medically necessary, or not overseen by a doctor, and that another entity was paid for recruiting patients. Ms. Owuama not only failed to report this fraudulent conduct, but also personally profited from it. *United States v. Owuama*, 4:14-cr-00040 (S.D. Tex.), ECF Nos. 75, 116, 135.

In contrast, cases in which courts impose prison sentences typically involve significant involvement by the defendant in the underlying wrongdoing and extensive efforts—far beyond what even the government claims here—to impede the governmental proceeding. For instance, a former general counsel of a company, Joshua Gayl, misled witnesses and victims of his company's mail and wire fraud, paid potential trial witnesses to influence their testimony, and lied in response to a criminal trial subpoena. *United States v. Gayl*, 1:16-cr-00154-NLH (D.N.J.). Mr. Gayl pleaded guilty to obstruction of justice in violation of 18 U.S.C. § 1503. Because of the seriousness of his deliberate and repeated attempts to influence the outcome of a criminal trial, he was sentenced to 12 months and a day in prison, three years' supervised release, and a $5,000 fine. *Id.*, ECF Nos. 5, 10, 11. Likewise, Ian Norris, a CEO of a company involved in a price-fixing scheme, covered up the price-fixing conspiracy by destroying documents, tampering with witnesses, making false statements, and recruiting more than a dozen subordinates and co-conspirators to participate in the cover-up. *United States v. Norris*, 2:03-cr-00632-ER (E.D. Pa.). Following trial, a jury found him guilty of conspiring to commit witness-tampering offenses. Despite the extensive misconduct, he received a sentence of 18 months' imprisonment and 3 years of supervised release. *Id.*, ECF Nos. 205, 206, 211.

Additional comparators for the Court's consideration are provided in Table 1 (Obstruction Cases) and Table 2 (Misprision Cases), which are included as Exhibit 2 and 3 to the



**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

Angeli Declaration.

**G. Incarceration would cause substantial harm to Mr. Sullivan's family.**

Where, as here, a defendant's incarceration will cause a "substantial, direct, and specific loss of essential caretaking," U.S.S.G. § 5H1.6 cmt. 1(B), the Court may consider a downward departure that will address the loss of caretaking support to the defendant's family. "A district court may also rely on the existence of family ties and responsibilities in varying downward [under 18 U.S.C. § 3553] on a defendant's sentence." *United States v. Martinez*, No. CR 09-3078 JB, 2011 WL 6828055, at *4 (D.N.M. Dec. 19, 2011). "If the nature of the offense and the character of the defendant tend to show that no end other than punishment will be served by the term of imprisonment set by the guidelines, if there is no threat to the community, and if society will ultimately benefit by allowing the defendant to care for his family, a departure may be proper." *United States v. Norton*, 218 F. Supp. 2d 1014, 1020 (E.D. Wis. 2002). These factors all exist and warrant a downward departure.

Mr. Sullivan is a devoted father and the primary caretaker for three daughters who depend upon him financially and emotionally.[40] Mr. Sullivan's two youngest daughters, both students at local high schools, have written to the Court about the central role Mr. Sullivan plays in their lives. In her letter, Celia Sullivan describes how she and Audrey "have always looked up to, admired, and aspired" to be like their father. Celia goes on to write: "My dad is the most important figure in my life. His unconditional love and the stability that he provides me has been what has gotten me through this time. I honestly don't know what I would do without him." (Letters of Support, Exhibit A at 15.) In her letter, Audrey Sullivan describes for the Court her deep attachment to her father: "There are some people who we care about but we can still survive when they are not around. And there are others who we need by our side or it feels like the world will end. That's my dad for me. (Letters of Support, Ex. A at 11.) Bridget Sullivan echoes these sentiments when she writes to the Court that her "dad's support and guidance have

[40] The current custodial agreement between Mr. Sullivan and his ex-wife grants Mr. Sullivan 70% custody of his minor children, Celia and Audrey.



**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

been essential to my well-being in every aspect of my life." (Letters of Support, Ex. A at 13.) As their letters to the Court make clear, Mr. Sullivan occupies an irreplaceable place in his daughters' lives.

Family and friends also recognize Mr. Sullivan's essential role in the upbringing of his daughters. Letters from his family make clear that Mr. Sullivan's extended family rely on him incalculably. Mr. Sullivan's "warmth, love, and unconditional love" has not only buoyed his daughters but provided strength for his entire family in times of grief. (Letters of Support, Ex. A at 16 (Chris Sullivan); *id*. at 24 (Mary Sullivan).) As the letters from his family discuss, Mr. Sullivan is a "pillar of support" for those in his community and the person around whom "the hopes and dreams of everyone in his family are built." (Letters of Support, Ex. A at 31 (Benny and Aholibah David).)


**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

## CONCLUSION

For the foregoing reasons, Mr. Sullivan requests that the Court impose a sentence of probation.

DATED: April 27, 2023.

*s/ David H. Angeli*
David H. Angeli
Tyler P. Francis
Michelle H. Kerin
Ursula Lalović
John D. Cline

*Attorneys for Defendant Joseph Sullivan*



**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880