# Exhibit A

**Subject:** RE: Joe Sullivan seeks early termination of probation
**Date:** Monday, September 23, 2024 at 8:45:11 AM Pacific Daylight Time
**From:** Swaminathan, Aravind
**To:** Nicole Brown, Wolfe, John
**CC:** Narayan, Ravi (USACAN), Carr, Ciarra, Mazer, Ross (USACAN)
**Attachments:** image001.png, image002.jpg, image003.png

Nicole,

Thank you very much.

Aravind

---

**From:** Nicole Brown <Nicole_Brown@canp.uscourts.gov>
**Sent:** Monday, September 23, 2024 8:44 AM
**To:** Wolfe, John <wolfe@orrick.com>
**Cc:** Narayan, Ravi (USACAN) <Ravi.Narayan@usdoj.gov>; Swaminathan, Aravind <aswaminathan@orrick.com>; Carr, Ciarra <ccarr@orrick.com>
**Subject:** RE: Joe Sullivan seeks early termination of probation

**[EXTERNAL]**

Thank you. Probation has no objection to the early termination request.

**Nicole Brown**
**Supervisory U.S. Probation Officer**
U.S. Probation Office - Northern District of California
1301 Clay Street, Suite 220-S
Oakland, CA 94612
Cell: 510-774-5487

---

**From:** Wolfe, John <wolfe@orrick.com>
**Sent:** Saturday, September 21, 2024 3:24 PM
**To:** Nicole Brown <Nicole_Brown@canp.uscourts.gov>
**Cc:** Narayan, Ravi (USACAN) <Ravi.Narayan@usdoj.gov>; Swaminathan, Aravind <aswaminathan@orrick.com>; Carr, Ciarra <ccarr@orrick.com>
**Subject:** RE: Joe Sullivan seeks early termination of probation

**CAUTION - EXTERNAL:**

Ms Brown-as a follow-up to our email exchange from yesterday, please see the two attached documents. The first is an email exchange between Mr. Sullivan and Ms. Navarro in which Ms. Navarro confirms that Mr. Sullivan's work on behalf of Ukrainian children will be credited against his community service obligation. The second is an email from Mr. Sullivan to Ms.

Navarro in which he documents his Ukraine related community service hours. In total, he has completed 417 hours-more than twice the number required by the Court. Please let me know if you have any questions or need more information to evaluate Mr. Sullivan's request for early termination from probation.

NOTE: I have also cc'd Mr. Ravi Narayan, the AUSA now handling Mr. Sullivan's matter so as to provide him with the same information related to Mr. Sullivan's compliance with his community service obligation as we are also seeking his agreement to early termination.

Thanks to both or you for your consideration of this information.

John Wolfe

---

**From:** Nicole Brown <Nicole_Brown@canp.uscourts.gov>
**Sent:** Friday, September 20, 2024 4:06 PM
**To:** Wolfe, John <wolfe@orrick.com>
**Subject:** RE: Joe Sullivan seeks early termination of probation

**[EXTERNAL]**

Great. I don't see it in his file, but if he has a copy, I will happily review his case again.

**Nicole Brown**
**Supervisory U.S. Probation Officer**
U.S. Probation Office - Northern District of California
1301 Clay Street, Suite 220-S
Oakland, CA 94612
Cell: 510-774-5487

---

**From:** Wolfe, John <wolfe@orrick.com>
**Sent:** Friday, September 20, 2024 4:01 PM
**To:** Nicole Brown <Nicole_Brown@canp.uscourts.gov>
**Cc:** Wolfe, John <wolfe@orrick.com>
**Subject:** RE: Joe Sullivan seeks early termination of probation

**CAUTION - EXTERNAL:**

Ms. Brown-thanks for your response. My understanding was that he had provided proof that he had completed the community service obligation imposed by the Court. Let me follow-up and get you whatever information I can locate.
JW

---

**From:** Nicole Brown <Nicole_Brown@canp.uscourts.gov>
**Sent:** Friday, September 20, 2024 3:52 PM
**To:** Wolfe, John <wolfe@orrick.com>
**Subject:** RE: Joe Sullivan seeks early termination of probation

**[EXTERNAL]**

Hello-

I just reviewed his case. He was ordered to complete 200 hours of community service and has not provided proof of completion. So, at this time, probation is opposed to early termination.

**Nicole Brown**
**Supervisory U.S. Probation Officer**
U.S. Probation Office - Northern District of California
1301 Clay Street, Suite 220-S
Oakland, CA 94612
Cell: 510-774-5487

---

**From:** Wolfe, John <wolfe@orrick.com>
**Sent:** Wednesday, September 18, 2024 2:59 PM
**To:** Nicole Brown <Nicole_Brown@canp.uscourts.gov>
**Cc:** Carla Navarro <Carla_Navarro@canp.uscourts.gov>; Wolfe, John <wolfe@orrick.com>; Swaminathan, Aravind <aswaminathan@orrick.com>
**Subject:** FW: Joe Sullivan seeks early termination of probation

**CAUTION - EXTERNAL:**

Ms. Brown-my name is John Wolfe and along with my colleague, Aravind Swaminathan, we represent Joseph Sullivan who is one of Ms. Navarro's probationers. I sent the email below to Ms. Navarro earlier this afternoon and received a bounce-back informing me that she is out on leave and directing inquiries to you. Set forth below is the email I earlier sent to Ms. Navarro related to Mr. Sullivan's desire to obtain an early termination from probation. I ask that you review this and, if possible, respond with any input you might be able to provide about the position your office might take on this request. Please let me know if you have any question or would like to schedule a call to discuss this request. Thank you for your attention to this request.
John Wolfe

---

**From:** Wolfe, John
**Sent:** Wednesday, September 18, 2024 12:59 PM
**To:** Carla_navarro@canp.uscourts.gov
**Cc:** Swaminathan, Aravind <aswaminathan@orrick.com>
**Subject:** Joe Sullivan seeks early termination of probation

Ms. Navarro-my name is John Wolfe and along with my colleague, Aravind Swaminathan (copied here), we represent Mr. Joesph Sullivan in his pending appeal before the Ninth Circuit and also on matters related to his pending probation. As you are likely aware, Mr. Sullivan has complied with all of the Court imposed financial obligations, has satisfied his Community Service obligation and has otherwise been an exemplary probationer. At this point Mr. Sullivan is interested in seeking early termination of his probation and in furtherance Mr. Swaminathan and I will be filing a motion with the Court seeking a termination order. We are

very interested in discussing this issue with you as we are hopeful that you would agree that early termination at this point is appropriate or at least not oppose our motion. I would appreciate it very much if you would let me know when you might have some time for a call to discuss this issue. Alternatively, if you are willing to agree to the motion or least not oppose it, a reply email indicating your position would be sufficient. Thanks very much for your attention to this matter.
John Wolfe

**John W. Wolfe**
Partner

Orrick
Seattle
T 1 206 839 4324
M 1 206 499 8861
wolfe@orrick.com

orrick

Ms

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication

# Exhibit B

**Subject:** RE: Joseph Sullivan Seeks Early Termination of Probation
**Date:** Tuesday, September 24, 2024 at 3:34:12 PM Pacific Daylight Time
**From:** Mazer, Ross (USACAN)
**To:** Carr, Ciarra
**CC:** Swaminathan, Aravind, Wolfe, John, Chan, Merry (USACAN)

**[EXTERNAL]**

Hi Ciarra,

The government will take a position on early termination once we review Mr. Sullivan's motion. A hearing on October 10 would be difficult for me. If you could notice the hearing for anytime the following week, that would be appreciated.

Thanks,
Ross

---------------------------------------------
**Ross D. Mazer**
Assistant United States Attorney
Northern District of California
Office: (415) 436-7033
Mobile: (415) 308-7894
Ross.Mazer@usdoj.gov

---

**From:** Carr, Ciarra <ccarr@orrick.com>
**Sent:** Tuesday, September 24, 2024 1:59 AM
**To:** Mazer, Ross (USACAN) <RMazer@usa.doj.gov>
**Cc:** Swaminathan, Aravind <aswaminathan@orrick.com>; Wolfe, John <wolfe@orrick.com>
**Subject:** [EXTERNAL] Joseph Sullivan Seeks Early Termination of Probation

AUSA Mazer,

As you are likely aware from the attached correspondence with Probation Officer Nicole Brown, we represent Mr. Joesph Sullivan in his pending appeal before the Ninth Circuit and on matters related to his pending probation. Mr. Joesph Sullivan is interested in seeking early termination of his probation, and in furtherance, we will be filing a motion with the Court seeking a termination order. Officer Brown confirmed Probation has no objection to the early termination request.

We write to notify the government that we will file the motion for early termination by Thursday, September 26 with a noticed hearing date of October 10, 2024 at 1:30pm.

At your convenience, we would greatly appreciate if you could confirm the government's position regarding Mr. Sullivan's request for early termination as well as the government's availability on

the noticed hearing date.

Please let us know if you have any questions, or if you would like to have a call to further discuss the request. Thank you for your consideration of this information.

Ciarra

**Ciarra Carr**
Managing Associate

Orrick
San Francisco
T +1-415-773-5639
M +1-626-353-8233
ccarr@orrick.com

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

# Exhibit C

WORLDWIDE FRIENDS

UKRAINE FRIENDS

November 8, 2023

Re. Case 3:20-cr-00337-WHO; US vs. Joseph Sullivan

To Whom it may concern:

I write to you in my capacity as Chairman of the Board of Worldwide Friends, on behalf of our Board of Directors and Founders. Worldwide Friends is a New York 501(c)(3) nonprofit, dedicated to providing humanitarian aid to people in crisis. We currently operate two missions: Ukraine Friends and Israel Friends.

We launched Ukraine Friends in February 2022, to respond to the unjustified Russian invasion of a sovereign and democratic nation. With broad support from donors across the United States, we initially focused on refugee resettlement, evacuating over 30,000 people and finding housing for over 10,000 people. Once migrations stabilized, we prioritized medical relief, and have imported over 90 ambulances and distributed over 75,000 military-grade first-aid kits. We have full-time staff on the ground and operate three warehouses, one in Poland and two in Ukraine. We will do this work for as long as necessary, but look forward to the day we can pivot to support rebuilding efforts.

In January 2023, we asked Joe Sullivan to take on the role of Chief Executive Officer of our Ukraine mission. A recruiter friend of Joe's had sought us out and explained Joe wanted an opportunity to volunteer for an organization dedicated to supporting the people of Ukraine. Joe did considerable work to support Ukraine when he was previously employed at Cloudflare, and was looking for a chance to do more. He wanted to volunteer a few hours a week, but when we offered him the CEO role he accepted and signed a contract to do the job on a full-time basis, with no financial compensation. As chairman of the board of the nonprofit, I oversee his work.

Joe jumped into this work, and in a very short time has had a very positive impact.

- He's been to Washington DC twice to support the Ukrainian Congress Committee of America's efforts at raising awareness around the war's impact on the education of children in Ukraine and on food security not just in Ukraine but across the developing world.
- He coordinated with other volunteer organizations on the delivery to Ukraine of 22 ambulances we purchased in Virginia with donor funds.
- He's keeping our ongoing operations running effectively, and has developed ideas for and launched new programs leveraging his deep ties to the Silicon Valley tech

community, such as a program to provide gently used laptops (that tech companies don't need after laying off employees) to children in Ukraine to help with their participation in remote learning, and a program to provide donated cyber security software to critical infrastructure and educational organizations in Ukraine.

- He's visited Ukraine twice already this year and will be taking another trip shortly. When he goes there, he pays his own way, and has used the trips to build relationships with our team on the ground and connect with authorities across Ukraine to ensure that our aid efforts are aimed at areas of greatest need. Unlike most first-time visitors to this war zone, Joe wasn't satisfied to just visit Kyiv and Lviv, but took on greater personal risk to go to Odesa and Mykolaiv to connect with communities close to the front lines--because he believed the needs were greater in those locations. He personally brought into the country laptops that he obtained from a fintech company and gave them directly to children at a Jewish community center in Mykolaiv and a Catholic orphanage in Lviv.
- He's already worked directly with Ukrainian government authorities to provide technical consultation (by friends of his in the US) on complicated cyber security issues related to IOT (internet of things) hardware security.
- He oversaw our efforts to provide logistics and security for Rachael Ray the celebrity TV host, as she visited Lviv and led a cooking class for orphans that aired on her show and drew awareness to our organization and helped with fundraising.

We are excited about the new ideas that Joe has brought to our team. Before he even traveled to Ukraine he connected with the Interior Ministry to prioritize education and support remote learning for children. Within days of arriving in Kyiv, Joe was asked by Ukrainian government officials to establish and provide advanced technical cyber security incident response training, to procure specialized hardware that can help establish backup systems, and to find specialists in the United States who can help on niche areas of security where there is no local expertise. We'd never be able to help the people of Ukraine in these areas without Joe's unique expertise, willingness to get his hands dirty on the ground in Ukraine, and network of security-expert friends he has called upon frequently already.

We want Joe to continue doing this volunteer work, and we formally request that it be considered community service as part of his probation. Before we onboarded him, Joe was very transparent with us about his pending case, and the potential that the sentence he would receive could interfere with his ability to operate as a volunteer. After doing our diligence to understand the case and who Joe is as a person, we took a chance and gave him the role. Given his history of public service, our perception that his offense was an aberration in an otherwise exemplary career, and his clear passion for helping the people of Ukraine, we felt he would make a great leader. Based on the results so far, we vastly underestimated his potential to make a difference. He adds incredible value to our efforts to provide humanitarian aid to children in need.

Because he's so uniquely qualified to lead, so extremely passionate about this work, and done so much already, we simply could not replace him without diminishing our impact greatly. We ask that he be encouraged to continue this work and that you set Joe on a path to support our

mission more deeply. His work with Ukraine Friends is an incredible community service, to a community in desperate need of support. In a short time he has done a great deal to help the people of Ukraine, and if given the opportunity he will do much more.

Sincerely,

DocuSigned by:

715C03F909BD449...

Michael Sinensky
Chairman of the Board
Ukraine Friends/Worldwide Friends

# Exhibit D

WORLDWIDE FRIENDS

UKRAINE FRIENDS

**Monthly Hours Tracker**

For: Joe Sullivan
Month: May 2023
Reviewed by: Michael Sinensky

DocuSigned by:
2E9D73BF1D57411...

Volunteer Hours Completed: 65

| Date | Hours |
|---|---|
| May 8, 2023 | 5 |
| May 9, 2023 | 4 |
| May 10, 2023 | 4 |
| May 11, 2023 | 2 |
| May 12, 2023 | 3 |
| May 15, 2023 | 5 |
| May 16, 2023 | 4 |
| May 17, 2023 | 2 |
| May 18, 2023 | 3 |
| May 19, 2023 | 5 |
| May 22, 2023 | 5 |
| May 23, 2023 | 4 |
| May 24, 2023 | 4 |
| May 25, 2023 | 3 |
| May 26, 2023 | 4 |
| May 30, 2023 | 4 |
| May 31, 2023 | 4 |

*Ukraine Friends is a humanitarian mission operating under the 501c3 Worldwide Friends Foundation, a charitable tax-exempt organization pursuant to Section 501(C)(3) of the Internal Revenue Code. EIN: 88-2071011.*

WORLDWIDE FRIENDS

UKRAINE FRIENDS

Key Accomplishments:

Joe connected with Rotary International, the nonprofit organization, and arranged for them to help Joe deliver laptops to kids who need them - coordinated details and requirements for laptops - focused on children in the Bucha region that was badly damaged during the initial invasion in 2022.

Joe prepared a 1-pager document that he then distributed to companies in the US to solicit donations of laptops. He gathered data on how 800,000 children had to switch from in-person to distance learning, and 40% do not have access to a laptop for that schooling, and presented it to donor candidates across the US.

Joe realized that children aren't just suffering from lack of access to tech for schooling, but are also dealing with mental health issues from trying to survive in a war zone, and came up with the idea of putting a sticker on each laptop with mental health tips tailored to teens, and got good content on suicide prevention hotlines, etc., and got it all translated into Ukrainian.




Joe turned his engagement party in his backyard into a fundraiser and raised thousands of dollars for the nonprofit to pay for reconditioning and shipping laptops to kids in Ukraine.

WORLDWIDE FRIENDS UKRAINE FRIENDS

**Monthly Hours Tracker**
For: Joe Sullivan
Month: June 2023
Reviewed by: Michael Sinensky

Volunteer Hours Completed: 58

DocuSigned by:
2E9D73BF1D57411...

| | |
|---|---|
| June 1, 2023 | 3 |
| June 2, 2023 | 3 |
| June 3, 2023 | 2 |
| June 6, 2023 | 4 |
| June 7, 2023 | 3 |
| June 8, 2023 | 3 |
| June 14, 2023 | 8 |
| June 15, 2023 | 8 |
| June 28, 2023 | 8 |
| June 29, 2023 | 8 |
| June 30, 2023 | 8 |

Key Accomplishments:

Joe connected with a laptop recycling company called Revivn, through a referral from a person at the company Anaplan that wanted to do donations, and Revivn agreed to partner with Joe on reconditioning laptops and delivering them to the Ukraine Friends warehouse in New York for us to ship over and deliver to children

Joe took a trip to Washington DC for "Ukrainian Days" where he met with people from across the country to share best practices and meet with members of Congress to share with them details of the plight of children trapped in a war zone. Joe also did a number of media interviews to help raise awareness and drive fund-raising for the work he is leading.

*Ukraine Friends is a humanitarian mission operating under the 501c3 Worldwide Friends Foundation, a charitable tax-exempt organization pursuant to Section 501(C)(3) of the Internal Revenue Code. EIN: 88-2071011.*

WORLDWIDE FRIENDS

UKRAINE FRIENDS

Joe closed an agreement with Capital One bank to donate laptops.

At his own expense, Joe flew to Poland and then traveled into Ukraine with a shipment of laptops for kids. He started out in Kyiv where he met with Rotary leaders and together delivered lots of laptops to kids in the Bucha region in a town called Moschun. Only children whose homes had been destroyed received donated laptops and we wished we had brought more..






WORLDWIDE FRIENDS

UKRAINE FRIENDS

**Monthly Hours Tracker**

For: Joe Sullivan

Month: July 2023

Reviewed by: Michael Sinensky

DocuSigned by:
2E9D73BF1D57411...

Volunteer Hours Completed: 89

| | |
|---|---|
| July 1, 2023 | 8 |
| July 2, 2023 | 8 |
| July 3, 2023 | 8 |
| July 4, 2023 | 8 |
| July 5, 2023 | 8 |
| July 10, 2023 | 5 |
| July 11, 2023 | 4 |
| July 12, 2023 | 3 |
| July 15, 2023 | 4 |
| July 16, 2023 | 4 |
| July 17, 2023 | 4 |
| July 18, 2023 | 4 |
| July 19, 2023 | 4 |
| July 24, 2023 | 4 |
| July 25, 2023 | 2 |
| July 26, 2023 | 2 |
| July 27, 2023 | 4 |
| July 28, 2023 | 1 |
| July 31, 2023 | 4 |

***Ukraine Friends is a humanitarian mission operating under the 501c3 Worldwide Friends Foundation, a charitable tax-exempt organization pursuant to Section 501(C)(3) of the Internal Revenue Code. EIN: 88-2071011.***

WORLDWIDE FRIENDS

UKRAINE FRIENDS

Key Accomplishments:

Joe arrived in Ukraine in late June and stayed for the first week of July. He delivered laptops to a volunteer IT school in Kyiv, and spent the Fourth of July delivering medical equipment to first responders who were back from the front lines of the war. He also helped support training for soldiers on how to use tourniquets and other medical gear that we provided as donations to the local community defense groups that were forced to defend their communities.

Joe met representatives of another nonprofit called Lifechanger and donated laptops to some teachers in their volunteer programs.



At one stop on this trip to Ukraine, Joe visited Lviv where he spent a bunch of time in the warehouse showing the team how to recondition and prepare laptops to deliver them to children, and fixing the ones that had gotten damaged during shipping. Unfortunately, a missile

WORLDWIDE FRIENDS

UKRAINE FRIENDS

landed right next to our warehouse in Lviv a couple of days after Joe's visit, and suffered a lot of damage - windows blown out, security cameras knocked off their mounts, etc.

In July Joe also built a relationship with some professors at Sienna College in New York and identified ways to partner to help young people stuck in the war zone. The first project was pairing a college student the professors had identified with a student in Ukraine who wanted to learn about how to work in information technology. Joe met with both students and prepared them and then connected them for the mentoring sessions. Joe also got Sienna to start a laptop drive, asking local students and families to donate laptops for Joe to take to Ukraine to give to kids.

Joe arranged for shipment and delivery into Ukraine in July of laptops donated by Credit Karma and Tines.

WORLDWIDE FRIENDS UKRAINE FRIENDS

**Monthly Hours Tracker**
For: Joe Sullivan
Month: August 2023
Reviewed by: Michael Sinensky DocuSigned by: 2E9D73BF1D57411...

Volunteer Hours Completed: 38

| | |
|---|---|
| August 1, 2023 | 4 |
| August 2, 2023 | 4 |
| August 3, 2023 | 4 |
| August 4, 2023 | 4 |
| August 7, 2023 | 2 |
| August 9, 2023 | 1 |
| August 14, 2023 | 5 |
| August 15, 2023 | 5 |
| August 17, 2023 | 1 |
| August 21, 2023 | 1 |
| August 22, 2023 | 1 |
| August 23, 2023 | 1 |
| August 24, 2023 | 1 |
| August 28, 2023 | 2 |
| August 30, 2023 | 1 |
| August 31, 2023 | 1 |

Key Accomplishments:

In August Joe spoke at two major security conferences as a keynote speaker and used the closing minutes of each session to ask people in the rooms to go back to their companies and find the used laptops and donate them through Joe. The speeches were in front of senior technical leaders of the biggest companies and this month led to a significant number of new

WORLDWIDE FRIENDS

UKRAINE FRIENDS

companies stepping up. Joe spent a lot of time meeting with each one and explaining how the processes work, the costs, the need for and how to ensure no data was left on the machines, etc.

Joe kicked off a new project this month that he and the team decided to call Digital Wings. Up to this point almost all of the laptop donations that Joe led were being made to orphanages, community centers, and schools. They decided to launch a nationwide program where any family could fill out a web form and request a laptop delivered to them directly. To ensure we didn't get overwhelmed with requests, we instituted a financial need requirement and also said we would prioritize those who had lost a parent in the war and who were stuck in remote schooling.

Joe arranged for shipment and delivery into Ukraine in August of laptops donated by Anaplan and Capital One.

WORLDWIDE FRIENDS

UKRAINE FRIENDS

**Monthly Hours Tracker**

For: Joe Sullivan

Month: September 2023

Reviewed by: Michael Sinensky

DocuSigned by:
2E9D73BF1D57411...

Volunteer Hours Completed: 36

| | |
|---|---|
| September 1, 2023 | 2 |
| September 5, 2023 | 4 |
| September 6, 2023 | 1 |
| September 7, 2023 | 3 |
| September 8, 2023 | 1 |
| September 11, 2023 | 5 |
| September 12, 2023 | 2 |
| September 13, 2023 | 1 |
| September 14, 2023 | 2 |
| September 15, 2023 | 2 |
| September 18, 2023 | 1 |
| September 21, 2023 | 2 |
| September 22, 2023 | 3 |
| September 25, 2023 | 2 |
| September 26, 2023 | 2 |
| September 27, 2023 | 1 |
| September 28, 2023 | 1 |
| September 29, 2023 | 1 |

WORLDWIDE FRIENDS

UKRAINE FRIENDS

Key Accomplishments:

With the kick-off of the new Digital Wings project, Joe made sure that the team had clear guidelines for vetting who should and who should not qualify for getting a laptop, and made sure that the program got wide distribution within Ukraine. Within days, the requests started pouring in. A good amount of time during the month was spent working through the standards to apply in reviewing applications.

Joe led a project to re-vamp the website so that we can use it to much more effectively drive donations. He got lots of volunteer support and donations and then made sure we used the money we raised to pay some people who live in Ukraine to build the new website. He felt we should make sure our donations and the money we spend goes to those who need it most.

WORLDWIDE FRIENDS

UKRAINE FRIENDS

**Monthly Hours Tracker**

For: Joe Sullivan

Month: October 2023

Reviewed by: Michael Sinensky

DocuSigned by:
2E9D73BF1D57411...

Volunteer Hours Completed: 30

| | |
|---|---|
| October 2, 2023 | 2 |
| October 3, 2023 | 1 |
| October 4, 2023 | 1 |
| October 5, 2023 | 1 |
| October 6, 2023 | 1 |
| October 7, 2023 | 3 |
| October 8, 2023 | 2 |
| October 10, 2023 | 2 |
| October 12, 2023 | 2 |
| October 13, 2023 | 1 |
| October 16, 2023 | 1 |
| October 17, 2023 | 1 |
| October 18, 2023 | 1 |
| October 19, 2023 | 1 |
| October 20, 2023 | 1 |
| October 23, 2023 | 2 |
| October 24, 2023 | 1 |
| October 25, 2023 | 1 |
| October 26, 2023 | 2 |
| October 27, 2023 | 1 |
| October 30, 2023 | 1 |
| October 31, 2023 | 1 |

***Ukraine Friends is a humanitarian mission operating under the 501c3 Worldwide Friends Foundation, a charitable tax-exempt organization pursuant to Section 501(C)(3) of the Internal Revenue Code. EIN: 88-2071011.***

WORLDWIDE FRIENDS

UKRAINE FRIENDS

Key Accomplishments:

Joe connected with another company called Lattice and got them to provide a big shipment of laptops.

When the events of October 7 happened in Israel, Joe helped the broader Worldwide Friends organization launch a new standalone nonprofit called Israel Friends. It was very smooth because he had stayed on top of all the documentation and paperwork.
Joe coordinated a laptop drive event in October at Sienna College.

Joe led a project to give laptop donations to another charity IT school in Kyiv.

WORLDWIDE FRIENDS

UKRAINE FRIENDS

**Monthly Hours Tracker**

For: Joe Sullivan

Month: November 2023

Reviewed by: Michael Sinensky

DocuSigned by:

2E9D73BF1D57411...

Volunteer Hours Completed: 59

| | |
|---|---|
| November 1, 2023 | 2 |
| November 2, 2023 | 2 |
| November 3, 2023 | 2 |
| November 6, 2023 | 2 |
| November 7, 2023 | 1 |
| November 8, 2023 | 2 |
| November 9, 2023 | 1 |
| November 10, 2023 | 1 |
| November 13, 2023 | 1 |
| November 14, 2023 | 1 |
| November 15, 2023 | 1 |
| November 16, 2023 | 2 |
| November 20, 2023 | 1 |
| November 26, 2023 | 8 |
| November 27, 2023 | 8 |
| November 28, 2023 | 8 |
| November 29, 2023 | 8 |
| November 30, 2023 | 8 |

WORLDWIDE FRIENDS

UKRAINE FRIENDS

Key Accomplishments:

Joe coordinated a large new donation project - Credit Suisse had identified a large cache of wifi gear that they do not need now that they are merging with another company (UBS), and they agreed to donate them to Ukraine as long as Joe would coordinate the work. He bridged the tech teams at a few different companies who had volunteered to help on the project, and got them all working together.  We hope this equipment will be sufficient to

Joe locked in CarGurus as the next company to donate laptops - they will be delivered in January. Joe aldso arranged for shipment and delivery into Ukraine in November of laptops donated by Cloudflare (through a partnership with Revivn).

Joe took another trip to Ukraine at his own expense. In Lviv he hosted a holiday party for a large number of children who had received donations of laptops in preceding months. He brought them together to check in on their experiences with the laptops and to see what else could be done for them.






*Ukraine Friends is a humanitarian mission operating under the 501c3 Worldwide Friends Foundation, a charitable tax-exempt organization pursuant to Section 501(C)(3) of the Internal Revenue Code. EIN: 88-2071011.*

WORLDWIDE FRIENDS

UKRAINE FRIENDS

**Monthly Hours Tracker**

For: Joe Sullivan

Month: December 2023

Reviewed by: Michael Sinensky

DocuSigned by:
2E9D73BF1D57411...

Volunteer Hours Completed: 42

| | |
|---|---|
| December 1, 2023 | 8 |
| December 2, 2023 | 8 |
| December 3, 2023 | 8 |
| December 4, 2023 | 3 |
| December 5, 2023 | 2 |
| December 6, 2023 | 2 |
| December 7, 2023 | 2 |
| December 8, 2023 | 2 |
| December 11, 2023 | 2 |
| December 12, 2023 | 2 |
| December 13, 2023 | 1 |
| December 14, 2023 | 1 |
| December 15, 2023 | 1 |

WORLDWIDE FRIENDS

UKRAINE FRIENDS

Key Accomplishments:

Joe's trip to Ukraine extended into December. Joe made stops at a number of houses to personally deliver laptops to children. Tragically, one of the homes that Joe visited got hit by a missile a few days later and the family was forced to evacuate and became homeless for a while. Here are pics of the home when Joe visited and after the missile:



Joe also visited the IT school in Kyiv to see how they were using the laptops, and to give feedback and bring back notes on areas for improvement for the project.

**WORLDWIDE FRIENDS** **UKRAINE FRIENDS**

While in Kyiv Joe met with and provided medical equipment to a university professor in Kyiv whose husband is a surgeon and who Joe had heard from a friend was suffering from a lack of medical equipment. It led to her posting a very nice message of thanks:

**Таня Доній**
4 hours ago ·

На тлі всіх цих ситуацій з допомогою Україні від урядів, яскравим променем виділяються звичайні громадяни цих країн, які якимось дивом опиняються тут під час війни. От і сьогодні трапилось таке диво. Лише вчора ми з моєю подругою, що живе в Америці думали де б взяти Ifaks. А тут виявилось, що Джо вже в Україні і готовий надати іх. Ці два чоловіки дуже багато допомагають і кажуть, що ми їх надихаємо. І їм не страшно тут, з нами, на нашій війні. Ну чи не диво на Андрія? ))

> In the background of all these situations with Ukraine's help from governments, a bright ray stands out the ordinary citizens of these countries, who miraculously end up here during the war. And today such a miracle happened. Just yesterday my friend who lives in America and I were thinking where to get ifaks. And then it turned out that Joe is already in Ukraine and ready to provide them. These two men help so much and say we inspire them. And they are not afraid here with us in our war. Isn't it a miracle for Andriy? ))
>
> · Hide Translation · Rate this translation



***Ukraine Friends is a humanitarian mission operating under the 501c3 Worldwide Friends Foundation, a charitable tax-exempt organization pursuant to Section 501(C)(3) of the Internal Revenue Code. EIN: 88-2071011.***

# Exhibit E

April 27, 2023

The Honorable William H Orrick III
450 Golden Gate Avenue
San Francisco CA 94102

Your Honor:

I'm sorry that I am taking your time today because of my actions and inactions in 2016. There has not been a day since my termination in 2017 that I haven't spent hours rehashing and anguishing over the decisions my team and I made then.

I am writing this letter because I want you to know that I am sorry for what I did. I understand it hurt others and served as a bad example. I don't want to make excuses or argue about the interpretation of facts. I want to assure you it won't happen again on my watch. And I want to dedicate my life to making up for it.

Before I say anything else, I want to thank your courtroom staff, the courthouse security team, pretrial services, the PSR writer, and everyone who treated my family with dignity throughout this process. I also want to thank you for letting the case be audible over Zoom so that my family across the country and across the ocean could listen.

**I Accept Responsibility**

I deeply regret the actions I took that led to the bringing of this case. I recognize the costs the case has had on so many - and I believe they all could have been avoided if I had acted differently back in 2016.

To protect the company, our customers, and our driver partners, my highest priority was to track down the young men who had accessed Uber's system and ensure that the data they downloaded would never be publicly disseminated. I am proud of the work my team did in this regard. We found them and made sure they knew that if the data were ever publicly exposed, we would hold them accountable. I believe this strategy was in the interest of the company, our customers, and our driver partners, and successfully prevented the data from ever being publicly disseminated.

But I had responsibilities beyond securing the data, responsibilities that I failed to live up to. I knew that it would have been embarrassing to Uber if the details of the incident

were to become publicly known. I informed the CEO Travis Kalanick and my team's assigned lawyer when the incident occurred, and followed other standard processes expected in any similar investigation, but I also helped pursue what I was told was an "aggressive" legal strategy of putting them into Uber's bug bounty program. This provided the company with a plausible basis to resolve the incident internally, and quietly, without having to treat the incident as a "data breach" necessitating disclosures to the authorities.

I regret this decision. As you hopefully have seen from the many letters of support submitted on my behalf, I have tried throughout my career to stand for integrity and transparency, and most importantly have spoken up repeatedly in many contexts and dedicated much of my career to getting the public and private sectors to work more closely on internet security. It is the biggest irony of my life that I personally have done more than anyone to undermine what I have always tried to stand for.

I should have seen to it that authorities were notified of the incident. I strongly believe that cybersecurity professionals must take the lead not only in celebrating our "wins" but fearlessly learning the right lessons from our "losses" and near-misses as well. Good cyber governance should involve transparency, clear lines of accountability, and erring on the side of disclosure rather than looking for ways to avoid it. My actions in 2016 fell short of these ideals.

In this case, I understood who was on the other side of the messages back then, and though I had never met him, I felt something for Brandon. I saw in him a reflection of some of the witnesses you heard at trial: Collin Green, Robert Fletcher, and Mat Henley were all in their youth a version of Brandon. I wanted to find a solution that could steer Brandon onto the right path while also protecting our customers at Uber. I did that and walked away feeling good in 2016. But as is obvious now, I needed to expand my aperture and make sure we did right by the government, and expectations at the FTC in particular. I clearly failed in that regard, and undermined a core principle that has animated my whole career.

**I Hurt Those I Care About Most**

Since 2017, the negative impact of my actions and inactions in 2016 have caused pain over and over to those I love the most. As my daughter Celia described in the video submitted with my sentencing materials, I am perfectly ok humiliating myself by doing a TikTok dance in front of 500 people to show her I love her. But this case is not the shame I wanted to bring on her and her sisters. From the date when I was fired and the

story splashed across the front pages of every newspaper around the world, my daughters and other family members have had to constantly read and hear about my lack of integrity and respond to hard or unspoken questions from each person they meet. It has pained me even more to have them see what it means for me to be under indictment for almost three years already, to see them distracted from school and other priorities, and to have to explain to them why we end up in secondary inspection every time we travel. I have since their youngest ages talked to my kids about telling the truth and reminded them that I would not punish them for things they do wrong except for not speaking up and telling the truth even when it hurts. And today I am the person most known in their world for a lack of living up to this standard.

The trial also brought back viscerally to me the pain I caused for the team of hundreds I had hired at Uber and built into a special organization. Many of them had followed me there from other companies and put their whole career in my hands. They trusted and relied on me, and together we had been building something unique. I loved that team and was so proud of them. My termination forced me to abandon them in a hostile environment and imposed on me a legal cone of silence so that to this day I have never been able to sit down and ask them how they are and tell them how sorry I am for the pain I brought on them.

I also hurt my peers in the profession. I have tried for decades to establish the role of a security leader inside a corporation as the one person who can be counted on to champion the user and promote better security through collaboration. I love the profession and the type of people it attracts--because you can't do that job if you are not ready to put yourself fully in service to others. But through this case, I've injected a significant modicum of distrust into the dynamic between corporate security and government groups.

**I Am Grateful For Those Who Have Lifted Me Up**

I will always carry a great weight because of this case, but it is a bit lighter from the efforts of so many who have supported me. I could have never imagined the range of deep positive emotions I have felt over these last months as I have received and read the letters submitted in support of leniency. They have been an unexpected and joyful silver lining. I've read over 200 notes written by true friends, many recalling stories from our relationships that had passed from my memory. I've joked that it is like getting to sit in on my own eulogy without having to die. I am grateful to every one of the hundreds of people who wrote individual letters to you, and I hope they have shown you a different side of me than was presented during the trial.

Case 3:20-cr-00337-WHO Document 253-1 Filed 04/27/23 Page 7 of 15


**I Will Make Up for My Mistakes**

As much as I have dwelled on my failures since 2017, I have also taken action to try to make up for my mistakes and have plans to do much more.

Since early 2018, I have attended and been a speaker at literally dozens of closed-door conferences of security executives to talk about how those leaders can avoid the mistakes that I have made. I have been reluctant to take the stage at public events in recent years due to the pending trial, but as soon as I am able, I intend to seek out every opportunity to speak loudly to the security community about how we can do better. I believe that we cannot be great at security as a country until we can establish much more transparency and much more collaboration between the private and public sectors. I believe that my actions and their resulting consequences have put me in a unique position to make a very high-profile effort to change things for the better. I want to go to every security conference and find every chance to stand up and tell the world that we need a better model with more collaboration. Even if I have lost the ability to partner with the government on stage while bringing that message, I can still call on the world to learn from my mistakes and not repeat them.

I have continued to give my focus and energy freely to those who need it. I spend a good deal of time mentoring students and supporting others in my profession. Almost all CISOs operate in environments under constant regulatory oversight, compete for budgets with profit-driving initiatives, struggle with getting their company aligned with their security program, and deal with the stresses of near daily incidents. As a result, I've been mentoring and speaking individually with CISOs about this case and how the lessons apply to their situations regularly since 2017.

I have also found a new passion in nonprofit work. After the trial, I turned to a friend who is a recruiter and told him I craved work to motivate and engage me constructively, and that I would prefer a chance to volunteer to help children in need or support Ukraine. Within a short time, he somehow found an opportunity for me to do both, as the CEO of a nonprofit dedicated to humanitarian aid for people in Ukraine. This work has given me a new sense of meaning in my life. I now oversee programs ensuring there are enough first aid kits distributed across Ukraine to deal with all the traumatic injuries caused by the war, and providing laptops and other support to the over 1.5 million children in Ukraine stuck doing remote education. I was fortunate enough to recently spend 2 weeks in Ukraine, traveling to Kyiv, Odesa, Mykolaiv, and

Lviv, where I met incredible people who are resilient in the face of war. I can't wait to go back and want to do all I can to help them until their crisis is over.

**Conclusion**

As I prepare to stand before you, I am closer to my family than ever before, I have the support of a large network of real friends, I am in a volunteer role where I am doing incredibly rewarding work helping those in need, and I am motivated to and still have an opportunity to use my voice to improve the state of internet security. I ask you to give me a chance to use what has happened here to give back to my community.

I am sorry for what I did. I understand it hurt others and set a bad example. I don't want to make excuses. I want to assure you I won't let the mistakes I made happen again on my watch. Ever. And I want to dedicate my life to making up for it.

Sincerely,

Joe Sullivan

# Exhibit F

(1) under continuous supervision for more than 18 months and in full compliance with all conditions throughout the supervision term or

(2) under continuous supervision for more than 30 months and in full compliance with all conditions throughout the last year.

Exceptions to this rule would be career violent and/or drug offenders as described in 28 U.S.C. § 994(h) and offenders convicted of a sex offense or terrorism predicate as described in 18 U.S.C. § 3583 (j) or (k) for which life terms of supervised release are authorized.

## § 380 The Transition Off Supervision

The transition out of the criminal justice system is a process, not an event. It is the culmination of a series of transitions that began when the offender was first arrested for the crime and is one of the most critical for achieving long-term public safety beyond the term of supervision. Transition off supervision is implemented throughout the supervision period by providing offenders with the tools — and connecting them to the social services — they require to function under decreasing levels of control.

### § 380.10 Early Termination

(a) Under 18 U.S.C. §§ 3564(c) and 3583(e)(1), the court may terminate terms of probation in misdemeanor cases at any time and terms of supervised release or probation in felony cases after the expiration of one year of supervision if satisfied that such action is warranted by the conduct of an offender and is in the interest of justice. (**Note:** Early termination of parole cases is governed by the *U.S. Parole Commission Rules and Procedures Manual*, Nov. 2007, Section 2.43.)

(b) Officers should consider the suitability of early termination for offenders as soon as they are statutorily eligible. The general criteria for assessing whether a statutorily eligible offender should be recommended to the court as an appropriate candidate for early termination are as follows:

(1) Stable community reintegration (e.g., residence, family, employment);

(2) Progressive strides toward supervision objectives and in compliance with all conditions of supervision;

(3) No aggravated role in the offense of conviction, particularly large drug or fraud offenses;

(4) No history of violence (e.g., sexually assaultive, predatory behavior, or domestic violence);

(5) No recent arrests or convictions (including unresolved pending charges) or ongoing, uninterrupted patterns of criminal conduct;

(6) No recent evidence of alcohol or drug abuse;

(7) No recent psychiatric episodes;

(8) No identifiable risk to the safety of any identifiable victim; and

(9) No identifiable risk to public safety based on the Risk Prediction Index.

(c) The existence of an outstanding financial penalty *per se* does not adversely affect early termination eligibility as long as the offender has been paying in accordance with the payment plan.

(d) During the first 18 months of supervision, the appropriateness of early termination should be based on the offender's overall progress in meeting supervision objectives and should include an evaluation of all the circumstances in the individual case. Offenders with identified risks to community safety should not be recommended for early termination. However, the failure to meet other criteria listed should not automatically exclude an offender from further consideration.

(e) At subsequent assessments, there is a presumption in favor of recommending early termination for probationers and supervised releasees:

(1) Who have been under supervision for at least 18 months and

(a) are not career violent and/or drug offenders (as described in 28 U.S.C. § 994(h)), sex offenders, or terrorists,

(B) present no identified risk to the public or victims, and

(C) are free from any moderate (**see:** Guide, Vol 8E, § 620.40.20) or high (**see:** § 620.40.30) severity violations; and

(2) Who have been under supervision for at least 42 months and

(a) are not career violent and/or drug offenders (as described in 28 U.S.C. § 994(h)), sex offenders, or terrorists, and

(B) are free from any moderate (**see:** Guide, Vol 8E, § 620.40.20) or high (**see:** § 620.40.30) severity violations.

(f) Early termination assessments should be discussed with the supervisor as part of the periodic evaluation process. A request to the court for early termination consideration should include a summary of the offender's adjustment under supervision, along with justification for a request for early termination supported by the chronological record. The request should also include options for the court to revisit the offender's early termination at a later time.

(g) Should the court order the termination of an offender's supervision, the case should be statistically closed immediately. Otherwise, until the next case evaluation, the case should ordinarily be supervised under low intensity supervision standards (**see:** Guide, Vol 8E, § 440).

## § 380.20 Case Closing Activities

(a) For cases under active supervision, officers are to undertake the following case closing activities during the last six months of the supervision term.

(1) *For offenders who continue to present current risks and needs* (as documented on the last case plan), interview the offender and his or her family or significant others to discuss future plans, particularly as they relate to the need for ongoing services to address risks and needs; and refer the offender to appropriate service providers in the community for assistance with substance abuse or mental health counseling and support, medication, housing, and other basic needs.

(2) *For offenders with outstanding monetary penalties*, notify the Financial Litigation Unit of the U.S. attorney's office of the pending termination of supervision for offenders who will have outstanding fine and restitution balances and provide the unit with all available information on offender resources and ability to pay.

(3) *For all offenders*,

(a) Assess whether the offender is subject to any newly enacted or expanded statutory requirements and, if so, implement or

# Exhibit G

COMMITTEE ON CRIMINAL LAW
of the
JUDICIAL CONFERENCE OF THE UNITED STATES
Gerald R. Ford Federal Building
110 Michigan Street, N.W., Room 602
Grand Rapids, MI 49503

Honorable Paul J. Barbadoro
Honorable Raymond W. Gruender
Honorable Judith C. Herrera
Honorable Ellen Segal Huvelle
Honorable Sterling Johnson, Jr.
Honorable Cindy K. Jorgenson

Honorable Irene M. Kelley
Honorable Theodore A. McKee
Honorable Franklin L. Noel
Honorable Charles R. Norgle, Sr.
Honorable Margaret Casey Rodgers
Honorable Keith Starrett
**Honorable Robert Holmes Bell**, Chair

TELEPHONE
616- 456 -2021

FACSIMILE
616-456-2538

February 16, 2012

MEMORANDUM

To: Judges, United States District Courts
United States Magistrate Judges

From: Honorable Robert Holmes Bell
Chair, Judicial Conference Committee on Criminal Law

RE: COST-CONTAINMENT STRATEGIES RELATED TO PROBATION AND PRETRIAL SERVICES OFFICES **(IMPORTANT INFORMATION)**

I write to you as Chair of the Judicial Conference Committee on Criminal Law. Given the budget constraints under which the probation and pretrial services program are operating, it is imperative that we align our resources effectively to address those cases that are more complex and pose the greatest risks to community safety, while reducing expenditures in less complex and lower risk cases when it is prudent to do so. We ask your assistance in this effort by ordering reduced scope investigations and supervision services in appropriate cases. The attached document provides specific information on reduced services options and the costs associated with them. We encourage you to discuss the document with your colleagues and chief probation and pretrial officers.

If you have any questions or suggestions for the Criminal Law Committee, please contact John Fitzgerald, Chief of the Criminal Law and Policy Staff, at John_Fitzgerald@ao.uscourts.gov or (202) 502-1625.

Attachment

cc: Chief Probation Officers
Chief Pretrial Services Officers

# Presentence Investigation Reports

**Background**: Rule 32(c) states that "[t]he probation officer must conduct a presentence investigation and submit a report to the court before it imposes sentence unless . . . the court finds that the information in the record enables it to meaningfully exercise its sentencing authority under 18 U.S.C. § 3553, and the court explains its findings on the record." The rule also states, however, that "[i]f the law permits restitution, the probation officer must conduct an investigation and submit a report that contains sufficient information for the court to order restitution."

**Cost Savings Options**: Full guideline presentence reports currently cost approximately $1,546 per report. Below are examples of options that require fewer resources, and can help expedite sentencing in certain cases.

1. Waiver of the Presentence Report – When the court finds that the information in the record enables it to meaningfully exercise its sentencing authority under 18 U.S.C. § 3553, and when a presentence report is not otherwise required, the court may waive the presentence report. If the presentence report is waived, and the defendant has at least nine months remaining on an imprisonment sentence, the probation office will prepare a Supplemental Report to the Bureau of Prisons (BOP). This abbreviated report assists the BOP in designation and classification determinations. These reports cost approximately $744 per report.

2. Modified Presentence Report – In any case, the court may order the probation officer to prepare a modified presentence investigation report. These reports are designed to give the court flexibility in ordering shorter reports in appropriate cases. For example, these reports could be used in a case involving a single defendant, convicted on a single count of conviction where the defendant has no or few ties to the United States and is not exposed to a lengthy term of imprisonment or supervision (e.g., class A misdemeanors, class E felonies, cases in which the plea agreements contemplate a brief period of imprisonment or no prison at all, deportable aliens). Modified presentence investigation reports may not be suitable if the defendant has a history of violence or sexual offenses, significant ties to the country, identified risks and needs (e.g., current substance abuse or mental health issues), or significant assets, since these issues tend to have greater influence on the sentence imposed, Bureau of Prisons designation and programming, and post-conviction supervision. These reports cost approximately $744 per report.

3. Expedited Sentencing Report – Sometimes referred to as "worksheets," these reports may be ordered when the court waives the preparation of a presentence report and only requires that the probation office calculate the offense level and criminal history score needed to determine the guideline range. These reports do not include a narrative description of the offense or the defendant's personal history. These reports cost approximately $335 per report.

# Early Termination of Supervision

**Background**: Under 18 U.S.C. §§ 3564(c) and 3583(e)(1), the court may terminate terms of probation in misdemeanor cases at any time and terms of supervised release or probation in felony cases after the expiration of one year of supervision if satisfied that such action is warranted by the conduct of an offender and is in the interest of justice.

**Cost Savings Options**: The average annual cost of supervision in fiscal year 2010 was approximately $3,938 per case.[1] Terminating appropriate cases before they reach their full term saves resources and allows officers to focus on offenders who continue to pose the greatest risk of recidivism. The general criteria for officers in assessing whether a statutorily eligible offender should be recommended to the court as an appropriate candidate for early termination are as follows:

1. Stable community reintegration (e.g., residence, family, employment);

2. Progressive strides toward supervision objectives and in compliance with all conditions of supervision (the existence of an outstanding financial penalty *per se* does not adversely affect early termination eligibility as long as the offender has been paying in accordance with the payment plan);

3. No aggravated role in the offense of conviction, particularly large drug or fraud offenses;

4. No history of violence (e.g., sexually assaultive, predatory behavior, or domestic violence);

5. No recent arrests or convictions (including unresolved pending charges) or ongoing, uninterrupted patterns of criminal conduct;

6. No recent evidence of alcohol or drug abuse;

7. No recent psychiatric episodes;

8. No identifiable risk to the safety of any identifiable victim; and

9. No identifiable risk to public safety reflected in the risk assessment.

AO staff examined whether offenders whose supervision was terminated early (ET) had different recidivism rates than similar offenders who were terminated at the full completion of their supervision term (FT). Results indicated that ET cases were arrested less often, for less serious charges, and were sentenced to terms of imprisonment less often. From a policy standpoint, it appears that the above criteria, when properly applied, does not jeopardize public safety.

[1] By comparison, the average annual cost of imprisonment in fiscal year 2010 was $28,284 per inmate.

**Location Monitoring Conditions**

**Background**: Under 18 U.S.C. § 3142(c)(1)(B), the court is authorized to order participation in the location monitoring program as a condition of pretrial release. The statute also requires the court to impose electronic monitoring as a condition of pretrial release in any case that involves a minor victim of certain sex offenses. Under 18 U.S.C. § 3563(b)(19), the court is authorized to impose a condition requiring that the probationer remain at his place of residence during non-working hours and, if the court finds it appropriate, that compliance with this condition be monitored by telephonic or electronic signaling devices (including global positioning systems (GPS)). The statute specifies that the home detention and home incarceration components of the program will be used only as an alternative to incarceration. This provision also applies to supervised release per 18 U.S.C. § 3583(d).

**Cost Savings Options**: The court can choose from several location monitoring technologies. Each technology offers distinct advantages, and each carries its own costs (consisting of equipment rental, monitoring time, and labor). Below are several examples of location monitoring technologies.

1. Voice Verification System – Telephones and automated systems verify a person's presence without traditional electronic monitoring equipment (i.e., no transmitter, receivers, tether) and serves as a cost-effective solution for monitoring compliance. The average daily cost for this technology in fiscal year 2011 was $1.60.

2. Radio Frequency (RF) Technology – A person's presence is verified at a location using a transmitter and receiver; 24-hour electronic surveillance designed to alert an officer when a participant leaves a location, returns home late from a pre-approved schedule, or tampers with the equipment. RF only monitors when the transmitter is in range of the receiver, and violations cannot be detected when the participant is out of range. The average daily cost for this technology in fiscal year 2011 was $3.50.

3. Passive GPS – Uses satellite tracking to record a participant's location from the time of departure from the residence until return. While home, the GPS monitor downloads the tracking information to the vendor's management system, which plots it into a mapping system for case management purposes. GPS is useful when there is no third party risk and real-time alerts are not needed. The average daily cost for this technology in fiscal year 2011 was approximately $6.00.

4. Active GPS – Allows continuous monitoring of a person's movements through an active tracking device, which may contain a GPS receiver, a cellular modem, a radio frequency receiver/dialer, or motion sensor. Appropriate for higher risk cases where an officer's immediate notification of an alert would be sought. The average daily cost for this technology in fiscal year 2011 was approximately $8.00.

5. Hybrid GPS – Allows monitoring of a person's movements through a combination of passive, active and RF technology. Officers may choose to utilize "hybrid location monitoring devices" because it offers multiple location monitoring technologies that can increase tracking accuracy in the community through the use of GPS while also better ensuring compliance to a curfew in their home through the use of Radio Frequency (RF)

technology. The average daily cost for this technology in fiscal year 2011 was approximately $7.00.

In addition to the cost of the technology, LM cases place greater requirements on staff, and therefore require the expenditure of greater salary resources. The table below reflects the average, per case salary costs for officers supervising LM cases (based on the national average salary for officers):

| | No LM Condition | Voice Verification | Radio Frequency | GPS |
|---|---|---|---|---|
| **Pretrial Services** | $1,211 | $1,298 | $1,492 | $1637 |
| **Probation** | $1,311 | $1,442 | $1,705 | $1,901 |

Judges are encouraged to consider the costs of the technology and staff time when imposing location monitoring conditions.

**Imposition and Modification of Special Conditions (Including Treatment)**

**Background**: One of the most well established evidence-based principles is that supervision interventions should be targeted based on the specific risk levels in each case. Often referred to as the "risk principle," this theory recognizes it is imprudent to take a one-size-fits-all approach to supervision and treatment. Resources should be delivered to defendants and offenders at higher risk of noncompliance or recidivism, which is generally measured by actuarial risk assessment instruments.[2] It is through intervention in higher risk cases that courts and officers efficiently further the goal of public safety during the period of supervision and beyond.

**Cost Savings Options**: Since 2005 the cost of providing treatment services (substance abuse, mental health, and sex offender) to defendants and offenders under federal supervision has risen by nearly 60 percent. Typically, these services are provided by vendors in the community under agreements with the local probation and pretrial services offices and paid from decentralized judiciary funds. In fiscal year 2010, for example, a total of $109,958,412 was spent on these services at an average cost of $1,251 per client.

The tables below summarize data reported by probation and pretrial services offices for fiscal year 2010. The costs shown in the table represent average expenditures per client for some of the most common types of treatment used to satisfy a special condition for substance abuse, mental health, or sex offender treatment.

| Substance Abuse Treatment | Average Spending Per Client |
|---|---|
| Individual Counseling | $ 497 |
| Group Counseling[3] | $ 707 |
| Manualized Cognitive Behavioral Group[4] | $ 779 |
| Short-term Residential | $ 4,025 |
| Long-term Residential | $ 7,572 |

[2]Risk assessment instruments are highly structured assessment instruments where the individual items are assigned numerical weights, combined in some mechanical way, and the scores are related to criminal behavior. The primary instruments used by the federal pretrial services and probation system are the Pretrial Services Risk Assessment, the Risk Prediction Index, and the Post Conviction Risk Assessment.

[3]While the average spent per client on group counseling is more than the average spent on individual counseling, it should be noted that group counseling sessions generally occur with greater frequency and over a longer period of time.

[4]Research shows that cognitive behavioral group treatment is among the most successful interventions with substance-dependent offenders. (Note: D.B. Wilson, L.A. Bouffard, and D.L. McKenzie, "A Quantitative Review of Structured Group-Oriented Cognitive-Behavioral Programs for Offenders," Criminal Justice and Behavior, Vol. 32, No. 2, pp. 172-204, 2005.) When and where available, this should be the default choice of treatment for substance-dependent offenders. *See also*, *Guide to Judiciary Policy*, Volume 8, Part E, Chapter 5, §550.20.60(b).

| Mental Health Treatment | Average Spending Per Client |
|---|---|
| Individual Counseling | $ 1,040 |
| Group Counseling | $ 675 |
| Cognitive Behavioral Group | $ 590 |

| Sex Offender Treatment | Average Spending Per Client |
|---|---|
| Individual (pretrial) | $ 842 |
| Individual (post conviction) | $ 1,410 |
| Group (pretrial) | $ 1,210 |
| Group (post conviction) | $ 1,623 |
| Physiological Measures (Plethysmograph, Polygraph, VRT) | $ 383 |

## Imposition and Length of Supervised Release

**Background**: Application Note 1 of the Commentary to USSG §5D1.1 says that the "court may depart from this guideline and not impose a term of supervised release if supervised release is not required by statute and the court determines, after considering the factors set forth in [18 U.S.C. § 3583(c), the defendant's criminal history, and any substance abuse history], that supervised release is not necessary."

**Cost Savings Options:** If supervision is not required by statute or the guidelines, the court should assess whether a term of supervision is necessary. To assist the court in making this determination, officers should consider the risks the defendant poses to community safety and whether supervision can effectively reduce those risks. Among the factors that the court can consider in deciding not to impose supervision are:

1. Stability in the community, home, and employment;
2. Compliance with the terms and conditions of any pretrial services supervision;
3. No aggravating role in the offense of conviction, particularly in large drug or fraud cases;
4. No history of violence (e.g., sexually assaultive, predatory behavior, or domestic violence);
5. No recent arrests (other than the count of conviction) and no pending charges;
6. No recent evidence of alcohol or drug abuse;
7. No recent psychiatric episodes;
8. No identifiable risk to the safety of any identifiable victim; and
9. No identifiable risk to public safety based on the results of any risk assessment.

The above list is not exhaustive, but it is designed to assist the court in assessing the need for any period of supervision. Also, the presence of a single factor, by itself, may not sufficiently justify a recommendation for supervision. For example, the fact that restitution is due or that a fine is recommended may not by itself mean that a term of supervision is necessary.

Supervision should not be imposed if the only offense of conviction is an infraction. Similarly, using the above criteria, the court should scrutinize whether it is appropriate to place on supervision a defendant whose only offense of conviction is a class B or C misdemeanor.

In ordering a term of supervision, the court should consider a term that is "sufficient, but not greater than necessary" to satisfy the statutory purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2) and recognizes the distinctions between a sentence of probation (which includes a punitive component) and a term of supervised release (which is not intended to punish the defendant).

It should be noted that, the guidelines manual effective on November 1, 2011, suggests that the court ordinarily should not impose a term of supervised release in a case in which supervised release is not required by statute and the defendant is a deportable alien who likely will be deported after imprisonment.